1
2
3
4
5
6
7

8
9

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

10  STATE OF WASHINGTON; and STATE
    OF OREGON,

11                                                    NO.

                        Plaintiffs,          COMPLAINT FOR
12                                            DECLARATORY AND
                                             INJUNCTIVE RELIEF
13        v.

14  DONALD TRUMP, in his official capacity
    as President of the United States;
15  EXECUTIVE OFFICE OF THE
    PRESIDENT; UNITED STATES
16  DEPARTMENT OF JUSTICE; PAMELA
    BONDI, in her official capacity as Attorney
17  General of the United States; UNITED
    STATES DEPARTMENT OF
18  HOMELAND SECURITY; KRISTI
    NOEM, in her official capacity as United
19  States Secretary of Homeland Security;
    UNITED STATES DEPARTMENT OF
20  DEFENSE; PETE HEGSETH, in his official
    capacity as Secretary of Defense;
21  DEPARTMENT OF GOVERNMENT
    EFFICIENCY SERVICE; AMY
22  GLEASON, in her official capacity as
    Acting DOGE Administrator; UNITED
23  STATES ELECTION ASSISTANCE
    COMMISSION; DONALD L. PALMER, in
24  his official capacity as Chairman of the U.S.
    Election Assistance Commission; THOMAS
25  HICKS, in his official capacity as Vice
    Chair of the U.S. Election Assistance
26  Commission; CHRISTY McCORMICK and
    BENJAMIN W. HOVLAND, in their

COMPLAINT FOR DECLARATORY AND          1          ATTORNEY GENERAL OF WASHINGTON
INJUNCTIVE RELIEF                                        Complex Litigation Division
                                                        800 Fifth Avenue, Suite 2000
                                                        Seattle, WA 98104-3188
                                                        (206) 464-7744

official capacities as Commissioners of the
U.S. Election Assistance Commission;
BRIANNA SCHLETZ, in her official
capacity as executive director of the U.S.
Election Assistance Commission;
FEDERAL EMERGENCY
MANAGEMENT AGENCY; CAMERON
HAMILTON, in his official capacity as
Senior Official Performing the Duties of
Federal Emergency Management Agency
Administrator,

Defendants.

## INTRODUCTION

1.     The Constitution gives the President no authority to set rules for how States conduct elections. Yet on March 25, 2025, President Trump issued an Executive Order (the Election Interference Order) purporting to dictate which ballots States can count, what voting equipment States should use, how States register voters, and more. Executive Order No. 14,248, 90 Fed. Reg. 14,005 (Mar. 28, 2025) ("Preserving and Protecting the Integrity of American Elections").[1] If implemented, the Order will disenfranchise untold numbers of voters nationwide, impose substantial new costs on States, and require States to revise their voting systems and equipment, all without any benefit to election security.

2.     The Election Interference Order violates multiple provisions of the Constitution, including the Elections Clause, U.S. Const. art. I, § 4, cl. 1, which gives States primary authority to regulate the time, place, and manner of federal elections. It also violates multiple federal statutes, including the National Voter Registration Act of 1993, Pub. L. No. 103-31, 107 Stat. 77 (1993), Help America Vote Act of 2002, Pub. L. No. 107-252, 116 Stat. 1666 (2002), and the Uniform and Overseas Citizens Absentee Voting Act of 1986, Pub. Law 99-410, 100 Stat. 924 (1986).

3.     The Election Interference Order harms States by purporting to override our sovereign laws governing the counting of votes and voter registration, imposing substantial costs

---

[1] A copy of this order is attached to this Complaint as Exhibit A.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

2

on States to change state voting systems and laws, and disenfranchising hundreds of thousands of State residents.

4.      To protect our Constitution, the right to vote, and the sanctity of the democratic process, this Court should block implementation of the Election Interference Order.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346(a)(2). This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202.

6.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants are United States agencies or officers sued in their official capacities. The State of Washington is a resident of this judicial district and a substantial part of the events or omissions giving rise to this Complaint occurred within the judicial district.

## PARTIES

**A.    Plaintiffs**

7.      The State of Washington is a sovereign state of the United States of America.

8.      The Attorney General of Washington is the chief legal adviser to the State and is authorized to act in federal court on behalf of the State on matters of public concern.

9.      The State of Oregon is a sovereign state of the United States of America.

10.     The Attorney General of Oregon is Oregon's chief legal officer and is authorized to represent the State in this Court.

11.     Sovereign immunity for non-monetary relief is waived by 5 U.S.C. § 702.

12.     Washington and Oregon (Plaintiff States) are aggrieved and have standing to bring this suit because Defendants' actions purport to usurp State authority to set ballot return deadlines, add voter registration requirements that are contrary to law, change voting system guidelines in a manner contrary to law, and unlawfully withhold or condition federal funding to Plaintiff States. These actions harm Plaintiff States' sovereign, proprietary, and quasi-sovereign

interests, and will continue to cause injury unless and until enforcement of the Election Interference Order is permanently enjoined.

**B.    Defendants**

13.    Defendant Donald Trump is the President of the United States. He is sued in his official capacity.

14.    Defendant Executive Office of the President is an agency of the federal government headquartered in Washington, D.C.

15.    Defendant United States Department of Justice is an agency of the federal government headquartered in Washington, D.C.

16.    Defendant Pamela Bondi is the United States Attorney General. She is sued in her official capacity.

17.    Defendant United States Department of Homeland Security is a federal agency headquartered in Washington, D.C.

18.    Defendant Kristi Noem is the United States Secretary of Homeland Security. She is sued in her official capacity.

19.    Defendant United States Department of Defense is an agency of the federal government headquartered in Arlington, VA.

20.    Defendant Pete Hegseth is the Secretary of Defense of the United States. He is sued in his official capacity.

21.    Defendant Department of Government Efficiency Service (DOGE) is an agency within the Executive Office of the President and, on information and belief, is headquartered in Washington, D.C.

22.    Defendant Amy Gleason is the Acting DOGE Administrator. She is sued in her official capacity.

23.    Defendant Election Assistance Commission (EAC) is an independent entity created by Congress through the Help America Vote Act of 2002.

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

24.     Defendant Donald Palmer is the Chairman of the EAC. He is sued in his official capacity.

25.     Defendant Thomas Hicks is the Vice Chair of the EAC. He is sued in his official capacity.

26.     Defendant Christy McCormick is a member of the EAC. She is sued in her official capacity.

27.     Defendant Benjamin Hovland is a member of the EAC. He is sued in his official capacity.

28.     Defendant Brianna Schletz is the executive director of the EAC. She is sued in her official capacity.

29.     Defendant Federal Emergency Management Agency (FEMA) is an agency within the Department of Homeland Security and is headquartered in Washington, D.C.

30.     Defendant Cameron Hamilton is the Senior Official Performing the Duties of FEMA Administrator. He is sued in his official capacity.

## ALLEGATIONS

**A.    The United States Constitution Gives States Primary Authority to Regulate Elections, Subject to Alteration By Congress**

31.     The Elections Clause of the United States Constitution, U.S. Const. art. I, § 4, cl. 1, provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of ch[oosing] Senators."

32.     Similarly, Article II, Section 1 of the United States Constitution provides that "Each state shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress." The Twelfth Amendment to the United States Constitution provides,

1  in relevant part, that "The Electors shall meet in their respective states and vote by ballot for

2  President and Vice-President."

3      33.    The Constitution nowhere empowers the President to set or alter State regulations

4  of elections.

5  **B.    Congress Has Adopted Laws Protecting the Ability of Voters to Register to Vote**

6      34.    In 1993, Congress enacted the National Voter Registration Act (NVRA), with the

7  purpose to "increase the number of eligible citizens who register to vote in elections for Federal

8  office." 52 U.S.C. § 20501(b)(1). The NVRA requires States to permit voters to register for

9  federal elections (1) when applying for a driver's license, (2) by mail, and (3) in person. 52

10  U.S.C. § 20503(a)(1)-(3). Congress enacted the NVRA under the Elections Clause, U.S. Const.

11  art. I, § 4, cl. 1.

12      35.    Congress enacted the NVRA based on its findings that "(1) the right of citizens

13  of the United States to vote is a fundamental right; (2) it is the duty of the Federal, State and

14  local governments to promote the exercise of that right; and (3) discriminatory and unfair

15  registration laws and procedures can have a direct and damaging effect on voter participation in

16  elections for Federal office and disproportionately harm voter participation by various groups,

17  including racial minorities." 52 U.S.C. § 20501(a).

18      36.    The NVRA requires each State to "accept and use" a National Mail Voter

19  Registration Form (Federal Form) to register voters for federal elections. 52 U.S.C.

20  § 20505(a)(1); *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013).

21      37.    In deliberations over the NVRA, both Houses of Congress considered and voted

22  on the specific question of whether to permit States to require voters to submit documentary

23  proof of citizenship to register using the Federal Form. *See* S. Rep. No. 103-6 (1993); 139 Cong.

24  Rec. 5098 (1993); H.R. Rep. No. 103-66, at 23 (1993) (Conf. Rep.); 139 Cong. Rec. 9231-32

25  (1993). In consideration of the statute's purpose, Congress rejected the proposal, with the final

26  Conference Committee Report concluding that allowing States to require documentary proof of

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1  citizenship was "not necessary or consistent with the purposes of this Act" and "could be

2  interpreted by States to permit registration requirements that could effectively eliminate, or

3  seriously interfere with, the [Act's] mail registration program[.]" H.R. Rep. No. 103-66, at 23-24.

4          38.    Congress prescribed the contents of the Federal Form in 52 U.S.C. § 20508(b).

5          39.    The Federal Form "may require only such identifying information (including

6  the signature of the applicant) . . . as is necessary to enable the appropriate State election

7  official to assess the eligibility of the applicant and to administer voter registration[.]" 52 U.S.C.

8  § 20508(b)(1).

9          40.    The Federal Form "shall include a statement that (A) specifies each eligibility

10 requirement (including citizenship); (B) contains an attestation that the applicant meets each

11 such requirement; and (C) requires the signature of the applicant, under penalty of perjury." *Id.*

12 § 20508(b)(2). However, the Federal Form "may not include any requirement for notarization or

13 other formal authentication." *Id.* § 20508(b)(3).

14         41.    Congress initially assigned authority for developing the Federal Form to the

15 Federal Election Commission (FEC). The FEC developed the original Federal Form through an

16 extensive notice and comment rulemaking process. *See* 58 Fed. Reg. 51,132 (Sept. 30, 1993)

17 (Advance Notice of Proposed Rulemaking); 59 Fed. Reg. 11,211 (Mar. 10, 1994) (Notice of

18 Proposed Rulemaking); 59 Fed. Reg. 32,311 (June 23, 1994) (Final Rules). This process

19 culminated in federal regulations that are currently codified as 11 C.F.R. §§ 9428.1 through

20 9428.7.

21         42.    The contents of the Federal Form are governed by these duly enacted regulations.

22 Specifically, the contents of the Federal Form are governed by 11 C.F.R. § 9428.4(b)(1)-(3),

23 which specifies the precise information that the Federal Form can request from an applicant.

24 With regard to citizenship, the regulations instruct that the Federal Form shall "list U.S.

25 Citizenship as a universal eligibility requirement," "[c]ontain an attestation on the application

26 that the applicant, to the best of his or her knowledge and belief, meets each of his or her state's

COMPLAINT FOR DECLARATORY AND                    7              ATTORNEY GENERAL OF WASHINGTON
INJUNCTIVE RELIEF                                                     Complex Litigation Division
                                                                      800 Fifth Avenue, Suite 2000
                                                                       Seattle, WA  98104-3188
                                                                           (206) 464-7744

specific eligibility requirements," and "[p]rovide a field on the application for the signature of the applicant, under penalty of perjury, and the date of the applicant's signature." 11 C.F.R. § 9428.4(b)(1)-(3).

43.     This approach was not an oversight. The FEC specifically considered the manner in which the form would address citizenship. Addressing whether to require information regarding naturalization, the FEC determined that "[t]he issue of U.S. citizenship is addressed within the oath required by the Act and signed by the applicant under penalty of perjury. To further emphasize this prerequisite to the applicant, the words 'For U.S. Citizens Only' will appear in prominent type on the front cover of the national mail voter registration form." 59 Fed. Reg. 32,311, 32,316 (June 23, 1994).

44.     The Federal Form has a number of safeguards to prevent non-citizen registration. A copy of the current version of the Federal Form is attached to this complaint as Exhibit B. The cover of the pamphlet states "For U.S. Citizens[,]" and the General Instructions repeatedly state that only U.S. citizens may register to vote and state that it is illegal to falsely claim U.S. citizenship to register to vote. For many States—including Washington and Oregon—the state-specific instructions reiterate the requirement that the applicant must be a U.S. citizen.

45.     The first question on the Federal Form asks "Are you a citizen of the United States of America?" and provides two boxes marked "Yes" and "No[.]" Applicants are required to check a box and are immediately informed that "If you checked "No" . . . do not complete form." The form also includes an attestation clause that sets out the requirements for voter eligibility, including that the applicant is a United States citizen. Applicants must sign the attestation under penalty of perjury and are informed that a person providing false information "may be fined, imprisoned, or (if not a U.S. citizen) deported from or refused entry to the United States."

46.     In 2022, Congress transferred authority over the Federal Form from the FEC to the EAC. 52 U.S.C. § 20508(a)(2). The EAC must "prescribe . . . regulations" to "develop a mail

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

8

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

voter registration application form for elections for Federal office[]" and must do so "in consultation with the chief election officers of the States." 52 U.S.C. § 20508(a)(1)-(2).

47.     The EAC may not "issue any rule, promulgate any regulation, or take any other action which imposes any requirement on any State or unit of local government, except to the extent permitted under section 20508(a) of this title." 52 U.S.C. § 20929.

48.     The NVRA requires that state voter registration agencies distribute the Federal Form "with each application for . . . service or assistance, and with each recertification, renewal, or change of address form[.]" 52 U.S.C. § 20506(a)(6). Agencies may instead use their "own form if it is equivalent to the" National Mail Voter Registration Form. *Id.* Agencies must also provide "[a]ssistance to applicants in completing voter registration application forms, unless the applicant refuses such assistance." 52 U.S.C. § 20506(a)(4)(A)(ii).

49.     Voter registration agencies in Plaintiff States have invested considerable time and money to develop computer systems that comply with the NVRA's requirements, create procedures to implement the existing process, and train staff regarding voter registration.

50.     In addition to the NVRA, Congress has also acted to protect voting rights through the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), which protects the rights of servicemembers and other U.S. citizens abroad to vote in elections for federal office.

51.     UOCAVA provides for the creation of a Federal Post Card Application that military and overseas voters can use to simultaneously register to vote and apply for an absentee ballot. 52 U.S.C. §§ 20301(b)(2), 20302(a)(4).

52.     UOCAVA directs the President's designee to "consult State and local election officials in carrying out this chapter[.]" 52 U.S.C. § 20301(b)(1). One of those duties is to "prescribe an official post card form, containing both an absentee voter registration application and an absentee ballot application, for use by the States[.]" 52 U.S.C. § 20301(b)(2).

53.     For purposes of UOCAVA, the President's designee is Secretary of Defense Pete Hegseth.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

9

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

**C.    Plaintiff States' Laws Ensure That Voting is Easily Accessible to Qualified Voters**

**1.    Washington**

54.    "It is the policy of the state of Washington to encourage every eligible person to register to vote and to participate fully in all elections, and to protect the integrity of the electoral process[.]" Wash. Rev. Code § 29A.04.205.

55.    Elections in Washington are jointly administered by the Secretary of State and county election officials. Washington Secretary of State Steve Hobbs is the "chief election officer for all federal, state, county, city, town, and district elections" governed by Title 29A of the Revised Code of Washington. Wash. Rev. Code § 29A.04.230.

56.    Washington has adopted a state voter registration form called the Washington State Voter Registration Form (Washington State Form). A copy of the current Washington State Form, which was most recently amended in July 2024, is attached to the Complaint as Exhibit C.

57.    U.S. citizens who reside in Washington, as well as eligible service and overseas voters, can complete and submit the Washington State Form online, complete and return a paper copy, or be automatically registered to vote as part of a transaction in which a state agency confirms the person's citizenship. *E.g.*, Wash. Rev. Code §§ 29A.08.120, .123, .315.

58.    As required by the NVRA, the Washington Department of Licensing, state agencies that provide public assistance, and state agencies offering programs for persons with disabilities offer the opportunity to register to vote. *See* 52 U.S.C. §§ 20504, 20506. Pursuant to Executive Order 15-02, the Governor of Washington specifically designated the following agencies as voter registration assistance agencies: the Department of Social and Health Services; the Health Care Authority; the Department of Health; the Health Benefits Exchange; and the Department of Services for the Blind. A copy of Executive Order 15-02, which is currently in effect, is attached to this Complaint as Exhibit D.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

10

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

59.     In 2024, 192,843 voters registered to vote through the Department of Licensing. In addition, 645,642 voters submitted a voter registration update as part of a transaction with the Department of Licensing.

60.     In 2024, 1,025 voters registered to vote through a transaction with a Washington State agency other than the Department of Licensing. In addition, 11,530 voters submitted a voter registration update as part of a transaction with a Washington State agency other than the Department of Licensing.

61.     In addition to accepting the Washington State Form, Washington also uses and accepts the Federal Form developed by the EAC, as required by federal law. 52 U.S.C. § 20505(a).

62.     Each national election cycle, tens of thousands of Washington voters use the Federal Form to register or update their voter registrations. For the 2020 election cycle, 28,140 voters registered to vote or updated their voter registrations using the Federal Form. For the 2024 election cycle, 32,785 voters in Washington registered to vote or updated their registrations using the Federal Form.

63.     As required by federal law, Washington also uses and accepts the Federal Post Card Application. 52 U.S.C. § 20302(a)(4). This form is designed for use by absent United States uniformed service members, their families, and citizens residing outside the United States. A copy of the current Federal Post Card Application is attached to this Complaint as Exhibit E. In 2024, 4,087 voters used the Federal Post Card Application to register to vote in Washington. An additional 14,803 voters used the Federal Post Card Application to update their voter registration information.

64.     In 2020, 6,520 voters used the Federal Post Card Application to register to vote in Washington. An additional 15,445 voters used the Federal Post Card Application to update their voter registration information.

11

65.     Voters may also register to vote in person at a county election office or, during the 18-day period before an election, at a voting center and at other locations designated by the county auditor. Wash. Rev. Code § 29A.40.160. Voter registration is also available at student engagement hubs on many university and higher education campuses. Wash. Rev. Code § 29A.40.180.

66.     Washington law allows voters to register to vote until 8:00pm on election day. Wash. Rev. Code § 29A.08.140(1). Beginning seven days before election day, voters must appear in person to register to vote. *Id.*

67.     Washington law defines the minimum information necessary to register to vote. Wash. Rev. Code § 29A.08.010. With respect to U.S. citizenship, Washington law requires "Affirmation of citizenship which confirms the individual is a United States citizen, in one of the following forms: (i) A check or indication in the box on a voter registration form confirming citizenship; or (ii) Presentation of documents as part of another government transaction confirming citizenship[,]" together with "[a] signature attesting to the truth of the information provided on the application Wash. Rev. Code § 29A.08.010(1)(d), (f).

68.     Washington is a universal vote-by-mail State. In Washington, every registered voter on active status is automatically mailed a ballot for each election. Wash. Rev. Code § 29A.40.010.

69.     In Washington, county auditors generally mail ballots to overseas and service voters at least 45 days before an election. Wash. Rev. Code § 29A.40.070; *see also* 52 U.S.C. § 20302(a)(8). For all other voters, county auditors mail ballots at least 18 days before the election. Wash. Rev. Code § 29A.40.070.

70.     Voters may return ballots through the United States Postal Service (USPS) or to a secure ballot drop box. *See* Wash. Rev. Code §§ 29A.40.091, .170.

71.     Under Washington law, all otherwise-valid ballots returned to a secure ballot drop box by 8:00pm on election day are counted. Wash. Rev. Code § 29A.60.190. Voters who are in

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

12

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1    line at 8:00pm must be allowed to vote. Wash. Rev. Code § 29A.40.160(16); Wash. Admin.

2    Code §§ 434-250-100(4), -350(1)(f),

3        72.    Some Washington counties secure their ballot drop boxes at 8:00pm on election

4    day but do not retrieve ballots until the following day. In order to protect the integrity of

5    elections, Washington law provides that "[b]allots must be removed from a ballot drop box by

6    at least two people, with a record kept of the date and time ballots were removed, and the names

7    of people removing them." Wash. Rev. Code § 29A.40.170(1). Some counties do not have

8    sufficient staff to assign two individuals to each drop box at 8:00pm on election day. Hiring

9    sufficient staff would require expenditure of additional money.

10       73.    Under Washington law, all otherwise-valid ballots postmarked on or before

11   election day and received no later than the day before certification by the county canvassing

12   board are counted. Wash. Rev. Code § 29A.60.190. If the postmark is missing or illegible,

13   election officials rely on the date on the ballot declaration to which the voter has attested. Wash.

14   Rev. Code § 29A.40.110(4). This means that ballots that are timely cast and otherwise valid will

15   be accepted as long as they are received up to 20 days after a general election or 13 days after a

16   primary election. Wash. Rev. Code § 29A.60.190.

17       74.    In the 2024 general election, election officials in Washington received 119,755

18   otherwise-valid ballots after election day that had a postmark dated no later than election day.

19       75.    In the 2024 primary election, election officials in Washington received 151,411

20   otherwise-valid ballots after election day that had a postmark dated no later than election day.

21       76.    In the 2020 general election, election officials in Washington received 196,833

22   otherwise-valid ballots after election day that had a postmark dated no later than election day.

23       77.    In the 2020 primary election, election officials in Washington received 585,397

24   otherwise-valid ballots after election day that had a postmark dated no later than election day.

25       78.    In the 2024 federal elections, Washington received over 30,000 ballots from

26   voters who had a mailing address outside the United States. In the 2020 federal elections,

Washinton received over 45,000 ballots from voters who had a mailing address outside the United States.

**2.    Oregon**

79.    "It is the policy of [Oregon] that all election laws and procedures shall be established and construed to assist the elector in the exercise of the right of franchise." Or. Rev. Stat. § 247.005.

80.    Secretary of State Tobias Read is Oregon's chief elections officer. Or. Rev. Stat. § 246.110. In Oregon, county elections officials register voters, furnish ballots, and count votes. *See, e.g.*, Or. Rev. Stat. §§ 246.200(1), 254.185.

81.    As required by federal law, Oregon uses and accepts the National Form, 52 U.S.C. § 20505(a), and the Federal Post Card Application, 52 U.S.C. § 20302(a)(4), which is designed for use by absent United States uniformed service members, their families, and citizens residing outside the United States. *See* Or. Rev. Stat. § 247.002(3).

82.    In Oregon, in addition to using the Federal Form, voters may submit citizenship and other information demonstrating their eligibility to certain state agencies. Or. Rev. Stat. § 247.012(c). Voters may also register by submitting a state form indicating that they are citizens of the United States, Or. Rev. Stat. §§ 247.012(a)-(b), 247.171(3)(e), or register online using a driver license, driver permit, state identification card, or social security number, Or. Rev. Stat. §§ 247.012(1)(c), 247.019. The current version of Oregon's state form, called "Oregon Voter Registration Card," is attached to this complaint as Exhibit F.

83.    Oregon is a universal vote-by-mail State. In Oregon, every registered voter on active status is automatically mailed a ballot for each election. Or. Rev. Stat. § 254.470(2).

84.    In Oregon, county election officials generally mail ballots to overseas and service voters 45 days before an election. Or. Rev. Stat. § 253.065(1)(a); *see also* 52 U.S.C. § 20302(8). For all other voters, county officials in Oregon generally mail in-state voters' ballots 20 days before an election, Or. Rev. Stat. § 254.470(2).

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

14

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

85.    Oregon voters may return ballots through the USPS, a county election office, or to a secure ballot drop box.

86.    Under Oregon law, all otherwise-valid ballots returned to a county election office or secure ballot drop box by 8:00pm on election day are counted. Or. Rev. Stat. §§ 253.070(2), 254.470(12).

87.    Under Oregon law, ballots postmarked on or before election day and received up to seven days after election day are counted. Or. Rev. Stat. § 254.470(6)(e)(B). In addition, ballots that arrive within seven days that are missing a postmark are deemed to be sent on election day as well. *Id.* § 254.470(8). That presumption is based on the voter's attestation that the ballot was cast and sent by mail on or before election day. *Id.* § 254.470(7); Oregon Vote By Mail Procedures Manual, at 89 (Appendix 23) (rev. March 2024), https://sos.oregon.gov/elections/documents/vbm_manual.pdf (designated as a rule by Or. Admin. R. 165-007-0030).

88.    In the 2020 general election, before Oregon changed its law to accept ballots received by mail after election day, at least 958 Oregon mail ballots were rejected as untimely. Since those laws were enacted, ballots are now counted that would have been rejected under prior law. In Oregon's 2024 general election, 13,596 ballots cast on or before election day but received after the election day were counted based on these changes to state law.

**D.    USPS Changes Have Created Delays for Voters Returning Ballots by Mail**

89.    Neither voters nor election officials have control over the time it takes the USPS—or international mail delivery agencies—to deliver a ballot to election officials.

90.    In the 2020 General Election season, USPS unlawfully implemented operational changes to mail service that resulted in its failure to timely deliver election mail. *See Washington v. Trump*, 487 F. Supp. 3d 976, 983-84 (E.D. Wash. 2020); *Pennsylvania v. DeJoy*, 490 F. Supp. 3d 833, 843 (E.D. Pa. 2020); *New York v. Trump*, 490 F. Supp. 3d 225, 231 (D.D.C. 2020).

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

15

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

91.     During the 2024 General Election season, USPS failed to timely deliver ballots mailed from election officials to some voters in Washington and Oregon. This provided voters less time to complete and return ballots.

92.     In many areas, ballots mailed by voters to election officials in their communities must be transported outside of the community to a USPS distribution center, sorted, and then returned to election officials. This process can delay the application of a postmark and increases the time that a ballot sent through USPS takes to be received by election officials.

93.     USPS has implemented service reductions and is considering further service reductions, including plans to allow slower mail delivery for rural and long-distance service areas.

94.     In addition, ballots returned to election officials by mail may be delayed due to other causes beyond the voter's control, such as inclement weather, natural disasters, and, in rare instances, malicious activity.

**E.      Plaintiff States' Laws Also Ensure that Elections are Secure Against Participation by Nonqualified Persons**

95.     Only U.S. citizens may register to vote in Washington and Oregon. Wash. Rev. Code §§ 29A.08.010(1)(f), .123(2); Or. Const. art. II, § 2.

96.     Voter registration applicants must affirmatively indicate that they are U.S. citizens. Wash. Rev. Code §§ 29A.08.123, .210, .315; Or. Rev. Stat. § 247.125(2)(a).

97.     Applicants must sign an oath declaring that "I am a citizen of the United States." Wash. Rev. Code § 29A.08.230. Knowingly providing false information on a voter registration form is a class C felony punishable by up five years in prison and a fine of up to $10,000. Wash. Rev. Code § 9A.20.021; Wash. Rev. Code § 29A.84.130(1), (2).

98.     In Oregon, voters may register by submitting a form indicating that they are citizen of the United States, Or. Rev. Stat. § 247.171(3)(e), or submitting citizenship information to certain state agencies, Or. Rev. Stat. § 247.012. Knowingly making a false statement on an

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

16

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1    election form is a class C felony punishable by imprisonment of up to 5 years and a fine of up to

2    $125,000. Or. Rev. Stat. §§ 161.605(3), 161.625(1)(d), 260.715(1), 260.993(2).

3         99.    Federal law also criminalizes making false statements in order to register to vote

4    in any federal, state, or local election. 18 U.S.C. § 1015(f). Persons violating this federal law

5    may be imprisoned for up to five years. *Id.*

6         100.    Federal laws also create serious immigration consequences for persons falsely

7    claiming citizenship in order to register to vote and for noncitizens who vote, including possible

8    deportation from the United States. 8 U.S.C. § 1227(a)(3)(D), (a)(6).

9         101.    Before a person is registered to vote, Washington election officials must confirm

10    the person's identity. Wash. Rev. Code § 29A.08.107; *see also* 52 U.S.C. § 21083(a)(5)(A). This

11    is done by comparing the applicant's driver's license number, state identification card number,

12    or the last four digits of the applicant's social security number to information maintained by the

13    Washington Department of Licensing. Wash. Rev. Code § 29A.08.107. Washington law also

14    identifies alternate forms of identity verification. *Id.* A ballot from the voter will not be accepted

15    without identity confirmation. *Id.*

16         102.    Washington law requires that state and county election officials regularly review

17    the statewide voter registration database to identify persons who are not eligible to vote. Wash.

18    Rev. Code §§ 29A.08.125, .510, .520(2), .610, .620.

19         103.    Washington law also permits members of the public and county prosecutors to

20    challenge a voter's registration. Wash. Rev. Code §§ 29A.08.810-.850. A challenge may be

21    based on, among other things, personal knowledge that "[t]he challenged voter is not a citizen

22    of the United States." Wash. Rev. Code § 29A.08.810(1)(e).

23         104.    Oregon law requires county election officials update voters' registration records

24    on an ongoing basis. *See, e.g.*, Or. Rev. Stat. §§ 247.292, 247.555, 247.563, 247.570. County

25    election officials also have authority to reject registrations of individuals not qualified to vote,

26    inquire into the validity of any registration, hold hearings regarding a registration's validity, and

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

17

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

cancel any invalid registration. Or. Rev. Stat. §§ 247.174, 247.195(1), 247.555. In addition, an election official or voter who suspects another person is not qualified to vote may challenge that person's ballot. Or. Rev. Stat. §§ 254.415(1), 254.426.

105.    Plaintiffs States participate in the Electronic Registration Information Center (ERIC). Through ERIC, participating States compare the statewide voter registration databases to identify potential duplicate registrations. ERIC also generates reports that assist States in identifying potentially ineligible voters, including reports identifying individuals who may have moved and voters who have died. Plaintiff States use this information to keep their voter registration databases up to date, while also implementing safeguards to prevent against wrongful cancelation of voter registrations.

106.    Elections in Plaintiff States are exceedingly transparent, except as necessary to protect ballot secrecy, essential voter privacy, and the security of voting systems. For example, the statewide voter registration database is available to the public and includes, among other things, voters' residential addresses and mailing addresses.

**F.    Washington and Oregon Use Multiple Voting Systems, All of Which Are Federally Certified**

107.    Counties in Washington and Oregon select and purchase voting systems that allow them to define ballots, cast and count votes, and report elections results, among other things. Wash. Rev. Code § 29A.12.005 ; Or. Rev. Stat. § 246.560. In each state, counties may use only voting systems that have been approved by the Secretary of State. Wash. Rev. Code § 29A.12.010; Or. Rev. Stat. § 246.550.

108.    Washington law requires that voting systems used by counties are tested and certified by a federally accredited independent testing authority in order to receive state certification. Wash. Rev. Code § 29A.12.080(5); Wash. Admin Code § 434-335-010, -040(1)(f).

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

18

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

109.    If a voting system no longer complies with federal guidelines, it may be decertified by the Secretary. Wash. Rev. Code § 29A.12.190(1); *see also* Wash. Admin Code § 434-335-260(1).

110.    At election centers in Washington, voters may use electronic systems to cast a vote. These systems are available for all voters but are specifically intended for voters with disabilities. The voting systems currently used are ClearVote 2.3 (Clear Ballot Group); Democracy Suite 5.17 (Dominion); EVS 6.4.0.0 (ESS); and Verity 2.7 (Hart InterCivic).

111.    Currently, eighteen counties use ClearVote 2.3, sixteen counties use Verity 2.7, four counties use EVS 6.4.0.0, and one county uses Democracy Suite 5.17.

112.    Two voting systems used by Washington counties are capable of using barcodes or quick response (QR) codes as part of the voting process. Specifically, Dominion's accessible voting unit allows a county to configure the unit to print a QR code or full ballot page, and ESS's accessible voting unit prints a record that includes a QR code that contains voter selections.

113.    All voting systems used in election centers in Washington provide a voter-verifiable paper record. And the vast majority of ballots in Washington are paper ballots, which do not use barcodes or QR codes that contain a vote. Instead, barcodes or QR codes on paper ballots contain information such as ballot style or precinct.

114.    Under Oregon law, a ballot tally machine must be certified by the Secretary of State before it is used in Oregon elections. Or. Rev. Stat. § 246.550. For the Secretary of State to approve such a system, it "must be certified by the Elections Assistance Commission (EAC) or be examined by a federally accredited voting systems testing laboratory (VSTL)." Or. Admin. R. 165-007-0350(1). Currently, Oregon counties use systems provided by three vendors, each of which the Secretary has approved: Clear Ballot's ClearVote; Hart's Verity Voting; and ESS's EVS.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

19

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

**G.  Congress Established Independent, Bipartisan, and Expert Entities to Assist States in the Administration of Elections**

115.    In 2002, Congress enacted the Help America Vote Act (HAVA), which, among other things, created the EAC. The EAC is "an independent entity" and has four members, all of whom are statutorily required to have experience with or expertise in election administration or the study of elections. 52 U.S.C. §§ 20921, 20923(a)(1), (3). The four members of the Commission are "appointed by the President, by and with the advice and consent of the Senate." 52 U.S.C. § 20923(1).

116.    The EAC's mission statement provides that it "is an independent, bipartisan commission whose mission is to help election officials improve the administration of elections and help Americans participate in the voting process."

117.    Congress designed the EAC to require bipartisan membership and cooperation. 52 U.S.C. §§ 20923(a)(2), (c), 20928. HAVA requires balanced membership between major political parties. See 52 U.S.C. § 20923(a)(2). It also requires that the chair and vice chair not be affiliated with the same political party. 52 U.S.C. § 20923(c). The Commission may act "only with the approval of at least three" of its four members. 52 U.S.C. § 20928.

118.    Congress also created the EAC Standards Board, the EAC Board of Advisors, and the Technical Guidelines Development Committee. 52 U.S.C. §§ 20941, 20961. Congress similarly ensured that these Boards and Committee were composed of individuals with experience with or expertise in elections, voting systems, and voter interests and would operate in a bipartisan manner. 52 U.S.C. §§ 20943(a), 20944(a), (b), 20961(c).

119.    HAVA authorizes the EAC to adopt or modify Voluntary Voting System Guidelines (VVSG) which must be consistent with the minimum voting system requirements set out in Federal statute. 52 U.S.C. §§ 20962, 21101, 21081-21085.

120.    HAVA provides a specific statutory process for adopting or modifying the VVSGs. 52 U.S.C. § 20962. As part of that process, the EAC must take into consideration the

comments and recommendations of the experts on the Standards Board and the Board of Advisors before voting to approve the adoption or modification of the guidelines. 52 U.S.C. §§ 20961(b)(1), 20962(d)(1). The EAC may not vote on the final adoption of a guideline (or modification of such guideline) until the expiration of the 90-day period. The EAC must also provide for publication of the proposed guidelines, an opportunity for public comment, and an opportunity for a public hearing. 52 U.S.C.§ 20962(a). HAVA does not provide any role for the President in the development, adoption, or modification of the VVSGs.

121.    HAVA requires the EAC to "provide for the testing, certification, decertification, and recertification of voting system hardware and software by accredited laboratories[.]" 52 U.S.C. § 20971(a)(1). To carry out its statutory duties related to the testing, certification, and decertification of voting systems, the EAC developed the Federal Voting System Testing and Certification Program. Neither the Help America Vote Act nor the Federal Voting System Testing and Certification Program provides any role for the President in the testing, certification, decertification, and recertification of voting system hardware and software.

122.    In order to receive certification from the EAC, voting systems must meet the VVSG guidelines. Since 2005, the EAC has adopted three versions of the VVSG. The latest iteration (VVSG 2.0) was adopted on February 10, 2021. In developing the VVSG 2.0, all sections of the prior VVSG were reviewed, reevaluated, and updated to meet modern expectations. The VVSG 2.0 requirements "represent the latest in both industry and technology best practices."

123.    The testing and certification process is a rigorous and time-consuming multi-step process, and the timeframe is lengthy and unpredictable. The EAC has just two accredited voting system testing labs. These labs run a variety of tests and procedures to ensure voting systems are safe, accessible, and functional. These labs are only able to accommodate a certain number of certifications at a time.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                                        21                  ATTORNEY GENERAL OF WASHINGTON
                                                                                    Complex Litigation Division
                                                                                    800 Fifth Avenue, Suite 2000
                                                                                    Seattle, WA  98104-3188
                                                                                    (206) 464-7744

124.   That the testing and certification process is lengthy and often takes months to years is demonstrated by the fact that the EAC is still in the process of testing the VSR1 2.1 voting system even though it accepted the manufacturer's application on March 31, 2023. Other voting systems currently under test have application acceptance dates of March 11, 2024, May 14, 2024, and January 14, 2025.

125.   Decertification is the process by which the EAC revokes a certification previously granted to a voting system. A decertified system may be resubmitted for certification and will be treated as any other system seeking certification.

126.   All the voting systems used by counties in Plaintiff States were certified under the then-applicable VVSG testing standards.

127.   No voting systems have been certified under the VVSG 2.0 testing standard.

**H.    Plaintiff States Receive Federal Funding for Elections and Criminal Justice Purposes**

128.   Congress has required the EAC to "make a requirements payment each year . . . to each State which meets the conditions described in" 52 U.S.C. § 21003 "for the year." 52 U.S.C. § 21001(a). States use this money for specified election purposes. 52 U.S.C. § 21001(b)(1).

129.   Funding from the EAC is a critical tool for improving the administration of federal elections. It allows States to maintain and purchase secure voting systems, facilitate post-election auditing, and improve election accessibility.

130.   Since 2020, the Washington Secretary of State has received over $20 million in grants from the EAC to support elections in Washington, particularly for cybersecurity efforts.

131.   The Oregon Secretary of State has received over $13 million in grants from the Election Assistance Commission to support election security in Oregon, of which more than $6 million remains available for future spending.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

22

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

132.    King County Elections administers elections in King County, Washington, the state's most populous county. The EAC awarded an Election Security Grant to King County Elections in 2020. King County Elections has received over $1,000,000 through this grant, with almost $400,000 remaining. King County Elections has used this funding for, among other things, a second fiber network, a network upgrade, 60 vote center printers, and a security camera replacement project. King County Elections recently sent a notice to the EAC seeking an extension to 2029.

133.    King County Elections has received and is receiving funding from the Department of Homeland Security's State Homeland Security Program, by way of the King County Office of Emergency Management. A reimbursement request for $150,000 is currently pending with the Department of Homeland Security for a camera replacement project. King County Elections was also recently awarded $195,000 for ballistic film and a public announcement system. The full amount remains available.

134.    King County Elections has received and is receiving funding from the Federal Emergency Management Agency's Urban Areas Security Initiative, by way of the King County Office of Emergency Management. Almost $250,000 remains available for election security workshops and personal protective equipment.

135.    The Washington Secretary of State Elections Division does not currently receive funding from the Homeland Security Grant Program from FEMA. But the Emergency Management Division of the Washington Military Department has previously shared elections-related projects that have been funded through this grant.

136.    The Washington Secretary of State has received an Electronic Absentee Systems for Elections (EASE) grant from the Department of Defense in the amount of $486,482.75. The Secretary of State used this grant to make enhancements to the online accessible markable ballot for military and overseas voters. In addition, Washington counties received three EASE grants

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

23

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1  in 2011 and 2013 in the amounts of $816,400.00, $743,580.00, and $1,818,700.00. The counties

2  used these grants to improve support for UOCAVA voters.

3      137.    The Oregon Secretary of State has been awarded a roughly $6 million EASE grant

4  to purchase equipment to modernize the voting process, including for UOCAVA and ADA

5  voters.

6      138.    The Washington Secretary of State Elections Division does not currently receive

7  funding from the Byrne Justice Assistance Grant (JAG) Program but it has received such funding

8  before and Washington intends to seek such funding in the future, as reflected in its State of

9  Washington Byrne Justice Assistance Grant Strategic Plan 2023-2027.

10     139.    The Oregon Secretary of State receives funding in the amount of $300,000 for

11 election security as a sub-awardee from JAG grant awarded to the Oregon Criminal Justice

12 Commission.

13 **I.  The President Acted Without Legal Authority in Purporting to Control State Ballot-Receipt Deadlines**

14     140.    Section 7 of the Election Interference Order directs the Attorney General to "take

15 all necessary action to enforce 2 U.S.C. 7 and 3 U.S.C. 1 against States that violate these

16 provisions by including absentee or mail-in ballots received after election day in the final

17 tabulation of votes for the appointment of Presidential electors and the election of members of

18 the United States Senate and House of Representatives."

19     141.    2 U.S.C. § 7 does not address ballot receipt deadlines. It states, in full, as follows:

20 "The Tuesday next after the 1st Monday in November, in every even numbered year, is

21 established as the day for the election, in each of the States and Territories of the United States,

22 of Representatives and Delegates to the Congress commencing on the 3d day of January next

23 thereafter."

24

25

26

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

142.    3 U.S.C. § 1 does not address ballot receipt deadlines. It states, in full, as follows: "The electors of President and Vice President shall be appointed, in each State, on election day, in accordance with the laws of the State enacted prior to election day."

143.    The President has no authority under 2 U.S.C. § 7 or 3 U.S.C. § 1 to impose—or require other entities to impose—a ballot-receipt deadline.

144.    Section 7 of the Election Interference Order directs the EAC to "condition any available funding to a State on that State's compliance with the requirement in 52 U.S.C. § 21081(a)(6) that each State adopt uniform and nondiscriminatory standards within that State that define what constitutes a vote and what will be counted as a vote, including that, as prescribed in 2 U.S.C. 7 and 3 U.S.C. 1, there be a uniform and nondiscriminatory ballot receipt deadline of election day for all methods of voting, excluding ballots cast in accordance with 52 U.S.C. 20301 et seq., after which no additional votes may be cast."

145.    52 U.S.C. § 21081(a) defines requirements that apply to voting systems, "including any lever voting system, optical scanning voting system, or direct recording electronic system[.]" That statute does not address ballot receipt deadlines.

146.    The EAC's funding to States is governed by 52 U.S.C. §§ 21001 through 21008. In particular, 52 U.S.C. § 21003 defines the specific conditions on the receipt of funds from the EAC. Establishing a particular ballot-receipt deadline is not one of the conditions established by Congress.

147.    The President has no authority to create additional conditions on funding from the EAC.

## J.    The President Acted Without Legal Authority in Purporting to Impose Burdensome Voter Registration Requirements

148.    The Election Interference Order attempts to require "documentary proof of U.S. citizenship" for individuals registering to vote using the Federal Form or the Federal Post Card Application.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

25

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

149.    Section 2(a) requires that, "[w]ithin 30 days of this order, the Election Assistance Commission shall take appropriate action to require, in its national mail voter registration form" two things: (1) "documentary proof of United States citizenship, consistent with 52 U.S.C. 20508(b)(3)"; and (2) "a State or local official to record on the form the type of document that the applicants presented as documentary proof of United States citizenship," including specific information, "while taking appropriate measures to ensure information security."

150.    Section 3(d) directs the Secretary of Defense to update the Federal Post Card Application "to require: (i) documentary proof of United States citizenship . . . and (ii) proof of eligibility to vote in elections in the State in which the voter is attempting to vote."

151.    Section 4(a) orders the EAC to "cease providing Federal funds to States that do not comply with" certain federal laws, "including any requirement for documentary proof of United States citizenship adopted pursuant to section 2(a)(ii) of this order."

152.    Section 2(a)(ii) defines "documentary proof of United States citizenship" narrowly, limiting it to "(A) a United States passport; (B) an identification document compliant with the requirements of the REAL ID Act of 2005 (Public Law 109-13, Div. B) that indicates the applicant is a citizen of the United States; (C) an official military identification card that indicates the applicant is a citizen of the United States; or (D) a valid Federal or State government-issued photo identification if such identification indicates that the applicant is a United States citizen or if such identification is otherwise accompanied by proof of United States citizenship."

153.    Plaintiff States are required by federal law to accept and use the Federal Form and the Federal Post Card Application. 52 U.S.C. §§ 20302(a)(4), 20505(a)(1).

154.    The NVRA imposes certain requirements regarding the Federal Form, including that it "may require only such identifying information . . . and other information . . . as is necessary to enable the appropriate State election official to

assess the eligibility of the applicant and to administer voter registration and other parts of the election process[.]" 52 U.S.C. § 20508(b)(1).

155.    Documentary proof of citizenship is not necessary to enable election officials in Plaintiff States to assess the eligibility of the applicant.

156.    The President has no authority to impose additional requirements with respect to voter registration for Federal elections.

157.    Section 2(d) directs "[t]he head of each Federal voter registration executive department or agency . . . under the National Voter Registration Act, 52 U.S.C. 20506(a)" to "assess citizenship prior to providing a Federal voter registration form to enrollees of public assistance programs." Under 52 U.S.C. 20506(a), States must designate voter registration agencies, including offices that provide public assistance and state-funded programs focused on services for persons with disabilities. States have the option to designate additional agencies, including "Federal and nongovernmental offices, with agreement of such offices." 52 U.S.C. § 20506(a)(3)(B)(ii).

158.    Section 2(d) does not define "Federal voter registration executive department or agency." To the extent it includes any State agencies (i.e., any agency other than an optional Federal governmental office referred to in 52 U.S.C. § 20506(a)(3)(B)(ii)), the President has no authority to impose such a requirement.

**K.    The President Acted Without Legal Authority in Purporting to Control Voting System Certification Standards and Dictate the Outcome of the Voting System Testing and Certification Process**

159.    Section 4(b)(i) of the Election Interference Order purports to require the EAC to "initiate appropriate action to amend the Voluntary Voting System Guidelines 2.0 and issue other appropriate guidance establishing standards for voting systems to protect election integrity." It specifically requires that "[t]he amended guidelines and other guidance shall provide that voting systems should not use a ballot in which a vote is contained within a barcode or quick-response

code in the vote counting process except where necessary to accommodate individuals with disabilities, and should provide a voter-verifiable paper record to prevent fraud or mistake."

160.    Section 4(b)(ii) provides that, "[w]ithin 180 days of the date of this order, the Election Assistance Commission shall take appropriate action to review and, if appropriate, re-certify voting systems under the new standards established under subsection (b)(i) of this section, and to rescind all previous certifications of voting equipment based on prior standards."

161.    Counties in Washington use voting systems that the Election Interference Order directs the EAC to exclude from its amended guidelines and decertify.

162.    Congress defined voting system standards in 52 U.S.C § 21081 and assigned to the EAC the responsibility to adopt voluntary voting system guidelines. 52 U.S.C. § 20962(a). Congress also assigned to the EAC the responsibility to test, certify, decertify, and recertify voting systems. 52 U.S.C. § 20971(a)(1).

163.    The President has no lawful role in adopting or modifying voting system guidelines or in testing, certifying, or decertifying voting systems or authority to direct any other entities to do so.

164.    Section 4(d) requires that the Secretary of Homeland Security and the Administrator of the Federal Emergency Management Agency must "heavily prioritize compliance with the Voluntary Voting System Guidelines 2.0" when "considering the provision of funding for State or local election offices or administrators through the Homeland Security Grant Programs, 6 U.S.C. 603 et seq."

165.    The conditions and criteria for Homeland Security Grant Program awards are set forth in statute at 6 U.S.C. § 603 through 605.

166.    The President, Secretary of Homeland Security, and Administrator of the Federal Emergency Management Agency have no authority to add additional conditions or criteria to these grants.

**L.    The President Acted Without Legal Authority in Purporting to Impose Additional Data-Sharing Requirements**

167.    Section 2(b)(iii) of the Election Interference Order directs the Department of Homeland Security, in coordination with the DOGE Administrator, to "review each State's publicly available voter registration list and available records concerning voter list maintenance activities as required by 52 U.S.C. 20507, alongside Federal immigration databases and State records requested, including through subpoena where necessary and authorized by law[.]"

168.    Section 2(e)(ii) directs the United States Attorney General to prioritize enforcement of certain federal laws, "including through the use of . . . State-issued identification records and driver license databases[.]"

169.    To the extent that Section 2(b)(iii) or 2(e)(ii) purports to permit access to nonpublic state records to which the Federal government does not otherwise have access, the President has no authority to do so.

170.    Section 5(a) directs the Attorney General to enter into information-sharing agreements with each State to provide the Department of Justice with "detailed information on all suspected violations of State and Federal election laws discovered by State officials[.]"

171.    Section 5(b) of the Election Interference Order further directs the Attorney General to "prioritize enforcement of Federal election integrity laws" and "review for potential withholding of grants and other funds that the Department awards and distributes" to States that decline to enter these information sharing agreements with the Federal government.

172.    The Department of Justice awards grant funding to States through multiple programs.

173.    The Department's Edward Byrne Memorial Justice Assistance Grant Program (JAG) is the leading source of federal justice funding to support State and local law enforcement. Congress has broadly authorized these funds to be used for law enforcement, court programs,

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

29

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

prevention and education programs, corrections, drug treatment programs, crime victim and witness programs, and certain mental health programs among other things. 34 U.S.C. § 10152.

174.    For fiscal year 2022, $291,446,986 was awarded through the JAG Program. Washington alone received nearly six million dollars. Under the same program, Oregon is due more than $7 million in funds that remain unexpended for fiscal years 2021–24.

175.    In enacting the JAG Program, Congress specifically directed how the Attorney General would allocate JAG funds. 34 U.S.C. §§ 10151-10158. Funding is determined by a statutory formula. *See* § 34 U.S.C. 10156.

176.    In "formula grant programs" like the JAG Program, Congress appropriates a set amount of funding and specifies "how the funds will be allocated among the eligible recipients, as well as the method by which an applicant must demonstrate its eligibility for that funding."

177.    Congress granted the Attorney General with limited discretion in the JAG allocation process. The Attorney General may, for example, reserve a small portion of JAG funds for specified purposes such as responding to "extraordinary increases in crime" or "to prevent" or "mitigate significant programmatic harm resulting from operation of the formula[.]" 34 U.S.C. § 10157.

178.    Outside of the JAG statute, Congress has authorized the Attorney General to withhold a portion of JAG funding only under narrow circumstances, such as where States fail to comply with statutory requirements. *See* 34 U.S.C. §§ 20927(a), 30307(e)(2)(A), 60105(c)(2).

179.    The Ninth Circuit and district courts within the Circuit have rejected attempts by the Executive Branch to bypass Congress and add conditions to JAG funding. *See City & County of San Francisco v. Barr*, 965 F.3d 753, 760 (9th Cir. 2020*); see also Oregon v. Trump*, 406 F. Supp. 3d 940, 956 (D. Or. 2019), *aff'd in part, vacated in part, remanded sub nom. City & County of San Francisco v. Garland*, 42 F.4th 1078 (9th Cir. 2022).

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

180.    Congress has not statutorily authorized the Attorney General to withhold JAG funding from States that decline to enter into election crime information-sharing agreements as directed by the President.

181.    In addition to the JAG Program, the Department of Justice manages grant programs authorized by the Violence Against Women Act (VAWA) 1994 and its subsequent reauthorizations designed to address domestic violence, dating violence, sexual assault, and stalking. In 2024, the Department announced grant awards of more than $690 million nationwide. The same year, Washington received 31 grants totaling $25,540,818. In 2024, Oregon received three grants totaling $2,053,841 in funding.

182.    Similar to the JAG Program, Congress directed the Attorney General to make VAWA grants to States based on a specific, predetermined formula. *See* 34 U.S.C. § 10446. Congress permitted the Attorney General to "impose reasonable conditions on grant awards" but only "to ensure that the States meet statutory, regulatory, and other program requirements." 34 U.S.C. § 10446(e)(3). Congress did not provide a mechanism for the Attorney General to withhold VAWA funds from States that decline to enter into election crime information-sharing agreements as directed by the President.

183.    The Department of Justice's Office of Juvenile Justice and Delinquency Prevention (OJJDP) manages a grant program to support State and local delinquency prevention and intervention efforts and juvenile justice system improvements. In fiscal year 2023, OJJDP awarded $46,070,137 nationwide, with over $1,000,000 sent to Washington jurisdictions. Instead of the Attorney General, Congress authorized an Administrator, appointed by the President, to make grants to States and local governments as determined by a statutory formula. 34 U.S.C. §§ 11111, 11131, 11132. The Administrator may withhold funds from grant recipients if programs fail to comply with statutory requirements established by Congress. 34 U.S.C. § 11183.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                                    31                ATTORNEY GENERAL OF WASHINGTON
                                                                        Complex Litigation Division
                                                                        800 Fifth Avenue, Suite 2000
                                                                        Seattle, WA 98104-3188
                                                                        (206) 464-7744

184.    The Department of Justice's Office for Victims of Crime (OVC) manages Victims of Crime Act formula grants to fund crime victim compensation and assistance programs. In fiscal year 2024, OVC awarded over $1,000,000,000 dollars in grants to States and territories, over $20 million of which supported Washington programs. Instead of the Attorney General, Congress authorized the OVC Director to make grants as determined by statutory formula. 34 U.S.C. §§ 20102, 20103. The Director may withhold funds from grant recipients if States fail to comply with statutory requirements established by Congress. 34 U.S.C. § 20110(f).

185.    Neither the President nor the Attorney General has the authority to add additional conditions or criteria to Department of Justice grants without action from Congress.

**M.    Plaintiff States Will be Irreparably Injured by the Election Interference Order**

186.    The Election Interference Order's attempt to invalidate Plaintiff States' ballot-receipt deadline laws or otherwise penalize Plaintiff States for such laws harm the State's sovereign interest in regulating elections and will impose monetary costs associated with altering election processes and educating voters about the changes.

187.    The Election Interference Order creates strict requirements regarding types of identification that are sufficient to prove U.S. citizenship. These are limited to passports, identification documents compliant with the REAL ID Act of 2005, official military identification cards indicating the applicant is a U.S. citizen, or valid Federal or State government-issued photo identification that indicates U.S. citizenship.

188.    Washington residents may obtain a standard driver's license or identicard (a state-issued identification card) without providing proof of citizenship. *See* Wash. Rev. Code § 46.20.035. This license "may not be used as evidence of or as a basis to infer an individual's citizenship or immigration status for any purpose." Wash. Rev. Code § 46.20.1921(1). Washington residents have the option to obtain an enhanced driver's license or enhanced identicard, both of which require proof of U.S. citizenship and are compliant with the Real ID

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  Act of 2005. Wash. Rev. Code § 46.20.202(2). Standard Washington state driver's licenses and

2  identicards are not compliant with the Real ID Act of 2005.

3      189.    Many residents of Plaintiff States who are eligible to register to vote do not have

4  the specific types of identification required by the Election Interference Order. The Election

5  Interference Order makes registering to vote more burdensome for these voters and state

6  agencies and will create significant confusion.

7      190.    The Election Interference Order's sections related to documentary proof of

8  citizenship are already causing confusion in States. Some voters mistakenly believe that they

9  must show proof of citizenship in order to register to vote.

10     191.    The Election Interference Order's requirement that State or local officials record

11 information will increase the burden on state and local officials processing the tens of thousands

12 of Federal Forms and the Federal Post Card Application received each year. This will increase

13 staff costs. In addition, Plaintiff States will need to develop additional computer systems to

14 securely record the additional information. These actions will impose significant monetary costs

15 on Plaintiff States.

16     192.    The Election Interference Order's requirement that the Federal Form require

17 documentary proof of citizenship will also impose significant costs on election officials and voter

18 registration agencies in Plaintiff States. Implementing the Election Interference Order will

19 require substantial time and resources for State agencies to update computer systems, adopt new

20 policies and procedures, and re-train staff on how to provide voter registration assistance to the

21 public. Implementation will also increase the staff time spent on applications, recertifications,

22 renewals, or change of address appointments.

23     193.    The Washington Office of the Secretary of State and the Elections Division of

24 the Oregon Secretary of State have already had to direct staff time to planning for changes

25 required by the Election Interference Order, and the time and resources required will rapidly

26 increase if this unlawful order is not enjoined.

194.    The Election Interference Order's requirement that the EAC modify the VVSGs and "rescind all previous certifications of voting equipment" within 180 days will also cause significant harm to Plaintiff States. At that time, there will be no voting systems capable of being certified under the standards set forth in the Election Interference Order, absent extraordinary and implausible steps by the EAC. This will irreparably harm Plaintiff States by eroding public confidence in election results, reducing the voting system options available to election officials, causing significant financial harms, and undermining election security.

195.    The Election Interference Order's requirement to withhold specified and unspecified funding to Plaintiff States—or to prioritize funding on extra-statutory criteria—will harm Plaintiff States by, among other things, impairing their ability to secure their elections, resulting in decreased levels of services for military and overseas voters, and interfering with efforts to make voting accessible to all qualified persons.

## CAUSES OF ACTION

### CLAIM 1
**(Article I, Section 4, Clause 1 – Elections Clause; Article II, Section 1 – Electors Clause)**

196.    Plaintiff States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

197.    Article I, section 4, clause 1 of the United States Constitution, "the Election Clause," provides that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of [choosing] Senators."

198.    Article I, section 4, clause 1 of the United States Constitution gives the specific right to the States to establish the time, place, and manner of electing Senators and Representatives.

199.    Article II, Section 1 of the United States Constitution provides that "Each state shall appoint, in such manner as the Legislature thereof may direct, a number of electors, equal to the whole number of Senators and Representatives to which the State may be entitled in the Congress." The Twelfth Amendment to the United States Constitution provides, in relevant, that "The Electors shall meet in their respective states and vote by ballot for President and Vice-President."

200.    All 50 States vest the right to vote for President in their people and appoint their presidential electors based on the results of popular elections.

201.    Where Congress "declines to preempt state legislative choices" by adopting federal legislation, the Elections Clause vests the States with responsibility for the "mechanics of congressional elections." *Foster v. Love*, 522 U.S. 67, 69 (1997); *see also Voting Rts. Coal. v. Wilson*, 60 F.3d 1411, 1414 (9th Cir. 1995) ("The broad power given to Congress over congressional elections has been extended to presidential elections[.]"). These clauses further grant States "wide discretion in the formulation of a system[.]" *United States v. Classic*, 313 U.S. 299, 311 (1941).

202.    Plaintiff States' laws—like the laws in many states—count all otherwise-valid ballots that are cast by election day, even if they are received after election day. Congress has not adopted legislation preempting this State legislative choice regarding the time, place, and manner of elections.

203.    Plaintiff States' laws verify citizenship through an attestation signed under penalty of perjury. Congress has not adopted legislation preempting this State legislative choice regarding the manner of elections.

204.    Plaintiff States' laws permit the use of voting systems that the Election Interference Order would require to be de-certified. Congress has not adopted legislation preempting—or permitting the President to preempt—this State legislative choice regarding the manner of elections.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
35
ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

205.     Plaintiff States' laws address the prosecution of individuals suspected of violating State election laws and do not require the States to share information with the Federal government. Congress has not adopted legislation preempting this State legislative choice regarding the manner of elections.

206.     Defendants' actions will cause irreparable harm to the States' constitutional authority to establish the time, place, and manner of elections in matters where Congress has declined to legislate.

207.     Sections 2(a), 2(d), 3(d), 4(a), 4(b), 4(d), 5(b), and 7 of the Election Interference Order seek to unconstitutionally deprive Plaintiff States of their constitutional authority to set the "Times, Places, and Manner of holding Elections for Senators and Representatives[.]" The Constitution permits only Congress, not the Executive Branch, to alter state laws related to the time, place, and manner of electing Senators, Representatives, and presidential electors.

208.     The Election Interference Order will cause harm to Plaintiff States and their residents.

## CLAIM 2
### (Tenth Amendment)

209.     Plaintiffs reallege the foregoing allegations as if fully set forth herein.

210.     The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." Through this amendment, the Framers intended the States to "keep for themselves. . . the power to regulate elections." *Gregory v. Ashcroft*, 501 U.S. 452, 461-62 (1991).

211.     The President has no enumerated power to regulate elections administration. Nor has he been authorized Congress to do so.

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

212.    Plaintiff States have the sovereign power to direct the manner of determining presidential electors and to regulate the time, place, and manner of elections, except as otherwise directed by Congress.

213.    Sections 2(a), 2(d), 3(d), 4(a), 4(b), 4(d), 5(b) and 7 of the Election Interference Order unconstitutionally attempt to regulate Plaintiff States' processes for appointment of presidential electors and the manner of elections for Senators and representatives without congressional authorization.

214.    Where Congress wishes to intrude on an area where States have used their police powers to regulate a matter of local concern, such as the manner of elections, it must do so clearly in unmistakable terms. *Gonzales v. Oregon*, 546 U.S. 243, 274 (2006). Federal law does not—in clear and unmistakable terms or any other terms—regulate how States count ballots cast on election day but received after election day. Instead, it explicitly defines "day for the election" (2 U.S.C. § 7) without specifying other time, place, and manner elements. Nor does federal law require proof of citizenship beyond that specified in 52 U.S.C. § 20501(b).

215.    The Federal government may not commandeer States to enact or administer a federal regulatory program. *Printz v. United States*, 521 U.S. 898, 933 (1997).

216.    Sections 2(a), 2(d), and 5(b) of the Election Interference Order seek to unconstitutionally commandeer State governments to administer regulatory policies of the President.

217.    The Election Interference Order's attempt to commandeer Plaintiff States to administer the President's preferred policies harms Plaintiff States.

## CLAIM 3
### (Constitutional Right to Vote)

218.    Plaintiffs reallege the foregoing allegations as if fully set forth herein.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

37

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

219.    The United States Constitution guarantees that "all qualified voters have a constitutionally protected right to vote . . . and to have their votes counted." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964).

220.    This right arises from multiple constitutional provisions, including (1) Article I, Section 2, Clause 1, which provides that members of the United States House of Representatives are "chosen . . . by the People of the several States"; (2) Article IV, Section 2, Clause 1, which provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States," and, therefore, the right to vote for national officers is a right and privilege of national citizenship that is protected by Article IV, Section 2, Clause 1; and (3) the Seventeenth Amendment which provides that United States Senators are "elected by the People" of each State.

221.    Defendants' actions interfere with the ability of U.S. citizens who are residents of Plaintiff States to register to vote and to have their timely cast ballots counted in the manner prescribed by State law. Defendants' actions also interfere with Plaintiff States' sovereign and quasi-sovereign interests.

222.    Defendants' actions are not supported by any interest that justifies this serious burden on the right to vote. Because Plaintiff States' laws do not require "documentary proof of United States citizenship," voter registration applications could not be rejected based on the absence of such proof. 52 U.S.C. § 10101(a)(2)(B). As a result, any purported requirement on the Federal Form or Federal Post Card Application would serve no valid purpose.

223.    Sections 2(a), 2(d), 3(d), 4(a), and 7 of the Election Interference Order unconstitutionally interfere with the right to vote.

224.    The Election Interference Order's increase the burden associated with registering to vote harms Plaintiff States.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

38

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

## CLAIM 4
### (*Ultra Vires* Action)

225.    Acts taken by the President in the absence of constitutional or statutory authority are *ultra vires* and unlawful. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).

226.    The President has no constitutional or statutory authority to alter—directly or indirectly—the content of the Federal Form or the Federal Post Card Application. *See, e.g.*, 52 U.S.C. §§ 20508, 20921.

227.    The President has no constitutional or statutory authority to dictate the actions of the EAC, an "independent entity" created by Congress. 52 U.S.C. § 20921.

228.    The President has no constitutional or statutory authority to direct changes to the Federal Post Card Application that are inconsistent with UOCAVA.

229.    The President has no constitutional or statutory authority to create new subpoena authority or compel States to share nonpublic information with the Federal government.

230.    The President has no constitutional or statutory authority to preempt—directly or indirectly—State regulations of the time, place, or manner of federal elections.

231.    The President has no constitutional or statutory authority to add to statutory conditions adopted by Congress for grants or awards.

232.    The President has no constitutional or statutory authority to define the guidelines governing certification of voting systems or determine which voting systems may be certified.

233.    Sections 2(a), 2(b)(iii), 2(d), 2(e)(ii), 3(d), 4(a), 4(b), 4(d), 5(b) and 7 of the Election Interference Order are beyond the President's constitutional and statutory authority and are therefore *ultra vires* and unlawful.

234.    These unlawful provisions in the Election Interference Order will harm Plaintiff States.

## CLAIM 5
### (Separation of Powers)

235.    Plaintiffs reallege the foregoing allegations as if fully set forth herein.

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

236.    Article I, Section 1 of the United States Constitution enumerates that: "[a]ll legislative powers herein granted shall be vested in . . . Congress." U.S. Const. art. I, § 1.

237.    The separation of powers doctrine represents a central tenet of our Constitution. *See, e.g.*, *Trump v. United States*, 603 U.S. 593, 637-38 (2024); *Seila Law LLC*, 591 U.S. 197, 227 (2020).

238.    Consistent with these principles, the Executive's powers are limited to those specifically conferred by the Constitution and federal statutes, and do not include any undefined residual or inherent power.

239.    Any instance where the President, by executive order or otherwise, directs an agency to take an action that runs afoul of a statute or the legislative intent of Congress, violates the Separation of Powers doctrine.

240.    The Constitution vests Congress—not the President—with the spending power. U.S. Const. art. I, § 8, cl. 1. In particular, only Congress—not the President—has authority to impose conditions on federal spending. *Id.*

241.    The Constitution vests Congress—not the President—with the appropriation power, not the President. U.S. Const. art. I, § 9, cl. 7.

242.    The Constitution provides "a single, finely wrought and exhaustively considered, procedure" through which "the legislative power of the Federal government [may] be exercised[,]" *INS. v. Chadha*, 462 U.S. 919 (1983), namely, through majority votes of both chambers of Congress and the signature of the President. U.S. Const. art. I, § 7.

243.    Sections 2(a), 2(d), 3(d), 4(a), 4(b), 4(d), and 7 of the Election Interference Order direct actions that conflict with the Elections Clause, the Electors Clause, the NVRA, UOCAVA, HAVA, the Administrative Procedure Act, and Congressional statutes establishing conditions on federal funding. Accordingly, these sections violate the constitutional separation of powers.

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

**CLAIM 6**
**(Violation of the Article II, Section 3 of the U.S. Constitution)**

244.    Plaintiffs reallege the foregoing allegations as if fully set forth herein.

245.    Article II, Section 3 of the U.S. Constitution provides that the President "shall take Care that the Laws be faithfully executed[.]" *See also Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes laws and the President . . . 'faithfully executes' them[.]" (quoting U.S. Const. art II, § 3)).

246.    Any instance where the President, by executive order or otherwise, directs an agency to take an action that runs afoul of a statute or the legislative intent of Congress, violates the Take Care clause. *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("[T]he President is without authority to set aside congressional legislation by executive order[.]"); *Kendall v. United States*, 37 U.S. 524, 613 (1838) (rejecting argument that by charging the President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution").

247.    By issuing the Election Interference Order to directing the EAC to violate the NVRA, UOCAVA, HAVA and the Administrative Procedure Act, the President has failed to faithfully execute the laws enacted by Congress in violation of the Take Care Clause.

248.    The President's failure to faithfully execute the laws will cause harm to Plaintiff States and the residents of each Plaintiff State.

**CLAIM 7**
**(National Voter Registration Act)**

249.    Plaintiffs reallege the foregoing allegations as if fully set forth herein.

250.    The NVRA provides that the Federal Form "may require only such identifying information . . . and other information . . . as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process[.]" 52 U.S.C. § 20508(b)(1).

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

41

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

251.  Documentary proof of citizenship is not necessary to enable state election officials in Plaintiff States to assess the eligibility of applicants to vote or to administer voter registration or other parts of the elections process. Accordingly, the Executive Order's direction to require documentary proof of citizenship violates 52 U.S.C § 20508(b)(1).

252.  The NVRA also requires proof of "each eligibility requirement (including citizenship)" by "attestation" signed "under penalty of perjury." 52 U.S.C. § 20508(b)(2). The NVRA further prohibits the Federal Form from "includ[ing] any requirement for notarization or other formal authentication." 52 U.S.C. § 20508(b)(3).

253.  In purporting to require documentary proof of citizenship, the Executive Order violates the NVRA by requiring formal authentication beyond attestation.

254.  The Election Interference Order will cause harm to Plaintiff States and the residents of each Plaintiff State.

### CLAIM 8
### (Declaratory Judgment — 2 U.S.C. §§ 1, 7; 3 U.S.C. §§ 1, 21(1))

255.  Plaintiffs reallege the foregoing allegations as if fully set forth herein.

256.  "In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

257.  There is actual, concrete controversy between the Attorney General and Plaintiff States as to whether 2 U.S.C. §§ 1, 7 and 3 U.S.C. §§ 1, 21(1) preempt Wash. Rev. Code § 29A.60.190 and Or. Rev. Stat. §§ 254.470(6)(e)(B), 254.470(8).

258.  Plaintiff States have a definite plan to continue to count ballots cast before but received after election day in accord with their election statutes. The federal government intends to enforce its contrary and erroneous view of the federal statutes: Section 7(a) of the Executive Order provides that "[t]he Attorney General shall take all necessary action to enforce 2 U.S.C.

§ 7 and 3 U.S.C. § 1 against States that violate these provisions by including absentee or mail-in ballots received after Election Day" in federal elections. Preemption of Plaintiff States' statutes would harm their sovereign interests in exercising their constitutional authority and impose financial costs to change their administration of elections and publicize those changes to election officials and the electorate.

259.    Wash. Rev. Code § 29A.60.190 and Or. Rev. Stat. §§ 254.470(6)(e)(B), 254.470(8) define the "Time, Place and Manner" of federal elections pursuant to their authority under Elections Clause of the U.S. Constitution, Article I, Section 4, Clause 1 and Article II, Section 1.

260.    Wash. Rev. Code § 29A.60.190 and Or. Rev. Stat. §§ 254.470(6)(e)(B), 254.470(8) are not preempted by 2 U.S.C. §§ 1, 7 or 3 U.S.C. §§ 1, 21(1).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff States request that the Court enter a judgment against Defendants and:

A.    Declare that various provisions of President Trump's Executive Order are *ultra vires* and unlawful for the following reasons:

1)    Section 2(a) violates the United States Constitution, the Help America Vote Act, and the National Voter Registration Act;

2)    Section 2(b)(iii) is unlawful to the extent that it purports to authorize subpoenas not otherwise authorized by law;

3)    Section 2(d) violates the United States Constitution and the National Voter Registration Act and is *ultra vires* to the extent that it applies to State voter registration agencies;

4)    Section 2(e)(ii) violates the United States Constitution and federal law to the extent that it purports to authorize access to state records in a manner inconsistent with state law;

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1          5)     Section 3(d) violates the United States Constitution, the National Voter

2   Registration Act, and the Uniformed and Overseas Citizens Absentee Voting Act;

3          6)     Section 4(a) is *ultra vires* and violates the United States Constitution;

4          7)     Section 4(b) and (d) are *ultra vires* and violate the United States

5   Constitution;

6          8)     Section 5(b) is *ultra vires* and violates the United States Constitution;

7          9)     Section 7 is *ultra vires* and violates the United States Constitution;

8   B.    Declare that Wash. Rev. Code § 29A.60.190 and Or. Rev. Stat.

9   §§ 254.470(6)(e)(B), 254.470(8) are not preempted by 2 U.S.C. §§ 1, 7 or 3 U.S.C. §§ 1, 21(1);

10   C.    Preliminarily and permanently enjoin Defendants from implementing or

11   enforcing the challenged provisions of the Election Interference Order;

12   D.    Award Plaintiff States their reasonable fees, costs, and expenses, including

13   attorneys' fees, and;

14   E.    Award such additional relief as the interests of justice may require.

15   DATED this 4th day of April 2025.

16                               NICHOLAS W. BROWN

17                               Attorney General

18                               NOAH G. PURCELL, WSBA #43492
                                *Solicitor General*

19                              *s/ Karl D. Smith*

20                               KARL D. SMITH, WSBA #41988
                                *Deputy Solicitor General*

21                               WILLIAM MCGINTY, WSBA #41868
                               KELLY A. PARADIS, WSBA #47175

22                               ALICIA O. YOUNG, WSBA #35553
                                *Deputy Solicitors General*

23                               FREEMAN E. HALLE, WSBA #61498
                               MICHELLE M. SAPERSTEIN, WSBA # 55539

24                               ZANE MULLER**
                                *Assistant Attorneys General*

25                               Office of the Washington State Attorney General
                               800 Fifth Avenue, Suite 2000

26                               Seattle, WA 98104-3188
                               206-464-7744

COMPLAINT FOR DECLARATORY AND      44      ATTORNEY GENERAL OF WASHINGTON
INJUNCTIVE RELIEF                                Complex Litigation Division
                                               800 Fifth Avenue, Suite 2000
                                             Seattle, WA  98104-3188
                                             (206) 464-7744

1
karl.smith@atg.wa.gov
noah.purcell@atg.wa.gov
2
william.mcginty@atg.wa.gov
kelly.paradis@atg.wa.gov
3
alicia.young@atg.wa.gov
freeman.halle@atg.wa.gov
4
zane.muller@atg.wa.gov
michelle.saperstein@atg.wa.gov
5

*Attorneys for Plaintiff State of Washington*
6

DAN RAYFIELD
7
Attorney General
8
*s/ Brian Simmonds Marshall*
9
BRIAN SIMMONDS MARSHALL*
CARLA A. SCOTT, WSBA #39947
*Senior Assistant Attorneys General*
10
KATE E. MORROW*
*Assistant Attorney General*
11
Oregon Department of Justice
100 SW Market Street
12
Portland, OR 97201
(971) 673-1880
13
brian.s.marshall@doj.oregon.gov
carla.a.scott@doj.oregon.gov
14
kate.e.morrow@doj.oregon.gov
15

*Attorneys for Plaintiff State of Oregon*
16

*Pro hac vice motion forthcoming
17
**Washington State bar admission pending
18

19

20

21

22

23

24

25

26

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

45