The Honorable John H. Chun

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | NO. 2:25-cv-00602-JHC |
| Plaintiffs, | DECLARATION OF STUART HOLMES |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States of America, et al., | |
| Defendants. | |

I, STUART HOLMES, declare as follows:

1.     I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge.

2.     I am the Director of Elections for the Secretary of State of the state of Washington. I have held this position for over three years. Prior to holding this position, I was the Deputy Director of Elections, and prior to that a Voter Registration Information Systems Manager. I have worked in election administration in the Office of the Secretary of State since 2014. Before that, I was the election supervisor for Benton County, Washington, from 2005 to 2014.

3.     In my current role, my duties include, among other things, overseeing the election systems in the state of Washington. I am responsible for making sure that, on a statewide basis, elections in Washington are conducted fairly, that voters have access to the means of exercising

1

their right to vote, and that Washington's elections are conducted with a high degree of integrity and security. I also lead the Secretary of State's supervision of election administration by counties. Some of my duties include ensuring that the State's and counties' administration of elections comply with state and federal election laws. As part of these duties, I keep abreast of legal requirements and participate in national conferences on election administration. I also generally keep abreast of other states' election administration practices and developments, particularly as it relates to vote by mail. In my role as elections director, I also oversee all aspects of the Secretary of State's role as Chief Election Officer, including working with counties on election administration, creating and implementing standards and trainings governing elections, and interacting with the public to address voters' questions and concerns and promote voter confidence.

4.      As part of my official responsibilities, the Washington Secretary of State selected me to serve as a member of the Election Assistance Commission's (EAC) Standards Board. The purpose of the Standards Board, as reflected in its charter, is to advise the EAC through review of the Voluntary Voting Systems Guidelines (VVSG).

5.      The EAC has implemented another one of the President's executive orders. The EAC annual grants to States. The FY 2025 grant's terms required a new certification in order to receive that grant. Under the heading "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" (Exec Order No. 14173, 90 Fed. Reg. 8633 (Jan. 31, 2025)), the EAC grant requires that States certify that they "do[] not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." A true and correct copy of the terms of the EAC grant conditions is included as **Exhibit A**.

### General Information About Washington Elections

6.      Secretary of State Steve Hobbs is the chief election officer in Washington. Secretary Hobbs works closely with county election officials to support local efforts and ensure consistency across the state. The Secretary has broad authority to adopt regulations governing

DECLARATION OF STUART HOLMES    2
NO. 2:25-cv-00602-JHC

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

the election process and also issues guidance (in the form of written "clearinghouses") to county election officials.

7.      The goals of preserving election security and maintaining broad access to the ballot can sometimes be in tension with one another. An election system with perfect accessibility will not necessarily be secure. And an election system with perfect security will not necessarily be accessible. Each state must balance these goals to meet all of the objectives of an election system. Election officials then implement those policy decisions.

8.      Washington has a number of procedures in place to make voting accessible. Most important, Washington is a universal vote by mail jurisdiction. This means that a ballot is mailed to every registered voter, every election, in each of Washington's 39 counties. In the 2024 general election, county election officials mailed ballots to 5,017,620 voters.

9.      County election officials mail ballots to voters who are covered by the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) at least 45 days before each election involving a federal office and mail ballots to all voters at least 18 days before each such election. Voters then have until election day to return their ballots through a variety of mechanisms, including at a ballot drop box, by prepaid return mail, or in-person at a voting center. Voters also have the option to vote in-person at a voting center. A voter's ballot is timely if it is returned to a ballot drop box by 8:00pm on election day, the voter is in line for a ballot drop box or a voting center by 8:00pm on election day, or the voter's ballot is postmarked by election day. Notably, a ballot does not have to be received by election day in order to count.

10.      Our office works closely with the United States Postal Service (USPS) to ensure that ballots are received by voters and election officials in a timely manner. In recent years, USPS changes have affected service and delivery. For example, USPS has closed some distribution centers. This means that mailed ballots often have to travel farther (sometimes hundreds of miles) to be processed and then have to travel back to the county auditor. This can cause delays in ballot returns. Even if a voter casts a ballot by mail before election day, it might

1   not be received by county election officials until after election day. This is a particular issue for

2   rural voters, as their mailed ballots generally have to travel farther to reach a USPS distribution

3   center.

4          11.    State law requires that counties have at least one drop box for every 15,000

5   registered voters and at least one ballot drop box in each city, town, and census-designated place

6   with a post office. Counties must also provide a ballot drop box for every federally recognized

7   Indian Tribe with a reservation in the county, at the request of the tribe. In addition, ballot

8   envelopes have prepaid postage, allowing voters to return ballots through USPS for free.

9          12.    The 2024 Cost of Voting Index (COVI) ranked Washington first in the nation for

10  voting accessibility. This is an index that allows easy comparison of election related laws and

11  policies across states with a particular focus on how difficult it is to vote in any given state. The

12  COVI, which debuted in 2020, is used by election officials across the country as a measure of

13  how well their systems meet the objective of voting accessibility. Oregon, which is another

14  universal vote by mail state, ranked second in the nation. The COVI's findings and methodology

15  were published in the Election Law Journal and are available online at the COVI's website:

16  https://costofvotingindex.com.

17         13.    Washington also has a score of 62 out of 65 according to the Vote at Home

18  Institute's ranking methodology. This puts Washington in a three-way tie for second in the nation

19  along with the District of Columbia and Nevada. The Vote at Home Institute's state scorecards

20  can be found on its website at https://voteathome.org/state-scorecard/. The Movement

21  Advancement Project ranks Washington number one nationally on a metric designed to test how

22  accessible a state's voting system is to voters. Washington received a score of 30.5 out of 35

23  possible points according to the organization's methodology, the third highest in the nation.

24  Notably, Washington scored 7 out of 7 points for "Election Security" and 6 out of 6 points for

25  "Independence & Integrity." The Movement Advancement Project's national rankings can be

26  found on its website at https://www.mapresearch.org.

DECLARATION OF STUART HOLMES                    4              ATTORNEY GENERAL OF WASHINGTON
NO. 2:25-cv-00602-JHC                                                  Complex Litigation Division
                                                                        800 5th Avenue, Suite 2000
                                                                          Seattle, WA 98104-3188
                                                                            (206) 464-7744

**Voter Registration in Washington**

14.     Washington election officials accept and use the Federal Form for voter registration purposes. Exhibit B of the Complaint (Dkt No. 1-2) is a true and correct copy of the current Federal Form. In 2024, Washington processed 3,144 new voter registrations through the Federal Form and 32,785 voter registration updates through the Federal Form.

15.     In 2020, 28,410 Washington voters used the Federal Form to submit a new voter registration or to update their existing voter registration.

16.     Washington has also developed its own mail voter registration form for the registration of voters in elections for federal and state office. This is called the "Washington State Voter Registration Form" or "State Form." The State Form meets all the criteria stated in 52 U.S.C. § 20508(b) and follows the requirements created by the Washington State Legislature in chapter 29A.08 of the Revised Code of Washington. Exhibit C to the Complaint (Dkt No. 1-3) filed in this case is a true and correct copy of the current State Form.

17.     The instructions on the State Form state that "You must be a United States citizen in order to register to vote. If you knowingly provide false information on this voter registration form or knowingly make a false declaration about your qualifications for voter registration you will have committed a class C felony that is punishable by imprisonment for up to five years, a fine of up to ten thousand dollars, or both." There is a section heading that says "Citizenship." In that section, there is a statement that says "I am a citizen of the United States" and two options for voters, one marked "yes" and the other marked "no" followed by the statement "If you answered *no*, do not complete this form." At the bottom of the State Form there is a section titled "Declaration and Signature." The declaration begins with the following sentence: "I declare that the facts on this voter registration form are true. I am a citizen of the United States[.]"

18.     Voters can use the State Form to register to vote or to update their existing voter registration.

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

19.    Voters can access the State Form online at www.votewa.gov. Voters who have a valid Washington State driver's license, driver's permit, or identification card issued by the Department of Licensing, or who have a valid social security number, may complete the State Form online. Voters who do not have any of those documents may print the State Form and return it by mail or in person. The State Form is available in 23 languages online.

20.    Voters can obtain a print version of the State Form at county election offices, public libraries, and state agencies. The Office of the Secretary of State also distributes printed versions of the State Form when requested online by groups, organizations, or agencies.

21.    Washington also offers automatic voter registration through the Washington State Department of Licensing. Individuals who provide proof of citizenship as part of a transaction at the Department of Licensing (i.e., persons who apply for and receive an enhanced driver's license or enhanced identification card) are automatically registered to vote or, if they are already registered voters, their voter registration information is automatically updated. This policy, adopted by the Legislature, ensures broad access to the right to vote and simultaneously helps to ensure that voter registration databases contain up-to-date information.

22.    In 2024, Washington election officials received 192,843 new voter registrations and 645,642 voter registration updates through the Department of Licensing.

23.    Washington also offers voter registration through state voter registration agencies. The Washington State Governor designated state voter registration agencies in Executive Order 15-02. Exhibit D to the Complaint (Dkt. No. 1-4) is a true and correct copy of this order, which remains in effect.

24.    In 2024, Washington election officials received 1,025 new voter registrations and 11,530 voter registration updates from state voter registration agencies.

DECLARATION OF STUART HOLMES
NO. 2:25-cv-00602-JHC

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**Planned Improvements to Washington Elections**

25.    The Secretary of State continually pursues improvements that make elections more accessible to all voters and more secure. Within available funds, the Elections Division is planning to pursue a variety of changes.

26.    The National Voter Registration Act (NVRA) requires specific notifications to voters at the time of registration or update. The Secretary of State, as Washington's chief election officer, is responsible for ensuring that these notifications are created and transmitted to voters uniformly across the state. Additionally, the Secretary of State is responsible for tracking notice responses and providing those responses to the EAC as part of the Election Administration and Voting Survey following every two years. The Secretary of State is planning improvements to the voter registration system, VoteWA, that will provide election administrators with a reliable and effective tool to transmit those communications to voters by mail. Additionally, under state law, these notices can be transmitted electronically, including by text message. This improves the notice response and accessibility of the response to all voters in the state of Washington.

27.    Timely, accurate, and accessible election results are important to the confidence of voters. The Secretary of State's Office has begun the process to overhaul the election results reporting system prior to the next federal election by starting a competitive solicitation. Once an apparently successful bidder is known, it is the Secretary of State's priority to provide voters and other stakeholders with a mobile friendly, accessible, and educational solution that provides election results for all federal, state, and local elections. The current election results reporting solution is 20 years old and no longer meets the expectations of the voters.

28.    To improve the accuracy and speed of voter registration processing, the Secretary of State's Office has consulted with a human centered design company, AnthroTech, to complete a user study during the 2024 general election. The outcomes of that study include improvements that would reduce lines at voting centers and voting assistance locations by improving the voter registration data entry. These improvements would also increase the accuracy of data entry by

providing a user-friendly and accessible interface that validates data entry. These improvements will also increase the accuracy and integrity of the voter registration database by providing more accurate data for use in the felon, death, mental competency, duplicate registration, and cross-state registration checks.

### Impacts of Documentary Proof of Citizenship Requirements

29.    The documentary proof of citizenship requirements in the executive order will create very significant costs in Washington.

30.    The executive order requires that a state or local official record on the Federal Form specific information about the type of document presented. This process would be handled by county officials as they are responsible for this type of processing of voter registration forms. However, the Office of the Secretary of State would have to make changes to the statewide voter registration database (known as VoteWA) to allow counties to record that information electronically. Based on past updates to the VoteWA databases, I estimate that this change would take at least 6 months and cost an estimated $237,000.

31.    In addition, to ensure uniform treatment of Washington residents, the Office of the Secretary of State will have to adopt regulations and develop and issue detailed guidance for counties, covering such topics as which specific documents do or do not qualify as documentary proof of citizenship, processes for determining whether the documentation is genuine, and specific procedures for keeping the information confidential. At a minimum, rulemaking typically requires 40 hours of staff time. I estimate that preparing guidance to implement the executive order will require an additional 700 hours of staff time. This work will necessarily divert limited staff time and resources away from other planned election improvements, such as those described above.

32.    Currently, state voter registration agencies use a version of the State Form for voter registration purposes. Substantively, the agency-based voter registration (ABVR) form is identical to the State Form. The difference is that the bottom left-hand corner indicates which

agency provided the form. This information is necessary for recordkeeping purposes and to monitor voter registration efforts at state voter registration agencies. Each agency-specific ABVR form is available in English and 22 other languages.

33.    The Office of the Secretary of State will have to assist state voter registration agencies in developing new ABVR forms that are equivalent to the new Federal Form required by the executive order. The Office of the Secretary of State will also have to assist state voter registration agencies in how to provide assistance to persons registering to vote through those agencies. This will all require staff time that must be diverted from other election processes.

34.    The Washington Health Benefits Exchange provides a URL link to the Secretary of State's online voter registration form. Under the executive order, that would not be possible because the State Form, which verifies citizenship based on a sworn attestation, is not virtually identical to the new Federal Form, which will require documentary proof of citizenship. Either the Washington Health Benefits Exchange must create its own ABVR form that requires documentary proof of citizenship or the Office of the Secretary of State must create a new online voter registration form that requires documentary proof of citizenship. Such a system would be different in kind from Washington's existing form, which does not involve applicants uploading documents. Based on past updates to online forms, I estimate that this change would take at least 6 months and cost an estimated $237,000.

35.    On April 11, 2025, the EAC executive director sent a letter to chief election officials. The letter stated that, "[c]onsistent with 52 U.S.C. § 20508(a)(2)," the EAC "is seeking consultation on development of the national mail voter registration form." A true and correct copy of this consultation letter is included as **Exhibit B**.

36.    On April 16, 2025, the EAC executive director sent a follow-up email stating that the responses to the consultation letter were due on May 2, 2025. A true and correct copy of this consultation letter is included as **Exhibit C**.

37.    In late April 2025, I attended the EAC Standards Board Meeting in Charlotte, North Carolina. All four EAC commissioners were present at this meeting. At the meeting, EAC General Counsel, Camden Kelliher, stated that the consultation letter was not the consultation required by the NVRA but was an additional, non-mandatory consultation letter. EAC Chair Donald Palmer also stated that regulations implementing the documentary proof of citizenship are "likely." This event took place after the preliminary injunction hearing in the D.C. case but before the court issued a preliminary injunction.

38.    On April 30, 2025, the EAC executive director sent an email that paused the solicitation of communications regarding implementing documentary proof of citizenship requirements in light of the preliminary injunction issued by the United States District Court for the District of Columbia. A true and correct copy of this email is included as **Exhibit D**.

39.    The Office of the Secretary of State (OSOS) maintains a "Guide to Registering Voters" to help individuals and organizations conducting voter registration drives. That guide is available online at https://www.sos.wa.gov/sites/default/files/2023-09/GuideToRegisteringVoters.pdf. That guide informs readers that a person must be a U.S. citizen in order to register to vote and directs readers to "[v]erify the registrant has answered the citizenship question (section 2)." The OSOS will need to update this guide if the executive order is not enjoined to clarify that voter registration drives using the Federal Form also include a documentary proof of citizenship requirement. This will necessarily divert staff time and resources away from our planned improvements to elections.

40.    The OSOS also maintains a Voter Registration Partner Training video, which is available online at https://www.youtube.com/watch?v=QfU7fH9gAg8. The video informs voters that "you just have to affirm that you are indeed a U.S. citizen." If the executive order is not enjoined, the OSOS will need to update this video to clarify the new distinction between the State Form and the Federal Form. This will necessarily divert staff time and resources away from our planned improvements to elections.

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

41.     The OSOS is already receiving telephone calls from voters who are confused about the executive order's documentary proof of citizenship requirements. The OSOS operates a voter hotline, and each call is either answered by staff or staff return a voicemail. Numerous voters have called wanting to know if they have to re-register to vote or to provide documentary proof of citizenship in order to receive a ballot for future elections. Other callers have questions about which specific types of documents will satisfy the executive order's requirements. Callers have expressed concerns about the cost to obtain documentary proof of citizenship and concerns about the effect of changing their last name. These types of calls always increase as we get closer to election day. As a result, the burden of responding to calls from voters about the executive order has already begun and, based on past experience, is certain to increase. This will require additional staff time.

42.     The OSOS is planning public education efforts about the executive order's requirements. This effort will be significant because voters will be seriously confused about what is and what is not required in Washington. The calls our office has already received show that some voters wrongly believe that they must show documentary proof of citizenship to continue to vote. I am very concerned that this confusion will result in voter suppression, with voters being afraid to cast a ballot because they have not provided documentary proof of citizenship.

43.     Public education efforts will involve engagement with media, a strategic messaging campaign, and utilizing social media. It will also involve mailings, if possible, and advertising, such as billboards, newspapers, and electronic ads. We would need to hire a vendor to assist and provide deliverables. Based on our recent experience with the "Mark the Ballot" public education campaign, I estimate that the public education campaign required as a result of the executive order would cost approximately $1,800,000 and involve approximately 800 hours of staff time.

44.     Documentary proof of citizenship is not required for Washington election officials to assess whether an applicant is eligible to register to vote. Washington has long relied

11

on sworn attestation and has never experienced significant numbers of noncitizens registering to vote.

### Impacts of Election Day Ballot Receipt Deadline

45.     Election officials in Washington routinely receive large numbers of ballots after election day that were postmarked on or before election day. In the 2024 general election, election officials received 119,755 such ballots. In the 2024 primary election, officials received 151,411 such ballots. In the 2020 general election, election officials received 196,833 such ballots. And in the 2020 primary election, election officials received 585,397 such ballots.

46.     Washington regularly has elections that are decided by narrow margins. For example, in the 2024 primary election, the margin between the second- and third-place finishers (determining which candidate would appear on the general election ballot) was only 51 votes out of the 1.9 million votes cast. As another example, in the 2022 general election, a race for the U.S. House of Representatives was decided by 2,629 votes.

47.     Rejecting tens of thousands or hundreds of thousands of ballots will undermine voter confidence in the integrity of election results, particularly for elections involving narrow margins and for elections where the public believes that the rejected ballots would disproportionately support one political party, candidate, or ballot measure.

48.     The executive order's ballot receipt deadline will also create very significant costs because federal and state races will be treated differently. The executive order only talks about including ballots in the tabulation for presidential electors and members of the U.S. House and Senate. Washington law will still require that votes cast in state elections be counted as long as the ballot is postmarked by election day. The usual process is that a team of election workers copy valid votes (here, votes for state and local offices and ballot measures) from the original ballot to a new ballot and then "spoiling" the old ballot. This always involves at least four election workers to be sure that the voter's choices are transferred correctly. This would be

exceptionally time-consuming and costly for counties. The OSOS will have to adopt additional rules and guidance and provide training on the processes.

49.    Some smaller counties in Washington have only two election workers. Complying with the documentary proof of citizenship requirements will be especially burdensome for these counties which, in all likelihood, will require assistance from the Office of the Secretary of State.

50.    Some Washington counties do not have enough election workers to collect ballots from all ballot drop boxes on election night. To ensure election integrity, election workers may only handle ballots in teams of two. These counties secure each ballot drop box at 8:00pm on election day to prevent any additional ballots from being deposited. A team of election workers then collects the ballots the following day. This primarily occurs in geographically large but sparsely populated counties, which may only be able to afford to hire two election workers for the entire county. If the executive order considers these ballots to be "received after Election Day," it will impose very significant costs on counties that have very limited budgets. These counties would have to hire and train enough election workers to have at least two for each drop box in the county.

51.    Each county in Washington must have at least one drop box for every 15,000 residents, and at least one ballot drop box in each city, town, or census-designated place with a post office. For the 2024 general election, there were 547 drop box locations and 67 voting centers. King County had 85 drop box locations, the most in the state.

**Impacts on Voting Systems in Washington**

52.    A voting system is essential to conduct elections successfully.

53.    Voting systems can have a variety of components and serve many functions. One component of a voting system is an accessible voting unit (AVU). AVUs are primarily designed for use by voters with disabilities, but they can be used by any voter in Washington. Voters make selections by touching the screen or using other accessibility equipment. Voters can also use

headphones to listen to the ballot. After voters make their selections, the AVU prints a paper ballot that the voter can then cast.

54.     Another component of a voting system is a tabulator. A tabulator scans ballots and tallies the votes cast on ballots.

55.     Voting systems are also used to create ballots.

56.     In Washington, each county chooses and purchases its own voting system. Each of Washington's 39 counties uses a voting system from one of four vendors: Hart InterCivic, Clear Ballot Group, Election Systems and Software, and Dominion Voting Systems.

57.     In Washington, 18 counties use the ClearVote 2.3 voting system from Clear Ballot Group, 16 counties use Verity 2.7 or Verity 2.5 from Hart InterCivic, 4 counties use EVS 6.4.0.0 from Election Systems and Software, and one county uses Democracy Suite 5.17 from Dominion. Each of these voting systems has been approved by the Secretary of State and has been certified to meet the EAC's Voluntary Voting System Guidelines 1.0.

58.     Two voting systems used by Washington counties are capable of using barcodes or quick response (QR) codes as part of the voting process. Specifically, Dominion's accessible voting unit allows a county to configure the unit to print a QR code or full ballot page, and Election Systems and Software's accessible voting unit prints a record that includes a barcode or QR code that contains voter selections.

59.     All voting systems in Washington provide a voter-verifiable record. The vast majority of ballots are paper ballots that were mailed to, and returned by, voters.

60.     In my role as Elections Director, I am familiar with the EAC's Voluntary Voting System Guidelines (VVSG). The VVSG is a set of technical standards for voting systems adopted by the EAC. Voting systems are tested against the VVSG standards as part of the EAC certification process.

61.     Manufacturers of voting systems can submit new or updated voting systems for testing by the two voting system test labs. These laboratories are private organizations that are

1    accredited by the EAC. Currently, there are only two accredited laboratories. Testing is a

2    rigorous and lengthy process, and the testing labs have limited capacity. The testing labs run a

3    variety of tests and procedures to ensure that that voting systems are safe, accessible, and

4    functional.

5        62.    The EAC accepts submissions of proposed changes to the VVSG from

6    stakeholders. The EAC's Testing and Certification Program consults with the National Institute

7    of Standards and Technology on the proposed changes. The EAC Testing and Certification

8    Program Director will then provide the Executive Director a report including recommended

9    updates to the VVSG. The report must be shared with the Technical Guidelines Development

10    Committee (TGDC) and is made available on the EAC's website. Feedback on the report is only

11    taken into consideration when deciding whether to make updates to the VVSG or not. If the

12    Executive Director decides to proceed with updating the VVSG, even if the TGDC does not

13    recommend the changes, then draft VVSG will be provided to the EAC's Board of Advisors and

14    Executive Board of the Standards Board for review and feedback.

15        63.    The draft VVSG also must be made available for a public comment period. After

16    comments and feedback are received, the EAC must review and address the comments. The

17    Executive Director then will provide the EAC Commissioners with the final draft of the revised

18    VVSG to vote on. The vote cannot take place less than 90 days from the date the draft was

19    provided to the Board of Advisors and Executive Board of the Standards Board. Adoption of

20    updated VVSG standards must be done with a quorum of Commissioners.

21        64.    When a new VVSG is adopted, the EAC does not decertify voting systems that

22    were certified under previous versions. In fact, under the VVSG Lifecycle Policy, the voting

23    system test labs continue to certify voting systems under previous versions for up to twelve

24    months after a new major version is adopted. Minor VVSG version changes do not limit the

25    availability of certification under prior versions.

26

65.     The EAC may decertify a voting system. The EAC's Lifecycle Policy requires that the EAC follow a process detailed in the EAC's Testing and Certification Program Manual and then a vote of the EAC Commissioners.

66.     All voting systems used in Washington have been certified to comply with VVSG 1.0 standards.

67.     The EAC adopted the VVSG 1.0 in 2005. This process took three years. The EAC made incremental revisions that resulted in VVSG 1.1, which it adopted in 2015. The process of adopting these incremental revisions took approximately three years, as the EAC had requested public comments on the proposed VVSG 1.1 in September 2012.

68.     In February 2021, the EAC adopted VVSG 2.0, which it describes as representing "the latest in both industry and technology best practices." This followed a 14 year development process that began in 2007. The voting system testing labs were not fully ready to test voting systems for compliance with VVSG 2.0 until November and December 2022. One voting system manufacturer submitted a system for testing under the VVSG 2.0 testing standard in February 2023. Others were submitted in August 2023, March 2024, and December 2024. At this time, no voting systems have been certified to comply with VVSG 2.0.

69.     None of the voting systems used by Washington counties have been certified to comply with VVSG 2.0, because no such systems currently exist. Similarly, none of the voting systems in Washington are certified to the amended VVSG 2.0 required by the executive order because those guidelines do not exist, and, accordingly, no voting systems have been certified to them.

70.     Due to the importance of carefully reviewing changes to the VVSG and the need for rigorous testing, it is simply not possible to update the VVSG and certify new voting systems in 180 days.

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

71.    The executive order requires that, within 180 days, the EAC must recertify existing voting systems under a standard that does not yet exist and decertify all other voting systems; 180 days from the executive order is September 21, 2025.

72.    This does not mean that the decertified systems are unreliable or insecure. To the contrary, all currently certified systems used in Washington have been repeatedly shown to be reliable and secure. This was shown through testing by independent testing authorities designated by the EAC, and through the many tests and audits to which those systems have been subjected in Washington, both before and after each election.

73.    Even so, if counties use voting systems that are federally decertified as a result of this executive order, that will result in decreased confidence in election integrity. Over the past decade, the OSOS has seen a sharp rise in voters who believe that voting systems are not secure. Currently, our office is able to point to federal certification when voters have questions. If these voting systems are federally decertified as a result of the executive order, that fact will be misrepresented and weaponized to further undermine voter confidence.

74.    If, as a result of the executive order, counties choose to hand count ballots instead of using a voting system to tabulate them, the process will be more time consuming and expensive and the results will be less accurate. Recounts in Washington elections happen regularly, particularly in local elections. When election officials hand counted ballots before adopting electronic systems to tabulate ballots, the vote totals would often meaningfully change during a recount. For example, in 1968, there was a statewide mandatory recount for the State Attorney General. The difference in votes cast in the November 5, 1968 general election between the two candidates, Slade Gorton (601,993) and John G. McCutcheon (596,021) was 5,972 votes. Following the recount, the difference between the candidates was 5,368 votes—a 604 vote difference. With electronic voting systems that tabulate ballots, there is very little change following a recount. For example, in 2024, there was a statewide mandatory hand recount for the Commissioner of Public Lands. The difference in votes cast in the August 6, 2024 primary

between the two candidates, Dave Upthegrove (396,300) and Sue Kuehl Pederson (396,249) was only 51 votes. Following the recount, the difference between the candidates was 49 votes—a two vote difference.

75.    If all counties in Washington adopt a single voting system that is certified to a new VVSG standard, that will undermine election security, increase costs, and reduce options. Using multiple voting systems in Washington creates an additional layer of security, as it is more difficult for bad actors to exploit any vulnerabilities. Having multiple options also increases competition and allows counties to obtain better deals when purchasing voting systems. Counties also have different needs that can be better served by different voting systems. For example, some counties have used instant runoff voting in their elections.

### Federal Funding for Washington Elections

76.    Since 2020, the Washington Secretary of State has received over $20 million in grants from the EAC. Washington has used this money for a variety of election-related improvements, particularly around cybersecurity. For example, the Secretary of State's Office was able to allocate $4 million dollars for county election offices to improve the physical and cyber security of the election offices, voting centers, and ballot drop boxes. The Office of the Secretary of State was also able to establish the Information Security and Response Division that provides security monitoring of the voter registration system, VoteWA, as well as provide consultation and guidance to all counties.

77.    When funds are appropriated by Congress for the improvement of election administration and election security, the EAC makes those grant funds available to the States and U.S. territories. In 2022, 2023, and 2024, it was approximately $1,000,000. This year, Washington was awarded and recently received a $272,727 grant. These funds are typically received in March or April of each year.

DECLARATION OF STUART HOLMES
NO. 2:25-cv-00602-JHC

18

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1        I declare under penalty of perjury under the laws of the State of Washington and the

2    United States of America that the foregoing is true and correct.

3        DATED this 23rd day of May 2025.

4

5

6                            STUART HOLMES

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF STUART HOLMES
NO. 2:25-cv-00602-JHC

19

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744