1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

The Honorable John H. Chun

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

STATE OF WASHINGTON; and,
STATE OF OREGON,

               Plaintiffs,

               v.

DONALD TRUMP, et al.,

               Defendants.

NO. 2:25-cv-00602-JHC

BRIEF OF *AMICI CURIAE*
LOCAL ELECTIONS OFFICIALS
IN SUPPORT OF PLAINTIFFS'
MOTION FOR PARTIAL
SUMMARY JUDGMENT

**BRADLEY BERNSTEIN SANDS LLP**
2800 FIRST AVENUE, SUITE 326
SEATTLE, WA 98121
206.337.6551

# TABLE OF CONTENTS

STATEMENT OF INTEREST ................................................................1

SUMMARY OF ARGUMENT ............................................................2

ARGUMENT ......................................................................................3

I.    THE EXECUTIVE ORDER'S DOCUMENTARY PROOF OF CITIZENSHIP REQUIREMENTS ARE UNLAWFUL, IMPRACTICAL, AND DISENFRANCHISING ........................................3

    A.    Section 2(a) Would Disenfranchise Voters ..........................................3

    B.    Section 2(a) Would Cause Significant Disruption to Local Election Administration ..............................................................8

    C.    Noncitizen Voting Is Very Rare .........................................................12

II.    THE EXECUTIVE ORDER'S IMPROPER ATTEMPT TO ALTER STATE BALLOT RECEIPT DEADLINES WOULD LEAD TO VOTER DISENFRANCHISEMENT, CAUSE ADMINISTRATIVE CONFUSION, AND PLACE BURDENS ON LOCAL ELECTIONS OFFICIALS ..........................................................14

    A.    Section 7 Would Lead to Voter Disenfranchisement .........................15

    B.    Section 7 Creates Administrative Confusion and Burdens ...............16

III.    THE EXECUTIVE ORDER'S VOTING SYSTEM GUIDELINES REQUIREMENTS ARE UNLAWFUL AND UNREALISTIC ..............18

    A.    Section 4(b) Is Unworkable .................................................................19

    B.    Enforcement of Sections 4(b) and 4(d) Would Create an Administrative and Budgetary Disaster for Impacted Local Governments ..............................................................................21

CONCLUSION ...................................................................................24

Appendix A – List of *Amicus Curiae* Local Elections Officials ..........................26

BRIEF OF *AMICI CURIAE* LOCAL
ELECTIONS OFFICIALS
NO. 2:25-CV-00602

i

**BRADLEY BERNSTEIN SANDS LLP**
2800 FIRST AVENUE, SUITE 326
SEATTLE, WA  98121
206.337.6551

# TABLE OF AUTHORITIES

**CASES**

*Coal. for Open Democracy v. Formella*,
    24-cv-00312 (D.N.H.)...................................................................................7

*Democratic Nat'l Comm. v. Wisconsin State Legislature*,
    141 S. Ct. 28 (2020)..................................................................................24

*Fish v. Schwab*,
    957 F.3d 1105 (10th Cir. 2020) ........................................................4, 5, 13

*Kobach v. U.S. Election Assistance Comm'n*,
    772 F.3d 1183 (10th Cir. 2014) ................................................................4

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
    2025 WL 1187730 (D.D.C. Apr. 24, 2025) .............................................4

*Mi Familia Vota v. Fontes*,
    719 F. Supp. 3d 929 (D. Ariz. 2024) .................................................13, 14

*N.H. Youth Movement v. Scanlan*,
    24-cv-00291 (D.N.H) .................................................................................7

**STATUTES**

2 U.S.C. § 7.................................................................................................14

3 U.S.C. § 1.................................................................................................14

42 U.S.C. § 405 (note) ...............................................................................12

49 U.S.C. § 30301 (note) .............................................................................5

52 U.S.C. § 20962(b) .................................................................................20

52 U.S.C. § 20501(a) ...........................................................................1, 3, 4

52 U.S.C. § 20501(b) ...............................................................................4, 6

52 U.S.C. § 20506(a) ...................................................................................4

52 U.S.C. § 20507........................................................................................13

52 U.S.C. § 20508(b) ...............................................................................3, 4

BRIEF OF *AMICI CURIAE* LOCAL
ELECTIONS OFFICIALS
NO. 2:25-CV-00602

ii

**BRADLEY BERNSTEIN SANDS LLP**
2800 FIRST AVENUE, SUITE 326
SEATTLE, WA 98121
206.337.6551

52 U.S.C. § 20962 ........................................................................ 18

52 U.S.C. § 20962(a) .................................................................. 20

52 U.S.C. § 20962(c) .................................................................. 20

Mich. Comp. Laws § 168.497(1)-(2) ........................................... 9

Mich. Comp. Laws § 168.795a(1) .............................................. 18

N.J. Rev. Stat. §§ 19:48-1–19:48-2 ............................................ 18

Nev. Rev. Stat. § 293B.063 ......................................................... 18

Or. Rev. Stat. § 247.292 ............................................................. 13

Or. Rev. Stat. § 247.555 ............................................................. 13

Or. Rev. Stat. § 247.563 ............................................................. 13

Or. Rev. Stat. § 247.570 ............................................................. 13

25 Pa. Stat. § 1329 ..................................................................... 13

Wash. Rev. Code §§ 29A.08.810-.850 ....................................... 13

**CONSTITUTIONAL PROVISIONS**

Cal. Const. art. XX, § 3 ................................................................ 1

Mich. Const. art. XI, § 1 .............................................................. 1

N.M. Const. art. XX, § 1 .............................................................. 1

**EXECUTIVE ORDERS**

Executive Order No. 14248, 90 Fed. Reg. 14005 (Mar. 25, 2025) ................. passim

**OTHER AUTHORITIES**

*Apply for your First Adult Passport*, U.S. Dep't of State ......................................... 6

*Birth, death, and other vital records*, Colorado Dep't of Public Health and
Environment ............................................................................. 6

Caitlyn Freeman & Jenn Smith, *As Real ID deadline becomes reality, WA
wait times stretch really long*, THE SEATTLE TIMES (May 6, 2025) ................. 10

BRIEF OF *AMICI CURIAE* LOCAL
ELECTIONS OFFICIALS
NO. 2:25-CV-00602

iii

**BRADLEY BERNSTEIN SANDS LLP**
2800 FIRST AVENUE, SUITE 326
SEATTLE, WA  98121
206.337.6551

*Celebrate National Voter Registration Day!*, City of Madison (Sept. 16, 2024) ............................................................................................. 8

Christine McLarty, *Public invited to demonstration of new voting machines*, ABC NEWS27 (Dec. 17, 2018) ........................................... 22

H.R. Rep. No. 115-150 (2017) (Conf. Rep.)........................................... 12

Holly Ramer, et. al., *New Hampshire town elections offer a preview of citizenship voting rules being considered nationwide*, ASSOCIATED PRESS (Mar. 25, 2025) ...................................................................... 7

Jillian Rothschild, et. al., *Who Lacks Documentary Proof of Citizenship?*, Center for Democracy and Civic Engagement (Mar. 2025) ............... 6

Letter from Nat'l Ass'n of Sec's of State and Nat'l Ass'n of State Election Directors to Postmaster General Louis DeJoy (Sept. 11, 2024) ...................... 16

Mark Cavitt, *State approves 10-year contracts for new voting equipment*, THE OAKLAND PRESS (Jun. 17, 2021) ................................................. 22

Matt Mencarini, *Township clerks run elections for half of Michigan residents. But what if no one wants the job?*, LANSING STATE JOURNAL (Oct. 23, 2024) .......................................................................... 9

*Mobile Voter Services Satellite Office Outreach*, Montgomery County (May 2, 2025).............................................................................. 8

*Mobile Voter Services Satellite Office Outreach*, Montgomery County (May 8, 2025).............................................................................. 8

Nicole C. Brambila, *Allegheny County's $20 million deal for a new voting system moves forward, but plans on installing and training are still in the works*, PUBLICSOURCE (Jan. 17, 2020) ......................................... 22

Nikki DeMentri & Tom Gardiner, *On final day of mail ballot voting on demand in Pennsylvania, Bucks County voters face long lines*, CBS NEWS (Oct. 30, 2024) ...................................................................... 10

Olivia Rubin, *Georgia voter roll audit finds only 20 noncitizens out of 8 million registered voters*, ABC NEWS (Oct. 23, 2024) ..................... 14

*Processing Times*, Commonwealth of Pennsylvania ............................... 6

Steve Simon, *ICYMI: Secretary Simon Remarks on Federal Support for Election Security*, Office of the Minnesota Secretary of State (Mar. 4, 2025) ................................................................................ 12

BRIEF OF *AMICI CURIAE* LOCAL
ELECTIONS OFFICIALS
NO. 2:25-CV-00602

iv

**BRADLEY BERNSTEIN SANDS LLP**
2800 FIRST AVENUE, SUITE 326
SEATTLE, WA  98121
206.337.6551

*Table 11: Receipt and Postmark Deadlines for Absentee/Mail Ballots*, National Conference of State Legislatures (May 12, 2025) ............................ 15

Technical Guidelines Development Committee, *Voluntary Voting System Guidelines VVSG 2.0* (Feb. 10, 2021) ................................................................ 18

Tom Sofield, *Bucks County Spends $5.2 Million For New Voting Machines*, Levittown Now (Dec. 5, 2019) ...................................................... 23

Trishna Begam, *Center for Internet Security facing federal funding cuts*, News10 (Apr. 22, 2025) ............................................................................ 12

*U.S. courts prepare for increase in election lawsuits*, American Bar Association (Oct. 28, 2024) ........................................................................ 17

U.S. Election Assistance Comm'n, *Board of Advisors* (May 20, 2025) ................. 20

U.S. Election Assistance Comm'n, *Certified Voting Systems* (Jan. 9, 2024) ......... 21

U.S. Election Assistance Comm'n, Dkt. No. EAC-2013-0004, *Mem. Concerning State Requests to Include Additional Proof-of-Citizenship Instructions on the National Voter Registration Form* (Jan. 17, 2014) ........ 8, 13

U.S. Election Assistance Comm'n, OMB Control No. 3265-0015, *National Voter Registration Application Form for U.S. Citizens* .................... 11

U.S. Election Assistance Comm'n, *Standards Board* (May 15, 2025) ................... 20

U.S. Election Assistance Comm'n, *Technical Guidelines Development Committee (TGDC) Member Roster* (Feb. 24, 2025) ....................................... 20

U.S. Election Assistance Comm'n, *Voluntary Voting System Guidelines (VVSG) Migration* (Jan. 9, 2024) ....................................................................... 21

U.S. Gov't Accountability Office, GAO-18-294, *Observations on Voting Equipment Use and Replacement* (Apr. 2018) ............................................ 20, 21

*VoteCal*, California Secretary of State ..................................................................... 11

Wayne Schutsky, *Arizona counties are contacting 200,000 voters who haven't provided proof of citizenship*, KJZZ Phoenix (Apr. 2, 2025) .............. 5

Yvonne Wingett Sanchez & Patrick Marley, *Grants tie Trump's anti-DEI order to election security money*, Wash. Post (Apr. 29, 2025) ...................... 24

BRIEF OF *AMICI CURIAE* LOCAL
ELECTIONS OFFICIALS
NO. 2:25-CV-00602

v

BRADLEY BERNSTEIN SANDS LLP
2800 FIRST AVENUE, SUITE 326
SEATTLE, WA 98121
206.337.6551

1

**STATEMENT OF INTEREST**

2

*Amici* are local elections officials from 33 jurisdictions across the country and sign this

3  brief in their individual capacities in support of Plaintiffs' Motion for Partial Summary Judgment

4  concerning the executive order entitled, "Preserving and Protecting the Integrity of American

5  Elections." Executive Order No. 14248, 90 Fed. Reg. 14005 (Mar. 25, 2025) ("EO," or

6  "Executive Order").[1] Like some of the motion's declarants, *amici* are responsible for

7  administering local, state, and federal elections in their respective localities. Upon taking office,

8  many *amici* swore to uphold or defend the United States Constitution,[2] including the right to

9  vote, and are duty-bound under the National Voter Registration Act ("NVRA") to "promote the

10  exercise of that right." 52 U.S.C. § 20501(a)(2). All are unified in their commitment to ensuring

11  that every eligible voter has an opportunity to cast a ballot. To carry out these duties, *amici*

12  develop policies and procedures for their offices, train staff and poll workers, educate voters,

13  and respond to real-time constituent needs within their respective states and localities.

14      As the front-line workers of election administration, *amici* are well-positioned to

15  understand the practicalities of running elections and write to offer their perspective on the

16  potential impact of the EO to the Court. Variances in state election codes mean that local

17

18      [1] No party or party's counsel authored this brief in whole or in part. No party or party's
19  counsel contributed money intended to fund preparation or submission of this brief. A list of all
*amici* is attached at Appendix A.

20      [2] *See, e.g.*, Cal. Const. art. XX, § 3 ". . . all public officers and employees . . . swear (or
21  affirm) [to] support and defend the Constitution of the United States . . . ."); Mich. Const. art. XI,
§ 1 ("All officers . . . [swear to] support the Constitution of the United States . . . ."); N.M. Const.
22  art. XX, § 1 ("Every person elected or appointed to any office shall . . . take and subscribe to an
23  oath or affirmation that he will support the constitution of the United States . . . .").

BRIEF OF *AMICI CURIAE* LOCAL
ELECTIONS OFFICIALS
NO. 2:25-CV-00602

1

**BRADLEY BERNSTEIN SANDS LLP**
2800 FIRST AVENUE, SUITE 326
SEATTLE, WA  98121
206.337.6551

1    elections officials across the country do not share the exact same day-to-day experience—some

2    serve hundreds of thousands of voters, running bustling offices with multiple staff members,

3    while others serve individual townships, operating part-time as a jurisdiction's sole election

4    administrator. But while their day-to-day operations may differ, *amici* agree on the effects of the

5    EO: it would disenfranchise voters and seriously disrupt local election administration.

## SUMMARY OF ARGUMENT

7       In addition to being *ultra vires*, the EO's one-size-fits-all directives that purport to override

8    authority belonging to states, local governments, and the independent Election Assistance

9    Commission ("EAC"), would severely disrupt elections at the state and local level. The EO

10   instructs the EAC to require voters to present documentary proof of citizenship to register to

11   vote. Such a requirement would make it more difficult to register, contrary to the purposes of

12   federal statutes passed to make it easier for eligible voters to exercise their right to vote. The

13   requirement would also compromise state and local election administration resources that are

14   already stretched thin by adding burdensome steps to registration processes. Likewise, the EO

15   directs states to stop accepting and counting mail-in ballots that arrive after Election Day, often

16   in violation of states' own election laws. If implemented, this change would also cause voter

17   disenfranchisement and increase election administration workloads. Finally, the EO seeks to

18   unilaterally de-certify *every* voting machine currently in use in the United States, making it

19   impossible for any local election office to conduct an election without high risk of severe

20   disruption and potentially costing local and state governments hundreds of thousands to millions

21   of dollars. To operate elections to the best of their ability and to attempt to prevent as much

22   disenfranchisement as possible, many local and state elections officials are already preparing for

23   the fallout if the EO is implemented, drawing important resources away from their day-to-day

BRIEF OF *AMICI CURIAE* LOCAL
ELECTIONS OFFICIALS
NO. 2:25-CV-00602

2

BRADLEY BERNSTEIN SANDS LLP
2800 FIRST AVENUE, SUITE 326
SEATTLE, WA 98121
206.337.6551

election administration responsibilities. *Amici* request that the Court grant the Plaintiffs' partial summary judgment motion.

## ARGUMENT

### I. THE EXECUTIVE ORDER'S DOCUMENTARY PROOF OF CITIZENSHIP REQUIREMENTS ARE UNLAWFUL, IMPRACTICAL, AND DISENFRANCHISING

In addition to being unlawful, the EO's documentary proof of citizenship ("DPOC") directives would disenfranchise voters and cause significant disruption to the orderly administration of elections at the local level. The EO directs the EAC to take action to require DPOC to register to vote using the National Mail Voter Registration Form (the "Federal Form"), a registration form prescribed by the NVRA. 52 U.S.C. §§ 20505(a)(1), 20508(b). In addition to ordering the EAC to "take appropriate action to require" DPOC as part of the Federal Form, Executive Order § 2(a)(i)(A), the EO also requires state or local officials who process Federal Forms to record information about each registrant's DPOC "while taking appropriate measures to ensure information security," *id*. § 2(a)(i)(B).

The President cannot order these changes. *See* Pl. Mot. for Part. Summ. J. at 9–12 ("Pl. Br."), ECF No. 37. Congress and the EAC have both already considered, and rejected, the prospect of adding proof of citizenship requirements to the voter registration process. Such requirements would disenfranchise voters and significantly disrupt the orderly administration of elections. The President does not have authority to override those decisions by executive order, including by mandating the result of the EAC's consideration.

#### A. Section 2(a) Would Disenfranchise Voters

Implementation of the EO's DPOC requirements would frustrate the purposes of the NVRA by making it harder to vote. It would require voter registration applicants who do not

1  have official copies of DPOC at home to overcome administrative hurdles to obtain DPOC in

2  advance of registration deadlines, straining scarce local government resources and rendering

3  ineffective the efforts of *amici* to fulfill their duty to make voter registration accessible to all

4  eligible voters. 52 U.S.C. § 20501(a). Indeed, one court has already found "a substantial risk

5  that, absent an injunction, . . . citizens will be disenfranchised in the present federal election

6  cycle" because of the EO's DPOC requirement. *League of United Latin Am. Citizens v. Exec.*

7  *Off. of the President*, 2025 WL 1187730, at *43 (D.D.C. Apr. 24, 2025) (quotation omitted).

8        Congress passed the NVRA to "*increase* the number of eligible citizens who register to

9  vote in elections for Federal office . . . [and] make it possible for Federal, State, and local

10  governments to implement this chapter in a manner that *enhances* the participation of eligible

11  citizens as voters . . . ." 52 U.S.C. § 20501(b) (emphasis added). The NVRA created the Federal

12  Form, which participating states must accept to register voters, *id*. § 20505(a)(1), along with any

13  "equivalent" forms of their own, *id*. § 20506(a)(6). Congress has already determined how the

14  Form may evaluate citizenship: by including an attestation from the voter that they are eligible

15  to vote. *Id*. § 20508(b)(2)–(3); *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1195

16  n.7 (10th Cir. 2014) ("Both houses of Congress debated and voted on the specific question of

17  whether to permit states to require [DPOC] in connection with the Federal Form, and ultimately

18  rejected such a proposal.").

19        It falls to many of *amici* to effectuate voter registration under the NVRA, and to them, the

20  reasoning of Congress in rejecting DPOC requirements is intuitive: more barriers to voting lead

21  to more disenfranchisement. That conclusion is not mere conjecture. When Kansas attempted to

22  impose DPOC requirements in 2011, that requirement prevented 31,089 applicants from

23  registering to vote, *Fish v. Schwab*, 957 F.3d 1105, 1127–1128 (10th Cir. 2020), even though

BRIEF OF *AMICI CURIAE* LOCAL
ELECTIONS OFFICIALS
NO. 2:25-CV-00602

**BRADLEY BERNSTEIN SANDS LLP**
2800 FIRST AVENUE, SUITE 326
SEATTLE, WA 98121
206.337.6551

the evidence did not show a substantial number of noncitizens on the rolls, *id*. at 1144. And in Arizona, where state law has required some form of proof of citizenship in state and local elections for over 20 years, county recorders are still grappling with paperwork issues, costing significant time to follow up with voter registration applicants who did not submit correct documentation in initial applications.[3]

This result is not surprising. To start, many eligible voters simply do not have proof of citizenship readily available. The EO's DPOC requirement appears to be met through production of a passport; military ID that indicates citizenship; or photo ID along with additional proof of citizenship. Executive Order § 2(a)(ii).[4] To someone removed from realities of voter registration, requiring DPOC may appear to make sense, but *amici* know that it in fact presents significant challenges for many eligible voters that can ultimately result in disenfranchisement. Millions of eligible voters do not have traditional forms of DPOC like birth certificates ready to produce.[5]

---

[3] Wayne Schutsky, *Arizona counties are contacting 200,000 voters who haven't provided proof of citizenship*, KJZZ Phoenix (Apr. 2, 2025), https://perma.cc/9EE8-UZ68 (Election officials are reaching out to an estimated 200,000 voters to resolve these issues; one official said she is handling them in batches "to give my small staff the ability to keep up with the influx of calls and responses.").

[4] What qualifies as additional proof is unspecified in the order, a source of confusion and concern for local elections officials. In addition to standalone proof of citizenship documents (a passport or certain kind of military ID), the EO states that a REAL ID-compliant document that "indicates the [voter registration] applicant is a citizen of the United States" would also qualify as DPOC. EO § 2(a)(ii)(B). But the REAL ID Act does not require states to indicate citizenship status on the REAL ID card, and thus few do. REAL ID Act § 202(c)(2)(B) (codified at 49 U.S.C. § 30301 (note)).

[5] A University of Maryland Survey conducted to gauge the potential impact of the SAVE Act, legislation that would require DPOC to register to vote, found that "[o]ver 21.3 million

BRIEF OF *AMICI CURIAE* LOCAL
ELECTIONS OFFICIALS
NO. 2:25-CV-00602

**BRADLEY BERNSTEIN SANDS LLP**
2800 FIRST AVENUE, SUITE 326
SEATTLE, WA  98121
206.337.6551

Requiring DPOC would disproportionately disenfranchise groups that include elderly voters, whose birth certificates were issued long ago; tribal members, whose documents may not align with federal standards; university students, who may live away from their residences for part of the year; unhoused people, who may not have secure locations to store documentation or reliable mailing addresses to receive documentation; eligible incarcerated voters, whose access to documentation is restricted; and low-income voters, for whom paying for new copies of DPOC is prohibitive, among many others.

The impact of the DPOC requirement is not limited to these groups. It can also make voter registration harder for anyone experiencing other life events around the time of a registration deadline, contrary to the goal of the NVRA to increase registrations. 52 U.S.C. § 20501(b). For example, many local governments run passport acceptance facilities responsible for processing passport applications, which can leave passport applicants without DPOC as registration deadlines approach. Someone using their official birth certificate to apply for a passport will have to hand over citizenship documentation for the duration of the passport processing time, which can be over two months.[6] New birth certificates can take weeks to process.[7] Eligible voters

---

eligible voters (9%) across the county do not have, or do not have easy access to, DPOC." Jillian Rothschild, et. al., *Who Lacks Documentary Proof of Citizenship?*, at 3, CENTER FOR DEMOCRACY AND CIVIC ENGAGEMENT (Mar. 2025), https://perma.cc/XRT4-KJWD.

[6] *Apply for your First Adult Passport*, U.S. Dep't of State, https://perma.cc/83G7-QKJ3 (indicating that passport applicants nationwide should allow for up to ten weeks to receive their passport in the mail between processing and mailing times).

[7] *See, e.g.*, *Processing Times*, Commonwealth of Pennsylvania, https://perma.cc/VZ7P-FBSJ (birth certificates take about three weeks to process); *Birth, death, and other vital records*, Colorado Dep't of Public Health and Environment, https://perma.cc/NHZ9-YMRT (normal vital

BRIEF OF *AMICI CURIAE* LOCAL
ELECTIONS OFFICIALS
NO. 2:25-CV-00602                    6                    BRADLEY BERNSTEIN SANDS LLP
2800 FIRST AVENUE, SUITE 326
SEATTLE, WA 98121
206.337.6551

1    who do not have voting registration deadlines top of mind when applying for a passport can thus

2    have their right to vote ensnared by red tape.

3        *Amici* also are concerned about the documentation required of people who have changed

4    their name. The experience of New Hampshire, which just adopted a new voter identification

5    law requiring DPOC to register, has shown that this concern is not hypothetical. While the impact

6    of the law is still being assessed in litigation,[8] news reports indicate that multiple people

7    attempting to register and vote in a recent lower-turnout local election had to be turned away,

8    including one who did not have documentation from her first marriage in the 1970s, while at

9    least one other voter who had changed her name in marriage had to make three trips to her polling

10    place before she was able to vote due to confusion over the identification requirements related

11    to her name change.[9]

12        Finally, some *amici* run voter registration drives in the community to meet eligible voters

13    where they are—an effort that would be stymied by DPOC requirements. For example, one

14    *amici's* elections office in Madison, Wisconsin prides itself on attending community events to

15    register voters. Their National Voter Registration Day activities in 2024 included events held at

16

17

18

19    records processing time is thirty business days).

20        [8] *See N.H. Youth Movement v. Scanlan*, 24-cv-00291 (D.N.H) (Compl. filed Sept 17, 2024);
      *Coal. for Open Democracy v. Formella*, 24-cv-00312 (D.N.H.) (Compl. filed Sept. 30, 2024).

21

22        [9] Holly Ramer, *et. al.*, *New Hampshire town elections offer a preview of citizenship voting
      rules being considered nationwide*, ASSOCIATED PRESS (Mar. 25, 2025), https://perma.cc/V4K2-
      U4S6.

23

BRIEF OF *AMICI CURIAE* LOCAL
ELECTIONS OFFICIALS
NO. 2:25-CV-00602

BRADLEY BERNSTEIN SANDS LLP
2800 FIRST AVENUE, SUITE 326
SEATTLE, WA  98121
206.337.6551

food pantries, botanical gardens, pizza shops, libraries, churches, and bakeries.[10] And Montgomery County, Pennsylvania, invested in a voter services van to reach voters where they are. In May 2025, it was scheduled to register voters and perform other voter services at a town's "First Friday" community event and at a shopping mall.[11] If registration required DPOC, *amici* in counties that provide such services would find their efforts to fulfill their duty to promote registration to be ineffective under the EO's directives: most people do not bring their passports or birth certificates to pick up their pizza.[12]

## B. Section 2(a) Would Cause Significant Disruption to Local Election Administration

Local elections offices would face extensive administrative challenges if the EAC were to carry out the EO's direction to require DPOC on the Federal Form. Executive Order § 2(a). The directive to review and record DPOC would require significant staff time and resources, already strained in many local elections offices.

First, DPOC review would require additional policy development and training for staff,

---

[10] *Celebrate National Voter Registration Day!*, City of Madison (Sept. 16, 2024), https://perma.cc/V9J3-DF5K.

[11] *Mobile Voter Services Satellite Office Outreach*, Montgomery County (May 2, 2025), https://perma.cc/5HPA-KHP2; *Mobile Voter Services Satellite Office Outreach*, Montgomery County (May 8, 2025), https://perma.cc/DC5B-BMEY.

[12] The EAC identified the harmful effect of DPOC requirements on community voter registration drives when rejecting Arizona's and Kansas's bids to add DPOC to the Federal Form in 2014. U.S. Election Assistance Comm'n, Dkt. No. EAC-2013-0004, *Mem. Concerning State Requests to Include Additional Proof-of-Citizenship Instructions on the National Voter Registration Form*, at 42 (Jan. 17, 2014), https://perma.cc/28DY-6RV9 (The EAC found that requiring DPOC could "discourage the conduct of organized voter registration programs, undermining one of the statutory purposes of the Federal Form.").

followed by creation and dissemination of voter education materials. In addition to spending time answering calls from confused voters, *amici* and their staff would have to devote time to proactive education about the change. Such outreach would vary by county depending on resources and voter needs, but could include updating website and social media materials, taking out ad space on the radio, sending mailers, and translating all such outreach materials into languages sufficient to reach all voters in their communities. For many local and state elections offices, it is "entirely possible there would not be sufficient funding to mount even the smallest of information campaigns." Farmer Decl. ¶ 23, Pl. Br., ECF No. 42.

Second, DPOC review would require additional staff time to process each Federal Form in states where local officials would be responsible for such review. In many cases, this is simply not possible with current staff and infrastructure. If every voter registration application took even a few more minutes to process, offices could be overwhelmed. In smaller jurisdictions, minimal staff and resources can make it difficult to tolerate major administrative changes. For example, in Michigan, local clerks who are responsible for carrying out voter registration often work part time in smaller townships, without any support staff. Mich. Comp. Laws § 168.497(1)–(2) (qualified individuals may register to vote with township clerks).[13] These part-time clerks may not be sufficiently resourced to review and record paperwork required to prove citizenship on top of their existing duties. In mid-size and larger jurisdictions, some local elections officials believe that they would need to open more offices to accommodate the DPOC requirement. *See,*

---

[13] Matt Mencarini, *Township clerks run elections for half of Michigan residents. But what if no one wants the job?*, LANSING STATE JOURNAL (Oct. 23, 2024), https://perma.cc/BAQ8-283T (For example, a clerk in Noble Township in Michigan serves 400 voters on a salary of $4,000 per year and cannot afford basic office resources like a photocopier.).

1    *e.g.*, Kimsey Decl. ¶ 9, Pl. Br., ECF No. 44.

2        Longer processing times could overload local government functions beyond elections as

3    eligible voters rush to vital records offices to get DPOC like birth certificates in time to meet

4    voter registration deadlines. *Amici* have seen these rushes cause service bottlenecks as deadlines

5    approach in the voting context, requiring additional staff time to meet voter needs and creating

6    longer wait times for voters.[14] Adding steps to review and record DPOC would not only worsen

7    these long waits and overtime hours at offices that process voter registration, but also would

8    extend such bottlenecks to other local government offices that process identification documents.

9        Apart from general administrative burdens, the EO also creates an unfunded requirement

10   that election officials collect and store sensitive data—an endeavor that could require building

11   new databases and increasing cybersecurity. Specifically, it requires state or local officials to

12   record information about the DPOC, including sensitive information like any "unique

13   identification number associated with the document," while also "tak[ing] appropriate measures

14   to ensure information security." Executive Order § 2(a)(i)(B).

15       First, the process of creating the data infrastructure to store DPOC information would be

16   enormous. Most local elections offices are not already in the business of processing and storing

17   citizenship documentation. Building appropriate systems to accommodate this new undertaking

18   ─────────────────

19   [14] Nikki DeMentri & Tom Gardiner, *On final day of mail ballot voting on demand in

20   Pennsylvania, Bucks County voters face long lines*, CBS NEWS (Oct. 30, 2024),
     https://perma.cc/VWT7-K3BB. In a recent example of ID-related bottlenecks, governments have

21   been overwhelmed by appointments to obtain REAL IDs, even though the REAL ID deadline has
     been pushed back repeatedly for years. Caitlyn Freeman & Jenn Smith, *As Real ID deadline

22   becomes reality, WA wait times stretch really long*, THE SEATTLE TIMES (May 6, 2025),
     https://perma.cc/6M7W-F9SH.

23

BRIEF OF *AMICI CURIAE* LOCAL                    10              BRADLEY BERNSTEIN SANDS LLP
ELECTIONS OFFICIALS                                              2800 FIRST AVENUE, SUITE 326
NO. 2:25-CV-00602                                                      SEATTLE, WA  98121
                                                                          206.337.6551

would be a complicated and time-consuming endeavor. It would require analyzing current data processing capabilities against new needs, including compatibility with state-level databases[15]; determining how to accommodate complex data entry fields like Section 2(a)(ii)(D)'s photo identification "accompanied by proof of United States citizenship"; reviewing state data privacy laws to determine whether there are specific storage requirements; building out the infrastructure to accommodate the changes; testing processes; and training staff to use the systems. Depending on how offices store data, recording DPOC could also require additional staff time when producing information for public records requests, because local elections offices would have to ensure that any personally identifiable information ("PII") is not included in such productions.

Second, storing sensitive PII would require additional cybersecurity resources. Best data security practices begin with limiting the amount of PII that an organization, including a local government, processes and maintains. Nearly all states that use the Federal Form require that applicants fill out only the last four digits of their Social Security number if a driver's license number is not available or is not an option under state law.[16] Such limited data collection is in line with standard data privacy practices that focus on minimizing sensitive data collection,

---

[15] For example, in California, counties have their own election management systems and would have to devote resources to ensuring that those systems are compatible with the statewide "VoteCal" system when it comes to DPOC records. *VoteCal*, California Secretary of State, https://perma.cc/8W53-CMV5 (county election management systems are "fed into" VoteCal).

[16] U.S. Election Assistance Comm'n, OMB Control No. 3265-0015, *National Voter Registration Application Form for U.S. Citizens*, https://perma.cc/34A2-EBJH. Only Kentucky, Tennessee, and Virginia require the full Social Security number, though Kentucky notes that: "[N]o person shall be denied the right to register because of failure to include social security number." *Id.* at 9.

BRIEF OF *AMICI CURIAE* LOCAL
ELECTIONS OFFICIALS
NO. 2:25-CV-00602

11

BRADLEY BERNSTEIN SANDS LLP
2800 FIRST AVENUE, SUITE 326
SEATTLE, WA 98121
206.337.6551

1    including those mandated in the federal government. *See, e.g.*, 42 U.S.C. § 405 (note) (The Social

2    Security Number Fraud Prevention Act of 2017 ("SSNFPA") restricts the use of full Social

3    Security numbers in federal agency mailings and requires redacted versions where possible);

4    H.R. Rep. No. 115-150, at 2 (2017) (Conf. Rep.) (The SSNFPA was implemented because "[t]he

5    theft and misuse of an SSN can cause significant disruptions for an individual . . . .").

6        Critically, at the same time as the EO attempts to create an unfunded data security mandate,

7    the federal government has *reduced* cybersecurity resources to support local governments. For

8    example, the Department of Government Efficiency recently cut funding to the Center for

9    Internet Security, which had been designated by the federal government to run the Elections

10   Infrastructure Information Sharing and Analysis Center ("EI-ISAC"), a program that provides

11   resources and services to local elections offices to combat cybersecurity threats.[17] Many *amici*

12   have relied on its no-cost and low-cost cybersecurity software, its security operations center that

13   provided cyber incident response assistance, and its threat intelligence reports, among other

14   services that local elections offices cannot fund on their own.[18] Such withdrawal of resources is

15   counterproductive to the EO's commandment to create and secure databases of sensitive PII.

16       **C.    Noncitizen Voting Is Very Rare**

17       The EO's DPOC requirement would burden voters' rights and disrupt local elections

18

19   _____

20   [17] Trishna Begam, *Center for Internet Security facing federal funding cuts*, NEWS10 (Apr.
     22, 2025), https://perma.cc/RY27-QP83 (Albany County's Chief Information Officer said: "The
21   loss of programs like . . . EI-ISAC will certainly impact our nation's collective ability to quickly
     detect cyber threats and remediate them.")

22   [18] Steve Simon, *ICYMI: Secretary Simon Remarks on Federal Support for Election
     Security*, Office of the Minnesota Secretary of State (Mar. 4, 2025), https://perma.cc/D68Y-TEL6.

23

BRIEF OF *AMICI CURIAE* LOCAL
ELECTIONS OFFICIALS
NO. 2:25-CV-00602

12

BRADLEY BERNSTEIN SANDS LLP
2800 FIRST AVENUE, SUITE 326
SEATTLE, WA  98121
206.337.6551

officials' duties in the name of ensuring that noncitizens do not vote—an occurrence that is exceedingly rare. *See, e.g.*, *Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 967 (D. Ariz. 2024) (finding that in Arizona, such attempts were "quite rare") (affirmed in part and vacated in part on other grounds); *Fish*, 957 F.3d at 1142 (determining that the plaintiff had not shown a substantial amount of noncitizen voter registrations when only 39 noncitizens had made it onto Kansas voter rolls from 1999 to 2013 and "administrative anomalies could account for the presence of many—or perhaps even most" of the 39) (quotation to district court omitted).[19]

State and local governments use myriad methods at their disposal to maintain accurate voting lists without impeding local election administration or disenfranchising eligible voters. In some states, for example, county officials are responsible for updating voter registration records. *See, e.g.*, Or. Rev. Stat. §§ 247.292, 247.555, 247.563, 247.570. Many *amici* oversee voter challenges under state laws, whereby individual voters' eligibility may be challenged by local authorities or members of the public who have knowledge that the voter is not eligible. *See, e.g.*, 25 Pa. Stat. § 1329; Wash. Rev. Code §§ 29A.08.810–.850. The NVRA requires participating states to make a "reasonable effort" to remove from voter registration rolls voters who have died or changed residence. 52 U.S.C. § 20507.

The federal government and state governments also already have the power to investigate

---

[19] Like the courts, the EAC has also found noncitizen voting to be extremely uncommon. In 2014 the EAC considered evidence of a certain number of noncitizens registered to vote submitted by Arizona and Kansas when they requested that the EAC add DPOC to the Federal Form. *Mem. Concerning State Requests*, *supra* n.12. The EAC noticed that if the data that the states submitted were accurate—which the EAC did not confirm—it would mean that only 0.007% of registered voters could have been noncitizens in Arizona and only 0.001% in Kansas. *Id.* at 33–34.

BRIEF OF *AMICI CURIAE* LOCAL
ELECTIONS OFFICIALS
NO. 2:25-CV-00602

13

BRADLEY BERNSTEIN SANDS LLP
2800 FIRST AVENUE, SUITE 326
SEATTLE, WA 98121
206.337.6551

voter fraud, though targeted efforts to identify noncitizen voters using that authority have produced minimal results. From 2002 to 2005, the U.S. Attorney General conducted such an investigation and, out of 200 million votes cast in federal elections in that period, the government's efforts ultimately resulted in indictments of only 15 people for noncitizen voting. *Mi Familia Vota*, 719 F. Supp. at 966. Recently, Georgia reviewed voter rolls to identify noncitizens and has only uncovered twenty out of a pool of 8.2 million registered voters, just nine of whom had ever voted—that is, 0.0001% of registered voters in the state.[20]

Placing the burden of preventing noncitizens from registering on eligible voters risks cancellation of at least tens of thousands of eligible voter registrations nationwide. Despite what the EO contends, risking mass disenfranchisement and overwhelming local elections offices with additional unfunded responsibilities in the name of preventing the very rare occurrence of noncitizen voting does not preserve the integrity of elections, and in fact does the opposite.

## II.  THE EXECUTIVE ORDER'S IMPROPER ATTEMPT TO ALTER STATE BALLOT RECEIPT DEADLINES WOULD LEAD TO VOTER DISENFRANCHISEMENT, CAUSE ADMINISTRATIVE CONFUSION, AND PLACE BURDENS ON LOCAL ELECTIONS OFFICIALS

The EO further attempts to improperly override state laws that establish mail-ballot and absentee ballot receipt deadlines after Election Day. Section 7(a) directs the Attorney General to "enforce" the EO's opinion that federal law prohibits the counting of mail-in and absentee ballots that arrive after Election Day, Executive Order § 7(a), notwithstanding the fact that federal law is silent on mail ballot receipt deadlines, 2 U.S.C. § 7 and 3 U.S.C. § 1, and many state laws

---

[20] Olivia Rubin, *Georgia voter roll audit finds only 20 noncitizens out of 8 million registered voters*, ABC NEWS (Oct. 23, 2024), https://perma.cc/XUD9-NPYN.

BRIEF OF *AMICI CURIAE* LOCAL
ELECTIONS OFFICIALS
NO. 2:25-CV-00602

BRADLEY BERNSTEIN SANDS LLP
2800 FIRST AVENUE, SUITE 326
SEATTLE, WA  98121
206.337.6551

allow those ballots to be counted. The EO also attempts to condition EAC funding to go only to states that do not have post-Election Day receipt deadlines. Executive Order § 7(b).

The EO may not override state law in the states—including some of *amici*'s, as well as Puerto Rico, the Virgin Islands, and Washington, D.C.—that accept certain mail-in or absentee ballots postmarked on or before Election Day.[21] *See* Pl. Br. at 15–20. As Plaintiffs point out, such mail ballot policies date back to the Civil War. *Id*. at 17. *Amici* in those states maintain a strong interest in confirming that the EO does not conflict with existing state law in order to minimize administrative burdens and voter disenfranchisement. *Amici* support Plaintiffs' position that the ballot arrival provisions of the EO are *ultra vires*.

### A.    Section 7 Would Lead to Voter Disenfranchisement

Section 7 would lead to disenfranchisement of *amici*'s voters in states that allow ballots to arrive after Election Day. In those states, voters are accustomed to the post-Election Day deadline. *Amici* would have to devote significant resources to voter education about the change. *See* Part I.B (explaining voter outreach and communication methods), *supra*; *see also* Wise Decl., ¶ 24, Pl. Br., ECF No. 48 (changes to voting laws can require voter education campaigns running in the millions of dollars). In their experience, no amount of such communication attempts could reach every eligible voter in the community, even if they had unlimited resources to carry them out. At least some voters consequently will turn in their ballots without enough

---

[21] *Table 11: Receipt and Postmark Deadlines for Absentee/Mail Ballots*, National Conference of State Legislatures (May 12, 2025), https://perma.cc/L5HD-CLNG.

time to be received by Election Day, thus inadvertently throwing away their vote.

Even if voters are aware of the EO's ballot receipt deadline and attempt to follow it, they could still be disenfranchised through no fault of their own given mail pick-up and drop-off delays. State and local elections officials have repeatedly noted, in a bipartisan fashion, that absentee and mail-in ballots, especially as mailed through the United States Postal Service, may be subject to delayed processing and delivery, arriving late through no fault of the voter.[22] State legislatures, having considered the potential for mail-service delays, have extended ballot receipt deadlines accordingly. Section 7 disregards state legislatures' attempts to protect voters and the franchise.

## B.    Section 7 Creates Administrative Confusion and Burdens

Section 7's plain conflicts with state laws regarding deadlines for mail-in ballots could result in complicated administrative burdens. In addition to being unlawful, Section 7 creates confusion amongst *amici* local elections officials as well as *amici*'s voters. *Amici* are concerned that they and voters could both receive different instructions from federal and state officials on which ballots can be processed and tabulated, resulting in voters losing trust in the election

---

[22] *See, e.g.*, Letter from Nat'l Ass'n of Sec's of State and Nat'l Ass'n of State Election Directors to Postmaster General Louis DeJoy (Sept. 11, 2024), https://perma.cc/D3WF-MGYC. *See also* Hall Decl. ¶ 30, Pl. Br., ECF No. 43. ("In addition to there being fewer USPS distribution centers at which postmarks are applied, my office has observed that USPS is slower and less reliable than in the past. A few years ago, we would receive mailings within approximately one to two days. Now, the timeframe is longer and unpredictable. Thus, even voters who mail their ballot days in advance of the election would not be guaranteed that their ballot would be received in time to be counted.")

ELECTIONS OFFICIALS
NO. 2:25-CV-00602

16

**BRADLEY BERNSTEIN SANDS LLP**
2800 FIRST AVENUE, SUITE 326
SEATTLE, WA  98121
206.337.6551

process, a serious problem that would require even more outreach by local elections offices whose resources are already strained. This confusion also raises the risk of administrative delay and mistakes in ballot receipt, processing, and tabulation as local elections officials attempt to sort through which authorities to follow and how to follow them. *Amici* are concerned about how to implement this unprecedented change and what those changes could look like.[23]

*Amici* in states where ballots may arrive and be counted after Election Day could find themselves at heightened risk of litigation no matter how they handle conflicts between state law and the EO regarding ballot arrival deadlines. In a hearing in a parallel case, when asked what "enforcement" under Section 7 might mean, the government's attorney responded, "Any number of actions, including criminal actions." Pardis Decl. Ex. A at 87:9–13, Pl. Br., ECF No. 38-1. While many local elections officials have already borne the brunt of the recent uptick in election litigation that has turned the smallest seeds of legal doubt into last-minute emergency lawsuits,[24] the threat of criminal prosecution in this way represents an escalation, and one that could make it more difficult to hire election workers who fear such prosecution. Farmer Decl. ¶ 34, Pl. Br., ECF No. 42. Additionally, many state statutes provide mechanisms for election challenges by members of the public, who might bring challenges to ballots based on the EO even when state law allows ballots to be accepted. Such litigation against local elections offices would come with

---

[23] There is also risk of administrative confusion as related to the receipt and tabulation of provisional ballots and ballot curing process in the many states that allow these processes. Section 7's apparent aim is to eliminate the tabulation of ballots received after Election Day, and some *amici* are concerned that the section's prohibition extends to provisional ballots and ballot curing.

[24] *U.S. courts prepare for increase in election lawsuits*, American Bar Association (Oct. 28, 2024), https://perma.cc/95ZL-QQ6Q.

BRIEF OF *AMICI CURIAE* LOCAL
ELECTIONS OFFICIALS
NO. 2:25-CV-00602

17

BRADLEY BERNSTEIN SANDS LLP
2800 FIRST AVENUE, SUITE 326
SEATTLE, WA  98121
206.337.6551

costs, even if courts find the suits to be meritless and ultimately dismiss them.

## III.    THE EXECUTIVE ORDER'S VOTING SYSTEM GUIDELINES REQUIREMENTS ARE UNLAWFUL AND UNREALISTIC

The EO's attempts to circumvent the EAC's statutorily-mandated deliberation processes to impose the administration's policy preference on voting systems on an expedited timeline is unlawful, Pl. Br. at 23–24, and, if enforced, would cause administrative and budgetary crises for jurisdictions whose machines do not meet that policy preference. By design, the EAC develops voluntary voting systems guidelines ("VVSG") through a deliberation process that includes extensive expert review and recommendations as well as public notice and comment. 52 U.S.C. § 20962. The most recent version of these guidelines is the Voluntary Voting System Guidelines 2.0.[25] As the title makes clear, the guidelines are indeed "voluntary." Certification of voting systems is a state-level responsibility, and, to varying degrees, some states have chosen to incorporate federal testing and certification standards into their own machine certification processes, while others have not.[26]

Notwithstanding the extensive review process required by statute, the EO requires the

---

[25] Technical Guidelines Development Committee, *Voluntary Voting System Guidelines VVSG 2.0* (Feb. 10, 2021), https://perma.cc/TPR8-7JVN.

[26] For example, some states require testing by federally accredited laboratories when possible. *See, e.g.*, Mich. Comp. Laws § 168.795a(1) (requiring certification by a testing authority accredited by the National Association of State Election Directors where possible). Some require testing to federal standards. *See, e.g.*, Nev. Rev. Stat. § 293B.063 ("No mechanical voting system may be used in this State unless it meets or exceeds the standards for voting systems established by the United States Election Assistance Commission."). And in other states, state certification requirements do not depend on any aspect of federal guidance. *See, e.g.*, N.J. Rev. Stat. §§ 19:48-1–19:48-2.

BRIEF OF *AMICI CURIAE* LOCAL ELECTIONS OFFICIALS NO. 2:25-CV-00602

BRADLEY BERNSTEIN SANDS LLP
2800 FIRST AVENUE, SUITE 326
SEATTLE, WA 98121
206.337.6551

1    EAC to "initiate appropriate action to amend the [VVSG] and issue other appropriate guidance

2    establishing standards for voting systems to protect election integrity," including by amending

3    the guidance to "provide that voting systems should not use a ballot in which a vote is

4    contained within a barcode or quick-response code in the vote counting process except where

5    necessary to accommodate individuals with disabilities. . . ." EO § 4(b)(i). Then, within 180

6    days of the EO, it requires the EAC to "review and, if appropriate, re-certify voting systems

7    under the new standards . . . and to rescind all previous certifications of voting equipment

8    based on prior standards." EO § 4(b)(ii). Finally, undercutting the voluntary nature of the

9    guidance, the EO orders the Secretary of Homeland Security and the Administrator of the

10   Federal Emergency Management Agency to "heavily prioritize" compliance with the

11   Voluntary Voting System Guidelines 2.0, presumably as amended per the EO's directives,

12   when distributing federal funds. EO § 4(d). As is the case for the other directives, this EO

13   mandate is both unlawful and impractical.

14       A.      Section 4(b) Is Unworkable

15       The EO unlawfully circumvents the statutory process for revisions to the VVSG and, in

16   doing so, attempts to create a mandate that is unrealistic to implement. The VVSG is designed

17   to be voluntary, and updates to the guidelines take time, because voting systems are complex

18   products that serve the complicated undertaking of election administration. Consulting with the

19   proper parties—technical experts, veterans of election administration and, importantly, the

20   public—to develop secure and realistic standards is a lengthy process that requires review,

21   discussion, and revision. Manufacturing and certifying machines take time. The timeline for

22   compliance expressed in the EO cannot be met by local and state election officials.

23       First, the statutorily mandated VVSG deliberation requirements are extensive, involving

BRIEF OF *AMICI CURIAE* LOCAL                    **BRADLEY BERNSTEIN SANDS LLP**
ELECTIONS OFFICIALS                              2800 FIRST AVENUE, SUITE 326
NO. 2:25-CV-00602                                SEATTLE, WA  98121
                                                 206.337.6551

significant expert feedback to produce workable guidance. The Executive Director of the EAC

must "take into consideration the recommendations provided by the Technical Guidelines

Development Committee." 52 U.S.C. § 20962(b)(1). This committee includes local elections

officials, state elections officials, and technical experts from industry and academia.[27] It must

submit the guidelines to the Board of Advisors, a 35-member board that includes

representatives from election official organizations and other government associations, and the

Standards Board, which is composed of 55 state election officials and 55 local elections

officials. 52 U.S.C. § 20962(b)(2)–(3).[28] Both boards submit comments and recommendations

to the EAC following their review. *Id.* § 20962(c). The EAC must also hold a public notice and

comment period for new draft guidelines, including an opportunity for a hearing. *Id.* §

20962(a). All of that carefully-designed review, discussion, and commentary from experts in

election administration and from the public is meaningless if the administration may issue a

pre-determined result.

  In unlawfully ignoring the expert-driven process, the EO seems to have missed the fact

that its commands are not realistic. It typically takes two to four years following an update of

VVSG standards before vendors can develop systems ready to be tested for certification.[29] The

---

[27] U.S. Election Assistance Comm'n, *Technical Guidelines Development Committee (TGDC) Member Roster* (Feb. 24, 2025), https://perma.cc/FP7X-PDFT.

[28] U.S. Election Assistance Comm'n, *Board of Advisors* (May 20, 2025), https://perma.cc/LJ73-9MBE; U.S. Election Assistance Comm'n, *Standards Board* (May 15, 2025), https://perma.cc/B4Q7-M384.

[29] U.S. Gov't Accountability Office, GAO-18-294, *Observations on Voting Equipment Use and Replacement* at 13 (Apr. 2018), https://perma.cc/HA9M-ARAX.

BRIEF OF *AMICI CURIAE* LOCAL
ELECTIONS OFFICIALS
NO. 2:25-CV-00602

BRADLEY BERNSTEIN SANDS LLP
2800 FIRST AVENUE, SUITE 326
SEATTLE, WA 98121
206.337.6551

process—from VVSG updates, to manufacturing, to certification, to local and state procurement—takes years.[30] *No* machines have been certified to the existing VVSG 2.0 standard, which was passed in 2021, let alone to the new specifications the EO attempts to impose.[31] The idea that the industry will develop sufficient machines under a *new* standard to meet demand of all jurisdictions at once and in short order is not realistic. Election officials cannot procure machines that do not exist.

**B.    Enforcement of Sections 4(b) and 4(d) Would Create an Administrative and Budgetary Disaster for Impacted Local Governments**

Even if there were machines available, it is difficult to overstate the time and money that procurement of voting machines requires of local elections officials. To begin, voting machines are expensive, costing from hundreds of thousands to millions of dollars. These costs are mostly borne by state and local governments.[32] For example, when counties across Pennsylvania upgraded systems following updated state guidance in 2019, Allegheny County

---

[30] U.S. Election Assistance Comm'n, *Voluntary Voting System Guidelines (VVSG) Migration* (Jan. 9, 2024), https://perma.cc/FG2S-3PPS ("It will take time for new systems to be developed, certified, and fielded for use in elections, particularly in an environment of constrained funding for state and local election offices.").

[31] U.S. Election Assistance Comm'n, *Certified Voting Systems* (Jan. 9, 2024), https://perma.cc/7RAG-7M7H. *See also* Holmes Decl. ¶¶ 68–69, Pl. Br., ECF No. 39 (no VVSG 2.0-certified systems currently exist).

[32] A 2018 GAO survey of state local elections officials found that "jurisdictions with 79 percent of the population nationwide obtain funds to acquire new voting equipment through local general funds or budgets as a direct appropriation." U.S. Gov't Accountability Office, GAO-18-294, *supra* n. 29. Over half of the 46 states that responded to the GAO survey did not provide any financial assistance, but eleven states responded that state funds cover all acquisition costs. *Id.*

BRIEF OF *AMICI CURIAE* LOCAL
ELECTIONS OFFICIALS
NO. 2:25-CV-00602

**BRADLEY BERNSTEIN SANDS LLP**
2800 FIRST AVENUE, SUITE 326
SEATTLE, WA  98121
206.337.6551

purchased new voting equipment for $13.4 million, with an additional $6.6 million contract covering software and training; only $1.5 million of that was paid with federal dollars.[33] *See also* Wise Decl. ¶ 48, Pl. Br., ECF No. 48 (new voting systems could cost King County more than $7 million); Hall Decl. ¶ 45, Pl. Br., ECF No. 43 (new voting systems could cost Thurston County $550,000).

The costs of these machines are not limited to the bill for machines and servicing contracts. The procurement process for such an expensive budget item involves a significant investment of time and resources. Just as the EAC-level process incorporates expert and public input to meet the needs of election administration nationwide, many local elections officials invest significant resources to design a selection process to meet the needs of their communities. For example, when Michigan certified new machines, the Oakland County Clerk held a vendor fair for local-level clerks in her county to seek feedback on what kind of equipment they preferred.[34] Similarly, when Pennsylvania issued new voting machine guidelines, many counties started their process with public demonstrations of eligible machines to gather input from voters.[35] Other costly steps include legal review, budget meetings, further

---

[33] Nicole C. Brambila, *Allegheny County's $20 million deal for a new voting system moves forward, but plans on installing and training are still in the works*, PUBLICSOURCE (Jan. 17, 2020), https://perma.cc/7TQL-MW7U.

[34] Mark Cavitt, *State approves 10-year contracts for new voting equipment*, THE OAKLAND PRESS (Jun. 17, 2021), https://perma.cc/753N-NZQD.

[35] Christine McLarty, *Public invited to demonstration of new voting machines*, ABC NEWS27 (Dec. 17, 2018), https://perma.cc/7Y6F-F68Q (Lebanon County rented out its Expo Center to invite the public to test and vote on eligible machines before the local commissioners carried out the formal selection process.)

public meetings and production of related public records, demonstrations from vendors, and consultation with information technology and security personnel to determine what machines can integrate with existing systems. Finally, after the machines have been procured, staff must be trained on the operation of the machines. Put simply, voting machine procurement, installation, and implementation is a massive undertaking.

The budget for newly-certified machines is not available in many jurisdictions, even if the machines were. When making these purchases, local elections officials expect the machines to last for at least a decade. For example, when Bucks County, Pennsylvania spent $5.22 million to purchase new machines at the end of December 2019, it was the first time they purchased machines since 2006.[36] For counties that purchased voting machines recently, buying new machines on the EO's timeline could mean having to find millions of dollars for an expense that they did not expect for years.

If the EAC were to move forward executing the EO's edicts, the consequences could be disastrous for local election administration. It is possible that, if jurisdictions cannot acquire new systems in time for an election, whether because they do not exist or because they are prohibitively expensive, they will either have to use the de-certified system or conduct a hand count, a slow and massively expensive endeavor. ECF No 44; Hall Decl. ¶ 47, Pl. Br., ECF No. 43. Either option is not a good one. Even if state law allowed the use of the machine de-certified by the EAC, news that it had been de-certified would undermine voter confidence. *See, e.g.*, Kimsey Decl. ¶ 24, Pl. Br., ECF No 44.  In *amici*'s experience, such lack of

---

[36] Tom Sofield, *Bucks County Spends $5.2 Million For New Voting Machines*, LEVITTOWN NOW (Dec. 5, 2019), https://perma.cc/V8CX-74E3.

BRIEF OF *AMICI CURIAE* LOCAL
ELECTIONS OFFICIALS
NO. 2:25-CV-00602

BRADLEY BERNSTEIN SANDS LLP
2800 FIRST AVENUE, SUITE 326
SEATTLE, WA  98121
206.337.6551

1  confidence is not only a harm in itself, but can also lead to harassment of election workers,

2  costly litigation, and delays in election certification.

3  ## CONCLUSION

4  The Executive Order, which constitutes an unlawful overreach by the executive branch,

5  would disenfranchise voters and disrupt local election administration. The issues raised in the

6  Plaintiffs' motion require prompt resolution. "[R]unning a statewide election is a complicated

7  endeavor" requiring "thousands of state and local officials and volunteers" to "participate in a

8  massive coordinated effort . . . ." *Democratic Nat'l Comm. v. Wisconsin State Legislature*, 141

9  S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring). The significant changes demanded by the EO

10 would be costly, but at the same time the EO directs agencies to *withhold* election funds from

11 states and local governments.[37] Meanwhile, the municipal budgeting process for many is a multi-

12 *year* endeavor, and many of *amici*'s municipalities are already facing budget shortfalls. The

13 unlawfulness of the EO is therefore of immediate concern to *amici*. *Amici* respectfully request

14 that the Court grant the Plaintiffs' motion for partial summary judgment and the above-

15 referenced sections of the EO be declared invalid and enjoined. Doing so would prevent both the

16 loss of significant state and local resources and large-scale disenfranchisement that will

17 otherwise occur because of this unlawful order.

18 Dated: June 5, 2025

19

20

---

21 [37] *See* EO §§ 4(a), 4(b), 5(b)(ii), and 7(b). Separately, the administration is attempting to
22 impose conditions wholly unrelated to elections on the disbursement of previously appropriated
   election security funds. Yvonne Wingett Sanchez & Patrick Marley, *Grants tie Trump's anti-DEI*
23 *order to election security money*, WASH. POST (Apr. 29, 2025), https://perma.cc/E5R6-WD6R.

BRIEF OF *AMICI CURIAE* LOCAL
ELECTIONS OFFICIALS
NO. 2:25-CV-00602

24

BRADLEY BERNSTEIN SANDS LLP
2800 FIRST AVENUE, SUITE 326
SEATTLE, WA  98121
206.337.6551

1

Respectfully submitted,

2

*/s/ Heidi B. Bradley*
Heidi B. Bradley, WSBA No. 35759

3

BRADLEY BERNSTEIN SANDS LLP
2800 First Avenue, Suite 326

4

Seattle, WA 98121
Phone: (206) 337 6551

5

hbradley@bradleybernstein.com

6

Michael Adame*
Shannon Eddy*

7

PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115

8

Oakland, CA 94609
Phone: (510) 738-6788

9

michael@publicrightsproject.org
shannon@publicrightsproject.org

10

11

*\* Pro hac vice forthcoming*

12

*Counsel for Amici Curiae*

13

14

15

16

17

18

19

20

21

22

23

BRIEF OF *AMICI CURIAE* LOCAL
ELECTIONS OFFICIALS
NO. 2:25-CV-00602

25

BRADLEY BERNSTEIN SANDS LLP
2800 FIRST AVENUE, SUITE 326
SEATTLE, WA  98121
206.337.6551

**Appendix A – List of *Amicus Curiae* Local Elections Officials,
joining in their Individual Capacities**

Jim Allen
*Director of Elections, Delaware County, Pennsylvania*

Lisa Brown
*Clerk and Register of Deeds, Oakland County, Michigan*

Barb Byrum
*Clerk, Ingham County, Michigan*

Mark Church
*Chief Elections Officer and Assessor-County Clerk-Recorder, San Mateo County, California*

Katharine Clark
*Clerk, Santa Fe County, New Mexico*

Domonique Clemons
*County Clerk and Register of Deeds, Genesee County, Michigan*

Kristin Connelly
*Clerk-Recorder and Registrar of Voters, Contra Costa County, California*

Lisa Deeley
*Commissioner and Vice Chair, Philadelphia City and County, Pennsylvania*

Jilline Dobratz
*Clerk, City of West Bend, Wisconsin*

Justin Douglas
*Commissioner, Dauphin County, Pennsylvania*

Diane Ellis-Marseglia
*Commissioner and Vice-Chair, Bucks County, Pennsylvania*

Diana Fuentes
*Clerk, City of San Diego, California*

Cathy Garrett
*Clerk, Wayne County, Michigan*

Michael Haas
*Interim Clerk, City of Madison, Wisconsin*

BRIEF OF *AMICI CURIAE* LOCAL
ELECTIONS OFFICIALS
NO. 2:25-CV-00602

26

BRADLEY BERNSTEIN SANDS LLP
2800 FIRST AVENUE, SUITE 326
SEATTLE, WA 98121
206.337.6551

Bob Harvie
*Commissioner and Chair, Bucks County, Pennsylvania*

Celia Israel
*Tax Assessor-Collector, Travis County, Texas*

Lisa Lawitzke
*Clerk, Bellevue Township, Michigan*

Nick Lima
*Registrar and Director of Elections, City of Cranston, Rhode Island*

Dyana Limon-Mercado
*Clerk, Travis County, Texas*

Jo Ellen Litz
*Commissioner, Lebanon County, Pennsylvania*

Paul Lopez
*Clerk and Recorder, City and County of Denver, Colorado*

Dele Lowman
*Former Voter Registration and Election Board Chair, DeKalb County, Georgia*

Neil Makhija
*Commissioner and Chairman of the Board of Elections, Montgomery County, Pennsylvania*

Kirk McDonough
*Chairperson, City of Cranston Board of Canvassers, Rhode Island*

Rocky Raffle
*Board of Elections Member and Chairperson, Athens-Clarke County, Georgia*

Dante Santoni
*Commissioner, Berks County, Pennsylvania*

Dawn Marie Sass
*Clerk and Deputy Treasurer, City of Exeter Clerk, Wisconsin*

Michael Siegrist
*Clerk, Canton Township, Michigan*

Aubrey Sonderegger
*Recorder, Coconino County, Arizona*

27

BRIEF OF *AMICI CURIAE* LOCAL
ELECTIONS OFFICIALS
NO. 2:25-CV-00602

**BRADLEY BERNSTEIN SANDS LLP**
2800 FIRST AVENUE, SUITE 326
SEATTLE, WA 98121
206.337.6551

David R. Voye
*Elections Division Manager, Allegheny County, Pennsylvania*

Baoky Vu
*Former Vice Chair, DeKalb County Board of Elections, Georgia*

Braxton White
*Commissioner, Clarion County, Pennsylvania*

Jamila Winder
*Commissioner, Montgomery County, Pennsylvania*

BRIEF OF *AMICI CURIAE* LOCAL
ELECTIONS OFFICIALS
NO. 2:25-CV-00602

BRADLEY BERNSTEIN SANDS LLP
2800 FIRST AVENUE, SUITE 326
SEATTLE, WA 98121
206.337.6551