The Honorable John H. Chun

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STATE OF WASHINGTON and STATE OF OREGON,

    Plaintiffs,

v.

DONALD J. TRUMP, *in his official capacity as President of the United States, et al.*,

    Defendants.

CASE NO.  2:25-cv-602-JHC

DEFENDANTS' MOTION TO DISMISS AND RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

NOTE ON MOTION CALENDAR: AUGUST 27, 2025

## DEFENDANTS' MOTION TO DISMISS AND RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

The Constitution limits the judicial power to "Cases" and "Controversies." U.S. Const. art. III, § 2. "Under Article III, federal courts do not adjudicate hypothetical or abstract disputes," "possess a roving commission to publicly opine on every legal question," or "exercise general legal oversight of the Legislative and Executive Branches." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Plaintiffs challenge President Trump's March 25, 2025 Executive Order directing various agencies and federal officers to protect the integrity of the election process "consistent with applicable law." But "federal courts do not issue advisory opinions," *id.* at 424, and this Court should dismiss this case without even reaching the merits because Plaintiffs lack standing; their claims are unripe; and one claim presents a political question.

DEFENDANTS' MOTION TO DISMISS AND
RESPONSE TO PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
No. 2:25-cv-602-JHC - 1

U.S. Department of Justice
950 PENNSYLVANIA AVE., NW
WASHINGTON, D.C. 20530
(202) 353-8679

1    Regardless, Plaintiffs' claims also fail on the merits. "The Constitution vests all executive

2    power in the President." *Touby v. United States*, 500 U.S. 160, 168 (1991) (citing U.S. Const. art.

3    II, § 1). "[I]t is the President to whom" all Executive Branch officials "report." *See id*. In this case,

4    Plaintiffs challenge the President's direction to subordinate Executive Branch officials to take

5    certain election-related actions within those officials' purview. Because the Constitution grants the

6    President supervisory authority over members of the Executive Branch, he may lawfully direct

7    how they carry out their statutory duties. For that reason, Plaintiffs fail to state a claim.

8                                    **BACKGROUND**

9        The National Voter Registration Act of 1993 ("NVRA") requires states to "accept and use"

10   a uniform federal form ("federal form") to register voters for federal elections. 52 U.S.C.

11   § 20505(a)(1). Congress charged the Elections Assistance Commission ("EAC"), *id*. § 20921,

12   created under the Help America Vote Act of 2002 ("HAVA"), *id*. §§ 20901 *et seq*., "in consultation

13   with the chief election officers of the States," with "develop[ing] a mail voter registration

14   application form for elections for federal office" and "promulgat[ing] regulations needed to carry

15   out that task." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 5 (D.C. Cir. 2016); 52 U.S.C.

16   § 20508(a)(2). Similarly, Congress charged the President's designee[1] in the Uniformed and

17   Overseas Citizens Absentee Voting Act ("UOCAVA") with developing "an official post card

18   form, containing both an absentee voter registration application and an absentee ballot application,

19   for use by the States." 52 U.S.C. § 20301(b)(2). The Department of Defense's Federal Voting

20   Assistance Program ("FVAP"), the entity responsible for administering UOCAVA as delegated

21

22   _____

23   [1] "The President selected the Secretary of Defense as the UOCAVA presidential designee by
     Executive Order." *United States v. Alabama*, 778 F.3d 926, 930 n.2 (11th Cir. 2015) (citing Exec.

24   Order No. 12,642, 53 Fed. Reg. 21,975 (June 8, 1988), *reprinted as amended in* 52 U.S.C.
     § 20301).

by the Secretary of Defense,[2] must similarly follow the Paperwork Reduction Act's notice-and-comment rule-making process to revise the federal post card application ("FPCA").[3]

On March 25, 2025, President Trump issued Executive Order 14248, entitled "Preserving and Protecting the Integrity of American Elections," 90 Fed. Reg. 14005 (Mar. 25, 2025) ("Executive Order"; sections cited as "EO § n"). The Executive Order explains that "[f]ree, fair, and honest elections unmarred by fraud, errors, or suspicion are fundamental to maintaining our constitutional Republic." *Id.* § 1. President Trump declared that his Administration will "enforce Federal law and . . . protect the integrity of our election process." *Id.*

To achieve that end, the Executive Order "enforce[s] the Federal prohibition on foreign nationals voting in Federal elections," *id.* § 2, by instructing agencies to take action to require documentary proof of citizenship on the national mail voter registration form and the federal post card application, among other measures designed to verify citizenship. The Executive Order also seeks to remediate voter fraud by, for example, enforcing the Election Day statutes, 2 U.S.C. § 7 and 3 U.S.C. § 1, which establish a day for federal elections, against states who do not require mail-in and absentee ballots to be received by Election Day.

On April 4, 2025, Plaintiffs, Washington and Oregon, filed a complaint in this Court challenging each of the sections described above—§§ 2(a), 2(b) 2(d), 2(e), 3(d), 4(a), 4(b), 4(d), 5(b), 7(a), and 7(b)—asserting that they interfere with the "right to vote," are *ultra vires*, and

---

[2] "The Secretary administers [UOCAVA's] responsibilities through" FVAP. *Alabama*, 778 F.3d at 930 n.2 (citing 32 C.F.R. § 233 (2014)).

[3] *See* 44 U.S.C. §§ 3501-3521; Proposed Collection, Comment Request (Federal Post Card Application (FPCA), Standard Form 76 (SF-76); OMB Control Number 0704-0503), Regulations.gov, https://www.regulations.gov/search?agencyIds=DOD&filter=%22SF-76%22 (listing FPCA-specific notice-and-comment dockets); Regulations.gov, Agency Information Collection Activities; Proposals, Submissions, and Approvals (Feb. 29, 2017), https://www.regulations.gov/document/DOD-2017-OS-0008-0001 (example of information collection notice for FCPA revisions).

DEFENDANTS' MOTION TO DISMISS AND
RESPONSE TO PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
No. 2:25-cv-602-JHC - 3

U.S. Department of Justice
950 PENNSYLVANIA AVE., NW
WASHINGTON, D.C. 20530
(202) 353-8679

1    violate the separation of powers as well as the NVRA, UOCAVA, HAVA, and the APA. Compl.

2    ECF No. 1. Plaintiffs moved for partial summary judgment, requesting that the Court hold that

3    sections 2(a), 4(a), 4(b), and 7 are *ultra vires* and permanently enjoin them. Pls.' Mot. for Partial

4    Summ. J. Dkt. # 37 ("Mot.).

5                                   **LEGAL STANDARDS**

6                                      **12(b)(1)**

7            Under Rule 12(b)(1), a defendant may facially or factually challenge the sufficiency of the

8    plaintiff's allegations to support subject-matter jurisdiction. *Leite v. Crane Co.*, 749 F.3d 1117,

9    1121 (9th Cir. 2014). Courts resolve facial attacks as they would a motion to dismiss under Rule

10   12(b)(6). *Id.*

11                                     **12(b)(6)**

12           Under Rule 12(b)(6), a complaint may be dismissed for failure to state a claim, if it does

13   not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

14   on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); Fed. R. Civ. P. 12(b)(6).

15                                     **Rule 56**

16           "Rule 56(a) provides that a court 'shall grant summary judgment if the movant shows that

17   there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

18   matter of law.'" *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir.

19   2012). (quoting Fed. R. Civ. P. 56(a)).

20                                    **ARGUMENT**

21           This Court should dismiss Plaintiffs' claims, which challenge sections 2(a), 2(b), 2(d), 2(e),

22   3(d), 4(a), 4(b), 4(d), 5(b), 7(a), and 7(b) under Rules 12(b)(1) and 12(b)(6). For the same reasons,

23   Plaintiffs are not entitled to summary judgment on their claims challenging sections 2(a), 4(a),

24   4(b), 7(a), and 7(b).

DEFENDANTS' MOTION TO DISMISS AND
RESPONSE TO PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
No. 2:25-cv-602-JHC - 4

U.S. Department of Justice
950 PENNSYLVANIA AVE., NW
WASHINGTON, D.C. 20530
(202) 353-8679

1    **I.       This Court lacks jurisdiction.**

2           "The Constitution grants Article III courts the power to decide 'Cases' or 'Controversies.'"

3    *Carney v. Adams*, 592 U.S. 53, 58 (2020) (citing U.S. Const. art. III, § 2). "The doctrine of standing

4    implements this requirement by insisting that a litigant 'prove that he has suffered a concrete and

5    particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed

6    by a favorable judicial decision.'" *Id.*[4] Relevant here, standing requires an "'injury in fact' that

7    must be 'concrete and particularized,' as well as 'actual and imminent,'" not "'conjectural or

8    hypothetical.'" *Id.* "[A] grievance that amounts to nothing more than an abstract and generalized

9    harm to a citizen's interest in the proper application of the law" is not "injury in fact." *Id.*

10          Article III also "requires . . . a plaintiff's claim [to] be ripe for adjudication."

11   *Stavrianoudakis v. Fish & Wildlife Serv.*, 108 F.4th 1128, 1138 (9th Cir. 2024). While standing

12   seeks to keep federal courts out of disputes involving conjectural injuries, the ripeness doctrine

13   seeks to prevent the adjudication of claims relating to "contingent future events that may not occur

14   as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998).

15   "There are two ripeness considerations: constitutional and prudential." *Stavrianoudakis*, 108 F.4th

16   at 1139. "Constitutional ripeness overlaps with the injury-in-fact element of Article III standing,

17   and 'therefore the inquiry is largely the same: whether the issues presented are definite and

18   concrete, not hypothetical or abstract.'" *Id.* "Prudential ripeness concerns 'the fitness of the issues

19   for judicial decision and the hardship to the parties of withholding court consideration.'" *Id.* "'A

20   claim is fit for decision if the issues raised are primarily legal, do not require further factual

21   development, and the challenged action is final.'" *Id.* "As to hardship, 'a litigant must show that

22   withholding review would result in direct and immediate hardship and would entail more than

23

24   _____

[4] Internal citations are generally omitted.

DEFENDANTS' MOTION TO DISMISS AND
RESPONSE TO PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
No. 2:25-cv-602-JHC - 5

U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, D.C. 20530
(202) 353-8679

1  possible financial loss.'" *Id.*

2  Plaintiffs challenge EO provisions they claim harm their "sovereign, proprietary, and

3  quasi-sovereign interests" by, *inter alia*, interfering in their authority to establish the time, place,

4  and manner of elections and imposing additional costs to change their administration of elections.

5  *E.g.*, Compl. ¶¶ 12, 186-95, 206-07, 213, 221, 258. Plaintiffs must demonstrate standing for each

6  claim they seek to press. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). Because

7  Plaintiffs either lack standing, their claims are not ripe, or they have raised a non-justiciable

8  political question, the Complaint should be dismissed.

9      A.  <u>Plaintiffs lack standing to challenge section 2 of the EO, and those claims are</u>
   <u>unripe (Claims 1-5)</u>.

10      *1.*    *Section 2(a) (Claims 1-5).*

11

12  Section 2(a) directs the EAC to "take appropriate action" to require documentary proof of

13  U.S. citizenship in the uniform federal form created under the NVRA, to "enforce the Federal

14  prohibition on foreign nationals voting in Federal elections." EO § 2(a); *see* 52 U.S.C.

15  §§ 20505(a)(1), 20508(a)(2); *Newby*, 838 F.3d at 5. This directive is consistent with—and indeed,

16  contemplates the exercise of—the rulemaking authority conferred on the EAC by the NVRA,

17  which allows the EAC to alter the federal form by promulgating regulations through notice-and-

18  comment rulemaking. *See* 52 U.S.C. § 20929; *National Voter Registration Act of 1993*, 59 Fed.

19  Reg. 32,311 (June 23, 1994). Before the federal form can be altered, the EAC must, among other

20  things, develop the change as a proposed rule, which must be approved by the EAC; issue a notice

21  of proposed rulemaking and solicit public comments; consult with the chief election officers of the

22  states pursuant to 52 U.S.C. § 20508(a)(2); consider revisions to the proposed rule based on

23  feedback from the public—including the Plaintiffs States—and then revise the rule as needed. *See*

24  5 U.S.C. § 553. Only after that process is completed may the EAC promulgate a final rule

DEFENDANTS' MOTION TO DISMISS AND
RESPONSE TO PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
No. 2:25-cv-602-JHC - 6

U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, D.C. 20530
(202) 353-8679

1   amending the federal form. *Id.* § 553(c). At that point, that final rule would presumably be subject

2   to review under the APA.

3       Because Section 2(a) contemplates that future action is required—there is no final agency

4   action here. *See Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019) (noting that whether the

5   challenged action "is a reviewable final agency action" "contextualizes the standing inquiry").

6   Plaintiffs thus cannot establish the requisite "concrete and particularized" and "actual or imminent"

7   injury in fact for standing purposes. *Lujan*, 504 U.S. at 560 (citation omitted).

8       Neither can Plaintiffs demonstrate that there is an "immediate dilemma" that is ripe for

9   judicial intervention. *See Texas*, 523 U.S. at 300 ("Here, as is often true, '[d]etermination of the

10  scope . . . of legislation in advance of its immediate adverse effect in the context of a concrete case

11  involves too remote and abstract an inquiry for the proper exercise of the judicial function.'").

12  Under these circumstances—where an operative rule has not even been proposed, much less

13  promulgated in final form—Plaintiff States cannot establish that Section 2(a) is "fit" for review

14  because future events have not yet occurred and, indeed, they "may not occur as anticipated." *See*

15  *id.* This lack of finality and definiteness counsels against judicial intervention. *See US W.*

16  *Commc'ns v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1118 (9th Cir. 1999). Since a final rule does not

17  yet exist, Plaintiff States do not yet know how they will be harmed—if at all. This lack of harm is

18  fatal to the justiciability of Plaintiffs' claims challenging Section 2(a).[5]

19

20  _____

21  [5] To date, the EAC has taken only one, preliminary "action" relevant to section 2(a): It sent a letter
    to Chief Election Officials seeking "consultation" on "development" of the federal form. Letter

22  from EAC Executive Director Brianna Schletz (Apr. 11, 2025), Dkt. # 39-2,
    https://www.eac.gov/sites/default/files/2025-05/April_11_2025_Consultation_Letter_

23  Package.pdf. Subsequently, two courts preliminarily enjoined section 2(a). *See California v.*
    *Trump*, 2025 WL 1667949 (D. Mass. June 13, 2025); *League of United Latin Am. Citizens v. Exec.*

24  *Off. of the President*, 2025 WL 1187730, at *3 (D.D.C. Apr. 24, 2025) ("*LULAC*"). These
    injunctions underscore that Plaintiffs suffer no immediate or imminent actual injury by operation

2.        *Sections 2(b)(iii), 2(e)(ii) (Claim 4).*

Section 2(b)(iii) provides that, to identify unqualified voters in the States, the Department of Homeland Security ("DHS") must "review" each State's publicly available registration list and other records "for consistency with Federal requirements." Section 2(e)(ii) provides that the Attorney General shall "prioritize enforcement" of laws that restrict non-citizens from registering to vote or voting, including through use of "State-issued ID records and driver license databases." Plaintiffs challenge these "data-sharing" provisions only in Claim 4 (*Ultra Vires*), in which they claim that "[t]he President has no constitutional or statutory authority to create new subpoena authority or compel States to share nonpublic information with the Federal government." Compl. ¶ 229. Plaintiffs seek declaratory relief and an injunction "[t]o the extent that" the EO purports to "permit access to nonpublic state records to which the Federal government does not otherwise have access" or to "authorize access to state records in a manner inconsistent with state law." *Id.* ¶ 169; *id.* at 43.

As a preliminary matter, as head of the Executive Branch, the President "possesses the authority to decide 'how to prioritize and how aggressively to pursue legal actions against defendants who violate the law,'" and to direct the Attorney General, his chief law enforcement officer, accordingly. *Trump v. United States*, 603 U.S. 593, 620 (2024). In "[o]ur constitutional system of separation of powers," courts lack jurisdiction to review the Executive Branch's enforcement priorities. *United States v. Texas*, 599 U.S. 670, 679, 681 (2023). Thus, this Court must dismiss Plaintiffs' challenge to section 2(e)(ii) on that ground alone.

---

of this EO provision. *See also* Dkt. # 39-4 (Apr. 30, 2025, email from B. Schletz) (pausing April 11, 2025, solicitation).

DEFENDANTS' MOTION TO DISMISS AND
RESPONSE TO PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
No. 2:25-cv-602-JHC - 8

U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, D.C. 20530
(202) 353-8679

If that were not enough, however, Plaintiffs aver that Sections 2(b)(iii) and 2(e)(ii) will "harm Plaintiff States," but they do not explain how, when, or why. Compl. ¶ 234. Nor could they. On its face, EO Section 2(b)(iii) directs DHS only to "review" each State's "publicly available voter registration list" and "available records" concerning voter list maintenance activities for "consistency with Federal requirements," including through subpoena "where necessary and authorized by law." Similarly, Section 2(e)(ii) requires "prioritiz[ation]" of enforcement of laws that restrict voting by non-citizens, such as through use of State-issued identification records and driver's license databases. Neither provision contains a date certain or defines this review and prioritization. Plaintiffs allege no facts to suggest that DHS or the Attorney General have taken any steps to review State records and do not explain what about either occurrence would harm them. As another court recognized in declining to preliminarily enjoin Section 2(b):

> Section 2(b) does not direct any particular action by the agencies it addresses. Section 2(b) describes no specific systems of records or procedures for disclosure. Instead, it leaves the details to the agencies while repeatedly admonishing those agencies to act "consistent with applicable law" and to take only "lawful and appropriate action.

*LULAC*, 2025 WL 1187730, at *45. The same is true of Section 2(e)(ii). Moreover, Claim 4's challenges to these provisions are not justiciable.

### 3.  Section 2(d) (Claims 1-5).

The Court lacks jurisdiction over claims challenging section 2(d), which directs the "head of each *Federal voter registration executive department or agency* . . . [to] assess citizenship prior to providing a Federal voter registration form to *enrollees* of public assistance programs" (emphases added). As Plaintiff States are not federal departments, agencies, or enrollees of public assistance programs, the provision does not apply to them. Plaintiffs appear to recognize as much in their Complaint, challenging the provision "to the extent it includes any State agencies (i.e., any

DEFENDANTS' MOTION TO DISMISS AND
RESPONSE TO PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
No. 2:25-cv-602-JHC - 9

U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, D.C. 20530
(202) 353-8679

agency other than an optional Federal governmental office referred to in 52 U.S.C. § 20506(a)(3)(B)(ii)).ʺ Compl. ¶ 158.

### B. Plaintiffs lack standing to challenge section 3(d), and those claims are unripe (Claims 1-5).

Section 3(d) directs the Secretary of Defense to update the FPCA pursuant to UOCAVA to require documentary proof of United States citizenship, "as defined by section 2(a)(ii) of th[e] order," and "proof of eligibility to vote in elections in the State in which the voter is attempting to vote." There are no facts to suggest what proof of eligibility might suffice, or how a UOCAVA voter might obtain such proof. The Secretary of Defense, via FVAP, has not yet updated the FPCA, and the EO does not establish a deadline to do so. The particulars of how or when section 3(d) will be implemented are thus unsettled.[6] Without knowing what is required to establish proof of eligibility to vote in elections in the state in which the voter is attempting to vote, which could vary among states, Plaintiffs (and the Court) can only speculate about whether the requirement would violate UOCAVA. Claims challenging Section 3(d) are not fit for judicial review because that provision "involves uncertain and contingent events that may not occur as anticipated or may not occur at all." *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 536 (1st Cir. 1995) (citation omitted). Absent any immediate harm to support ripeness, the Court should dismiss Plaintiffs' claims regarding Section 3(d).

### C. Plaintiffs lack standing to challenge section 4 of the EO, and those claims are unripe (Claims 1-5).

*1.    Section 4(a) (Claims 1-5).* Section 4(a) directs the EAC to take "all appropriate action" to "cease providing Federal funds" to States that do not comply with 52 U.S.C.

---

[6] The FPCA available on the FVAP website is still the 01-2023 revision. FVAP, "Federal Post Card Application (FPCA)," https://www.fvap.gov/uploads/fvap/forms/fpca.pdf (last visited July 14, 2025).

DEFENDANTS' MOTION TO DISMISS AND
RESPONSE TO PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
No. 2:25-cv-602-JHC - 10

U.S. Department of Justice
950 PENNSYLVANIA AVE., NW
WASHINGTON, D.C. 20530
(202) 353-8679

§ 21145," such as the requirement to use the federal form, including any requirement for documentary proof of citizenship adopted pursuant to section 2(a). Because Plaintiffs' challenges to section 2(a) are not justiciable, the same outcome is warranted with respect to their challenge to section 4(a). *See supra* I.A.1.

      2.    *Section 4(b) (Claims 1, 2, 4, 5).* Section 4(b)(i) directs the EAC to "initiate appropriate action" to amend the Voluntary Voting System Guidelines 2.0 and issue "other appropriate guidance" for voting systems to "protect election integrity." Section 4(b)(ii) instructs that, within 180 days of the EO, the EAC shall take "appropriate action" to review and, if appropriate, re-certify voting systems under its new standards and rescind previous certifications of voting equipment. "Voluntary Voting System Guidelines (VVSG) are a set of specifications and requirements against which voting systems can be tested to determine if they meet required standards." *VVSG,* https://www.eac.gov/voting-equipment/voluntary-voting-system-guidelines (last visited July 14, 2025).

Plaintiffs allege that Washington counties "use voting systems" that Section 4(b) "directs the EAC to . . . decertify." Compl. ¶ 161. Jurisdiction is lacking for several reasons. As a threshold matter, "states' adoption of the standards is completely voluntary, as the name suggests, and limited to equipment acquired by states and EAC-certified." *See* Saige Draiger, *Election Assistance Commission Updates Voluntary Voting System Guidelines* (June 30, 2022), https://www.ncsl.org/state-legislatures-news/details/election-assistance-commission-updates-voluntary-voting-system-guidelines.[7] Any alleged injury is therefore not traceable to the Executive

---

[7] Certain States have required, through state law, that any voting systems be certified by the EAC, such that de-certification would render the de-certified States non-compliant with State law. EAC, *Voluntary Voting System Guidelines* (Jan. 31, 2025), https://www.eac.gov/voting-equipment/voluntary-voting-system-guidelines. However, Oregon and Washington are not among them. Under Oregon law, "All voting systems . . . must be certified by [EAC] *or be examined by*

DEFENDANTS' MOTION TO DISMISS AND
RESPONSE TO PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
No. 2:25-cv-602-JHC - 11

U.S. Department of Justice
950 PENNSYLVANIA AVE., NW
WASHINGTON, D.C. 20530
(202) 353-8679

1    Order but to Plaintiffs' decision to participate in the VVSG. *See, e.g.*, *McConnell v. Fed. Election*

2    *Comm'n*, 540 U.S. 93, 228 (2003) (a party's alleged injury was not fairly traceable to the

3    challenged provision because it "stem[med] not from the operation of [the law], but from their

4    own personal . . . choice"), *overruled on other grounds by Citizens United v. Fed. Election*

5    *Comm'n*, 558 U.S. 310 (2010). Even if jurisdiction could rest on Plaintiffs' voluntary participation,

6    there would be no standing (and Plaintiffs' claims are unripe) because they do not establish that

7    the EAC has imminently decertified or will imminently decertify any of Plaintiffs' systems. In

8    fact, the EAC has only certified one voting system under the *current* standard—VVSG 2.0—that

9    predated the EO.[8] Finally, even if decertification were imminent as to Plaintiffs, the claimed harm

10   is, at best, speculative. *Id.* at 22 (surmising that "[u]sing federally de-certified voting systems will

11   undermine public confidence in elections in Plaintiff States"). For all these reasons, the Court lacks

12   jurisdiction over claims challenging section 4(b).

13          3.    *Section 4(d) (Claims 1, 2, 4, 5).* Finally, section 4(d) provides that the DHS

14   Secretary and the Administrator of the Federal Emergency Management Agency shall, in

15   considering funding for State or local election offices or administrators through the Homeland

16   Security Grant Programs, "heavily prioritize compliance" with the VVSG and completion of

17   testing through the accreditation process. Like section 2(e)(ii), discussed *supra* I.A.2., Section 4(d)

18

19

20   _____

21   ***a federally accredited voting systems testing laboratory (VSTL)***." OAR 165-007-0350(1)
     (emphasis added). Under Washington law, voting devices must similarly be tested and certified by

22   an "independent testing authority" designated by EAC. Wash. Rev. Code §§ 29A.12.050, .080(5).
     Laboratories are not manufacturers, and the "accreditation" process is distinct from "certification"

23   of a voting system.
     [8] EAC, *The EAC Announces First Certified Voting System to VVSG 2.0* (July 10, 2025),

24   https://www.eac.gov/news/2025/07/10/eac-announces-first-certified-voting-system-voluntary-
     voting-system-guidelines-vvsg.

does not contain a date certain or otherwise define the Agencies' review and prioritization, so Plaintiffs do not identify any relevant non-speculative Article III injury.

### D. <u>Plaintiffs lack standing to challenge section 5(b) of the EO, and those claims are unripe (Claims 1, 2, 4).</u>

Section 5(b) provides that, *if* States are unwilling to enter into information-sharing agreements or "refuse to cooperate in investigations and prosecutions of election crimes," the Attorney General shall (i) "prioritize enforcement" of Federal election-integrity laws in such States; and (ii) review for "potential" withholding of funds that the Department awards and distributes, "in the Department's discretion," to State and local governments.

Section 5(b)(i) does not define how or when the Attorney General shall "prioritize" enforcement, and it will only be invoked at all if States first take certain steps. Section 5(b)(ii) speaks only in hypothetical terms ("potential" withholding of funds) and, in any event, involves the Department's non-justiciable enforcement discretion. *See TransUnion*, 594 U.S. at 429 (under Article II, the Executive Branch possesses authority to decide "how to prioritize and how aggressively to pursue legal actions against defendants who violate the law"). The Attorney General is the President's "chief law enforcement officer" who "provides vital assistance to [him] in the performance of [his] constitutional duty to preserve, protect, and defend the Constitution." *Trump v. United States*, 603 U.S. 593, 620 (2024). Moreover, the Executive Branch's enforcement decisions are not subject to judicial review because "courts generally lack meaningful standards for assessing the propriety of enforcement choices." *See United States v. Texas*, 599 U.S. 670, 679 (2023).

For the foregoing reasons, EO Section 5(b) does not generate a ripe, concrete injury for purposes of Article III standing.

DEFENDANTS' MOTION TO DISMISS AND
RESPONSE TO PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
No. 2:25-cv-602-JHC - 13

U.S. Department of Justice
950 PENNSYLVANIA AVE., NW
WASHINGTON, D.C. 20530
(202) 353-8679

1

2

**E.  This Court lacks jurisdiction to consider Plaintiffs' Claim 6, and Plaintiffs lack standing to bring it.**

3

Claim 6 alleges that "[b]y issuing the [Executive] Order . . . the President . . . failed to

4

faithfully execute the laws enacted by Congress in violation of the Take Care Clause." Compl.

5

¶ 247. Article II, section 3 of the Constitution provides that the President "shall take care that the

6

Laws be faithfully executed." U.S. Const. art II, § 3. But whether the President appropriately

7

exercised his take-care authority is a non-justiciable political question. "[A] controversy involves

8

a political question where there is a textually demonstrable constitutional commitment of the issue

9

to a coordinate political department; or a lack of judicially discoverable and manageable standards

10

for resolving it." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012) (cleaned up).

11

Plaintiffs attempt to recast their claims that the EO violated the "NVRA, UOCAVA, HAVA, and

12

the APA" as a take-care clause violation. Compl. ¶ 247. Plaintiffs assert no independent basis for

13

this claim other than their separate allegations that the EO violates the NVRA, UOCAVA, HAVA,

14

and the APA. *Id*. ¶¶ 246, 247. But the take-care authority is committed to the President, and Courts

15

lack manageable standards for determining whether a president appropriately exercised that

16

authority. *Cf. Texas*, 599 U.S. at 679 (explaining that "courts generally lack meaningful standards

17

for assessing the propriety of [Executive Branch] enforcement choices").

18

This Court also lacks jurisdiction to consider Claim 6 because it is "a generalized

19

grievance[ ] about the conduct of the government." *Flast v. Cohen*, 392 U.S. 83, 106 (1968). To

20

have standing, Plaintiffs must allege a concrete and particularized injury. *Lujan*, 504 U.S. at 560.

21

Here, they allege that the "President's failure to faithfully execute the laws will cause harm to

22

Plaintiff States and the residents of each Plaintiff State." Compl. ¶ 248. The Supreme Court has

23

"repeatedly rejected claims of standing predicated on the right possessed by every citizen, to

24

DEFENDANTS' MOTION TO DISMISS AND
RESPONSE TO PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
No. 2:25-cv-602-JHC - 14

U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, D.C. 20530
(202) 353-8679

require that the Government be administered according to law" *Valley Forge Christian Coll. v.*

*Ams. United for Separation of Church & State, Inc.,* 454 U.S. 464, 482-83 (1982)) (cleaned up).

      F.   <u>Plaintiffs lack standing to challenge section 7(a), and those claims are unripe</u>
           <u>(Claims 1-5, 8)</u>.

     Section 7(a) interprets 2 U.S.C. § 7 and 3 U.S.C. § 1 to require a national ballot receipt

deadline and instructs the Attorney General to "take all necessary action to enforce [the statutes]

against States that violate" them. What that action will be, how it will be enforced, and against

whom is entirely speculative, and is not a basis for Article III standing or ripeness. Similar to

Section 5(b)(ii), discussed *supra*, this instruction to the Attorney General is a matter of

enforcement discretion that belongs to the Executive Branch. *See supra* I.D.

     At the outset, the Attorney General has done nothing so far—and so any dispute about what

she may do in the future, and whether any such action would violate Plaintiffs' legal rights, is

necessarily speculative. The Attorney General can lawfully enforce these statutes by, for example,

sending letters to the Plaintiff States encouraging compliance with the President's interpretation of

2 U.S.C. § 7 and 3 U.S.C. § 1. Because the Attorney General can enforce these statutes "consistent

with applicable law," as set forth in Section 11(b) of the Executive Order, there is no risk of

imminent harm, as Plaintiffs allege. *See Trump v. New York*, 592 U.S. 125, 131 (2020); *see also*

*LULAC*, 2025 WL 1187730, at *51 ("[I]t is unclear on the present record whether Section 7(a) will

lead imminently to any unlawful action" because the "Attorney General . . . must implement

Section 7(a), as the Executive Order says, 'consistent with applicable law.'"); *see also Trump v.*

*AFGE*, No. 24A1174, 606 U.S. ___ (2025) (Sotomayor, J., concurring) (concurring in grant of stay

because "the relevant Executive Order directs agencies to" act "consistent with applicable law").

In *Trump v. New York*, for example, plaintiffs challenged a memorandum issued by President

Trump instructing the Secretary of Commerce to implement a policy, "to the maximum extent

DEFENDANTS' MOTION TO DISMISS AND
RESPONSE TO PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
No. 2:25-cv-602-JHC - 15

U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, D.C. 20530
(202) 353-8679

1    feasible and consistent with the discretion delegated to the executive branch," that would have

2    excluded "from the apportionment base aliens who are not in a lawful immigrant status." 592 U.S.

3    at 129-30. The Supreme Court found that the plaintiffs failed to establish both standing and

4    ripeness because the "case [was] riddled with contingencies and speculation that impede[d]

5    judicial review" and "[a]ny prediction how the Executive Branch might eventually implement [its]

6    general statement of policy is 'no more than conjecture' at this time." *Id.* at 131, 134.

7        Such is the case here. At bottom, Plaintiffs' challenge to section 7(a) is based on a

8    presumption of bad-faith execution by the government. Plaintiffs allege no basis to support that

9    presumption, which would be contrary to the presumption of good faith that courts routinely accord

10   the government. *See, e.g., Am. Cargo Transp., Inc. v. United States*, 625 F.3d 1176, 1180 (9th Cir.

11   2010).

12       Because there is no reason for the Court to presume the Attorney General will enforce

13   Section 7(a) unlawfully, Plaintiffs' alleged injury is entirely speculative. Accordingly, they failed

14   to establish both standing and ripeness. *See LULAC*, 2025 WL 1187730, at *51 (declining to enjoin

15   Section 7(a) because the "Court 'cannot simply assume' that the Attorney General will disregard

16   the 'requirement of lawful implementation'").[9]

17   **II.    Plaintiffs' claims fail on the merits.**

18       A.   Plaintiffs lack a cause of action to bring any claim in their Complaint.

19       To state an actionable claim, a plaintiff must provide a cause of action under which relief

20   can be granted. *See Davis v. Passman*, 442 U.S. 228, 239 (1979) ("If a litigant is [a proper] party

---

[9] Claim 7, which alleges that the EO violates the NVRA does not cite a particular EO provision. *See* Compl. ¶¶ 249–54. Fairly construed, Claim 7 challenges EO § 2(a) and is similarly not justiciable. *Supra* II.B.2. For the reasons discussed above, Plaintiffs also lack standing to bring that claim, which is not ripe. *Supra* I.A.1.

DEFENDANTS' MOTION TO DISMISS AND
RESPONSE TO PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
No. 2:25-cv-602-JHC - 16

U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, D.C. 20530
(202) 353-8679

1   to invoke the power of the courts, it is said that he has a 'cause of action' . . . and that this cause

2   of action is a necessary element of his 'claim.'"). In the absence of a cause of action, the court

3   must dismiss for failure to state a claim. *See id*. at 239 & n.18.

4          The Plaintiffs cannot sue the President under the APA. *Franklin v. Massachusetts*, 505

5   U.S. 788, 796 (1992). And an APA challenge requires final agency action. 5 U.S.C. § 704.

6   Presumably recognizing these problems, Plaintiffs bring eight claims, which can all be

7   characterized as *ultra vires* claims, though they are not all labeled that way. Claim 1 asserts a claim

8   under the Elections and Electors Clauses, Compl. ¶¶ 196-208; Claim 2, under the Tenth

9   Amendment, *id*. ¶¶ 209-17; and Claim 3, the "Constitutional Right to Vote," *id*. ¶¶ 218-24. Claim

10  4 asserts that several of the EO's sections are *ultra vires*. *Id*. ¶¶ 225-34. Claim 5 maintains that

11  certain sections violate the separation of powers. *Id*. ¶¶ 235-43. Claim 6 alleges that the President's

12  actions under the EO violate his take-care authority, *id*. ¶¶ 244-248, while Claim 7 asserts that the

13  EO violates the NVRA, *id*. ¶¶249-54, and Claim 8 simply requests a declaratory judgment, *id*. ¶¶

14  255-60. But "[u]ltra vires review is . . . unavailable if, as is usually the case, a statutory review

15  scheme provides aggrieved persons 'with a meaningful and adequate opportunity for judicial

16  review,' or if a statutory review scheme forecloses all other forms of judicial review." *Nuclear*

17  *Regul. Comm'n v. Texas*, 145 S. Ct. 1762, 1776 (2025). Here, a statutory review scheme provides

18  Plaintiffs with a means of challenging provisions of the EO, as they apply to the agencies tasked

19  with specific responsibilities—the APA.[10] Instead, Plaintiffs allege no cause of action that allows

20  them to bring any of their claims.

21         Claim 8, which appears to assert a claim for a declaratory judgment, is particularly

22

_____

23  [10] Plaintiffs could not bring APA claims against the President directly. *Dalton v. Specter*, 511 U.S.

24  462, 469 (1994) ("[T]he President's actions were not reviewable under the APA, because the
    President is not an 'agency' within the meaning of the APA."). In any event, Plaintiffs are not

problematic. Compl. ¶¶ 255-60. A declaratory judgment is not a claim, and the Declaratory Judgment Act does not provide an affirmative cause of action; it provides a remedy. *City of Reno v. Netflix, Inc.*, 52 F.4th 874, 876 (9th Cir. 2022) (affirming dismissal of complaint because "the Declaratory Judgment Act provides an affirmative remedy only when a cause of action otherwise exists"). Accordingly, this Court should dismiss Plaintiffs' claims, including Claim 8, for failure to state a cause of action.

  B. <u>The President lawfully instructed the EAC to carry out section 2(a)'s directive (Claims 1-5, 7).</u>

   Plaintiffs allege that section 2(a) is *ultra vires* and violates the Elections and Electors Clauses, the anti-commandeering doctrine, the "right to vote," the NVRA, and the separation of powers. Compl. ¶¶ 207, 213, 216, 223, 233, 243, 253.[11] But the President neither exceeded his constitutional authority nor violated the NVRA in directing the EAC to "take appropriate action to require" documentary proof of citizenship on the federal form. EO § 2(a).

   1. *Section 2(a) does not violate the Constitution.*

   Article II, section 1 of the Constitution provides that "[t]he executive power shall be vested in a President of the United States of America." U.S. Const. art. II, § 1, cl. 1. "[T]he President's power necessarily encompasses 'general administrative control of those executing the laws,' throughout the Executive Branch of government, of which he is the head." *Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002); *see Myers v. United States*, 272

_____

entitled to an injunction against the President. *Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992) (plurality) (noting that, "in general," courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties").

[11] Plaintiffs conclusorily allege that sections 2(a), 2(d), 3(d), 4(a), and 7 "interfere with the right to vote," without further explanation. Compl. ¶ 223. Because they fail to plausibly plead a claim in claim 3 and because those sections are lawful for the reasons explained, this Court should dismiss claim 3.

DEFENDANTS' MOTION TO DISMISS AND      U.S. Department of Justice
RESPONSE TO PLAINTIFFS' MOTION FOR     950 Pennsylvania Ave., NW
PARTIAL SUMMARY JUDGMENT       Washington, D.C. 20530
No. 2:25-cv-602-JHC - 18         (202) 353-8679

U.S. 52, 135 (1926) (explaining that the President "may properly supervise and guide [agency officials'] construction of the statutes under which they act in order to secure that unitary and uniform execution of the laws which [Article II] of the Constitution evidently contemplated in vesting general executive power in the President alone"). While the President is not a "lawmaker," he may "direct that a congressional policy be executed in a manner prescribed by Congress." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587-88 (1952). This is why Presidents of both parties have long directed agencies to exercise their authority to take regulatory actions without any suggestion of constitutional impropriety. *See, e.g.*, Exec. Order No. 13693, 80 Fed. Reg. 15871 (Mar. 19, 2015); Exec Order No. 13338, 69 Fed. Reg. 26751 (May 11, 2004).

Congress empowered the EAC to "prescribe such regulations as are necessary to . . . develop a mail voter registration application form for elections for Federal office" "in consultation with the chief election officers of the States." 52 U.S.C. § 20508(a). The EAC must also submit various reports to Congress "assessing the impact of [the NVRA] on the administration of elections for Federal office . . . and . . . recommend[ing] . . . improvements." *Id.* § 20508(a)(3). The EAC exercises Executive power when it carries out these duties and is therefore subject to the administrative control of the President. It is undisputed that the EAC has the authority to update the federal form. Accordingly, under section 2(a) of the Executive Order, the President was well within his authority to direct the EAC to "take appropriate action to require . . . documentary proof of United States citizenship" on the federal form. EO § 2(a). "[A]ppropriate action," *id.*, includes the process for amending the federal form set forth by statute. *See* 52 U.S.C. § 20508(a).

Plaintiffs allege that "the President has no constitutional or statutory authority to dictate the actions of the EAC, an 'independent entity' created by Congress." Compl. ¶ 227. The President's actions in section 2(a), Plaintiffs assert, "run[] roughshod over the[] statutory safeguards" that Congress put in place, requiring the EAC to be composed of four members (two

DEFENDANTS' MOTION TO DISMISS AND
RESPONSE TO PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
No. 2:25-cv-602-JHC - 19

U.S. Department of Justice
950 PENNSYLVANIA AVE., NW
WASHINGTON, D.C. 20530
(202) 353-8679

1   from each major political party) and any EAC action to be approved by at least three

2   commissioners. Mot. at 11-12. Simplified, then, Plaintiffs' argument is the President lacks the

3   power to direct multimember boards that exercise Executive power. That argument is wrong, as

4   the Supreme Court has recently noted. *Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025). Because

5   "[t]he entire 'executive Power' belongs to the President alone," when an agency, like the EAC

6   "exercise[s] *any* executive power," it is subject to the President's supervisory authority. *Seila Law*

7   *LLC v. CFPB*, 591 U.S. 197, 213, 216–17 (2020) (emphasis added); *see also id*. at 216 & n.2 ("[i]t

8   is hard to dispute that the powers of the FTC at the time of *Humphrey's Executor* would at the

9   present time be considered 'executive,' at least to some degree"); *City of Arlington v. FCC*, 569

10   U.S. 290, 304 n.4 (2013) (even though the activities of administrative agencies "take 'legislative'

11   and 'judicial' forms," "they are exercises of—indeed, under our constitutional structure they *must*

12   *be* exercises of—the 'executive Power'" (quoting U.S. Const. art. II, § 1, cl. 1)).

13                 2.    *Section 2(a) does not violate the NVRA.*

14       In addition to challenging the President's authority to direct the actions of the EAC,

15   Plaintiffs assert that section 2(a)'s directive violates the NVRA. Mot. at 9, 11-12; *see also* Compl.

16   ¶¶ 249-54. Plaintiffs assert that "[d]ocumentary proof of citizenship is not necessary to enable state

17   election officials in Plaintiff States to assess the eligibility of applicants to vote," and therefore the

18   EO's "direction to require [it] violates 52 U.S.C. § 20508(b)(1)." *Id*. ¶ 251. Plaintiffs argue that

19   the NVRA already requires proof of citizenship by attestation and that any documentary proof of

20   citizenship requirement violates the NVRA's prohibition on "includ[ing] any requirement for

21   notarization or other formal authentication." *Id*. ¶ 252 (alteration in original). But the EAC's

22   decision to amend the federal form to require documentary proof of citizenship—a decision that

23   has not yet occurred, *see supra* I.A.1.—would not violate the NVRA. (Indeed, precisely because

24

DEFENDANTS' MOTION TO DISMISS AND
RESPONSE TO PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
No. 2:25-cv-602-JHC - 20

U.S. Department of Justice
950 PENNSYLVANIA AVE., NW
WASHINGTON, D.C. 20530
(202) 353-8679

1  such a decision has not occurred, any opinion by this court on the scope of the NVRA would be

2  an impermissible advisory opinion.)

3       The NVRA charges the EAC with prescribing regulations to "develop a mail voter

4  registration application form for elections." 52 U.S.C. § 20508(a)(2). The form must "include a

5  statement that . . . specifies each eligibility requirement (including citizenship)" and "contains an

6  attestation that the applicant meets each such requirement." *Id.* § 20508(b)(2)(A)-(B). But the form

7  "may require only such identifying information . . . as is necessary to enable the appropriate State

8  election official to assess the eligibility of the applicant and to administer voter registration." *Id.*

9  § 20508(b)(1). And it "may not include any requirement for notarization or other formal

10  authentication." *Id.* § 20508(b)(3). That Congress "debated whether to include a requirement of

11  further proof of citizenship on the Federal Form but rejected such a requirement," Mot. at 10, is of

12  no import because "[t]he plain language of a statute controls its interpretation." *Escondido Mut.*

13  *Water Co. v. FERC*, 692 F.2d 1223, 1234 (9th Cir. 1982) *rev'd in part*, 466 U.S. 765 (1984).

14       As the form's developer, the EAC determines what identifying information "is necessary"

15  to assess an applicant's eligibility to vote. *Newby*, 838 F.3d at 10; *see also Arizona v. Inter Tribal*

16  *Council of Ariz., Inc.*, 570 U.S. 1, 19 (2013) ("ITCA"). Congress's determination that the form

17  must contain an attestation that the applicant meets the requirements to register to vote does not

18  preclude the EAC from later determining that documentary proof of citizenship is necessary for

19  state election officials to determine voter eligibility. If the EAC made such a determination through

20  notice-and-comment rulemaking, it could prescribe regulations to alter the form. Adding a

21  documentary-proof requirement to the form would not run afoul of Congress's instruction that the

22  form not include any requirement for notarization or formal authentication. "[F]ormal

23  authentication" must be read in light of "notarization." *See Waetzig v. Halliburton Energy Servs.,*

24  *Inc.*, 145 S. Ct. 690, 699 (2025) ("[S]tatutory terms must be read in the context of their

DEFENDANTS' MOTION TO DISMISS AND          U.S. Department of Justice
RESPONSE TO PLAINTIFFS' MOTION FOR          950 PENNSYLVANIA AVE., NW
PARTIAL SUMMARY JUDGMENT              WASHINGTON, D.C. 20530
No. 2:25-cv-602-JHC - 21                  (202) 353-8679

1    neighbors . . . ."). Notarization requires a notary to "attest to the authenticity of . . . a signature,"

2    Notarize, Black's Law Dictionary (12th ed. 2024), for the purpose of "verifying that the person

3    signing the document is who they claim to be," *see, e.g.*, *Wright v. Marjem Recovery, LLC*, No.

4    CIV.A. 13-12058-TSH, 2014 WL 4274528, at *1 (D. Mass. Aug. 27, 2014). Formal authentication,

5    therefore, must mean some requirement used to authenticate the applicant's identity. *See*

6    Authentication, Black's Law Dictionary (12th ed. 2024) ("Broadly, the act of proving that

7    something (as a document) is true or genuine."). The documentary proof of citizenship would serve

8    to substantiate an applicant's U.S. citizenship, not verify his identify. Said in a slightly different

9    context, a photocopy of a driver's license would be documentary proof of identification, even

10   though it would not serve as *authentication* of that identification akin to a notarization. The same

11   principle holds for passports and citizenship. Any documentary-proof-of-citizenship requirement

12   therefore does not constitute a requirement for formal authentication. And—again—even if

13   Plaintiffs believe it is, they will have an opportunity to make such an argument during forthcoming

14   notice-and-comment rulemaking, and in an eventual challenge to a final agency action. They

15   cannot press that argument in this unripe context.

16        Plaintiffs cite cases that they contend show that documentary proof of citizenship is not

17   necessary for purposes of the NVRA. Mot. at 10-11. But these cases concern whether the NVRA

18   permits *states* to require documentary proof of citizenship for voter registration. *Mi Familia Vota*

19   *v. Fontes*, 129 F.4th 691, 706, 719 (9th Cir. 2025); *Fish v. Schwab*, 957 F.3d 1105, 1142, 1144

20   (10th Cir. 2020); *Kobach v. EAC*, 772 F.3d 1183, 1195, 1197-98 (10th Cir. 2014). And the EAC

21   is the entity Congress has charged with determining what identifying information "is necessary"

22   to be included on the federal form. *Newby*, 838 F.3d at 10; *see also ITCA*, 570 U.S. at 19. Thus,

23   these cases say nothing about whether the EAC could lawfully amend the federal form to require

24   documentary proof of citizenship.

DEFENDANTS' MOTION TO DISMISS AND
RESPONSE TO PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
No. 2:25-cv-602-JHC - 22

U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, D.C. 20530
(202) 353-8679

1    Finally, section 2(a) does not violate the anti-commandeering doctrine, which prohibits the

2    federal government from "compel[ling] the States to implement . . . federal regulatory programs."

3    *Printz v. United States*, 521 U.S. 898, 925 (1997). Plaintiffs allege that section 2(a)

4    "commandeer[s] State governments to administer regulatory policies of the President." Compl.

5    ¶ 216. Plaintiffs' meaning is not entirely clear. To the extent they argue that developing the federal

6    form that states must use commandeers state governments, that is tantamount to an argument that

7    the NVRA is unconstitutional, separate and apart from the EO. *See* 52 U.S.C. § 20508. Whether

8    Congress may constitutionally direct the EAC to develop the federal form and require states to use

9    it does not depend on the form's content. *See supra* II.B. (explaining that the directive that the

10   form require documentary proof of citizenship is lawful).

11   The Elections Clause provides that state governments may choose "[t]he Times, Places and

12   Manner of holding" federal elections, unless "Congress . . . make[s] or alter[s] such Regulations."

13   U.S. Const. art. I., § 4, cl. 1. The Clause, in other words, "invests the States with responsibility for

14   the mechanics of congressional elections, but only so far as Congress declines to preempt state

15   legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997). Here, Congress has chosen the manner

16   of voter registration for federal elections, and the Elections Clause makes clear that that choice

17   preempts states' choices to the contrary. Section 2(a) therefore does not unlawfully commandeer

18   "State governments to administer regulatory policies of the President."

19   C.  The EO's text forecloses Plaintiffs' challenge to sections 2(b)(iii) and 2(e)(ii)
         (Claim 4).

20

21   Plaintiffs allege that sections 2(b)(iii) and 2(e)(ii) are unlawful and *ultra vires* because they

22   are "beyond the President's constitutional and statutory authority." Compl. ¶ 233. Specifically,

23   they maintain that "Section 2(b)(iii) is unlawful to the extent that it purports to authorize subpoenas

24   not otherwise authorized by law," and "Section 2(e)(ii) violates the United States Constitution and

DEFENDANTS' MOTION TO DISMISS AND
RESPONSE TO PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
No. 2:25-cv-602-JHC - 23

U.S. Department of Justice
950 PENNSYLVANIA AVE., NW
WASHINGTON, D.C. 20530
(202) 353-8679

1    federal law to the extent that it purports to authorize access to state records in a manner inconsistent

2    with state law." *Id*. at 43. Section 2(b)(iii) directs the "Department of Homeland Security, in

3    coordination with the DOGE Administrator," to "review each State's publicly available voter

4    registration list and available records concerning voter list maintenance activities as required by

5    52 U.S.C. [§] 20507, alongside Federal immigration databases and State records requested,

6    including through subpoena where necessary and authorized by law, for consistency with Federal

7    requirements." EO § 2(b)(iii). Section 2(e)(ii) instructs the Attorney General to "prioritize

8    enforcement of 18 U.S.C. [§§] 611 and 1015(f) and similar laws that restrict non-citizens from

9    registering to vote or voting, including through use of: . . . State-issued identification records and

10   driver license databases." EO § 2(e)(ii).

11        As explained above, the President has the authority to direct Executive Branch officials to

12   execute the law. *Supra* II.B.1. Plaintiffs object to the directive in section 2(b)(iii) "to the extent" it

13   allows for "subpoenas not otherwise authorized by law." Compl. at 43. However, the EO's text

14   itself directs DHS, in coordination with the DOGE Administrator, to conduct a review "through

15   subpoena where necessary and authorized by law." EO § 2(b)(iii). By its own terms, therefore, the

16   EO forecloses the harm Plaintiffs allege. Similarly, Plaintiffs object to section 2(e)(ii)'s directive

17   "to the extent that it purports to authorize access to state records in a manner inconsistent with

18   state law." *Id*. § 2(e)(ii). But Plaintiffs have not explained how this section might authorize access

19   in a manner inconsistent with state law. Nor is there any reason to believe that the Attorney General

20   will violate the EO's directive that it "be implemented consistent with applicable law." *Id*. § 11(b);

21   *see also LULAC*, 2025 WL 1187730, at *51 (the "Court 'cannot simply assume' that the Attorney

22   General will disregard the 'requirement of lawful implementation'" (citation omitted)); *AFGE*,

23   No. 24A1174, 606 U.S. ___ (2025) (Sotomayor, J., concurring).

24

DEFENDANTS' MOTION TO DISMISS AND
RESPONSE TO PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
No. 2:25-cv-602-JHC - 24

U.S. Department of Justice
950 PENNSYLVANIA AVE., NW
WASHINGTON, D.C. 20530
(202) 353-8679

1

2

      **D.** <u>The EO's text similarly forecloses Plaintiffs' challenge to section 2(d) (Claims 1-5).</u>

3

4

      Plaintiffs allege that section 2(d) is *ultra vires*, violates the separation of powers, the anti-commandeering doctrine, the Elections and Electors Clauses, the NVRA, and the "right to vote," but only "to the extent that it applies to State voter registration agencies." Compl. ¶¶ 207, 213, 216, 223, 233, 243; *id*. at 43.[12]  It does not.

5

6

7

8

      By its plain terms, section 2(d) directs the "head of each ***Federal voter registration executive department or agency*** . . . [to] assess citizenship prior to providing a Federal voter registration form to ***enrollees*** of public assistance programs." EO § 2(d) (emphasis added). This provision does not state that it applies to Plaintiff States, who are neither federal departments or agencies nor enrollees of public assistance programs. Indeed, Plaintiff States appear to recognize as much in their Complaint, alleging that: "To the extent [section 2(d)] includes any State agencies [i.e. any agency other than an optional Federal governmental office . . . the President has no authority to impose such a requirement." Compl. ¶ 158. But because section 2(d) does not apply to State voter registration agencies, Plaintiffs fail to state a claim with respect to 2(d).

9

10

11

12

13

14

15

16

      For that same reason, section 2(d) does not violate the anti-commandeering doctrine. Because section 2(d) does not apply to state voter registration agencies, it "does not compel states or state officials to comply with its requirements." *United States v. Richardson*, 754 F.3d 1143, 1146 (9th Cir. 2014).

17

18

19

20

21

22

23

24

---

[12] *See supra* n.11.

E. <u>The President lawfully instructed the Secretary of Defense to carry out section 3(d)'s directive (Claims 1-5).</u>

Plaintiffs allege that section 3(d) is *ultra vires*, violates the Elections and Electors Clauses, the separation of powers, the "right to vote," and unlawfully interferes with the manner of federal elections in states. Compl. ¶¶ 207, 213, 223, 233, 243.[13] Specifically, Plaintiffs assert in their prayer that "Section 3(d) violates the United States Constitution, the [NVRA] and the [UOCAVA]." *Id*. at 43. But section 3(d), as Plaintiffs acknowledge, directs the Secretary of Defense to update the FPCA to require "documentary proof of United States citizenship" and "proof of eligibility to vote in elections in the State in which the voter is attempting to vote." EO § 3(d). It is unclear, and Plaintiffs make no attempt to explain, how this directive violates the NVRA. Concerning Plaintiffs' two remaining objections to section 3(d)'s lawfulness, however, the President has the authority to direct the Secretary of Defense to "update the Federal Post Card Application" for the reasons explained above, *see supra* II.B.1., and section 3(d) is consistent with UOCAVA's text and design.

UOCAVA serves "to facilitate absentee voting by United States citizens, both military and civilian, who are overseas." *Reeves v. Nago*, 535 F. Supp. 3d 943, 948 (D. Haw. 2021). To that end, the Secretary of Defense must, in consultation with State and local election officials, "prescribe an official post card form, containing both an absentee voter registration application and an absentee ballot application." 52 U.S.C. § 20301(b)(1), (2).

While this dispute is unripe, nothing in UOCAVA *limits* what kind of document requirements the Secretary of Defense may "prescribe" on the "official post card form." *Id*. § 20301(b)(2). And Congress has made clear in the statute itself that UOCAVA voters must be

---

[13] *See supra* n.11.

DEFENDANTS' MOTION TO DISMISS AND
RESPONSE TO PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
No. 2:25-cv-602-JHC - 26

U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, D.C. 20530
(202) 353-8679

1    "qualified to vote" in their "place[s] of residence" or "the last place in which [they were] domiciled

2    before leaving the United States." *See, e.g.*, *id.* § 20310(1), (5). Being "qualified to vote"

3    necessarily requires U.S. citizenship under federal law. *Id.*; 18 U.S.C. §§ 1015(f), 611 (unlawful

4    for any alien to vote in Federal elections); *see United States v. Alabama*, 998 F. Supp. 2d 1283,

5    1290 (M.D. Ala. 2014) (it "is an obvious given" "that UOCAVA is aimed at only federal

6    elections"). Section 3(d)'s directive that the Secretary of Defense update the FPCA to require

7    "documentary proof of [] citizenship" and "proof of eligibility to vote in elections in the State in

8    which the voter is attempting to vote" does not conflict with, and in fact aligns with, UOCAVA's

9    requirements.

10           F.    The President lawfully instructed the EAC to carry out section 4(a)'s directive
                   (Claims 1-5).

11

12           Plaintiffs allege that section 4(a) is *ultra vires*, violates the separation of powers, the "right

13    to vote," and the Elections and Electors Clause. Compl. ¶¶ 207 213, 223, 233, 243.[14] Plaintiffs

14    argue that section 4(a) unlawfully "condition[s] EAC funding on States rejecting Federal Forms

15    that lack" documentary proof of citizenship because Congress has already "specified the

16    conditions that apply to EAC funding" and the "President cannot unilaterally add conditions."

17    Mot. at 12 (citing 52 U.S.C. § 21003; *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1233-35 (9th

18    Cir. 2018)). But the statutory sections cited in the EO provide for the condition it directs the EAC

19    to apply.

20           For a state to be "eligible to receive a requirements payment" under the HAVA, 52 U.S.C.

21    § 21003(a) requires the state's "chief executive officer . . . or designee . . . [to] certify[] that the

22    State is in compliance with the requirements referred to in subsection (b)," which include

23

24    _____

      [14] *See supra* n.11.

1  "compliance with each of the laws described in section 21145," *id*. § 21003(b)(3). The laws named

2  in 52 U.S.C. § 21145 include the NVRA, among others. *Id*. § 21145(a). And the NVRA requires

3  that states use the federal form developed by the EAC. *See id*. § 20505(a)(1); *see also id*.

4  § 20508(a)(1). Thus, to be eligible to receive HAVA requirements payments, states must use the

5  EAC's federal form.

6      Section 4(a) only parrots the NVRA's requirement. The EO directs the EAC to "cease

7  providing Federal funds to States that do not comply with the Federal laws set forth in 52 U.S.C.

8  [§] 21145, including the requirement in 52 U.S.C. [§] 20505(a)(1) that States accept and use the

9  national mail voter registration form . . . , including any requirement for documentary proof of

10  United States citizenship adopted pursuant to section 2(a)(ii)." EO § 4(a). The NVRA's command

11  that states use the federal form is not limited to the version first created in response to the NVRA's

12  directive—it applies to all future iterations of that form developed by the EAC, including any

13  version that requires documentary proof of citizenship. *See, e.g.*, *Newby*, 838 F.3d at 4; 52 U.S.C.

14  §§ 20505(a)(1), 20508(a)(2)). By requiring states to certify compliance with the laws set forth in

15  52 U.S.C. § 21145, including the NVRA's requirement to use the federal form, Congress

16  necessarily contemplated the possibility that states may not agree to the certification and that

17  funding may be withheld on that basis. 52 U.S.C. § 21003(a) ("A State is eligible to receive a

18  requirements payment for a fiscal year if . . . ."). Section 4(a) lawfully directs the EAC to apply

19  existing statutory funding conditions set forth by Congress.

20      G.  The President lawfully instructed the EAC to carry out section 4(b)'s directive
          (Claims 1, 2, 4, 5).

21

22      Plaintiffs allege that section 4(b) is *ultra vires*, violates the separation of powers and

23  Elections and Electors Clauses, and unlawfully attempts to regulate the manner of federal elections

24  in the Plaintiff States. Compl. ¶¶ 207, 213, 233, 243. Section 4(b)(i) directs the EAC to "initiate

DEFENDANTS' MOTION TO DISMISS AND
RESPONSE TO PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
No. 2:25-cv-602-JHC - 28

U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, D.C. 20530
(202) 353-8679

1    appropriate action to amend" the VVSG 2.0 "and issue other appropriate guidance establishing

2    standards for voting systems to protect election integrity." EO § 4(b)(i). "[E]xcept where necessary

3    to accommodate individuals with disabilities," the amended guidelines and guidance "shall

4    provide that voting systems should not use a ballot in which a vote is contained within a barcode

5    or quick-response code in the vote counting process." *Id*. And "[w]ithin 180 days of the date of

6    [the EO]," the EAC "shall take appropriate action to review and, if appropriate, recertify voting

7    systems under the new standards . . . , and to rescind all previous certifications of voting equipment

8    based on prior standards." *Id*. § 4(b)(ii).

9            Despite Plaintiffs' assertions that the President has no "authority to direct any other

10   entities" to "adopt[ ] or modify[ ] voting system guidelines in testing, certifying, or decertifying

11   voting systems," Compl. ¶ 163, the EAC is an Executive agency. And the President has the

12   authority to direct Executive agencies to carry out their statutory duties in a particular way,

13   consistent with that statute. *Supra* II.B.1. Congress charged the EAC with "adopt[ing] . . . the

14   voluntary voting system guidelines," 52 U.S.C. § 20962(a), and with "testing, certif[ying],

15   decertif[ying], and recertif[ying] . . . voting system hardware and software by accredited

16   laboratories," *id*. § 20971(a)(1). Section 20962(a) sets forth the process for adopting the VVSG,

17   which includes publishing notice of the proposed guidelines in the federal register and an

18   opportunity for public comment. The President's directive in section 4(b)(i) accounts for this

19   statutory process, as it directs the EAC to "initiate appropriate action to amend" the VVSG 2.0.

20   And, as explained, the head of the Executive Branch possesses the authority to direct the EAC to

21   carry out that the amendment process in a particular way, consistent with the statute. *Supra* II.B.1.

22   Similarly, section 4(b)(ii) directs the EAC to "take appropriate action" to recertify voting systems

23   under the new standards "if appropriate," and "rescind all previous certifications . . . based on prior

24   standards." This is not inconsistent with section 20971's requirements. Accordingly, section 4(b)

DEFENDANTS' MOTION TO DISMISS AND
RESPONSE TO PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
No. 2:25-cv-602-JHC - 29

U.S. Department of Justice
950 PENNSYLVANIA AVE., NW
WASHINGTON, D.C. 20530
(202) 353-8679

1    is not *ultra vires* and does not violate the separation of powers. Nor does it violate the Elections or

2    Electors Clauses because Congress delegated particular duties to the EAC. Congress, of course,

3    may modify the manner of federal elections in states. U.S. Const. art. I, § 4 cl. 1; *id*. art. II, § 1, cl.

4    2. And the President may direct the manner in which the EAC executes its mandate.

5         Even if that were not true, however, the VVSG is, as the name indicates, voluntary. Because

6    states do not have to adopt the VVSG, section 4(b) of the EO cannot violate the vertical separation

7    of powers.

8              H.   Plaintiffs' claims challenging section 4(d) fail (Claims 1, 2, 4, 5).

9         Plaintiffs allege that section 4(d) violates the separation of powers, the Elections and

10   Electors Clauses, is *ultra vires*, and unlawfully attempts to regulate the manner of federal elections

11   in the Plaintiff States. *See* Compl. ¶¶ 207, 213, 233, 243. Section 4(d) directs the Secretary of

12   Homeland Security and the Administrator of FEMA to, "consistent with applicable law," prioritize

13   compliance with the VVSG 2.0 and completion of testing through the Voting System Test Labs

14   accreditation process when "considering the provision of funding for State or local election offices

15   or administrators through the Homeland Security Grant Programs."  EO § 4(d). Plaintiffs' claims

16   fail because section 4(d) cannot be unlawful when it merely directs agencies to act in accordance

17   with applicable law. *AFGE*, No. 24A1174, 606 U.S. ___ (2025) (Sotomayor, J., concurring).

18        Definitionally, directing executive agencies to take action *to the extent consistent with*

19   *applicable law* cannot be interpreted as an order to violate the law. It is plainly lawful for the

20   President to instruct agencies to act within their own statutory authorities to implement the

21   President's priorities consistent with applicable law. *See, e.g.*, *Sherley v. Sebelius*, 689 F.3d 776,

22   784 (D.C. Cir. 2012) ("[A]s an agency under the direction of the executive branch, it must

23   implement the President's policy directives to the extent permitted by law.").

24        In *Building & Construction Trades Department, AFL-CIO v. Allbaugh*, 295 F.3d 28 (D.C.

DEFENDANTS' MOTION TO DISMISS AND
RESPONSE TO PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
No. 2:25-cv-602-JHC - 30

U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, D.C. 20530
(202) 353-8679

1  Cir. 2002), the plaintiffs challenged an executive order that provided that "to the extent permitted

2  by law," no federal agency and no entity that receives federal assistance for a construction project

3  could require or prohibit bidders or contractors from entering into a project labor agreement. *Id.*

4  at 29. The plaintiffs sued, claiming that the executive order exceeded the President's constitutional

5  authority. *See id.* at 31-32. The D.C. Circuit rejected this argument, pointing out that the executive

6  order "directs [agencies] how to proceed in administering federally funded projects, but only '[t]o

7  the extent permitted by law.'" *Id.* at 33. The court concluded that "[t]he mere possibility that some

8  agency might make a legally suspect decision" in the future is not a ground for an injunction. *Id.*;

9  *see also Common Cause v. Trump*, 506 F. Supp. 3d 39, 47 (D.D.C. 2020) (three judge panel)

10  (Katsas, J.) ("We cannot ignore these repeated and unambiguous qualifiers imposing lawfulness

11  and feasibility constraints on implementing the memorandum.").

12       Nor does section 4(d) "preclude[] a court from examining whether [it] is consistent with

13  law," rendering "judicial review . . . a meaningless exercise." *City & Cnty. of S.F.*, 897 F.3d at

14  1240.[15]   As the D.C. Circuit noted, "[i]n the event that an agency does contravene the law in a

15  particular instance, an aggrieved party may seek redress through any of the procedures ordinarily

16  available to it," including "an action in the district court challenging that specific decision."

17  *Allbaugh*, 295 F.3d at 33; *see* 5 U.S.C. § 702.

18       I.  Plaintiffs' challenge to section 5(b) lacks merit (Claims 1, 2, 4).

19       Plaintiffs allege that section 5(b) violates the anti-commandeering doctrine, the Election

20  and Electors Clauses, and is *ultra vires*. *See* Compl. ¶¶ 207, 216, 233. Section 5(b) directs the

21

22  _____

23  [15] *City & County of San Francisco* is not to the contrary. The executive order challenged there
   "unambiguously command[ed]" that DHS condition grant eligibility on compliance with certain

24  immigration laws. 897 F.3d at 1240.  Section 4(d), by contrast, merely instructs DHS to "prioritize"
   compliance with the VVSG 2.0 and testing accreditation process.

Attorney General to take certain actions with respect to States that refuse to enter information-sharing agreements or refuse to cooperate in investigations and prosecutions of elections crimes. In particular, the Attorney General shall review whether discretionary grant funds should be withheld from such States, "as consistent with applicable law." EO § 5(b)(ii).[16] Plaintiffs fail plausibly to allege that this directive is unlawful.

First, section 5(b)(ii) does not violate the anti-commandeering doctrine, which as stated prohibits the federal government from "compel[ling] the States to implement . . . federal regulatory programs." *Printz*, 521 U.S. at 925. Section 5(b) "does not compel states or state officials to comply with its requirements." *Richardson*, 754 F.3d at 1146. Indeed, section 5(b) does not require anything; "there is no indication that the federal government has ordered [Plaintiffs] to provide additional support in connection with" its efforts to enforce federal election laws. *United States v. King Cnty.*, 122 F.4th 740, 758 (9th Cir. 2024). It merely provides that the Attorney General shall *consider* withholding discretionary funds from States that *choose* not to enter information-sharing agreements or cooperate with federal prosecutions. That poses no problem under the Tenth Amendment.

Plaintiffs' conclusory assertion that section 5(b) violates the Elections and Electors Clauses fares no better. Plaintiffs do not try to explain how a directive that the Attorney General simply consider withholding discretionary funding "alter[s] state laws related to the time, place and manner of electing Senators, Representatives, and presidential electors." Compl. ¶ 207.

As for the *ultra vires* claim, the President, as the head of the Executive Branch, plainly has the authority to direct the Attorney General, an Executive Branch official, to "review" a particular

---

[16] Insofar as Plaintiffs challenge section 5(b)(i), that claim fails for lack of standing. *See supra* I.D.

DEFENDANTS' MOTION TO DISMISS AND
RESPONSE TO PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
No. 2:25-cv-602-JHC - 32

U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, D.C. 20530
(202) 353-8679

1    matter committed to her discretion, "consistent with applicable law." EO § 5(b)(ii); *supra* II.B.1.

2    Plaintiffs also fail to allege that the President acted "contrary to a *specific prohibition* in a statute"

3    by issuing 5(b)(ii)'s directive. *Nuclear Regul. Comm'n*, 145 S. Ct. at 1776. Because Plaintiffs do

4    not plausibly plead a constitutional or statutory basis supporting their *ultra vires* claim, it must

5    fail—especially in light of section 5(b)(ii)'s express directive that the Attorney General carry out

6    her review "consistent with applicable law." *See AFGE*, No. 24A1174, 606 U.S. ___ (2025)

7    (Sotomayor, J., concurring).

8                J.    Plaintiffs' challenges to sections 7(a) and (b) lack merit (Claims 1-5, 8).

9            Plaintiffs allege that section 7 of the Executive Order violates the Election and Electors

10   Clause, the separation of powers, the "right to vote,"[17] and is *ultra vires*. Compl. ¶¶ 207, 213, 223,

11   233, 243. Plaintiffs argue that "[t]he President has no constitutional authority to create ballot-

12   receipt deadlines for federal elections." Mot. at 15. But the President did not create a ballot-receipt

13   deadline for federal elections—Congress did. The EO does not alter the Election Day statues—2

14   U.S.C. § 7 and 3 U.S.C. § 1. The President, as the person responsible for taking care that the laws

15   are properly executed, put forward his interpretation of those statutes. The Executive has

16   interpreted the law for centuries—this is nothing new, and certainly nothing constitutionally

17   objectionable. In any event, the President's interpretation of the Election Day statutes accords with

18   their text, purpose, and history, and he has the authority to interpret for the Executive Branch what

19   they require.

20           Article II, section 3 of the Constitution charges the President with the duty to "take Care

21   that the Laws be faithfully executed." "[A]n essential part of execution of the law is the

22   interpretation of that law." *Ameron, Inc. v. U.S. Army Corps of Eng'rs*, 809 F.2d 979, 990 (3d Cir.

23

24   _____
     [17] *See supra* n.11.

1986). Functionally, "the executive cannot execute [a] law's command until he decides what that command is, and absent a determination by the courts the executive must find the law's command himself." *Id*. Thus, the President's duty under the take-care clause "often puts upon him the duty to interpret [the law] for the Executive Department." *Id*.; *see also Bowsher v. Synar*, 478 U.S. 714, 750 n.16 (1986) (Stevens, J., concurring) ("interpret[ing]" a "law enacted by Congress" is "a power normally committed initially to the Executive under the Constitution's prescription that he 'take Care that the Laws be faithfully executed'"); *Huggins v. Isenbarger*, 798 F.2d 203, 208 (7th Cir. 1986) (Easterbrook, J., concurring). Plaintiffs' attempt to elevate this commonplace reality to a violation of the separation of powers is unavailing.

The Claims challenging section 7 can be dismissed simply by respecting the unremarkable conclusion that the President can interpret the law—leaving the propriety of that interpretation for a day when that interpretation is properly ripe. But if the court addresses the substance of this dispute, Plaintiffs fail to state a claim. The Election Day statutes establish a uniform, national Election Day for federal elections. 2 U.S.C. § 7; 3 U.S.C. § 1; *Foster*, 522 U.S. at 69 . Section 7 provides that "[t]he Tuesday next after the 1st Monday in November, in every even numbered year, is established as *the day for the election*, in each of the States and Territories of the United States, of Representatives and Delegates to the Congress commencing on the 3d day of January next thereafter." 2 U.S.C. § 7 (emphasis added). And section 1 further specifies that "[t]he electors of President and Vice President shall be appointed, in each State, *on election day*." 3 U.S.C. § 1 (emphasis added). But Congress enacted 3 U.S.C. § 1 and 2 U.S.C. § 7, in 1845 and 1872, when absentee voting was in its infancy. *Republican Nat'l Comm. v. Wetzel*, 120 F.4th 200, 204, 209 (5th Cir. 2024); *Foster*, 522 U.S. at 69. The advent of commonplace no-excuse-absentee voting presents the question of what having a "day for the election" means for purposes of those statutes,

DEFENDANTS' MOTION TO DISMISS AND
RESPONSE TO PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
No. 2:25-cv-602-JHC - 34

U.S. Department of Justice
950 PENNSYLVANIA AVE., NW
WASHINGTON, D.C. 20530
(202) 353-8679

1    including whether ballots must be received by that day. *See* David Horton, *The Dead Voter Rule*,

2    73 Ala. L. Rev. 341, 350 (2021).

3         The President answered that question by interpreting the Election Day statutes for

4    Executive Branch officials in section 7(a) and 7(b) of the Executive Order. In section 7(a), he

5    instructed the Attorney General to "take all necessary action to enforce 2 U.S.C. [§] 7 and 3 U.S.C.

6    [§] 1 against States that violate these provisions by including absentee or mail-in ballots received

7    after Election Day in the final tabulation of votes for the appointment of Presidential electors and

8    the election of members of the United States Senate and House of Representatives." EO § 7(a).

9    And in 7(b) he directed the EAC to "condition any available funding to a State on that State's

10   compliance with" 52 U.S.C. § 21081(a)(6)'s requirement "that each state adopt uniform and

11   nondiscriminatory standards . . . including that, as prescribed in 2 U.S.C. [§] 7 and 3 U.S.C. [§] 1,

12   there be a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods

13   of voting," except for UOCAVA votes. EO § 7(b). It was soundly within the President's authority

14   to interpret the Election Day statutes in a manner consistent with the statutes' text so that Executive

15   Branch officials could carry out their commands.

16        The only on-point federal appellate opinion holds that the Election Day statutes require

17   ballots to "be both cast by voters and received by state officials" on Election Day. *Wetzel*, 120

18   F.4th at 204.[18] The term "election" in 2 U.S.C. § 7 has three "definitional elements": (1) official

19   action, or one "involv[ing] an element of government action"; (2) finality, or "the polity's final

20

---

21   [18] Plaintiffs attempt to discredit *Wetzel* by characterizing it as contrary to the "overwhelming
22   weight of authority." Mot. at 19. But *Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d
     354, 365 (D.N.J. 2020), *Bognet v. Secretary Commonwealth of Pennsylvania*, 980 F.3d 336, 364
23   (3d Cir. 2020), *vacated as moot sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021) (mem.),
     and *Bost v. Illinois State Board of Elections*, 684 F. Supp. 3d 720, 739 (N.D. Ill. 2023), do not
24   consider the original meaning of "election" in 1872, and *Bognet* and *Bost* were both decided on
     standing.

DEFENDANTS' MOTION TO DISMISS AND
RESPONSE TO PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
No. 2:25-cv-602-JHC - 35

U.S. Department of Justice
950 PENNSYLVANIA AVE., NW
WASHINGTON, D.C. 20530
(202) 353-8679

1    choice of an office-holder"; and (3) consummation, or "when the last ballot is received and the

2    ballot box is closed." *Id*. at 207-08 (emphasis omitted). Continuing to receive ballots after Election

3    Day means that the election is not final or consummated until after Election Day and therefore

4    violates the Election Day statutes. *Id*. at 208-09, 215. Section 7(a) therefore merely seeks to enforce

5    2 U.S.C. § 7 as written.

6         History reveals that the term "'election' include[d] both ballot casting and ballot receipt."

7    *Id.* at 209. These two concepts were not bifurcated until the Civil War to "secure the franchise of

8    soldiers in the field." *Id*. Even then, soldiers voted by casting their ballots in ballot boxes that

9    election officials brought to the battlefield or else sending a proxy to deposit their votes in the

10    ballot box at the soldier's home precinct. *Id*. In other words, the act of voting concluded when the

11    vote was received. After that, states allowing civilian absentee voting still required votes to be

12    received by Election Day. *Id*. at 210. By 1977, only two of 48 states allowing absentee voting

13    counted ballots received after Election Day. *Id.*; *see also Brnovich v. Democratic Nat'l Comm.*,

14    594 U.S. 647, 670 (2021). And in January 2020, 14 states and the District of Columbia counted

15    ballots postmarked by Election Day, whereas the other 36 states required receipt on or before that

16    date. *Wetzel*, 120 F.4th at 211. This history of absentee voting "says nothing about whether States

17    can extend the election past the uniform, singular Election Day required by federal law"; rather,

18    "the practice of absentee voting that arose during the Civil War demonstrates that the election

19    concludes when all ballots are received." *Wetzel*, 120 F.4th at 211. "'[L]ate-in-time outliers" have

20    no bearing on "the original public meaning of the Election-Day statutes." *Id*.

21         As to purpose, Congress enacted the Election Day statutes to prohibit early federal

22    elections in some states, which were influencing election results in states voting later. *Foster*, 522

23    U.S. at 73. But permitting absentee ballots to be received after Election Day is equally

24    discriminatory. After all, "[h]aving once granted the right to vote on equal terms, [a] State may

DEFENDANTS' MOTION TO DISMISS AND
RESPONSE TO PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
No. 2:25-cv-602-JHC - 36

U.S. Department of Justice
950 PENNSYLVANIA AVE., NW
WASHINGTON, D.C. 20530
(202) 353-8679

1  not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush*

2  *v. Gore*, 531 U.S. 98, 104–05 (2000). Yet states arbitrarily treat some people's votes differently

3  when they permit absentee votes to be received after Election Day. If postmarks are unenforced,

4  for example, absentee voters have several extra days after Election Day to cast their votes.

5      Moreover, "[t]he postal service permits senders to recall mail," *Wetzel*, 120 F.4th at 208,

6  which could permit "voters [to] . . . change their votes after Election Day," *id.*[19] Some states such

7  as Illinois even provide for counting mail-in ballots lacking a postmark so long as they are

8  "received by the election authority after the polls close on election day and before the close of the

9  period for counting provisional ballots" and "the date inserted on the certification," after opening

10  the ballot, "is election day or earlier." 10 Ill. Comp. Stat. Ann. 5/19-8(c).

11      Under that regime, it is possible to imagine that an un-postmarked ballot, delivered after

12  Election Day but before counting concluded, could be counted based on a person's fraudulent

13  certification date. Congress intended the Election Day statutes to curb that type of behavior, which

14  results in treating some votes differently. *Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169,

15  1173-74 (9th Cir. 2001) ("Whenever you provide that elections shall take place upon the same

16  day, you do interpose a not inconsiderable check to frauds in elections . . . ." (quoting Cong. Globe,

17  42d Cong., 2d Sess. 618 (1872)). Permitting it to continue by allowing ballots to be received after

18  Election Day contradicts Congress's purpose.

19      Furthermore, congressional inaction says very little, if anything, about congressional

20  intent. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 495 n.13 (1985) ("[C]ongressional silence,

21

22  [19]      USPS      Postmarking      Guidelines,      USPS      (2025),

23  https://about.usps.com/kits/kit600/kit600_039.htm#:~:text=In%20the%20normal%20course%20
of,before%20they%20enter%20the%20mailstream (last visited July 14, 2025). ("In the normal

24  course of operations, the Postal Service does not postmark, or 'cancel' every piece of mail in the
system. The primary purpose of cancellation is to ensure that postage cannot be reused . . . .").

1  no matter how 'clanging,' cannot override the words of the statute."); *Rapanos v. United States*,

2  547 U.S. 715, 749 (2006) (plurality op.). Nor does it invalidate the President's interpretation of the

3  Election Day statutes. Congress legislated against the backdrop of the historical understanding of

4  what an "election" meant in 1845 and 1872. The President's interpretation does not contradict the

5  statutes.

6       The President's interpretation that the Election Day statutes require ballots to be received

7  by Election Day also does not violate the vertical separation of powers or state sovereignty. *See*

8  Compl. ¶¶ 207, 213, 243. According to its Article I, section 4 authority to "alter" the "Time, Places,

9  and Manner of holding" federal elections, Congress preempted state law when it enacted the

10  Election Day statutes. U.S. Const. art. I, § 4, cl. 1. The President merely interpreted the text of

11  Congress's command. *See Foster*, 522 U.S. at 71 ("For all of petitioners' invocations of state

12  sovereignty, there is no colorable argument that § 7 goes beyond the ample limits of the Elections

13  Clause's grant of authority to Congress.").

14       Plaintiffs claim that the EO's exemption of UOCAVA votes from the ballot-receipt

15  deadline reveals that the President is "not [merely] attempting to enforce federal law" because the

16  Election Day statutes contain no such exception and UOCAVA provides that state deadlines apply.

17  Mot. at 18. But the fact that the Election Day statutes contain no exception for UOCAVA votes

18  supports the long-standing rule that ballots were to be timely received by Election Day and any

19  deviation from that rule must be specified.

20            *1.  Section 7(b) permissibly conditions funding on the adoption of*
                   *nondiscriminatory standards.*
21

22       With respect to section 7(b) specifically, Plaintiffs allege that "the EAC's funding to States

23  is governed by 52 U.S.C. §§ 21001 through 21008," and that "§ 21003 defines the specific

24  conditions on the receipt of [those] funds," which do not include "[establishing a particular ballot-

DEFENDANTS' MOTION TO DISMISS AND
RESPONSE TO PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
No. 2:25-cv-602-JHC - 38

U.S. Department of Justice
950 PENNSYLVANIA AVE., NW
WASHINGTON, D.C. 20530
(202) 353-8679

1  receipt deadline." Compl. ¶ 146. And "[t]he President has no authority to create additional

2  conditions on funding from the EAC," Plaintiffs argue. *Id*. ¶ 147. But section 7(b) simply directs

3  the EAC to condition state funds "consistent with 52 U.S.C. § 21001(b) and other applicable law,"

4  on a state's compliance with an existing statutory requirement: to "adopt uniform and

5  nondiscriminatory standards that define what constitutes a vote and what will be counted as a vote

6  for each category of voting system used in the State." 52 U.S.C. § 21081(a)(6).

7       Section 21001(a) provides that the EAC "shall make a requirements payment each year . .

8  . to each State which meets the conditions described in section 21003." *Id.* § 21001(a). Section

9  21003 requires states to certify their compliance with the requirements in § 21003(b) to be "eligible

10  to receive a requirements payment." *Id*. § 21003(a). One of those requirements includes filing a

11  state plan with the EAC that describes "[h]ow the State will use the requirements payment to meet

12  the requirements of subchapter III," which includes § 21081(a)(6)'s directive to "adopt uniform

13  and nondiscriminatory standards that define what constitutes a vote." *Id*. §§ 21003(b)(1)(A),

14  21004(a)(1), 21081(a)(6). A state's failure to meet that requirement would make it "[in]eligible to

15  receive a requirements payment." *See id*. § 21003(a).

16       To that end, section 7(b) specifies that "what constitutes a vote and what will be counted

17  as a vote" must "includ[e] that, as prescribed in 2 U.S.C. [§] 7 and 3 U.S.C. [§] 1, there be a

18  uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting

19  . . . after which no additional votes may be cast," except for UOCAVA votes. EO § 7(b).  Requiring

20  a uniform ballot receipt deadline of Election Day for all methods of voting ensures that a state's

21  definition of what constitutes a vote is nondiscriminatory by not privileging absentee voters'

22  ballots. *Supra* II.J. Thus, to comply with § 21081(a)(6)'s mandate, states must adopt a uniform

23  ballot receipt deadline of Election Day. This condition does not usurp Congress's constitutional

24  powers, because Congress itself set the condition in § 21081(a)(6) (as well as in the Election Day

DEFENDANTS' MOTION TO DISMISS AND
RESPONSE TO PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
No. 2:25-cv-602-JHC - 39

U.S. Department of Justice
950 PENNSYLVANIA AVE., NW
WASHINGTON, D.C. 20530
(202) 353-8679

statutes).

**CONCLUSION**

For these reasons, the Court should deny Plaintiffs' motion for partial summary judgment

and dismiss Plaintiffs' Complaint.


Dated: July 14, 2025                    Respectfully submitted,


BRETT A. SHUMATE
Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division, Federal Programs Branch

LESLEY FARBY
Deputy Director
Civil Division, Federal Programs Branch

*/s/ Bridget K. O'Hickey*
BRIDGET K. O'HICKEY
JOHN BAILEY
Counsel to the Assistant Attorney General
U.S. Department of Justice
Civil Division
950 Pennsylvania Avenue,
NW Washington, DC 20530
(202) 353-8679
Bridget.K.O'Hickey@usdoj.gov

MARIANNE F. KIES
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
(202) 353-1819
Marianne.F.Kies@usdoj.gov

*Attorney for Defendants*

DEFENDANTS' MOTION TO DISMISS AND
RESPONSE TO PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
No. 2:25-cv-602-JHC - 40

U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, D.C. 20530
(202) 353-8679

1

CERTIFICATE OF SERVICE

2        I, Bridget O'Hickey, hereby certify that I served a true copy of the above document upon

3   all counsel of record via this court's electronic filing system and upon any non-registered

4   participants via first class mail. I further certify that this memorandum contains 12,600 words, in

5   compliance with the Local Civil Rules.

6

7   Dated: July 14, 2025                          /s/ *Bridget K. O'Hickey*_____
                                                  BRIDGET K. O'HICKEY
8                                                 Counsel to the Assistant Attorney General

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24