1

2

3                                    THE HONORABLE JOHN H. CHUN

4

5

6

7                    UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF WASHINGTON
8                              AT SEATTLE

9  STATE OF WASHINGTON; and STATE          CASE NO. 2:25-cv-00602-JHC
   OF OREGON,
10                                         ***AMICUS* BRIEF OF FORMER**
                           Plaintiffs,     **REPUBLICAN MEMBERS OF**
11                                         **CONGRESS IN SUPPORT OF**
           v.                              **WASHINGTON AND OREGON**
12
13  DONALD TRUMP, in his official capacity
    as President of the United States;
14  EXECUTIVE OFFICE OF THE
    PRESIDENT; UNITED STATES
    DEPARTMENT OF JUSTICE; PAMELA
15  BONDI, in her official capacity as Attorney
    General of the United States; UNITED
16  STATES DEPARTMENT OF
    HOMELAND SECURITY; KRISTI
17  NOEM, in her official capacity as United
    States Secretary of Homeland Security;
18  UNITED STATES DEPARTMENT OF
    DEFENSE; PETE HEGSETH, in his official
19  capacity as Secretary of Defense;
    DEPARTMENT OF GOVERNMENT
20  EFFICIENCY SERVICE; AMY
    GLEASON, in her official capacity as
21  Acting DOGE Administrator; UNITED
    STATES ELECTION ASSISTANCE
22  COMMISSION; DONALD L. PALMER, in
    his official capacity as Chairman of the U.S.
23  Election Assistance Commission; THOMAS
    HICKS, in his official capacity as Vice Chair
24  of the U.S. Election Assistance Commission;
    CHRISTY McCORMICK and BENJAMIN
25  W. HOVLAND, in their official capacities as
    Commissioners of the U.S. Election
26  Assistance Commission; BRIANNA
    SCHLETZ, in her official capacity as
27  executive director of the U.S. Election

AMICUS BRIEF OF FORMER REPUBLICAN                    **GOLDFARB & HUCK**
MEMBERS OF CONGRESS IN SUPPORT OF                    **ROTH RIOJAS, PLLC**
WASHINGTON AND OREGON                                925 Fourth Avenue, Suite 3950
CASE NO. 2:25-cv-00602-JHC                           Seattle, Washington 98104
                                                     (206) 452-0260

1    Assistance Commission; FEDERAL
     EMERGENCY MANAGEMENT
2    AGENCY; CAMERON HAMILTON, in his
     official capacity as Senior Official
3    Performing the Duties of Federal emergency
     Management Agency Administrator,
4
                         Defendants.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

1

2

3

**TABLE OF CONTENTS**

**PAGE**

4

I.      INTRODUCTION ................................................................................................. 1

II.     IDENTITY AND INTEREST OF AMICI CURIAE......................................... 1

III.    ARGUMENT ...................................................................................................... 3

        A.      Congress Passed HAVA and Created the EAC to Provide Necessary
                Support to State and Local Election Officials........................................ 3

        B.      Congress Created the EAC to Help States Administer Elections—Not to
                Authorize Executive Usurpation of Their Authority ............................. 6

        C.      Congress Created the EAC as an Independent, Bipartisan, Expert-Driven
                Commission ......................................................................................... 10

        D.      The Executive Order Undermines the EAC and Offends Basic Notions of
                Federalism and the Separation of Powers ........................................... 14

IV.     CONCLUSION................................................................................................. 17

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

AMICUS BRIEF OF FORMER REPUBLICAN
MEMBERS OF CONGRESS IN SUPPORT OF
WASHINGTON AND OREGON - iii
CASE NO. 2:25-cv-00602-JHC

**GOLDFARB & HUCK
ROTH RIOJAS, PLLC**
925 Fourth Avenue, Suite 3950
Seattle, Washington 98104
(206) 452-0260

## TABLE OF AUTHORITIES

**PAGE**

*CASES*

*Bush v. Gore*,
　531 U.S. 98 (2000) ......................................................................................... 4

*California v. Trump*,
　No. 25-cv-10810-DJC, 2025 WL 1667949 (D. Mass. June 13, 2025) ........................ 16

*Gregory v. Ashcroft*,
　501 U.S. 452 (1991) ......................................................................................... 16

AMICUS BRIEF OF FORMER REPUBLICAN
MEMBERS OF CONGRESS IN SUPPORT OF
WASHINGTON AND OREGON - iv
CASE NO. 2:25-cv-00602-JHC

GOLDFARB & HUCK
ROTH RIOJAS, PLLC
925 Fourth Avenue, Suite 3950
Seattle, Washington 98104
(206) 452-0260

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

## I.    INTRODUCTION

This case presents a critical question concerning the President's claim of unilateral authority to direct the Election Assistance Commission ("EAC") to take actions regulating the time, place, and manner of U.S. elections. *See* Exec. Order No. 14248, 90 Fed. Reg. 14005 (Mar. 25, 2025) (the "Executive Order"). Of particular concern are the President's directives that, *inter alia,* the EAC: (1) adopt new Voluntary Voting System Guidelines and rescind all certifications of voting equipment based on existing standards; (2) require documentary proof of citizenship to register to vote using the National Mail Voter Registration Form (i.e., the "Federal Form"); and (3) restrict federal funding to only states that comply with new documentary proof of citizenship requirements and ballot receipt deadlines announced in the Executive Order. *Id.*

The President asserts that he has unilateral power to regulate U.S. elections and direct the EAC in these unprecedented ways. Oregon and Washington contend that the President has no such authority, because the Constitution authorizes the states and Congress (not the President) to regulate elections, and the EAC is an independent, bipartisan entity created by Congress as part of the Help America Vote Act of 2002 ("HAVA"), 52 U.S.C. § 20901 *et seq.* Amici are former Republican Members of Congress who participated in the negotiation and passage of HAVA. They respectfully submit this amicus brief to provide the Court with relevant background on the Congressional decision to pass groundbreaking bipartisan election reform in the wake of the 2000 election, including the creation of the EAC to provide state and local election officials with bipartisan, independent, expert-driven assistance with election administration.

## II.    IDENTITY AND INTEREST OF AMICI CURIAE

Amici are former Republican members of the House of Representatives and Senate who participated in the enactment of HAVA and are therefore well-positioned to speak to the problems

AMICUS BRIEF OF FORMER REPUBLICAN
MEMBERS OF CONGRESS IN SUPPORT OF
WASHINGTON AND OREGON - 1
CASE NO. 2:25-cv-00602-JHC

**GOLDFARB & HUCK
ROTH RIOJAS, PLLC**
925 Fourth Avenue, Suite 3950
Seattle, Washington 98104
(206) 452-0260

Congress sought to solve and the considerations of federalism and the separation of powers that culminated in the creation of the EAC.[1] Amici do not take a position on the specific directives set forth in the Executive Order, but rather highlight that the President's attempts to unilaterally regulate elections and direct the actions of the EAC are in tension with the text and structure of the Constitution and laws passed by Congress to *prevent* the federal government from injecting politics into state and local election administration. They write to offer relevant context concerning the need for an independent, bipartisan, expert-driven commission and their perspective on why the President's actions at issue here are antithetical to the structure, purpose, and history of the agency. Amici include:

- **Senator Chuck Hagel (R-NE):** A decorated Vietnam War veteran, Senator Hagel served two terms as a U.S. Senator representing Nebraska from 1997 to 2009, where he served on the Foreign Relations, Banking, and Intelligence Committees. Following his time in Congress, he served as the 24th United States Secretary of Defense from 2013 to 2015.

- **Representative Christopher Shays (R-CT):** Representative Shays represented Connecticut's 4th Congressional District in the U.S. House of Representatives from 1987 to 2009. During this time he served on the Government Reform, Financial Services, Budget and Homeland Security Committees. Prior to his time in the U.S. House of Representatives, Shays served thirteen years in the Connecticut General Assembly.

- **Representative James Greenwood (R-PA):** Representative Greenwood represented Pennsylvania's 8th Congressional District in the U.S. House of Representatives for six terms, from 1993 to 2005. During his time in Congress, he served on the House Energy and Commerce Committee where he chaired the Subcommittee on Oversight and Investigations. Representative Greenwood was one of the original cosponsors of HAVA.

---

[1] No party or party's counsel authored this brief in whole or in part. No party or party's counsel contributed money intended to fund preparation or submission of this brief.

**GOLDFARB & HUCK ROTH RIOJAS, PLLC** 925 Fourth Avenue, Suite 3950 Seattle, Washington 98104 (206) 452-0260

## III.    ARGUMENT

Congress passed HAVA and created the EAC in the aftermath of the November 2000 election. Through extensive hearings, Congress learned that state and local election officials were in desperate need of additional funding and expertise to address critical problems with election technologies and infrastructure, and a trusted, objective source of resources and information for election administration. As Members of Congress at the time, amici participated in the creation of the EAC to provide this critical assistance to state and local governments while respecting the federal government's limited role in U.S. elections. Amici also know firsthand that Congress created the EAC to serve as an independent, bipartisan, expert-driven commission removed from partisan influence. The Executive Order ignores the clear commands of Congress and settled constitutional principles dating back to the Founding—while opening the door to further presidential abuses of power.

### A.    Congress Passed HAVA and Created the EAC to Provide Necessary Support to State and Local Election Officials

The U.S. Constitution explicitly grants state governments the power to determine the "times, places and manner" of federal elections, while providing Congress the superseding authority to alter or preempt state election laws. U.S. Const., art. I, § 4, cl. 1. The Constitution does not grant the President any authority in this area, apart from the general responsibility to "take care that the Laws" passed by Congress "are faithfully executed." U.S. Const., art. II, § 3. Pursuant to its Elections Clause authority, Congress has enacted several statutes addressing voter registration and vote-counting technology, including the National Voter Registration Act of 1993 ("NVRA"). 52 U.S.C. §§ 20501-20511. The NVRA imposed several significant requirements on state and local election officials, including directing states to accept voter registration applications by mail using the National Mail Voter Registration Form and mandating certain practices that states may

AMICUS BRIEF OF FORMER REPUBLICAN
MEMBERS OF CONGRESS IN SUPPORT OF
WASHINGTON AND OREGON - 3
CASE NO. 2:25-cv-00602-JHC

**GOLDFARB & HUCK
ROTH RIOJAS, PLLC**
925 Fourth Avenue, Suite 3950
Seattle, Washington 98104
(206) 452-0260

use to maintain their voter registration lists. 52 U.S.C. §§ 20505(a)(1), 20507.[2] The NVRA was, however, an unfunded mandate—it provided no financial support to states and local governments to facilitate compliance with the NVRA's requirements. *See* 52 U.S.C. §§ 20501-20511.

Following the November 2000 election administration failures that culminated in *Bush v. Gore*, 531 U.S. 98 (2000), Senate and House committees held numerous hearings on election reform examining the challenges state and local governments faced in administering elections, including the absence of federal financial support. For example, during a May 2001 hearing on election reform before the Senate Committee on Commerce, Science and Transportation, Representative Sheila Jackson Lee (D-TX) testified that "one of the issues that were raised as we spoke to local governments is that [they] have the muster and the will, but the collaborative effort of federal funding is important."[3] The committees heard from election officials around the country warning that the voting challenges that plagued elections in Florida could easily have occurred in any state due, in part, to lack of funding. 148 Cong. Rec. S2528 (daily ed. Apr. 11, 2002) (statement of Sen. Chris Dodd).[4] As Senator Mitch McConnell (R-KY) opined, "[e]veryone agrees we should provide resources to States and localities to improve their systems and election administration."[5]

These hearings also illustrated the extent to which states and localities were employing an array of voting policies and technologies, creating a need for trustworthy centralized resources,

---

[2] *See also* R. Sam Garrett, Cong. Rsch. Serv., R45302, *Federal Role in U.S. Campaigns and Elections: An Overview* 9 (2018), https://www.congress.gov/crs-product/R45302.

[3] *S. 368 and Election Reform: Hearing Before the S. Comm. on Com., Sci. and Transp.,* 107th Cong. 6 (2001) (statement of Rep. Sheila Jackson Lee).

[4] *See S. 368 and Election Reform: Hearing Before the S. Comm. on Com., Sci. and Transp.,* 107th Cong. 11 (2001) (statement of Sen. John McCain observing that without federal funding it is highly unlikely that governments can "make the technical changes which are necessary so that every vote has an equal opportunity to be voted").

[5] *Election Reform: Volume 1, Hearings Before the S. Comm. on Rules and Admin.,* 107th Cong. 118 (2001) (statement of Sen. Mitch McConnell).

GOLDFARB & HUCK
ROTH RIOJAS, PLLC
925 Fourth Avenue, Suite 3950
Seattle, Washington 98104
(206) 452-0260

including expert guidance and information-sharing. 147 Cong. Rec. S2476 (daily ed. Mar. 19,

2001) (statement of Senator Chris Dodd) ("What became clear from [the election reform] hearings

is that there is a bipartisan recognition that States and localities need assistance to enable them to

efficiently, and effectively, administer Federal elections on a nondiscriminatory basis.").[6] At a

subsequent hearing on technology and the voting process, one witness discussed at length the need

for best practices and standards developed by experts and readily accessible voting technology

information, advocating that "there needs to be a place where officials can go and where vendors

can go to say these are the requirements that we recommend, these are the procedures that can

bring you to those requirements, and these are the sources of information."[7]

Recognizing the critical need to address these concerns before the upcoming 2004 election,

both the House and Senate began work on election reform bills. In November 2001, H.R. 3295,

the Help America Vote Act, was introduced into the House by Representative Robert Ney (R-OH),

along with more than 70 original bipartisan cosponsors, including amici Representative James

Greenwood. Help America Vote Act of 2001, H.R. 3295, 107th Cong. (2001). At the same time,

a parallel bill was introduced in the Senate to address the "fundamental flaw" in the election system

that was "the lack of Federal direction, leadership, and resources provided to the States and

localities to meet their responsibility as the administrators of Federal elections." Martin Luther

King, Jr. Equal Protection of Voting Rights Act of 2001, S.565, 107th Cong. (2001).[8] Senators

Mitch McConnell (R-KY), Kit Bond (R-MO), and Chris Dodd (D-CT) then negotiated a bipartisan

---

[6] *See also* Karen L. Shanton, Cong. Rsch. Serv., *The Help America Vote Act of 2002 (HAVA): Overview and Ongoing Role in Election Administration Policy* 3 (2023), https://www.congress.gov/crs-product/R46949 ("HAVA Report").

[7] *Hearing on Technology and the Voting Process Before the Comm. on H. Admin.*, 107th Cong 42 (2001) (statement of Christopher Baum).

[8] *See Statements on Introduced Bills and Joint Resolutions*, 147 Cong. Rec. S2475 (daily ed. March 19, 2001).

**GOLDFARB & HUCK
ROTH RIOJAS, PLLC**
925 Fourth Avenue, Suite 3950
Seattle, Washington 98104
(206) 452-0260

update to the Senate proposal, which was introduced in February 2002.[9] Both the House and Senate bills were passed with significant bipartisan majorities, and a joint conference committee was convened. 148 Cong. Rec. H2596 (May 16, 2002). This process culminated in a "compromise" final version, which was adopted by an overwhelming supermajority in both the House (357-48) and the Senate (92-2) and signed by President George W. Bush in October 2002. Pub L. No. 107-252.[10]

**B.    Congress Created the EAC to Help States Administer Elections—Not to Authorize Executive Usurpation of Their Authority**

HAVA "marked something of a shift in the federal approach to election administration."[11] Unlike prior federal election laws, "HAVA was the first to back its requirements with substantial support" including the creation of the EAC, dedicated to "help[ing] election officials improve the administration of elections and help[ing] Americans participate in the voting process." 52 U.S.C. § 20921.[12]

The idea of an independent, bipartisan, expert-driven commission was initially proposed by Senator Mitch McConnell (R-KY) as part of a separate bill to "bring focused expertise to bear on the administration of elections, and, importantly, award matching grants to States and localities to improve the accuracy and integrity of our election system." 147 Cong. Rec. S5631 (daily. ed. May 24, 2001). In negotiating the inclusion of the EAC in HAVA, Congress grappled with the extent of its own constitutional authority regarding elections, and the corollary authority vested in

---

[9] *See Equal Protection of Voting Rights Act of 2001,* 148 Cong. Rec. S710 (daily ed. Feb. 13, 2002).

[10] *See* S. Roll Call Vote No. 238, 107th Cong. (Oct. 16, 2002); H. Roll Call Vote No. 462, 107th Cong. (Oct. 10, 2002).

[11] Karen L. Shanton, Cong. Rsch. Serv., R45770, *The U.S. Election Assistance Commission (EAC): Overview and Selected Issues for Congress* 1 (2023), https://www.congress.gov/crs-product/R45770 ("EAC Report").

[12] *See also id.* at 1-2.

AMICUS BRIEF OF FORMER REPUBLICAN
MEMBERS OF CONGRESS IN SUPPORT OF
WASHINGTON AND OREGON - 6
CASE NO. 2:25-cv-00602-JHC

the EAC. While some members worried about shifting the balance of election administration authority from states to the federal government, others were concerned that states could not make the changes necessary in the aftermath of the 2000 election without significant federal assistance.[13] Gradually, a bipartisan consensus consolidated around the creation of an independent election agency that supported, rather than undermined, the decentralized elections process. As Representative Robert Ney (R-OH) explained during House hearings on election reform, "[w]e want to ensure that the elections in America continue to be run at the state level and local level . . . we don't want to federalize or nationalize the election process. Our decentralized system of government has served us well."[14] When he introduced the legislation in the fall of 2001, Representative Ney emphasized that the commission would be structured to perform an advisory, as opposed to an administrative, role in elections, and explained that the purpose of the EAC "is to assist State and local governments with their election administration problems; its purpose is not to dictate solutions or hand down bureaucratic mandates." 147 Cong. Rec. H9287 (daily ed. Dec. 12, 2001). And during the final votes on the conference report resolving conflicts between the House and Senate versions, Representative Ney explained that the EAC "is not meant and does not have the power to dictate to States how to run their elections. This will not be a bill where Washington, D.C. turns around and says, this is the way you do it." 148 Cong. Rec. H7838 (daily ed. Oct. 10, 2002).[15]

---

[13] *See* HAVA Report, *supra* note 6 at 16.

[14] John Cochran, *Election 'Reform' Movement Gives Way to Caution,"* CQ Weekly, June 2, 2001, https://library.cqpress.com/cqmagazine/toc.php?mode=weekly-date&level=3&values=2001%7E06|June.

[15] The final version of HAVA, however, did include minimum standards for voting systems and other key aspects of election administration, along with funding to help facilitate state compliance. *See* 52 U.S.C. §§ 21081-21083.

AMICUS BRIEF OF FORMER REPUBLICAN
MEMBERS OF CONGRESS IN SUPPORT OF
WASHINGTON AND OREGON - 7
CASE NO. 2:25-cv-00602-JHC

GOLDFARB & HUCK
ROTH RIOJAS, PLLC
925 Fourth Avenue, Suite 3950
Seattle, Washington 98104
(206) 452-0260

Likewise, Senator Mitch McConnell (R-KY) advocated that "[r]ather than dictate from Washington, we should empower States and localities with essential data from a centralized source."[16] When Senator Mitch McConnell (R-KY) and Senator Chris Dodd (D-CT) introduced S.565 in February 2002, Senator Dodd confirmed, "[Senator McConnell and I] believe this compromise is constitutionally sound. The compromise is squarely within the broad grant of congressional authority to legislate in the subject area of the administration of Federal elections." 148 Cong. Rec. S711 (daily ed. Feb. 13, 2002). Reflecting on the EAC, Senator McConnell later explained, "[w]hen we wrote the Help America Vote Act, we took care to reinforce—not undermine—the limits of federal involvement in America's elections."[17]

In devising the appropriate structure and authority for the EAC, Congress sought to avoid the concerns raised by Oregon and Washington in this case. In particular, Representative Robert Ney (R-OH) argued that the system of administering elections at a state and local level was important to preserve because "[t]he dispersal responsibility for election administration has made it impossible for a single centrally controlled authority to dictate how elections will be run and thereby be able to control the outcome." 148 Cong. Rec. H7838 (daily ed. Oct. 10, 2002). The EAC was expressly "not . . . the EPA of elections where you get a new rule and regulation every week and then they say, 'well the authors of the bill, did you mean this? No? Well we are going to do it . . . any way."[18] Instead, the EAC struck "the appropriate balance between local and Federal involvement. It provides for Federal assistance, acknowledging the responsibility we share to

---

[16] *Election Reform: Volume 1, Hearings Before the S. Comm. on Rules and Admin.,* 107th Cong. 118 (2001) (statement of Sen. Mitch McConnell).

[17] Mitch McConnell, Opinion, *Trump Gives Democrats a Voting Gift*, WALL ST. J., Apr. 7, 2025, https://archive.ph/30TWq; *see also* 151 Cong. Rec. S1625 (daily ed. Feb. 17, 2005).

[18] *Hearing on the Conduct of Elections and Proposals for Reform Before the Comm. on H. Admin.*, 109th Cong. 91 (2005) (statement of Rep. Robert Ney).

GOLDFARB & HUCK
ROTH RIOJAS, PLLC
925 Fourth Avenue, Suite 3950
Seattle, Washington 98104
(206) 452-0260

1    ensure that the elections that send all of us to Washington are conducted properly, without

2    concentrating power in Washington in a manner that will prove at best ineffective, and at worst

3    dangerous." 148 Cong. Rec. H7838 (daily ed. Oct. 10, 2002). Consistent with these constitutional

4    principles, HAVA contains no delegation of authority to the President to direct the actions of the

5    EAC.

6

7        Further, it is clear from the detailed structure prescribed by HAVA that the EAC exists to

8    "facilitat[e] or incentiviz[e] elections activities rather than compel[] them."[19] The EAC was created

9    as an "independent entity" charged with "serv[ing] as a national clearinghouse and resource for

10   the compilation of information and review of procedures with respect to the administration of

11   Federal elections." 52 U.S.C. §§ 20921-20922. It is responsible for administering grant programs;

12   providing for the testing, certification, decertification, and recertification of voting system

13   hardware and software by accredited laboratories; developing the federal Voluntary Voting

14   Systems Guidelines ("VVSG"); issuing voluntary guidance for implementing the requirements in

15   Title III of HAVA; conducting research and sharing best practices; and operating the Help America

16   Vote College Program. *Id.* at § 20922. Its rulemaking authority is exceptionally limited, as the

17   EAC may not "issue any rule, promulgate any regulation, or take any other action which imposes

18   any requirement on any State or unit of local government," except as it relates to reporting to

19   Congress on the impact of the NVRA and to maintaining the federal mail voter registration form.

20   52 U.S.C. §§ 20508, 20929. Likewise, the EAC has no authority to enforce HAVA—Congress

21   explicitly left that authority to the Department of Justice. 52 U.S.C. § 21111.

22

23       The structure of the EAC also heavily involves state and local officials in its administration,

24

25   recognizing that they "will have a voice on this commission." 148 Cong. Rec. H7838 (daily ed.

26

27   ───────────────

[19] *See* EAC Report, *supra* note 11 at 4.

**GOLDFARB & HUCK
ROTH RIOJAS, PLLC**
925 Fourth Avenue, Suite 3950
Seattle, Washington 98104
(206) 452-0260

Oct. 10, 2002) (statement of Rep. Robert Ney). Representative Robert Ney (R-OH) explained, "[w]hile the commissioners will have expertise and experience with election issues and administration, they can still benefit from the advice and council [sic] of those who are on the ground, running elections around this country." *Id.* For example, one of the EAC's statutory advisory boards, the Standards Board, charged with reviewing certain guidance and best practices promulgated by the EAC, is composed of one state official and one local official from every state and territory. 52 U.S.C. §§ 20942-20943. And in 2021, the EAC established the Local Leadership Council, consisting entirely of local election officials, to "provide recommendations and direct feedback to the EAC on a range of election administration topics.[20] In this way, the EAC sought to ensure the appropriate balance between local and federal involvement. *See* 148 Cong. Rec. H7838 (daily ed. Oct. 10, 2002).

### C.    Congress Created the EAC as an Independent, Bipartisan, Expert-Driven Commission

The legislative history of HAVA also reflects Congress's determination that structuring the EAC as an independent, bipartisan, expert-driven agency was critical to its ability to fulfill its mandate. In initial discussions over the EAC and HAVA, Senator Mitch McConnell (R-KY) acknowledged that election aid to state and local governments "cannot be accomplished in a partisan manner. Only through a bipartisan effort to assess and support the strengths and identify and correct the failures can we achieve meaningful, and lasting, election reform." 148 Cong. Rec. S2530 (daily ed. Apr. 11, 2002). Throughout the negotiations, Senator McConnell (R-KY) continued to emphasize that the best way to achieve the goal of providing election assistance to states and localities was "by establishing an independent, bipartisan election commission" that

---

[20] U.S. Election Assistance Commission, *Local Leadership Council,* May 15, 2025, www.eac.gov/about-eac/local-leadership-council.

AMICUS BRIEF OF FORMER REPUBLICAN MEMBERS OF CONGRESS IN SUPPORT OF WASHINGTON AND OREGON - 10 CASE NO. 2:25-cv-00602-JHC

GOLDFARB & HUCK ROTH RIOJAS, PLLC 925 Fourth Avenue, Suite 3950 Seattle, Washington 98104 (206) 452-0260

would "be a permanent repository for the best, unbiased, and objective election administration information for states and communities across America." 148 Cong. Rec. S10419 (daily ed. Oct. 15, 2002). Without unbiased and objective election administration information, election officials would have "no way to make an objective analysis of what [their] needs are." *Id.* In the House, Representative Mark Foley (R-OH) explained that his "contention from the beginning has been if we are going to implement meaningful reform, we cannot do it in a partisan manner. Managing good, solid elections that count every vote cast is not about what party you belong to. It is about sound public policy." 148 Cong. Rec. H6345 (daily ed. Sept. 18, 2002).

The EAC's unique structure reinforces this Congressional focus on bipartisanship by mitigating against capture by a partisan majority or excessive control of any individual.[21] Unlike other independent agencies, HAVA requires that the four commissioners of the EAC be staffed by two individuals from each of the major political parties and that the chair and vice chair not be affiliated with the same political party. 52 U.S.C. §§ 20923(a)(2), (c). In this way, Congress emphasized that "bipartisanship is assured." 147 Cong. Rec. H9287 (daily ed. Dec. 12, 2001) (statement of Rep. Robert Ney). Moreover, actions taken by the EAC require support from at least three members, 52 U.S.C. § 20928, "[i]n order to ensure that all actions taken by the commission are strictly bipartisan, including the approval of any grants and the issuance of all guidelines." 148 Cong. Rec. S2532 (daily ed. Apr. 11, 2002) (statement of Sen. Chris Dodd). These structural elements represent a deliberate choice to ensure that no single party or partisan agenda can dominate the EAC's direction and to guarantee compromise and consensus in the EAC's work.[22]

---

[21] *See* HAVA Report, *supra* note 6 at 16.

[22] In contrast, many independent agencies created by Congress—such as the Federal Communications Commission, National Labor Relations Board, Commodities Futures Trading Commission, and others—have an odd number of seats, ensuring a partisan imbalance when all members are seated, and are permitted to take action without bipartisan agreement.

AMICUS BRIEF OF FORMER REPUBLICAN
MEMBERS OF CONGRESS IN SUPPORT OF
WASHINGTON AND OREGON - 11
CASE NO. 2:25-cv-00602-JHC

**GOLDFARB & HUCK
ROTH RIOJAS, PLLC**
925 Fourth Avenue, Suite 3950
Seattle, Washington 98104
(206) 452-0260

1
2
3
4
5
6
7

Equally important was ensuring that the EAC was guided by technical expertise. As Representative Sherwood Boehlert (R-NY) explained, "[w]e [want to] ensure that the best technical minds in the country will work with Federal, State and local officials on developing standards and on certifying the labs that will determine whether the standards are met." 147 Cong. Rec. H9297 (Dec. 12, 2001). Nowhere were these priorities more pronounced than in the statutory process for consideration and adoption of the VVSG.

8
9
10
11
12
13
14
15
16

In giving the EAC responsibility for promulgating the VVSG, Congress detailed specific procedures that prioritize technical expertise. Congress created the Technical Guidelines Development Committee ("TGDC") to start the process by developing recommendations for the guidelines and subsequent modifications. 52 U.S.C. § 20961(b). The Director of the National Institute of Standards and Technology ("NIST") is the TGDC's chair, and its membership is limited to fourteen individuals with technical and scientific expertise related to voting systems and voting equipment. 52 U.S.C. § 20961(c). Congress specifically directed NIST to provide "technical support" to the TGDC as needed to develop these recommendations. 52 U.S.C. § 20961(e).

17
18
19
20
21
22
23
24
25
26
27

Next in the process is mandatory review by two additional advisory bodies created by Congress, the Standards Board and Board of Advisors, for input by a wide range of experts and stakeholders. 52 U.S.C. §§ 20962(b)-(d). Several seats on the Board of Advisors must be filled by "members representing professionals in the field of science and technology," while many are reserved for state and local election officials and administrators, and others are limited to specified federal officials with particular areas of expertise. 52 U.S.C. § 20944. Congress required that the seats be allocated in a "manner which ensures that the Board of Advisors will be bipartisan in nature." *Id.* Likewise, the Standards Board must include one state and one local election official

AMICUS BRIEF OF FORMER REPUBLICAN
MEMBERS OF CONGRESS IN SUPPORT OF
WASHINGTON AND OREGON - 12
CASE NO. 2:25-cv-00602-JHC

**GOLDFARB & HUCK
ROTH RIOJAS, PLLC**
925 Fourth Avenue, Suite 3950
Seattle, Washington 98104
(206) 452-0260

from every state in the country, with an explicit guarantee that officials from the same state "may not be members of the same political party." 52 U.S.C. § 20943.

In addition to mandatory public notice and comment, Congress required that the EAC "take into consideration" the "recommendations" and "comments" of the TGDC, Advisory Board, and Standards Board before adopting or revising the VVSG. 52 U.S.C. § 20962(a), (b)(1), (c), (d)(1). Indeed, the EAC must afford the Standards Board and Advisory Board at least 90 days to review and comment on the draft guidelines before voting to adopt them. 52 U.S.C. § 20962(d)(2). Reflecting on these expert-driven processes, Senator Mitch McConnell (R-KY) explained that it "[gave] state election authorities more resources and expert help as they navigated new technologies and reformed voting procedures."[23]

Through this commitment to independent, bipartisan, technical expertise, the EAC performs a critical public service by supplying state and local officials with objective and workable information, guidelines, and accessibility standards for voting equipment. As part of its research on best practices, the EAC has recently produced resources to help election officials respond to, among others, new cyber security risks, challenges arising from the COVID-19 pandemic, and reported increases in threats to election workers.[24] In today's fractured information ecosystem, EAC's reputation for objective and expert-driven research allows its resources to be respected by state and local officials across the country.

Similarly, due to the EAC's political independence, subject matter expertise, and thorough deliberative processes, many states have, to varying degrees, chosen to incorporate the VVSG into

---

[23] McConnell, *supra* note 17.
[24] EAC Report, *supra* note 11 at 11.

AMICUS BRIEF OF FORMER REPUBLICAN
MEMBERS OF CONGRESS IN SUPPORT OF
WASHINGTON AND OREGON - 13
CASE NO. 2:25-cv-00602-JHC

**GOLDFARB & HUCK
ROTH RIOJAS, PLLC**
925 Fourth Avenue, Suite 3950
Seattle, Washington 98104
(206) 452-0260

their law and practice.[25] The Commission's recommendations carry great weight among election officials and the voting public, even in jurisdictions where there is no legal requirement to adhere to the voluntary standards for certification. Vendors, states, and local governments also invest significant time and resources in adopting and complying with the voluntary standards because of their trustworthiness. It often takes years for vendors to develop and certify new systems and millions of dollars for state and local governments to procure voting systems compliant with the voluntary guidelines. Even after the adoption of the VVSG 2.0 in 2021, the first system was just certified this month—and the EAC estimates that "it will take time for new systems to be developed, certified, and fielded for use in elections, particularly in an environment of constrained funding for state and local election offices."[26]

### D.      The Executive Order Undermines the EAC and Offends Basic Notions of Federalism and the Separation of Powers

Irrespective of the specific policies that the President is attempting to implement in the Executive Order, the effort to supplant the independent, bipartisan, expert-driven processes and structures of the EAC with partisan presidential control compromises the legitimacy and efficacy of the agency. Replacing the EAC's measured expertise with the President's political priorities undermines the fundamental values and functions of the commission—calling into doubt the reasons why Democratic and Republican jurisdictions alike rely upon its recommendations and guidance. With state and local election officials facing ever-growing physical and cyber threats to

---

[25] *See* Brief of *Amici Curiae* Local Election Officials in Support of Plaintiffs' Motion for Partial Summary Judgment at 18-23, *Washington v. Trump*, No. 2:25-cv-00602, (W.D. Wash. June 6, 2025), Dkt. No. 53.

[26] U.S. Election Assistance Commission, *Voluntary Voting System Guidelines (VVSG) Migration,* July 14, 2025, https://www.eac.gov/election-officials/voluntary-voting-system-guidelines-vvsg-migration; *see* U.S. Election Assistance Commission, *The EAC Announces First Certified Voting System to Voluntary Voting System Guidelines (VVSG) 2.0,* July 10, 2025, https://www.eac.gov/news/2025/07/10/eac-announces-first-certified-voting-system-voluntary-voting-system-guidelines-vvsg.

**GOLDFARB & HUCK
ROTH RIOJAS, PLLC**
925 Fourth Avenue, Suite 3950
Seattle, Washington 98104
(206) 452-0260

1  the administration of elections and combating extensive misinformation and public distrust, the

2  President's attempted politicization of the EAC threatens the commission's utility to these public

3  servants just when they need it most.

4      Settled principles of federalism and the separation of powers are likewise treated as an

5  afterthought by the Executive Order. Respecting the federalist nature of our system and conscious

6  of the extraordinary risks arising from poorly designed national election policy or the perception

7  of political bias, Congress has been appropriately cautious when imposing uniform, national

8  election rules that affect every voting jurisdiction throughout the country. Rather, federal election

9  laws have typically been the product of extensive congressional fact-finding, expert consultation,

10  rigorous public and private debate, and at the end of the day, bipartisan agreement. This was true

11  of the Voting Rights Act of 1965 and its reauthorizations; the Uniformed and Overseas Citizens

12  Absentee Voting Act of 1986; the statute at issue here, HAVA; the Military and Overseas Voter

13  Empowerment Act of 2009; and most recently, the Electoral Count Reform Act of 2022.[27]

14      Indeed, when Congress enacted HAVA, broad bipartisan majorities anticipated, and sought

15  to prevent, the President from exerting excessive centralized authority over elections in order to

16  preserve our centuries-old decentralized elections system. Reflecting upon the Executive Order

17  and his critical role in passage of HAVA and creation of the ECA, Senator Mitch McConnell (R-

18  KY) recently stated, "[d]elegation of authority over election administration is crystal clear.

---

[27] *See* R. Sam Garrett, Cong. Rsch. Serv., R47520, *The Voting Rights Act: Historical Development and Policy Background* (2023), https://www.congress.gov/crs-product/R47520; Kevin Coleman, Cong. Rsch. Serv., RS20764, *The Uniformed and Overseas Citizens Absentee Voting Act: Overview and Issues* (2016), https://www.congress.gov/crs-product/RS20764; Brian C. Kalt, *Unconstitutional But Entrenched: Putting UOCAVA and Voting Rights for Permanent Expatriates On A Sound Constitutional Footing*, 81 Brook. L. Rev. 441, 446 (2016); *The Electoral Count Act: The Need for Reform Hearing Before the Sen. Comm. on Rules and Admin.*, 117th Cong. (2022); L. Paige Whitaker & Elizabeth Rybiki, Cong. Rsch. Serv., IN12065, *The Electoral Count Act and Presidential Elections* (2022), https://www.congress.gov/crs-product/IN12065.

GOLDFARB & HUCK ROTH RIOJAS, PLLC 925 Fourth Avenue, Suite 3950 Seattle, Washington 98104 (206) 452-0260

Elections may have national consequences but the power to conduct them rests in state capitols."[28] As a sister court recently held, federal law does not "afford[ ] the President the power to conscript states . . . to carry out his Executive Order mandates." *California v. Trump*, No. 25-cv-10810-DJC, 2025 WL 1667949, at *11 (D. Mass. June 13, 2025); *see also Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991) ("[A] healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front.").

Within Congress, there are competing views as to how extensively the Constitution authorizes congressional regulation of elections. Yet, as between the Legislative and Executive branches, the Elections Clause is unambiguous: Congress has authority to create and alter election rules; the President does not. Congress created the EAC and delegated it the responsibility for providing election assistance to state and local government officials. Not only did Congress refuse to delegate any such authority to the President, but the statutory structure and procedures of the EAC are incompatible with a presidential prerogative to dictate the outcome of EAC decisions. *See California,* 2025 WL 1667949 at *11 (federal law does not "afford[ ] the President the power . . . to direct the outcome of the EAC's processes"). Allowing the President to ignore the laws passed by Congress and repurpose an independent, bipartisan, expert-driven agency to advance a partisan agenda would weaken critical protections in our constitutional order. *See Gregory*, 501 U.S. at 458 ("[T]he separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch . . .").

The Founders recognized the dangers of granting the President unilateral power over the time, place, or manner of elections, so they gave the presidency no such power. Congress likewise refused to delegate any such authority in creating the EAC. The potential for abuse was then, as it

---

[28] McConnell, *supra* note 17.

**GOLDFARB & HUCK
ROTH RIOJAS, PLLC**
925 Fourth Avenue, Suite 3950
Seattle, Washington 98104
(206) 452-0260

is now, self-evident.[29] In the words of Senator McConnell, sanctioning this improper assertion of presidential power could ease the way for future presidents to "carry out a complete federal takeover of American elections."[30]

### IV.    CONCLUSION

With supermajorities in each chamber and the national trauma of the 2000 election still a fresh memory, Congress created the EAC to act as an independent, bipartisan, expert-driven commission with a mandate to support state and local governments in election administration. The Executive Order subverts the entire statutory scheme, not to mention constitutional text, structure, and practice. Had such abuses been foreseeable at the time, amici—and no doubt, clear majorities of their former colleagues—would have refused to create the EAC, trust a politicized commission to develop and promulgate the VVSG, or endow it with any of the other authorities at issue here.

RESPECTFULLY SUBMITTED this July 21, 2025.

*The undersigned certifies that this proposed motion contains 5284 words, in compliance with the Local Civil Rules.*

---

[29] *See* Lisa Marshall Manheim, *Presidential Control of Elections*, 74 Vand. L. Rev. 385, 390 (2021).
[30] McConnell, *supra* note 17.

AMICUS BRIEF OF FORMER REPUBLICAN
MEMBERS OF CONGRESS IN SUPPORT OF
WASHINGTON AND OREGON - 17
CASE NO. 2:25-cv-00602-JHC

1

2

**GOLDFARB & HUCK ROTH RIOJAS, PLLC**

3
*/s/ Christopher M. Huck*
Christopher M. Huck, WSBA No. 34104
(huck@goldfarb-huck.com)

4

5
*/s/ Kit W. Roth*
Kit W. Roth, WSBA No. 33059
(roth@goldfarb-huck.com)

6

7
*/s/ R. Omar Riojas*
R. Omar Riojas, WSBA No. 35400
(riojas@goldfarb-huck.com)

8

9
*/s/ Kimberlee L. Gunning*
Kimberlee L. Gunning, WSBA No. 35366
(gunning@goldfarb-huck.com)

10

11
925 Fourth Avenue, Suite 3950
Seattle, Washington 98104
Telephone: (206) 452-0260

12

13
**PROTECT DEMOCRACY PROJECT**

14
*/s/ Beau C. Tremitiere*
Beau C. Tremitiere, admitted *Pro Hac Vice*
(beau.tremitiere@protectdemocracy.org)

15

16
*/s/ Lauren E. Groth*
Lauren E. Groth, admitted *Pro Hac Vice*
(lauren.groth@protectdemocracy.org)

17

18
300 Center Dr, Suite G-251
Superior, Colorado 80027
Telephone: (202) 579-4582

19

20
*Attorneys for Senator Chuck Hagel,
Representative James Greenwood, and
Representative Chris Shays*

21

22

23

24

25

26

27

AMICUS BRIEF OF FORMER REPUBLICAN
MEMBERS OF CONGRESS IN SUPPORT OF
WASHINGTON AND OREGON - 18
CASE NO. 2:25-cv-00602-JHC

**GOLDFARB & HUCK
ROTH RIOJAS, PLLC**
925 Fourth Avenue, Suite 3950
Seattle, Washington 98104
(206) 452-0260

1

## <u>CERTIFICATE OF SERVICE</u>

2

3       The undersigned certifies that the foregoing document was filed electronically with the

4   Clerk of the Court using the CM/ECF system on July 21, 2025 and was served via the Court's

5   CM/ECF system on all counsel of record.

6
7       DATED this July 21, 2025.

8                                                */s/ R. Omar Riojas*
                                                 R. Omar Riojas, WSBA No. 35400
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

**GOLDFARB & HUCK
ROTH RIOJAS, PLLC**
925 Fourth Avenue, Suite 3950
Seattle, Washington 98104
(206) 452-0260