The Honorable John H. Chun

1

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT
9            WESTERN DISTRICT OF WASHINGTON
                        AT SEATTLE
10

11

12  STATE OF WASHINGTON; and,
    STATE OF OREGON,
13

14          Plaintiffs,                    No. 2:25-cv-00602-JHC

15              v.                         BRIEF OF *AMICUS CURIAE* BRENNAN
                                           CENTER FOR JUSTICE IN SUPPORT OF
16  DONALD J. TRUMP, et al.,               PLAINTIFFS' MOTION FOR PARTIAL
                                           SUMMARY JUDGMENT
17          Defendants.

18

19

20

21

22

23

24

25

26

# TABLE OF CONTENTS

STATEMENT OF INTEREST.................................................................................1

SUMMARY OF ARGUMENT..............................................................................1

BACKGROUND ..................................................................................................4

I.     THE VOLUNTARY VOTING SYSTEM GUIDELINES ARE CRITICAL
TO ELECTION ADMINISTRATION.........................................................4

     A.   The VVSGs Are Developed by an Independent, Bipartisan Agency. ..............5

     B.   States Rely on the VVSGs to Test, Certify, and Implement Their
Voting Machinery. ........................................................................6

     C.   Barcode and QR Code Technology Is Widely Used in Voting Systems
Across the Nation. .......................................................................9

ARGUMENT .....................................................................................................10

I.     IMPLEMENTATION OF THE EXECUTIVE ORDER WOULD
DISRUPT ELECTIONS NATIONWIDE..................................................10

     A.   The Executive Order Would Strand Many States Without Legally
Compliant Voting Systems. ..........................................................11

     B.   It Would Be Prohibitively Expensive to Implement Any System that
Complies with the Executive Order..............................................12

     C.   The Timeline for Implementing New Guidelines and Voting
Systems—Even If They Were Available—Is Infeasible................14

II.    THE ORDER UNDERMINES PUBLIC TRUST IN VOTING SYSTEMS........15

CONCLUSION...................................................................................................17

BRIEF OF *AMICUS CURIAE*
BRENNAN CENTER FOR JUSTICE - i
NO. 2:25-CV-00602

GORDON    600 University Street
TILDEN    Suite 2915
THOMAS    Seattle, WA 98101
CORDELL   206.467.6477

# TABLE OF AUTHORITIES

**CASES**

*Brnovich v. Democratic Nat'l Comm.,*
    594 U.S. 647 (2021) ........................................................................... 15

*California v. Trump,*
    No. 25-cv-10810-DJC, 2025 WL 1667949 (D. Mass. June 13, 2025) ...................... 13

*Crawford v. Marion Cnty. Election Bd.,*
    553 U.S. 181, 197 (2008) .................................................................... 15

*Purcell v. Gonzalez,*
    549 U.S. 1 (2006) ............................................................................ 15

**STATUTES**

52 U.S.C. § 20922(1) ............................................................................ 5

52 U.S.C. § 20923 ............................................................................... 6

52 U.S.C. § 20961 ............................................................................... 6

52 U.S.C. § 20962 ............................................................................... 5

52 U.S.C. § 20962(a) ........................................................................... 5

52 U.S.C. § 20962(b) ........................................................................... 6

52 U.S.C. § 20962(b)(1) ........................................................................ 6

52 U.S.C. § 20962(c) ........................................................................... 6

52 U.S.C. § 20962(d) ........................................................................... 6

Alaska Stat. Ann. § 15.20.910 .................................................................. 8

Ariz. Rev. Stat. § 16-442(B) ................................................................... 8

Cal. Elec. Code § 19101(a) ..................................................................... 8

Del. Code Tit. 15, § 5001A(c) .................................................................. 7

Ga. Comp. R. & Regs. 590-8-1-.01(d)(1) ......................................................... 7

BRIEF OF *AMICUS CURIAE*
BRENNAN CENTER FOR JUSTICE - ii
NO. 2:25-CV-00602

GORDON      600 University Street
TILDEN      Suite 2915
THOMAS      Seattle, WA  98101
CORDELL     206.467.6477

Md. Code, Elec. Law § 9-102(d)(2) ................................................................ 8

N.M. Stat. § 1-9-14(A) ....................................................................................... 8

**EXECUTIVE ORDERS**

Executive Order No. 14248, 90 Fed. Reg. 14005 (Mar. 25, 2025) ........................ passim

**OTHER AUTHORITIES**

Abby Vesoulis, *States Are Trying to Stop Election Meddling. But the Real Risk is Public Confidence*, Time (Mar. 5, 2019) ........................................................ 16

Adam Doe, *Collin County spends $2.3 million on new hand-marked ballot system*, Cmty. Impact (June 25, 2025) ................................................................ 4

Arizona.Vote, *How we secure Arizona's elections* .......................................... 16

Brennan Ctr. for Justice, *Brennan Center Overview of Voting Equipment* (May 31, 2018) .................................................................................................. 10

Brennan Ctr. for Justice, *Voting Machines & Infrastructure* (last visited July 19, 2025) ... 1

Caroline Nihill, *Connecticut to Spend $25M on new voting machines*, Statescoop (Sept. 28, 2023) ...................................................................................... 13

Derek Tisler & Lawrence Norden, *Some Good News for Donald Trump: We Already Use Paper Ballots*, Brennan Ctr. for Justice (Aug. 23, 2024) ................................ 10

Derek Tisler, *States Must Take the Lead on Election Security*, Brennan Ctr. For Justice (Dec. 19, 2024) ............................................................................ 14

Emily Burns & Maha Quadri, *Independent Agencies Must Remain Independent*, Campaign Legal Ctr. (Apr. 22, 2025) ................................................................ 6

Jessica Huseman, *State Lawmakers Need to Consider Practical Realities When it Comes to Elections*, Votebeat (Feb. 13, 2023) .................................................. 15

Jessica Huseman, *Why Trump wants to ban barcodes on ballots, and what it means for voters and election officials*, Votebeat (Mar. 28, 2025) ........................... 10, 12

Karen L. Shanton, Cong. Rsch. Serv. R47592, *Federal Standards and Guidelines for Voting Systems: Overview and Potential Considerations for Congress Summary* (2023) . 8

BRIEF OF *AMICUS CURIAE*
BRENNAN CENTER FOR JUSTICE - iii
NO. 2:25-CV-00602

GORDON    600 University Street
TILDEN    Suite 2915
THOMAS    Seattle, WA  98101
CORDELL    206.467.6477

Layla Ferris, *False claims about machines "switching" votes are going viral. Here's what to know*, CBS News (Oct. 24, 2024) ................................................................ 15

Lou Ann Blake, *BMDs: The Common-Sense Voting Solution*, Nat'l Fed'n of the Blind (Apr. 26, 2019) ............................................................................................... 9, 10

Maggie Miller, *Georgia awards contract for new voting machines*, The Hill (July 29, 2019) ............................................................................................................ 13

Nat'l Ass'n of State Election Dirs., *NASED Letter to US Election Assistance Commission Regarding Deprecation of the VVSG 1.0* (Mar. 17, 2023) ................................. 16

Nat'l Conf. of State Legislatures, *Executive Order on Elections: Implications for States* (Apr. 25, 2025) .................................................................................... 14, 15

Ohio Sec'y of State, *Election Security Fact Sheet* ............................................. 16

Oregon Sec'y of State, *Election Integrity* ......................................................... 15

Press Release, Representative Rachel Keshel, *Representative Rachel Keshel Praises President Trump's Executive Order to Restore Transparent, Verifiable Elections* (Apr. 7, 2025) .................................................................................................................... 4

Ruby Edlin, Megan Maier & Warren Stewart, *Costs for Replacing Voting Equipment in 2024*, Brennan Ctr. for Justice (Feb. 7, 2024) ............................................... 13, 14

S.B. 135, 132nd Gen. Assemb. (Ohio 2018) ..................................................... 13

U.S. Election Assistance Comm'n, *State Requirements and the U.S. Election Assistance Commission Voting System Testing and Certification Program* (Aug. 3, 2023) ............. 4, 7

U.S. Election Assistance Comm'n, *Election Security Grant* (Apr. 23, 2025) ................. 14

U.S. Election Assistance Comm'n, *The EAC Announces First Certified Voting System to Voluntary Voting System Guidelines (VVSG) 2.0* (July 10, 2025) ....................... 2, 11, 14

U.S. Election Assistance Comm'n, *Voluntary Voting System Guidelines* (Jan. 31, 2025) ............................................................................................. 5, 6

U.S. Election Assistance Comm'n, *VVSG Lifecycle Policy* (June 16, 2023) ................... 11

U.S. Election Assistance Comm'n, *Requirements for the Voluntary Voting System Guidelines 2.0* (Feb. 10, 2021) ........................................................................ 5

BRIEF OF *AMICUS CURIAE*
BRENNAN CENTER FOR JUSTICE - iv
NO. 2:25-CV-00602

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA 98101
206.467.6477

U.S. Gov't Accountability Off., GAO-18-294, *Observations on Voting Equipment Use and Replacement* (2018) ................................................................................ 13

Verified Voting, *The Price of Voting* (Mar. 2021) ............................................. 12

Verified Voting, *Understanding the Election Tech Implications in the Trump Administration's Executive Order* (Apr. 9, 2025) ............................................... 9

Verified Voting, *Voting Equipment Database* ................................................... 9

Wendy Underhill, *The Help America Vote Act: 20 Years Later, Nat'l Conf. of State Legislatures* (June 1, 2022) ......................................................................... 5, 6

BRIEF OF *AMICUS CURIAE*
BRENNAN CENTER FOR JUSTICE - v
NO. 2:25-CV-00602

GORDON    600 University Street
TILDEN    Suite 2915
THOMAS    Seattle, WA  98101
CORDELL    206.467.6477

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**STATEMENT OF INTEREST**

*Amicus curiae* Brennan Center for Justice at NYU School of Law (the "Brennan Center") is a nonprofit, non-partisan law and public interest law institute that seeks to strengthen, revitalize, and defend our systems of democracy and justice. The Brennan Center is a leader in the field of the systems and structures of election administration. The Brennan Center has long been dedicated to researching and understanding voting systems and election infrastructure.[1] The Brennan Center's interest in this case stems from its extensive history of working to ensure that elections are secure and to preserve and protect voting rights across all communities in America.[2] While the Brennan Center supports Plaintiffs' Motion for Partial Summary Judgment on each of their claims, it offers here its particular experience on voting systems to inform the Court of the harms that will ensue from Section 4(b) of the Executive Order.

**SUMMARY OF ARGUMENT**

On March 25, 2025, President Trump issued an Executive Order that will create grave uncertainty and chaos for states' administration of elections. In particular, Section 4(b) of the Order instructs the Election Assistance Commission ("EAC") to amend the standards it sets for voting infrastructure, known as the Voluntary Voting System Guidelines ("VVSGs"). Under the Order, the EAC must amend the VVSGs to direct the removal of barcodes and QR codes from ballots, to "review and, if appropriate, re-certify voting systems under the new standards established under subsection (b)(i) of this section, ***and to rescind all previous certifications of voting equipment based on prior standards***," Executive Order § 4(b)(ii) (emphasis added). By its plain terms, this provision would force the EAC to decertify all machines that it previously certified, impacting the vast majority of states.

---

[1] *See* Brennan Ctr. for Justice, *Voting Machines & Infrastructure*, https://www.brennancenter.org/issues/defend-our-elections/election-security/voting-machines-infrastructure (last visited July 19, 2025).

[2] The Brennan Center separately represents a set of plaintiffs in *League of Women Voters v. Trump*, No. 1:25-cv-00955 (D.D.C.), who have focused on challenging the constitutionality of Section 2(a) of Executive Order No. 14248, 90 Fed. Reg. 14005 (Mar. 25, 2025) ("Executive Order" or "Order"); that litigation does not involve a challenge to Section 4(b) of the Order.

BRIEF OF *AMICUS CURIAE*
BRENNAN CENTER FOR JUSTICE - 1
NO. 2:25-CV-00602

GORDON    600 University Street
TILDEN    Suite 2915
THOMAS    Seattle, WA 98101
CORDELL   206.467.6477

For many years, states have relied on support from the EAC—an independent, bipartisan agency—to run elections and operate their voting systems. The EAC's standards for voting systems and the VVSGs provide baseline requirements for voting machine cybersecurity, accessibility, and usability that vendors (the manufacturers of electronic voting systems) agree to meet and which many states have adopted. Because of the VVSGs, election officials can assure voters that their votes are being recorded accurately on technology that operates in accordance with independent and authoritative standards, bolstering public confidence in the integrity of our elections.

Updating the VVSGs is a painstaking task that requires years of development and testing. For this reason, EAC policy ensures that previous certifications remain valid when new versions of the VVSGs are under development, so election officials can maintain this important—and in some cases, legally required—stamp of approval for their current voting systems until new systems become available. The current guidelines—VVSG 2.0—are the first major revision to the VVSGs in over 15 years. Four years after that approval, in July 2025, the EAC announced the first voting system certified to VVSG 2.0.[3]

*Amicus* Brennan Center highlights here the disruptive and far-reaching impacts of Section 4(b) of the Executive Order on election administration nationwide. ***First***, the Order will effectively nullify the legality of voting systems across eleven states and the District of Columbia (which, by state law, require federal certification), and will deny every state access to a federally-certified voting system. It obligates the EAC to establish a *new* VVSG standard, even though the full process—for the EAC to develop and adopt new guidelines, for voting system vendors to develop compliant systems, for laboratories to test new systems, for the EAC to certify systems, and for those systems to hit the market—will take years. In the meantime, states will be unable to rely on certification to existing standards, because the Order instructs the EAC to "rescind all previous

---

[3] U.S. Election Assistance Comm'n, *The EAC Announces First Certified Voting System to Voluntary Voting System Guidelines (VVSG) 2.0* (July 10, 2025), https://www.eac.gov/news/2025/07/10/eac-announces-first-certified-voting-system-voluntary-voting-system-guidelines-vvsg.

BRIEF OF *AMICUS CURIAE*
BRENNAN CENTER FOR JUSTICE - 2
NO. 2:25-CV-00602

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA 98101
206.467.6477

1   certifications" of equipment under prior standards.[4] Executive Order § 4(b)(ii). This will prevent

2   states from ensuring a smooth transition to new versions of voting systems that meet updated

3   federal guidelines.

4     **Second**, the Executive Order would saddle states with immense costs to procure new voting

5   systems. This extraordinary burden could not come at a worse time, considering that federal and

6   state funding for elections are at their lowest point in years and continue to decline. The

7   unpredictability of funding makes it nearly impossible for election officials to quickly procure new

8   voting systems following updates to federal guidelines.

9     **Third**, not only will the Order foist enormous funding challenges on states, it will create a

10  timing nightmare—it will be virtually impossible for states to field federally-certified election

11  equipment in time and before election season. Again, there is much to be done, from start to finish,

12  to conduct accurate and secure elections: The process of developing and approving new guidelines,

13  designing and certifying new voting equipment, and implementing new election systems in states

14  and counties typically takes years.

15    **Finally**, the Executive Order will undoubtedly undermine public trust in elections at a time

16  when false conspiracy theories abound on the security of our nation's voting equipment. The Order

17  would unfairly stigmatize our voting systems, sending the wrong message to the voting public that

18  current systems do not meet federal standards, even as voters are casting their ballots on those

19  systems.

20    Indeed, the Executive Order is already affecting how states run their elections, jeopardizing

21  stability and public trust. Some state legislators are already using the Order as an excuse to attempt

22  to change their voting systems—for example, an Arizona state legislator asked the State "to

23  conduct the 2026 elections using hand-marked, hand-counted paper ballots" and "end funding for

24  non-compliant electronic systems and cancel maintenance contracts that will become obsolete

25

26  ---

[4] As Plaintiffs have pointed out, the President lacks authority to order changes to election systems guidelines or dictate the outcome of the process for testing and certification of voting systems. *See* Pls' Mot. for Part. Summ. J. at 21, ECF No. 37.

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

under federal standards."[5] And we can already see the coming funding crisis as a result of the Order: A county in Texas spent $2.3 million to purchase voting equipment for hand-marked ballots in an effort to comply with the Executive Order.[6]

The conduct of secure elections is fundamental to safeguarding our democracy. Far from enhancing election security, the Executive Order will pose additional and near-impossible challenges for states, undermine public confidence in voting systems, and destabilize upcoming elections. *Amicus* Brennan Center urges the Court to rule in favor of Plaintiffs on their challenge to Section 4(b) of the Executive Order.

## BACKGROUND

### I.    THE VOLUNTARY VOTING SYSTEM GUIDELINES ARE CRITICAL TO ELECTION ADMINISTRATION.

The EAC is the only federal agency that Congress has tasked with the authority to test and certify voting systems. The EAC meets that charge through the VVSGs.[7] As Plaintiffs' Motion for Partial Summary Judgment correctly explains, Congress vested the EAC—an independent, bipartisan commission—with the power to guide state election officials in how to best safeguard and systematize voting systems across the nation. And Congress defined a specific statutory process for modifying the VVSGs, leaving the President no unilateral authority to mandate that the EAC update the VVSGs or discard the current guidelines. The Executive Order's rejection of barcodes and QR codes on ballots similarly disrupts and upends time-tested systems and sows chaos into states' election systems. Changing the VVSGs so drastically and quickly, as the

---

[5] Press Release, Representative Rachel Keshel, *Representative Rachel Keshel Praises President Trump's Executive Order to Restore Transparent, Verifiable Elections* (Apr. 7, 2025), https://www.azleg.gov/press/house/57LEG/1R/250407KESHELEO.pdf.

[6] Adam Doe, *Collin County spends $2.3 million on new hand-marked ballot system*, Cmty. Impact (June 25, 2025), https://communityimpact.com/dallas-fort-worth/mckinney/government/2025/06/25/collin-county-spends-23-million-on-new-hand-marked-ballot-system/.

[7] U.S. Election Assistance Comm'n, *State Requirements and the U.S. Election Assistance Commission Voting System Testing and Certification Program* 3–4 (Aug. 3, 2023), https://www.eac.gov/sites/default/files/2023-08/State%20Requirements%20for%20Certification%202023.pdf.

---

BRIEF OF *AMICUS CURIAE*
BRENNAN CENTER FOR JUSTICE - 4
NO. 2:25-CV-00602

GORDON    600 University Street
TILDEN    Suite 2915
THOMAS    Seattle, WA  98101
CORDELL    206.467.6477

Executive Order demands, would overturn decades of work by the EAC and threaten existing state processes.

### A. The VVSGs Are Developed by an Independent, Bipartisan Agency.

The Help America Vote Act ("HAVA") was passed in the wake of the 2000 presidential election, when prolonged delays in tallying votes brought issues with election administration to the forefront.[8] HAVA set baseline operational requirements and provided funding for states to administer elections.[9] In order to assist states with complying with the new law, Congress created the EAC, a bipartisan advisory agency.[10] Among the EAC's mandatory duties under HAVA is promulgating the VVSGs. 52 U.S.C. § 20922(1).

The VVSGs are a "set of specifications and requirements against which voting systems can be tested to determine if they meet required standards."[11] The latest version, VVSG 2.0, adopted in 2021, contains detailed guidelines for the design and implementation of voting systems with the goal of ensuring all voting systems possess "basic functionality, accessibility, and security capabilities."[12] The VVSGs are designed to be used by voting system manufacturers and laboratories as they design, build, and stress-test voting systems acquired by states and local jurisdictions for use in elections.[13]

HAVA sets forth the procedure for the EAC to develop and adopt new versions or modifications of the VVSGs. 52 U.S.C. § 20962. The EAC must publish notice of the proposed guidelines or modification of guidelines in the Federal Register and provide an opportunity for public comment and a public hearing on the record. *Id.* § 20962(a). The EAC must also consider

---

[8] Wendy Underhill, *The Help America Vote Act: 20 Years Later*, Nat'l Conf. of State Legislatures (June 1, 2022), https://www.ncsl.org/state-legislatures-news/details/the-help-america-vote-act-20-years-later.

[9] *Id.*

[10] *Id.*

[11] U.S. Election Assistance Comm'n, *Voluntary Voting System Guidelines* (Jan. 31, 2025), https://www.eac.gov/voting-equipment/voluntary-voting-system-guidelines.

[12] U.S. Election Assistance Comm'n, *Requirements for the Voluntary Voting System Guidelines 2.0* 5 (Feb. 10, 2021), https://www.eac.gov/sites/default/files/TestingCertification/Voluntary_Voting_System_Guidelines_Version_2_0.pdf.

[13] *Id.* at 9.

BRIEF OF *AMICUS CURIAE*
BRENNAN CENTER FOR JUSTICE - 5
NO. 2:25-CV-00602

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA 98101
206.467.6477

1    recommendations by the Technical Guidelines Development Committee. *Id.* §§ 20961,

2    20962(b)(1). Further, the EAC must submit the proposed guidelines to the Board of Advisors and

3    the Standards Board for additional comment and review. *Id.* § 20962(b), (c). HAVA created these

4    three entities and established detailed membership requirements for each to ensure that a wide

5    range of viewpoints is considered, including the views of state and local officials that run elections,

6    and that expertise and consensus drive all modifications to the VVSGs. Finally, the EAC must vote

7    to adopt any new guideline or modification, which cannot occur until 90 days have passed since

8    the EAC submitted the proposed guidelines to the Board of Advisors and Standards Board. *Id.* §

9    20962(d). The certification process predictably takes a long time. Prior to the 2021 publication of

10   VVSG 2.0, the last VVSG modification was in 2015, when VVSG 1.1 was published.[14]

11       A key feature of the VVSGs is that they are developed by a bipartisan, independent agency,

12   in collaboration with technical experts and based on public input. The EAC consists of four

13   members—no more than two of whom may be affiliated with the same political party—appointed

14   by the President with the advice and consent of the Senate. 52 U.S.C. § 20923. The EAC's balanced

15   structure also creates stability for elections by allowing states and other interested parties to plan

16   their voting systems using one set of guidelines without fear that the rules are going to change with

17   every new Presidential administration.[15]

18       **B.    States Rely on the VVSGs to Test, Certify, and Implement Their Voting Machinery.**

19

20       Though "voluntary," the VVSGs have in practice become a fundamental component of

21   state election systems. State reliance on the VVSGs takes several forms, from requiring that a

22   state's voting systems have been tested to VVSG standards, to mandating that the state purchase

23

24   [14] U.S. Election Assistance Comm'n, *supra* note 11; *see also* Underhill, *supra* note 8 ("Since the adoption of VVSG 1.0 in 2005, updates have been slow in coming, and vendors have been slow to adapt to new guidelines.").

25   [15] *See* Emily Burns & Maha Quadri, *Independent Agencies Must Remain Independent*, Campaign Legal Ctr. (Apr. 22, 2025), https://campaignlegal.org/update/independent-agencies-must-remain-independent ("Congress specifically insulated independent agencies and the civil servants running them from partisan influence and political pressure to ensure they could focus on long-term public good and not the short-term political whims of the president or party leaders.").

26

BRIEF OF *AMICUS CURIAE*
BRENNAN CENTER FOR JUSTICE - 6
NO. 2:25-CV-00602

GORDON    600 University Street
TILDEN    Suite 2915
THOMAS    Seattle, WA  98101
CORDELL   206.467.6477

machines that have been officially certified by the EAC.[16] Many states have enacted laws or regulations that require their voting systems to comply with the VVSGs. In total, the current voting systems of eleven states and Washington, D.C. would be out of compliance with their own states' laws if the Executive Order takes effect. While other states do not specifically require certification, their incorporation of federal guidelines and testing processes demonstrates an intent to use federally-certified voting systems and the value of doing so; these states too would face disruptive impacts from the Order.

The laws of eleven states and Washington, D.C. require their voting systems to be federally certified, meaning the machines must be both tested to federal standards by a federally accredited laboratory and approved by the EAC itself.[17] Delaware, for example, mandates that voting systems "must be certified by the United States Election Assistance Commission, or designated federal authority, as meeting or exceeding the voluntary voting systems standards or guidelines as promulgated by the United States Election Assistance Commission . . . ." Del. Code Tit. 15, § 5001A(c). Georgia's regulations similarly require that "[p]rior to submitting a voting system for certification by the State of Georgia, the proposed voting system's hardware, firmware, and software must have been issued Qualification Certificates from the EAC." Ga. Comp. R. & Regs. 590-8-1-.01(d)(1). Implementation of the Executive Order—specifically the requirement to rescind all prior certifications—threatens to leave these states without any voting system that complies with these legal requirements. Because the EAC certifies systems according to the VVSGs, these states effectively incorporate the VVSGs as a necessary component for voting system certification.

Approximately 25 states mandate some combination of testing by a nationally accredited laboratory or testing to the VVSGs for voting systems seeking certification.[18] These states explicitly incorporate federal standards and practices into their statutes and regulations, giving

---

[16] *See* U.S. Election Assistance Comm'n, *supra* note 7, at 2.

[17] *Id. at* 3–4.

[18] *Id.*

BRIEF OF *AMICUS CURIAE*
BRENNAN CENTER FOR JUSTICE - 7
NO. 2:25-CV-00602

GORDON    600 University Street
TILDEN    Suite 2915
THOMAS    Seattle, WA  98101
CORDELL   206.467.6477

them the force of law and demonstrating an intent to use only those voting systems that are tested and certified to the VVSGs, even if certification itself is not expressly required. For example, New Mexico requires that: "All voting systems certified for use in the state shall be tested by an independent authority and shall comply with all requirements in the Election Code and the most recent voluntary voting system guidelines adopted and implemented by the United States election assistance commission." N.M. Stat. § 1-9-14(A). Arizona requires that its voting machines "have been tested and approved by a laboratory that is accredited pursuant to the help America vote act of 2002." Ariz. Rev. Stat. § 16-442(B). Maryland likewise requires both that its systems have been "examined by an independent testing laboratory that is approved by the U.S. Election Assistance Commission" and that the systems are "shown by the testing laboratory to meet the performance and test standards for electronic voting systems established by the Federal Election Commission or the U.S. Election Assistance Commission[.]" Md. Code, Elec. Law § 9-102(d)(2).

And even as to other states that do not expressly mandate adherence to the VVSGs, the guidelines still play a critical role in their elections. Two states use the VVSGs as a model for their own voting system guidelines. California law demands that "the Secretary of State shall adopt standards that meet or exceed federal voluntary voting system guidelines set forth by the United States Election Assistance Commission"—effectively using the VVSGs as a baseline for more stringent state voting standards. Cal. Elec. Code § 19101(a). Alaska similarly considers whether the "Federal Election Commission has certified the voting machine or vote tally system" as a factor when deciding whether to certify a voting system. Alaska Stat. Ann. § 15.20.910. In these states, the VVSGs have a strong albeit indirect influence on the certification process.

Moreover, because the specialized companies that manufacture and sell voting systems must meet the needs of as many jurisdictions as possible to be commercially viable, the economic reality is that nearly every major voting system in use by states has been federally certified.[19] As

---

[19] *See* Karen L. Shanton, Cong. Rsch. Serv. R47592, *Federal Standards and Guidelines for Voting Systems: Overview and Potential Considerations for Congress* Summary (2023), https://www.congress.gov/crs-product/R47592 ("[W]idespread adoption of the [VVSGs] by states under their own state laws means that the VVSG have significant influence in practice, shaping the kinds of voting systems vendors develop and market.").

BRIEF OF *AMICUS CURIAE*
BRENNAN CENTER FOR JUSTICE - 8
NO. 2:25-CV-00602

GORDON    600 University Street
TILDEN    Suite 2915
THOMAS    Seattle, WA  98101
CORDELL    206.467.6477

1   a result, the impact of the Executive Order would drastically constrain the market for voting system

2   equipment for all states, even those that do not mandate compliance with the VVSGs in some form.

3            C.      **Barcode and QR Code Technology Is Widely Used in Voting Systems Across the Nation.**

4   In its mandate to the EAC to revise the VVSGs, the Executive Order specifically demands

5   that the EAC develop new guidelines that prohibit the use of barcodes and QR codes to encode

6   votes. Executive Order § 4(b)(i). That alone would cause a sea change to election systems across

7   the country. The vast majority of voting systems on the market rely on components or machines

8   that encode votes using a barcode or QR code. Today, 1,954 counties in forty states have some

9   voting machines that use QR codes or barcodes to record votes.[20] The same goes for the two largest

10  vendors of voting systems in use today, ES&S and Dominion, whose machines collectively cover

11  72% of all voters nationwide.[21]

12  Barcodes and QR codes are commonly used in ballot marking devices ("BMDs"), which

13  allow individuals to make their selections on an electronic screen and print a voter-verifiable paper

14  ballot with the voter's selections encoded in the barcode, in addition to human-readable text.[22]

15  Election jurisdictions use BMDs to satisfy federal accessibility requirements because they allow

16  for the use of assistive technology, like audio and tactile interfaces, for voters with print

17  disabilities.[23] And some states and counties use BMDs for all voters,[24] as these systems can support

18

19

20

21

22  _____

23  [20] Verified Voting, *Understanding the Election Tech Implications in the Trump Administration's Executive Order* (Apr. 9, 2025), https://verifiedvoting.org/blog-executive-order-apr-2025/.

24  [21] *See* Verified Voting, *Voting Equipment Database*, https://verifiedvoting.org/equipmentdb/ (last visited July 19, 2025).

25  [22] Verified Voting, *supra* note 20.

26  [23] *See* Lou Ann Blake, *BMDs: The Common-Sense Voting Solution*, Nat'l Fed'n of the Blind (Apr. 26, 2019), https://nfb.org/index.php/blog/bmds-common-sense-voting-solution.

[24] Verified Voting, *supra* note 20.

BRIEF OF *AMICUS CURIAE*
BRENNAN CENTER FOR JUSTICE - 9
NO. 2:25-CV-00602

GORDON    600 University Street
TILDEN    Suite 2915
THOMAS    Seattle, WA  98101
CORDELL   206.467.6477

more ballot styles and languages and provide greater accessibility to all voters, without the need for a different ballot for voters who self-identify as disabled.[25]

There is no evidence that barcodes or QR codes reduce the accuracy of vote tallying.[26] Moreover, an estimated 98% of all votes cast in the 2024 general election—including those cast using BMDs—were cast in a way that maintained a paper record of the vote.[27] Because these voter-verifiable paper records that BMDs print also contain human-readable text, they can be audited after an election just like hand-marked paper ballots to confirm that a voter's ballot was counted as the voter intended. By requiring states to immediately purchase new voting systems, these new provisions would therefore add an enormous and unnecessary burden that cannot be justified by accuracy concerns.

## ARGUMENT

## I.    IMPLEMENTATION OF THE EXECUTIVE ORDER WOULD DISRUPT ELECTIONS NATIONWIDE.

Upending the existing process for drafting and publishing the VVSGs will have far-reaching and burdensome consequences for states. First, the Executive Order would leave some states without compliant voting systems. Second, the Order will force states to spend millions to purchase and distribute new voting systems. Third, the Order's implementation timeline is entirely unworkable. In particular, the many states that require their voting systems to satisfy federal testing or certification under the VVSGs would be caught in a catch-22: They either continue to use their current voting systems, which may be deemed noncompliant and lead to severe financial consequences; or they implement an alternative system at their own cost, a near impossible task.

---

[25] *See* Brennan Ctr. for Justice, *Brennan Center Overview of Voting Equipment* (May 31, 2018), https://www.brennancenter.org/our-work/research-reports/brennan-center-overview-voting-equipment; Lou Ann Blake, *supra* note 23.

[26] *See* Jessica Huseman, *Why Trump wants to ban barcodes on ballots, and what it means for voters and election officials*, Votebeat (Mar. 28, 2025), https://www.votebeat.org/2025/03/28/trump-executive-order-elections-bans-barcodes-qr-codes-explained/.

[27] *See* Derek Tisler & Lawrence Norden, *Some Good News for Donald Trump: We Already Use Paper Ballots*, Brennan Ctr. for Justice (Aug. 23, 2024), https://www.brennancenter.org/our-work/analysis-opinion/some-good-news-donald-trump-we-already-use-paper-ballots.

BRIEF OF *AMICUS CURIAE*
BRENNAN CENTER FOR JUSTICE - 10
NO. 2:25-CV-00602

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

### A.    The Executive Order Would Strand Many States Without Legally Compliant Voting Systems.

The Executive Order's unilateral elimination of existing standards puts states in an untenable position. The Order directs the EAC to establish new voting guidelines, effectively tossing out the prior VVSGs, and to "rescind [within 180 days of the Order] all previous certifications of voting equipment based on prior standards."[28] This reverses the EAC's existing policy, called the "lifecycle policy," which *explicitly* states that the process of adopting new VVSGs "does not affect the status of any EAC certified voting system."[29] Indeed, election systems "may only be decertified upon a vote of the Commissioners and following the process detailed in the EAC's Testing and Certification Program Manual."[30]

The VVSG lifecycle policy creates an important backstop that avoids stranding states without workable voting machines. Upon adoption of new VVSGs, the policy sets an expiration date after which manufacturers cannot submit new machines running the previous VVSG version for testing.[31] That policy is designed to ensure a smooth transition between standards so states can take the time necessary to implement updated regulations without undue financial burdens, preserve the systems' functionality, and train election workers and inform the electorate. The Order instead pulls the rug out from under states, mandating the development of a new set of VVSGs without leaving remaining certifications in place.

Even if the EAC moved quickly to adopt a new set of standards, states would not be able to immediately comply. Four years after VVSG 2.0 was adopted, just one voting system has been certified to these guidelines, and that new system was only certified in July 2025.[32] The two largest

---

[28] Executive Order § 4(b)(ii) ("Within 180 days of the date of this order, the Election Assistance Commission shall take appropriate action to review and, if appropriate, re-certify voting systems under the new standards established under subsection (b)(i) of this section, and to rescind all previous certifications of voting equipment based on prior standards.").

[29] U.S. Election Assistance Comm'n, *VVSG Lifecycle Policy* 4 (June 16, 2023), https://www.eac.gov/sites/default/files/TestingCertification/VVSG_Lifecycle_Policy_9_22.pdf.

[30] *Id.*

[31] *Id.*

[32] U.S. Election Assistance Comm'n, *supra* note 3.

BRIEF OF *AMICUS CURIAE*
BRENNAN CENTER FOR JUSTICE - 11
NO. 2:25-CV-00602

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

voting system vendors—ES&S and Dominion—have not even submitted systems for testing to VVSG 2.0 yet. It is therefore unclear when widespread VVSG 2.0-compliant voting systems will be available for states to purchase, let alone voting systems that have been certified to a *new* and undeveloped set of guidelines that vendors have not yet considered. The Order thus sets a standard that is unattainable in the near term.

The short timeline and disruptive changes mandated by the Executive Order will make it difficult, if not impossible, to procure EAC-certified voting machines. Additionally, as described *supra* Part I.B, many state laws link voting systems to the VVSGs. Thus, many states will not have access to the voting machines that are required by their own laws, leaving jurisdictions open to increased post-election investigations, audits, and civil suits—while voters are in limbo.

The Order's targeting of barcodes and QR codes also affects the majority of voting systems currently in use, forcing states to develop and adopt new vote counting procedures on the fly and precariously close to election season. Most voting systems on the market have components that use barcodes in conjunction with a human-readable paper ballot to record or tabulate votes. In Georgia and South Carolina, as well as most or many counties in Arkansas, Delaware, New Jersey, Ohio, Pennsylvania, Tennessee, Texas, and West Virginia, *all* in-person voters cast ballots on components that encode votes in barcodes or QR codes.[33] As explained below, it would be incredibly costly for these jurisdictions to replace their voting systems and implement new counting procedures to even attempt to comply with the Executive Order.[34]

### B.    It Would Be Prohibitively Expensive to Implement Any System that Complies with the Executive Order.

The Executive Order will impose significant, unfunded compliance costs on states. Voting equipment is expensive, generally at least several thousand dollars for each machine.[35] In a series

---

[33]    Verified    Voting,    *The    Verifier    —    Manufacturers —    November    2026*, https://verifiedvoting.org/verifier/#mode/navigate/map/makeEquip/mapType/normal/year/2026 (last visited June 10, 2025).

[34] Huseman, *supra* note 26.

[35] Verified Voting, *The Price of Voting* 55 (Mar. 2021), https://verifiedvoting.org/wp-content/uploads/2021/03/Price-of-Voting-FINAL2.pdf.

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

1  of studies conducted from 2014 to 2024, the Brennan Center analyzed the cost of replacing or

2  updating voting systems across the country. [36] Replacing a single voting machine costs

3  approximately $5,000.[37] And the cost of replacing even a subset of voting equipment in about half

4  the states would be approximately $203 million.[38] Replacing all voting machines would cost even

5  more. These figures are not hypothetical:

6  - In 2019, Georgia awarded Dominion Voting Systems a $107 million contract to
7    replace all of the state's voting systems with machines that encode votes in a QR
     code.[39]
8  - In 2018, Ohio allocated $104.5 million for the Secretary of State to purchase new
     voting systems for the state.[40]
9  - And in 2023, Connecticut Governor Ned Lamont announced that the state would
10   spend $25 million to replace voting machines in the state.[41]

11  The costs faced by state officials charged with election administration are not limited to the

12  purchase of the voting machines. Jurisdictions must expend resources to train workers on the new

13  machines and educate voters on any new voting procedures.[42] One federal district court has already

14  preliminarily enjoined several provisions of the Executive Order, based in part on the irreparable

15  harm it would impose on states through the time, cost, and effort associated with compliance.[43]

16  Worse, all of this comes at a time when federal funding for election equipment is declining.

17  From 2020 through 2024, Congress appropriated $205 million for election funding—a steep drop

18

19  [36] Ruby Edlin, Megan Maier & Warren Stewart, *Costs for Replacing Voting Equipment in 2024*, Brennan Ctr. for
20  Justice (Feb. 7, 2024), https://www.brennancenter.org/our-work/analysis-opinion/costs-replacing-voting-equipment-2024.

21  [37] *See id.*

22  [38] *Id.*

23  [39] Maggie Miller, *Georgia awards contract for new voting machines*, The Hill (July 29, 2019),
    https://thehill.com/policy/cybersecurity/455211-georgia-awards-contract-for-new-voting-machines/.

24  [40] S.B. 135, 132nd Gen. Assemb. (Ohio 2018).

25  [41] Caroline Nihill, *Connecticut to Spend $25M on new voting machines*, Statescoop (Sept. 28, 2023),
    https://statescoop.com/connecticut-to-spend-25m-on-new-voting-machines/.

26  [42] U.S. Gov't Accountability Off., GAO-18-294, *Observations on Voting Equipment Use and Replacement* 28 (2018),
    https://www.gao.gov/assets/gao-18-294.pdf.

[43] *California v. Trump*, No. 25-cv-10810-DJC, 2025 WL 1667949, at *15-17 (D. Mass. June 13, 2025).

BRIEF OF *AMICUS CURIAE*
BRENNAN CENTER FOR JUSTICE - 13
NO. 2:25-CV-00602

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA 98101
206.467.6477

from 2017–2019 funding levels ($805 million).[44] In 2025, Congress allocated just $15 million for election funding.[45] And the Executive Order neither provided any additional funding to offset the cost of replacing election equipment nor indicated that the White House would seek further appropriations from Congress.

The Order only further burdens an untenable funding situation for states responsible for conducting elections. The uncertainty of federal funding presents extraordinary challenges to states seeking to schedule election expenditures in advance.[46]

### C.    The Timeline for Implementing New Guidelines and Voting Systems—Even If They Were Available—Is Infeasible.

Aside from these crushing funding challenges, the implementation timeline for compliance will be nearly impossible for states. Indeed, creating a *new* version of the VVSGs would require significant development, testing, and certification. That is no small matter—for context, VVSG 2.0 was the product of *a 15-year effort*, taking into account feedback from cybersecurity experts, voters, local officials, and policy experts. VVSG 2.0 was approved in 2021, with the first system certified to VVSG 2.0 just this month, four years later.[47] Thus, the process of developing and approving an updated VVSG 2.0, and testing and certifying new voting systems to these updated guidelines realistically will take years.[48]

And updating the VVSGs and buying new machines are just the tip of the iceberg for states conducting elections. States will also need several months after receiving the machines to deliver them to each jurisdiction, train workers on the machines, update logic and accuracy testing procedures and post-election audit protocols to ensure the machines count votes accurately, and

---

[44] Derek Tisler, *States Must Take the Lead on Election Security*, Brennan Ctr. For Justice (Dec. 19, 2024), https://www.brennancenter.org/our-work/research-reports/states-must-take-lead-election-security.

[45] U.S. Election Assistance Comm'n, *Election Security Grant* (Apr. 23, 2025), https://www.eac.gov/grants/election-security-funds.

[46] *See* Ruby Edlin et al., *supra* note 36.

[47] U.S. Election Assistance Comm'n, *supra* note 3.

[48] Nat'l Conf. of State Legislatures, *Executive Order on Elections: Implications for States* (Apr. 25, 2025), https://www.ncsl.org/elections-and-campaigns/executive-order-on-elections-implications-for-states#toc4.

BRIEF OF *AMICUS CURIAE*
BRENNAN CENTER FOR JUSTICE - 14
NO. 2:25-CV-00602

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

1  educate the public on how to use the machines.[49] Many states do not have the luxury of time. New

2  Jersey and Virginia have statewide elections in just a few months. Some states have primary

3  elections in about a year.[50] The result of the Executive Order would be a scramble to implement a

4  process that should instead be undertaken with deliberation and care to ensure a secure, trustworthy

5  election.

6  **II.    THE ORDER UNDERMINES PUBLIC TRUST IN VOTING SYSTEMS.**

7          Public trust in elections is a critical foundation of our democracy. Time and again, the

8  Supreme Court has recognized the importance of avoiding actions that "undermine public

9  confidence in the fairness of elections and the perceived legitimacy of the announced outcome."

10  *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 672 (2021); *see also Purcell v. Gonzalez*, 549

11  U.S. 1, 4 (2006) ("Confidence in the integrity of our electoral processes is essential to the

12  functioning of our participatory democracy."); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S.

13  181, 197 (2008) ("[Public confidence in elections] encourages citizen participation in the

14  democratic process."). By sowing confusion and mistrust in the equipment needed to run our

15  elections today, the Executive Order will undermine public trust in elections—and our

16  democracy.[51]

17          Facing public criticisms over the security and accuracy of voting systems in recent years,

18  state officials have consistently pointed to federal certification in public education efforts to

19  reassure voters that their voting systems have been independently tested and that a bipartisan

20  federal commission has determined that the systems meet security best practices. For example:

21          • Oregon's election integrity webpage highlights that all machines have "passed
22            federal lab tested certification . . . ."[52]

---

23  [49] Jessica Huseman, *State Lawmakers Need to Consider Practical Realities When it Comes to Elections*, Votebeat (Feb.
24  13, 2023), https://www.votebeat.org/2023/2/13/23594541/voting-machines-costs-state-lawmakers-procurement/.

    [50] Nat'l Conf. of State Legislatures, *supra* note 48.

25  [51] *See, e.g.*, Layla Ferris, *False claims about machines "switching" votes are going viral. Here's what to know*, CBS
    News (Oct. 24, 2024), https://www.cbsnews.com/news/false-claims-machines-switching-votes-what-to-know/.

26  [52] Oregon Sec'y of State, *Election Integrity*, https://sos.oregon.gov/elections/Pages/security.aspx (last visited July 17,
    2025).

BRIEF OF *AMICUS CURIAE*
BRENNAN CENTER FOR JUSTICE - 15
NO. 2:25-CV-00602

GORDON    600 University Street
TILDEN    Suite 2915
THOMAS    Seattle, WA 98101
CORDELL   206.467.6477

- Ohio's election security fact sheet explains that "[f]ederal and bipartisan state experts test, examine, and certify all voting equipment as secure."[53]
- Arizona's webpage on securing elections emphasizes that "[a]ll equipment used in Arizona must be certified by . . . the [EAC] . . . ."[54]

State election directors, in particular, have emphasized the importance of public trust in effectively administering elections.[55] The National Association of State Election Directors ("NASED") wrote a letter to the EAC in advance of the 2024 election after the EAC announced it would stop certifying new machines running VVSG 1.0 for administrative reasons.[56] NASED stressed that states and localities should be able to continue to buy and use systems running the older version of the VVSG, which were still acceptable and safe for public use.[57] The letter underscored that "[h]istory has proven that false information will spread regarding the seemingly bureaucratic components of the EAC's voting system testing and certification program."[58] NASED also noted that previous false information "resulted in dozens of lawsuits against states across the country claiming that their voting systems are uncertified and casting doubt on election results."[59] The Executive Order will cast doubt on voting systems that are currently secure and effective, as well as the EAC's certification process, which in turn will further undermine public faith in the integrity of elections.

NASED's letter also highlights the importance of ensuring a seamless transition between versions of the VVSGs to avoid gaps in compliance. As described in *supra* Part I.A, the EAC's lifecycle policy allowed states to continue using voting systems running previous versions of the

---

[53] Ohio Sec'y of State, *Election Security Fact Sheet*, https://www.ohiosos.gov/elections/voters/secure/ (last visited July 17, 2025).

[54] Arizona.Vote, *How we secure Arizona's elections*, https://www.arizona.vote/secure_elections (last visited July 17, 2025).

[55] Abby Vesoulis, *States Are Trying to Stop Election Meddling. But the Real Risk is Public Confidence*, Time (Mar. 5, 2019), https://time.com/5543649/2020-elections-voter-security-states/.

[56] Nat'l Ass'n of State Election Dirs., *NASED Letter to US Election Assistance Commission Regarding Deprecation of the VVSG 1.0* (Mar. 17, 2023), https://www.nased.org/news/nasedletter031723.

[57] *Id.*

[58] *Id.*

[59] *Id.*

BRIEF OF *AMICUS CURIAE*
BRENNAN CENTER FOR JUSTICE - 16
NO. 2:25-CV-00602

GORDON    600 University Street
TILDEN    Suite 2915
THOMAS    Seattle, WA 98101
CORDELL   206.467.6477

1  VVSGs while they undertake the lengthy transition to new voting systems. The EAC's prior

2  process also gave jurisdictions enough time to smoothly transition to a new version of the VVSGs.

3  The Executive Order discards these critical protections. By directing the EAC to "rescind all

4  previous certifications" of machines, the Order overturns the established approach to

5  decertification upon which states and localities have come to rely. Executive Order § 4(b)(ii). This

6  will create a rushed and unprecedented timeline, resulting in chaos and sowing mistrust in elections.

7                                    **CONCLUSION**

8         Section 4(b) of the Executive Order, if implemented, will leave states scrambling to secure

9  federally certified equipment and will foment public mistrust in voting systems. For the foregoing

10 reasons, along with the reasons articulated by Plaintiffs, the Court should rule in favor of Plaintiffs

11 on their challenge to Section 4(b) of the Order, maintaining the status quo and allowing the

12 bipartisan, independent EAC to work as designed to make elections more efficient, accessible, and

13 secure.

14        I certify that this memorandum contains 5,606 words, in compliance with the Local Civil

15 Rules.

16

17

18

19

20

21

22

23

24

25

26

BRIEF OF *AMICUS CURIAE*
BRENNAN CENTER FOR JUSTICE - 17
NO. 2:25-CV-00602

GORDON    600 University Street
TILDEN    Suite 2915
THOMAS    Seattle, WA  98101
CORDELL   206.467.6477

1    DATED this 24th day of July 2025.

2
          s/ Michael Rosenberger
3         Michael Rosenberger, WSBA #17730
          GORDON TILDEN THOMAS & CORDELL LLP
4         600 University Street, Suite 2915
          Seattle, WA 98101
5         206.467.6477
6         mrosenberger@gordontilden.com

7         Jeremy Creelan*
          Abigail Schmidt*
8         JENNER & BLOCK LLP
          1155 Avenue of the Americas
9         New York, NY 10036
          212.891.1600
10        jcreelan@jenner.com
11        aschmidt@jenner.com

12        Anand Viswanathan*
          Eleanor Slota*
13        JENNER & BLOCK LLP
          1099 New York Avenue N.W., Suite 900
14        Washington, DC 20001
          202.639.6000
15        aviswanathan@jenner.com
16        eslota@jenner.com

17        Derek Tisler*
          Eliza Sweren-Becker*
18        BRENNAN  CENTER  FOR  JUSTICE  AT  NYU
          SCHOOL OF LAW
19        120 Broadway, Suite 1750
          New York, NY 10271
20        646.292.8310
21        sweren-beckere@brennan.law.nyu.edu
22        tislerd@brennan.law.nyu.edu

23        Counsel for Amicus Curiae Brennan Center for Justice

24        *Pro hac vice applications forthcoming

25

26