1
2
3
4
5
6
7
8
9
10
11
12
13
14

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STATE OF WASHINGTON ET AL.,

Plaintiffs,

v.

DONALD TRUMP ET AL.,

Defendants.

CASE NO. 2:25-cv-00602-JHC

**ORDER RE: PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANTS' MOTION TO DISMISS**

**I**
**INTRODUCTION**

Plaintiffs challenge Executive Order 14,248, entitled "Preserving and Protecting the Integrity of American Elections." Before the Court are Plaintiffs' Motion for Partial Summary Judgment and Defendants' Motion to Dismiss. Dkt. ## 37 & 64. The Court has considered the parties' motions, responses, and replies (Dkt. ## 37, 64, 103, & 113); the briefs from *amici curiae* (Dkt. ## 53, 72, 81, 83, 88, & 89); the parties' supplemental briefs and responses (Dkt. ## 122, 123, 124, & 125); and the governing law. Being fully advised, the Court GRANTS in part and DENIES in part both motions.

The Court believes it should state at the outset what this case and the parties' motions do and do not concern. This case is not about whether the states, Congress, or the executive offer

better or worse ways to run elections.  It is also not about whether the current laws governing American elections could benefit from updates or modifications.  And the parties do not dispute the importance of fair elections.  Instead, the parties' motions concern four general issues: (1) whether Plaintiffs' legal challenge to Executive Order 14,248 (the EO) is justiciable; (2) if so, whether Plaintiffs have a cause of action to support their claims; (3) if so, whether the President has the authority to issue the directives contained in the challenged portions of the EO; and (4) if the President lacks such authority, to what relief are Plaintiffs entitled.

As for the first question, the Court concludes that Plaintiffs have established standing and ripeness for all but one of their claims.  As for the second, it determines that Plaintiffs have an equitable cause of action to support their separation-of-powers claims.  It thus reviews Plaintiffs' separation-of-powers challenges to EO §§ 2(a), 3(d), 4(a), 4(b), 4(d), 7(a), and 7(b).  As for all other claims in the Complaint, the Court dismisses them without prejudice.

As for the third issue, the heart of this matter, the Court concludes that Plaintiffs have plausibly alleged, and for some provisions proved, that the EO violates separation of powers.  As stated by the Supreme Court, although the Constitution vests the executive power in the President, "[i]n the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952).  Accordingly, the "Constitution entrusts Congress and the States—not the President—with the authority to regulate federal elections."  *League of United Latin Am. Citizens v. Exec. Off. of President (LULAC I)*, 780 F. Supp. 3d 135, 155 (D.D.C. 2025).[1]  The Court thus concludes that Plaintiffs have plausibly alleged that EO §§ 3(d) and 4(d)

---

[1] As stated by amici Former Republican Members of Congress:
The Founders recognized the dangers of granting the President unilateral power over the time, place, or manner of elections, so they gave the presidency no such power. Congress

violate separation of powers.  It also concludes that there is no genuine dispute as to any material fact that EO §§ 2(a), 4(a), 4(b), 7(a), and 7(b) violate the separation of powers doctrine and are therefore unlawful.  The Court's reasoning and outcome accords with the opinions of the other federal courts that have considered challenges to this EO.[2]

As for the fourth and final question, the Court concludes that Plaintiffs are entitled to various forms of equitable relief.  It thus grants Plaintiffs' request to hold that EO §§ 2(a), 4(a), 4(b), 7(a), and 7(b) are unlawful and permanently enjoin the named Defendants from taking any action to implement or give effect to these provisions in a manner that would harm Plaintiffs.  It also grants Plaintiffs' request to declare that Washington's and Oregon's ballot-receipt deadlines are not preempted by 2 U.S.C. § 7 and 3 U.S.C. § 1.  In granting this relief, the Court seeks to award Plaintiffs the complete relief to which they are entitled to under the Constitution and restore the proper balance of power among the Executive Branch, the states, and Congress envisioned by the Framers.

---

likewise refused to delegate any such authority in creating the [Election Assistance Commission]. The potential for abuse was then, as it is now, self-evident. In the words of Senator McConnell, sanctioning this improper assertion of presidential power could ease the way for future presidents to "carry out a complete federal takeover of American elections."

Dkt. # 72 at 20–21 (quoting Mitch McConnell, *Trump Gives Democrats a Voting Gift*, Wall St. J. (Apr. 7, 2025, at 5:18 pm ET), https://archive.ph/30TWq).

[2] *See generally LULAC I*, 780 F. Supp. 3d 135; *League of United Latin Am. Citizens v. Exec. Off. of President (LULAC II)*, 2025 WL 3042704 (D.D.C. Oct. 31, 2025); *California v. Trump (California I)*, 786 F. Supp. 3d 359 (D. Mass. 2025); *California v. Trump (California II)*, 2025 WL 2663106 (D. Mass. Sep. 17, 2025).

II

BACKGROUND

A.    The Parties

   1.    Plaintiffs

Plaintiffs Washington and Oregon are sovereign states of the United States of America. Both have extensive legal codes governing elections.  *See* Revised Code of Washington (RCW) Title 29A; Oregon Revised Statues (ORS) Title 23.  These laws govern various aspects of the states' elections, including voter registration, assessment of voter eligibility requirements, certification of state-level voting systems, and procedures and timelines for processing ballots. *See generally id.*

Plaintiffs require all voters to be U.S. citizens.[3]  Plaintiffs also require all voters to verify citizenship prior to being added to the state's voter registration rolls, typically via attestation under penalty of perjury on a voter registration application form.  *See* RCW 29A.08.010(1); ORS 247.171(3).  Attesting to citizenship under penalty of perjury accords with the current method for verifying citizenship on the national mail voter registration form (the Federal Form), adopted pursuant to the National Voter Registration Act of 1993 (NVRA), Pub. L. No. 103-31, 107 Stat.

---

[3] Washington law states:
   The minimum required information provided on a voter registration application in order to place a voter registration applicant on the voter registration rolls includes: . . . [a] signature attesting to the truth of the information provided on the application . . . and [a]ffirmation of citizenship which confirms the individual is a United States citizen, in one of the following forms: (i) A check or indication in the box on a voter registration form confirming citizenship; or (ii) Presentation of documents as part of another government transaction confirming citizenship.
RCW 29A.08.010(1).
   Oregon law states:
   Each voter registration card designed or approved by the Secretary of State shall describe the penalties for knowingly supplying false information on the registration card and shall contain space for a person to provide[:] . . . [a]n indication that the person is a citizen of the United States[ ] and [a] signature attesting to the fact that the person is qualified to be an elector.
ORS 247.171(3).

ORDER RE: PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT AND DEFENDANTS'
MOTION TO DISMISS - 4

77 (1993).[4]  A person who provides false information when registering to vote in Washington or Oregon, including by falsely claiming to be a U.S. citizen, can be criminally prosecuted and subject to penalties of imprisonment for up to five years, fines, and deportation.[5]

As for voting systems,[6] Plaintiffs "use a variety of voting systems from different manufacturers."  Dkt. # 37 at 13 (citing Dkt. ## 39 at 13–14 & 40 at 6).  "These voting systems include tabulators, which scan ballots and count the votes for each race, and accessible voting units, which provide assistive technology for voters with disabilities."  *Id.*  Plaintiffs allege that in Washington,[7] "any voter may use an accessible voting unit" and "at least one county uses

---

[4] The NVRA states:
The mail voter registration form . . . shall include a statement that— (A) specifies each eligibility requirement (including citizenship); (B) contains an attestation that the applicant meets each such requirement; and (C) requires the signature of the applicant, under penalty of perjury[.]
52 U.S.C. § 20508(b)(2); *see also* 11 C.F.R. § 9428.4(b) (setting the contents of each eligibility requirement on the Federal Form, including the citizenship requirement).

[5] *See* RCW 29A.84.130(2), 9A.20.021(c) (maximum penalty of five years in prison, a fine in an amount fixed by the court of $10,000, or both); ORS 260.715(1), 260.993(2), 161.605(3), 161.625(d) (maximum penalty of five years in prison, a fine in an amount fixed by the court of $125,000, or both); 18 U.S.C. § 1015(f) (maximum penalty of five years in prison, a fine, or both); 8 U.S.C. § 1227(a)(3)(D)(i) (defining false representation of citizenship for any purpose or benefit under the chapter as a deportable offense).

[6] Federal law defines a "voting system" as:
(1) the total combination of mechanical, electromechanical, or electronic equipment (including the software, firmware, and documentation required to program, control, and support the equipment) that is used— (A) to define ballots; (B) to cast and count votes; (C) to report or display election results; and (D) to maintain and produce any audit trail information; and
(2) the practices and associated documentation used— (A) to identify system components and versions of such components; (B) to test the system during its development and maintenance; (C) to maintain records of system errors and defects; (D) to determine specific system changes to be made to a system after the initial qualification of the system; and (E) to make available any materials to the voter (such as notices, instructions, forms, or paper ballots).
52 U.S.C. § 21081(b).  Washington and Oregon have adopted similar definitions.  *See* RCW 29A.12.005 (defining "voting system"); ORS 254.005(11)–(12) (defining "voting machine" and "vote tally system"); OR. ADMIN. R. 165-007-0350 (2025) (referring to voting machines and vote tally systems submitted for certification pursuant to ORS 246.550 as "voting systems").

[7] Neither the Complaint nor Plaintiffs' Motion mention accessible voting units or use of barcodes in Oregon.  *See generally* Dkt. ## 1 & 37.

ORDER RE: PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT AND DEFENDANTS'
MOTION TO DISMISS - 5

accessible voting units that print a ballot containing a barcode that contains votes." *Id.* (citing Dkt. ## 39 at 13–14 & 43 at 11).

In both Washington and Oregon, all voting systems must receive approval from the respective Secretary of State before they can be used in an election. *See* RCW 29A.12.050; ORS 246.550. In Washington, "[n]o voting device shall be approved by the Secretary of State unless it[:] . . . has been tested and certified by an independent testing authority designated by the United States election assistance commission [(the EAC)]." RCW 29A.12.080(5). In Oregon, all voting systems submitted for certification "must be certified by the [EAC] or be examined by a federally accredited voting systems testing laboratory" before being approved by the Secretary of State. OR. ADMIN. R. 165-007-0350(1) (2025); *see also* ORS 246.550. The EAC, in turn, will certify voting systems that meet certain criteria. *See* 52 U.S.C. § 20971. One such criterion is that the system must comply with the Voluntary Voting System Guidelines (VVSGs), a set of technical standards for voting systems designed and adopted by the EAC pursuant to the Help America Vote Act of 2002 (HAVA), Pub. L. No. 107-252, 116 Stat. 1666 (2002). *See* 52 U.S.C. §§ 20961–20962, 20971. Plaintiffs attest that as of the filing of this action, "[a]ll the voting systems used by counties in Plaintiff States were certified under [formerly applicable] VVSG testing standards" and none "have been certified under the VVSG 2.0 testing standard" (or any later standard).[8] Dkt. # 1 at 22.

---

[8] The VVSG 2.0 testing standard, adopted by the EAC in February 2021, replaced the VVSG 1.1 testing standard and is now the current federal testing standard for voting systems. *See Voluntary Voting System Guidelines*, United States Election Assistance Commission (Dec. 23, 2025), https://www.eac.gov/voting-equipment/voluntary-voting-system-guidelines. The EAC is currently in the process of updating the VVSGs. *See, e.g.*, *Voluntary Voting System Guidelines VVSG 2.1*, United States Election Assistance Commission, https://www.eac.gov/sites/default/files/2025-06/DRAFT_Voluntary_Voting_System%20Guidelines_Version_2.1_TGDC_Member_Review.pdf (last visited Jan. 6, 2026) (draft of the VVSG 2.1).

ORDER RE: PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT AND DEFENDANTS'
MOTION TO DISMISS - 6

As for election dates, Plaintiffs hold general elections, including elections for federal office, "on the first Tuesday after the first Monday of November[.]"  RCW 29A.04.321(1); *see also* ORS 254.056 ("The general election shall be held on the first Tuesday after the first Monday in November[.]").  This date accords with the date for federal general elections set forth by Congress in the Election Day statutes—2 U.S.C. §§ 1, 7 and 3 U.S.C. §§ 1, 21.[9]

As for voting procedures, Plaintiffs are universal vote-by-mail states.  *See* Dkt. # 1 at 12, 14; *see also* RCW 29A.40.010, .070; ORS 254.470(2)(a).  This means that before every election, Plaintiffs mail an official ballot to every actively registered voter in the state.  But despite automatically receiving a ballot in the mail, Washington and Oregon voters do not have to cast their ballots by mail.  Instead, they may vote by mailing their ballot to the county auditor with a postmark no later than the day of the election or by: returning their ballot to their county auditor no later than 8:00 p.m. on Election Day; depositing their ballot in a secure ballot drop box no later than 8:00 p.m. on Election Day; going in person to a designated early voting location and

---

[9] 2 U.S.C. § 1 states:
At the regular election held in any State next preceding the expiration of the term for which any Senator was elected to represent such State in Congress, at which election a Representative to Congress is regularly by law to be chosen, a United States Senator from said State shall be elected by the people thereof for the term commencing on the 3d day of January next thereafter.
2 U.S.C. § 7 states:
The Tuesday next after the 1st Monday in November, in every even numbered year, is established as the day for the election, in each of the States and Territories of the United States, of Representatives and Delegates to the Congress commencing on the 3d day of January next thereafter.
3 U.S.C. § 1 states:
The electors of President and Vice President shall be appointed, in each State, on election day, in accordance with the laws of the State enacted prior to election day.
3 U.S.C. § 21 states:
"[E]lection day" means the Tuesday next after the first Monday in November, in every fourth year succeeding every election of a President and Vice President held in each State, except, in the case of a State that appoints electors by popular vote, if the State modifies the period of voting, as necessitated by force majeure events that are extraordinary and catastrophic, as provided under laws of the State enacted prior to such day, "election day" shall include the modified period of voting.

ORDER RE: PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT AND DEFENDANTS'
MOTION TO DISMISS - 7

casting their ballot during the location's operating hours; or going in person to a designated voting location on Election Day and casting their ballot prior to 8:00 p.m. (or after 8:00 p.m. if they were inside the voting location or in line to vote by 8:00 p.m.).[10]

Plaintiffs do not certify their election results on the day of the election, nor does any other U.S. state or territory.[11]  This allows Plaintiffs (and many other states[12]) to count mail-in ballots received after Election Day, so long as the ballot is: (1) mailed and post-marked no later than Election Day; and (2) received by the appropriate state official before certification and within the state's designated time frame for receiving mail-in ballots.[13]  *See* RCW 29A.60.190; ORS 254.470(6)(e).  Plaintiffs allege that during the 2024 general election, "election officials in Washington received 119,755 otherwise-valid ballots after election day that had a postmark dated no later than election day" and Oregon officials received 13,596 such ballots.  Dkt. # 1 at 13, 15.

In terms of election administration more generally, Plaintiffs allege (and Defendants do not contest) that state-wide elections are massive undertakings, requiring significant resources and planning by state officials long before the election occurs.  *See generally* Dkt. ## 1 & 37.  To

---

[10] *See* RCW 29A.40.160, .170, .091; ORS 253.070, 254.470, 254.474.

[11] *See* RCW 29A.60.190; ORS 254.555; *see also Election results certification dates, 2024*, Ballotpedia, https://ballotpedia.org/Election_results_certification_dates,_2024#State_certification_dates,_2024 (last visited Jan. 6, 2026) (confirming that during the last presidential election, no U.S. state or territory certified their election results on the same day as the day of the federal election).

[12] In their amicus brief, the National Vote at Home Institute contends that "at least sixteen states, including Washington and Oregon, plus Puerto Rico, the Virgin Islands, and Washington D.C., accept mail-in or absentee ballots if those ballots are postmarked on or before Election Day."  Dkt. # 88 at 10.  Due to recent legislative enactments, sources indicate that it is now 14 states, plus Guam, Puerto Rico, the Virgin Islands, and Washington, D.C., that accept such ballots.  *See Table 11: Receipt and Postmark Deadlines for Absentee/Mail Ballots*, National Council of State Legislatures (Dec. 24, 2025), https://www.ncsl.org/elections-and-campaigns/table-11-receipt-and-postmark-deadlines-for-absentee-mail-ballots.

[13] Washington will accept ballots received up to 20 days after a general election and 13 days after a primary election.  *See* RCW 29A.60.190.  Oregon will accept ballots received up to seven days after the date of the election.  *See* ORS 254.470(6)(e).

help mitigate these costs, Congress has allocated substantial funds to support election administration at the state and local levels.  These funds include those disbursed by the EAC, with Congress requiring the EAC to "make a requirements payment each year . . . to each State which meets" certain eligibility criteria.  52 U.S.C. § 21001(a).  Plaintiffs allege that they both meet these eligibility requirements and have received regular payments from the EAC.  *See* Dkt # 1 at 22.  Plaintiffs' EAC grants have totaled over $33 million since 2020, with Washington receiving more than $20 million and Oregon receiving more than $13 million.  *Id*.  Plaintiffs also allege that they have benefited—and are now benefitting—from various other federal grant programs designed to improve state and local elections, including those overseen by the Department of Homeland Security (DHS), the Federal Emergency Management Agency (FEMA), and the Department of Defense (DOD).  *See id.* at 23–24.

    2.    Defendants

Defendants consist of federal officials and federal government agencies involved in election administration and enforcement of federal election laws.  The Individual Defendants are: President Donald Trump, Attorney General Pamela Bondi, Secretary of Homeland Security Kristi Noem, Secretary of Defense Pete Hegseth, Acting DOGE Administrator Amy Gleason, EAC Chairman Donald Palmer, EAC Vice Chair Thomas Hicks, EAC Members Christy McCormick and Benjamin Hovland, EAC Executive Director Brianna Schletz, and Senior Official Performing the Duties of FEMA Administrator Cameron Hamilton.[14]  The Agency Defendants include: the EAC, an independent bipartisan agency created by Congress under HAVA and charged with improving election administration nationwide; the DOD, the agency

---

[14] The Individual Defendants have all been named and sued in their official capacities.  *See* Dkt. # 1 at 4–5.  As Cameron Hamilton apparently no longer holds this office, his successor is automatically substituted as a party.  *See* Fed. R. Civ. P. 25(d).

tasked with administering the Uniformed and Overseas Citizens Absentee Voting Act of 1986 (UOCAVA), Pub. L. No. 99-410, 100 Stat. 924 (1986), and ensuring that uniformed servicemembers and other U.S. citizens overseas are able to vote while overseas; and the U.S. Department of Justice, the agency tasked with enforcing violations of federal law, including federal election law. They also include the other executive offices and agencies implicated by EO 14,248—the Executive Office of the President, the DHS, the U.S. Department of Government Efficiency (DOGE), and FEMA.

B.     The Executive Order

On March 25, 2025, President Donald Trump signed into law Executive Order 14,248, "Preserving and Protecting the Integrity of American Elections." *See* Exec. Order 14,248, 90 Fed. Reg. 14005 (Mar. 25, 2025). The order provides that "[f]ree, fair, and honest elections unmarred by fraud, errors, or suspicion are fundamental to maintaining our constitutional Republic." *Id.* § 1. It also states, "It is the policy of [the] Administration to enforce Federal law and to protect the integrity of [the U.S.] election process." *Id.* In pursuit of this goal, the order directs various federal officials and government agencies to take certain actions to safeguard the integrity of American elections. *See generally id.*

As pertinent to this action, EO § 2, entitled "Enforcing the Citizenship Requirement for Federal Elections," sets forth several measures to "enforce the Federal prohibition on foreign nationals voting in Federal elections[.]" *Id.* § 2. Section 2(a) states, "Within 30 days of the date of this order, the [EAC] shall take appropriate action to require . . . documentary proof of United States citizenship" on the Federal Form. *Id.* § 2(a)(i). It also defines "documentary proof of citizenship" (DPOC), indicating that § 2(a)'s DPOC requirement can be satisfied only via:

> (A) a United States passport; (B) an identification document compliant with the requirements of the REAL ID Act of 2005 (Public Law 109-13, Div. B) that indicates the applicant is a citizen of the United States; (C) an official military

identification card that indicates the applicant is a citizen of the United States; or (D) a valid Federal or State government-issued photo identification if such identification indicates that the applicant is a United States citizen or if such identification is otherwise accompanied by proof of United States citizenship.

*Id.* § 2(a)(ii).  Section 2 then directs various federal officials to enforce the citizenship requirement: § 2(b) instructs the Secretary of Homeland Security, the Secretary of State, and the DHS, in coordination with the DOGE Administrator, to take a series of prescribed actions to "identify unqualified voters registered in the States"; § 2(d) directs "[t]he head of each Federal voter registration executive department or agency" under the NVRA to "assess citizenship prior to providing a Federal voter registration form to enrollees of public assistance programs"; and § 2(e) directs the Attorney General to "prioritize enforcement" of laws "that restrict non-citizens from registering to vote or voting[.]"  *Id.* § 2.

Section 3, "Providing Other Assistance to States Verifying Eligibility," sets forth additional measures that federal officials must take to "assist States in determining whether individuals are eligible to register and vote[.]"  *Id.* § 3.  One such measure is § 3(d)'s requirement that the Secretary of Defense "update the Federal Post Card Application [(FPCA)], pursuant to the [UOCAVA], to require: (i) documentary proof of United States citizenship, as defined by section 2(a)(ii) of this order; and (ii) proof of eligibility to vote in elections in the State in which the voter is attempting to vote."  *Id.* § 3(d).

Section 4, meanwhile, is aimed at "improving the [EAC]."  *Id.* § 4.  Section 4(a) directs the EAC to

take all appropriate action to cease providing Federal funds to States that do not comply with the Federal [election] laws set forth in 52 U.S.C. 21145, including the requirement . . .  that States accept and use the [Federal Form], including any requirement for documentary proof of United States citizenship adopted pursuant to section 2(a)(ii) of this order.

*Id.* § 4(a).  Section 4(b) then instructs the EAC to "initiate appropriate action to amend the [VVSG] 2.0 and issue other appropriate guidance establishing standards for voting systems to protect election integrity."  *Id* § 4(b)(i).  The provision clarifies that

> The amended guidelines and other guidance shall provide that voting systems should not use a ballot in which a vote is contained within a barcode or quick-response code in the vote counting process except where necessary to accommodate individuals with disabilities, and should provide a voter-verifiable paper record to prevent fraud or mistake.

*Id.*  Section 4(b) also requires the EAC to "take appropriate action to review and, if appropriate, re-certify voting systems under the new standards established under [§ 4(b)(i)], and to rescind all previous certifications of voting equipment based on prior standards" within "180 days of the date of this [EO.]"  *Id.* § 4(b)(ii).  Section 4 concludes by instructing the DHS Secretary and FEMA Administrator to "heavily prioritize compliance with the [VVSG] 2.0 developed by the [EAC] and completion of testing through the Voting System Test Labs accreditation process" when "considering the provision of funding for State or local election offices or administrators through the Homeland Security Grant Programs."  *Id.* § 4(d).

Section 5, entitled "Prosecuting Election Crimes," directs the Attorney General to act to "protect the franchise of American citizens and their right to participate in fair and honest elections[.]"  *Id.* § 5.  In pursuit of this goal, § 5 instructs the Attorney General to "take all appropriate action to enter into information-sharing agreements, to the maximum extent possible, with the chief State election official or multimember agency of each State."  *Id.* § 5(a).  It also provides,

> To the extent that any States are unwilling to enter into such an information sharing agreement or refuse to cooperate in investigations and prosecutions of election crimes, the Attorney General shall: (i) prioritize enforcement of Federal election integrity laws in such States . . .; and (ii) review for potential withholding of grants and other funds that the Department awards and distributes, in the Department's discretion, to State and local governments for law enforcement and other purposes, as consistent with applicable law.

*Id.* § 5(b).

Section 7, "Compliance with Federal Law Setting the National Election Day," instructs certain federal officials to act to implement the "Federal laws that set the uniform day for appointing Presidential electors and electing members of Congress[.]" *Id.* § 7. Specifically, § 7(a) instructs the Attorney General to

> take all necessary action to enforce 2 U.S.C. 7 and 3 U.S.C. 1 against States that violate these provisions by including absentee or mail-in ballots received after Election Day in the final tabulation of votes for the appointment of Presidential electors and the election of members of the United States Senate and House of Representatives.

*Id.* § 7(a). Section 7(b), meanwhile, requires the EAC to "condition any available funding to a State on that State's compliance" with the ballot-receipt deadline set forth in § 7(a), excluding ballots cast in that state under the UOCAVA. *Id.* § 7(b).

The EO concludes with two general provisions addressing severability and implementation. Section 10 states, "If any provision of this order, or the application of any provision to any agency, person, or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other agencies, persons, or circumstances shall not be affected thereby." *Id.* § 10. Section 11 provides "This [EO] shall be implemented consistent with applicable law" and nothing in it "shall be construed to impair or otherwise affect: (i) the authority granted by law to an executive department or agency, or the head thereof; or (ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals." *Id.* § 11.

The EO has not been repealed or modified since its issuance in March 2025. *See generally id.* Thus, apart from the injunctions discussed in part II.C below, all provisions of the EO remain operative.

ORDER RE: PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT AND DEFENDANTS'
MOTION TO DISMISS - 13

C.    Other Challenges to the EO

EO 14,248 is currently facing two other legal challenges.  The first, *League of United Latin American Citizens (LULAC) v. Executive Office of the President* (Case No. 25-cv-00946-CKK), was filed in the United States District Court for the District of Columbia by three groups of organizational plaintiffs.  In April 2025, the *LULAC* plaintiffs moved to preliminarily enjoin certain named defendants and their agents from taking any action to implement or give effect to EO §§ 2(a), 2(b), 2(d), 7(a), and 7(b), "arguing that the President lacks the power to issue those orders."  *LULAC I*, 780 F. Supp. 3d at 154.  On April 24, 2025, the Honorable Colleen Kollar-Kotelly granted the plaintiffs' motions in part and denied in part.  *Id.* at 225.  The court concluded that the plaintiffs presented justiciable claims and were substantially likely to succeed on the merits of their challenges to §§ 2(a) and 2(d).  *Id.* at 203, 212.  Accordingly, it granted the plaintiffs a preliminary injunction as to §§ 2(a) and 2(d).  *Id.* at 225.  The court denied the plaintiffs' motions as to §§ 2(b), 7(a), and 7(b), concluding that on the record at that time, the plaintiffs had not shown that they were substantially likely to succeed on the merits of their claims.  *Id.* at 206, 214, 219.  In rejecting the plaintiffs' § 7 challenge, the court noted that the plaintiffs had not adequately demonstrated standing, suggesting that "the most natural parties to seek an injunction against enforcement under Section 7(a) are the States themselves," not the organizations.  *Id.* at 214.

The parties then cross-moved for partial summary judgment on the plaintiffs' § 2(a) separation-of-powers claim.  *See LULAC II*, 2025 WL 3042704, at *1.  On October 31, 2025, Judge Kollar-Kotelly granted the plaintiffs' motion, thereby permanently enjoining the "EAC, its Commissioners, and its Executive Director, from taking any action to implement or give effect to [EO § 2(a)], including taking any action based on the Executive Order to modify the content of the Federal Form to require documentary proof of U.S. citizenship."  *Id.* at *38.  The decision

1    was appealed, and as of the date of this order, is pending before the D.C. Circuit.  *See LULAC II*,

2    2025 WL 3042704 (D.D.C. Oct. 31, 2025), *appeal docketed*, No. 25-5476 (D.C. Cir. Dec. 31,

3    2025).

4        The second case, *California v. Trump* (Case No. 25-cv-10810-DJC), was filed in the

5    United States District Court for the District of Massachusetts by 19 states' Attorneys General on

6    behalf of their states.  *See California I*, 786 F. Supp. 3d at 371.  In May 2025, the *California*

7    plaintiffs moved to preliminarily enjoin certain named defendants and their agents from

8    implementing EO §§ 2(a), 2(d), 3(d), 7(a), and 7(b), arguing that these provisions are *ultra vires*

9    and violate separation of powers.  *See id.* at 377–89.  On June 13, 2025, the Honorable Denise

10   Casper granted the plaintiffs' motion, concluding that the plaintiffs presented justiciable claims

11   and were substantially likely to succeed on the merits of their constitutional claims.  *Id.* at 395–

12   96.  The court thus preliminarily enjoined the named defendants and their agents from

13   implementing §§ 2(a), 2(d), 3(d), and 7(b) in full, and § 7(a) as to civil and criminal enforcement

14   actions.[15]  *Id.*  Soon after, the *California* defendants moved to dismiss the plaintiffs' challenges

15   to §§ 2(a), 2(d), 3(d), 7(a), 7(b), and 4(a)[16] for lack of standing and failure to state a claim.

16   *California II*, 2025 WL 2663106, at *1.  On September 17, 2025, Judge Casper denied the

17   defendants' motion, concluding that the plaintiffs' claims are justiciable and that the plaintiffs

18   plausibly allege a constitutional violation.  *Id.* at *13.

19

20

21

22   _____

     [15] The defendants immediately appealed this decision and as of the date of this Order, such appeal
23   remains pending before the First Circuit.  *See California I*, 786 F. Supp. 3d 359 (D. Mass. 2025), *appeal
     docketed*, No. 25-1726 (1st Cir. Aug. 1, 2025).
     [16] The § 4(a) argument was raised for the first time in defendants' reply, but the court still
24   addressed it as though it was part of the motion to dismiss.  *See California II*, 2025 WL 2663106, at *3–4,
     12.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

D.      The Present Action

In 2025, Plaintiffs filed this equitable challenge to EO 14,248 in this District.  Dkt. # 1.
The Complaint alleges that EO §§ 2(a), 2(b)(iii), 2(d), 2(e)(ii), 3(d), 4(a), 4(b), 4(d), 5(b), 7(a),
and 7(b) are *ultra vires*, violate the U.S. Constitution, and are otherwise unlawful under the
NVRA, HAVA, UOCAVA, and Election Day statutes.  *Id.* at 2.  Plaintiffs now move for partial
summary judgment, requesting that the Court: (1) "hold that sections 2(a), 4(a), 4(b), and 7 of the
Executive Order are *ultra vires* and a violation of the separation of powers"; (2) "permanently
enjoin Defendants from implementing [said sections]"; and (3) "enter a declaratory judgment
that Plaintiff States' ballot-receipt deadlines are not preempted by 2 U.S.C. § 7 or 3 U.S.C. § 1."
Dkt. # 37 at 10, 33.  Defendants cross-move to dismiss the Complaint, arguing that the Court
should dismiss all of Plaintiffs' claims for lack of subject matter jurisdiction or failure to state a
claim.  Dkt. # 64 at 1–2.[17]

Based on its initial review of the briefing, the Court directed the parties to provide
supplemental briefing on various topics.  Dkt. # 114.  Because of the lapse in government
appropriations, the Court temporarily stayed the case.  *See* Dkt. ## 115 & 116.  After the stay
was lifted, the parties filed their supplemental briefs and responses.[18]  *See* Dkt. ## 122, 123, 124,
& 125.  The parties' motions are now fully briefed and ripe for decision.

---

[17] The Court also received amicus briefs from Local Elections Officials (Dkt. # 53), Former
Republican Members of Congress (Dkt. # 72), the Republican Party of Arizona and RITE PAC (Dkt.
# 81), Bipartisan Former State Secretaries of State (Dkt. # 83), the National Vote at Home Institute (Dkt.
# 88), and the Brennan Center for Justice (Dkt. # 89).

[18] Because the supplemental briefing addressed the Court's questions, the Court does not find oral
argument necessary.  Also, Defendants did not request oral argument.  *See generally* Dkt. ## 64 & 113.

1

2

### III
### PROCEDURAL STANDARDS

A.    Plaintiffs' Motion for Partial Summary Judgment

Federal Rule of Civil Procedure 56 governs Plaintiffs' Motion for Partial Summary

Judgment (Dkt. # 37).  Under the rule, summary judgment is appropriate if the evidence viewed

in the light most favorable to the nonmoving party shows "that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  A fact is "material" if it "might affect the outcome of the suit[.]"  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "'genuine' only if there is sufficient

evidence for a reasonable fact finder to find for the non-moving party."  *Far Out Prods., Inc. v.*

*Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248–49).

The party moving for summary judgment bears the initial burden of showing that there is

no genuine dispute as to any material fact and that they are entitled to prevail as a matter of law

on all claims for which they seek summary judgment.  *See Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986).  If the moving party meets its burden of production, the burden then shifts to

the nonmoving party to identify specific facts from which a factfinder could reasonably find in

its favor.  *See id.* at 324; *see also Anderson*, 477 U.S. at 250.  Although the court must draw all

"justifiable inferences" in favor of the nonmoving party, the nonmoving party may not rely on

"mere allegations or denials" to create a genuine issue of material fact.  *Endy v. Cnty. of L.A.*,

975 F.3d 757, 763 (9th Cir. 2020) (citing *Anderson*, 477 U.S. at 248, 255).  At the summary

judgment stage, conclusory, nonspecific statements in affidavits cannot create a genuine dispute

of material fact, and missing facts will not be presumed.  *See Lujan v. Nat'l Wildlife Fed'n*, 497

U.S. 871, 888–89 (1990).

1

2

B.    Defendants' Motion to Dismiss

Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) govern Defendants' Motion to

3

Dismiss (Dkt. # 64).  Rule 12(b)(1) applies to motions to dismiss for lack of subject matter

4

jurisdiction, including for lack of Article III standing.  Fed. R. Civ. P. 12(b)(1); *see also White v.*

5

*Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000) ("Because standing . . . pertain[s] to a federal court's

6

subject-matter jurisdiction under Article III, [it is] properly raised in a motion to dismiss under

7

Federal Rule of Civil Procedure 12(b)(1), not Rule 12(b)(6).").  The party invoking federal

8

jurisdiction bears the burden of proving it.  *See FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231

9

(1990).  A defendant may contest jurisdiction through a "facial attack," which "accepts the truth

10

of the plaintiff's allegations but asserts that they 'are insufficient on their face to invoke federal

11

jurisdiction.'"  *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (quoting *Safe Air for*

12

*Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004)).  A "district court resolves a facial

13

attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations

14

as true and drawing all reasonable inferences in the plaintiff's favor, the court determines

15

whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction."  *Id.*

16

(citing *Pride v. Correa*, 719 F.3d 1130, 1133 (9th Cir. 2013)).

17

Rule 12(b)(6) applies to motions to dismiss for failure to state a claim.  Fed. R. Civ. P.

18

12(b)(6).  In considering a Rule 12(b)(6) motion, "the district court must accept all material

19

allegations in the complaint as true, and construe them in the light most favorable to the non-

20

moving party."  *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 956 (9th Cir.

21

2013) (citing *Moyo v. Gomez*, 32 F.3d 1382, 1384 (9th Cir. 1994)).  It must also draw all

22

reasonable inferences in favor of the nonmoving party.  *Wyler Summit P'ship v. Turner Broad.*

23

*Sys., Inc.*, 135 F.3d 658, 663 (9th Cir. 1998).  "To survive a motion to dismiss, a complaint must

24

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

1    face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550

2    U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content

3    that allows the court to draw the reasonable inference that the defendant is liable for the

4    misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556).  Dismissal is proper only if

5    plaintiffs have not alleged a "cognizable legal theory" or there is an "absence of sufficient facts

6    alleged to support a cognizable legal theory." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir.

7    2001).

8        When evaluating a motion to dismiss, the court considers the complaint but may also

9    consider other materials, such as "documents attached to the complaint, documents incorporated

10   by reference in the complaint, [and] matters of judicial notice—without converting the motion to

11   dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 908 (9th

12   Cir. 2003).  When parties have already briefed the question of summary judgment, the court may

13   also consider the summary judgment record in its resolution of the motion to dismiss.  *See Jones

14   v. L.A. Cent. Plaza LLC*, 74 F.4th 1053, 1061 (9th Cir. 2023).

**IV**
**DISCUSSION**

16       Plaintiffs seek partial summary judgment.  They ask the Court to: (1) hold that EO

17   §§ 2(a), 4(a), 4(b), 7(a), and 7(b) are *ultra vires* and violate constitutional separation of powers;

18   (2) permanently enjoin Defendants from implementing the challenged provisions; and (3) enter a

19   declaratory judgment stating that "the federal election day statutes, 2 U.S.C. § 7 and 3 U.S.C.

20   § 1, do not preempt Washington and Oregon's ballot-receipt deadline laws."  Dkt. # 37 at 10, 33.

21       Defendants cross-move to dismiss all of Plaintiffs' claims.  *See generally* Dkt. # 64.

22   Defendants contend that this Court lacks jurisdiction to hear Plaintiffs' challenges to EO §§ 2(a),

2(b)(iii), 2(d), 2(e)(ii), 3(d), 4(a), 4(b), 4(d), 5(b), and 7(a)[19] because "Plaintiffs either lack standing" or "their claims are not ripe." *Id*. at 6. They also contend that the Court lacks jurisdiction to consider Claim 6 from the Complaint—Violation of Article II, Section 3 of the U.S. Constitution. *Id*. at 14. Defendants argue that even if this Court determines that it has jurisdiction, it should still dismiss the Complaint because: (1) Plaintiffs "lack a cause of action to bring any claim in their Complaint[,]" *id*. at 16; (2) the text of the EO forecloses Plaintiffs' challenges to §§ 2(b)(iii), 2(e)(ii), and 2(d), *id*. at 23, 25; and (3) the directives contained in EO §§ 2(a), 3(d), 4(a), 4(b), 4(d), 5(b), 7(a), and 7(b) represent lawful exercises of the President's power. *Id*. at 18, 26–28, 30, 33.

Because Plaintiffs do not oppose dismissal of their challenges to §§ 2(b)(iii), 2(e)(ii), and 5(b), *see* Dkt. ## 103 at 47 & 123 at 7, nor their Constitutional Right to Vote and Take Care Clause claims (Claims 3 and 6 in the Complaint), *see* Dkt. # 123 at 10, the Court dismisses these claims without prejudice and declines to address them below. As for the other claims, for the reasons below, the Court accepts the parties' arguments in part and rejects them in part.[20]

A.    Subject Matter Jurisdiction

1.    Standing

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Murthy v. Missouri*, 603 U.S. 43, 56 (2024); *see also* U.S. Const. art. III, § 2, cl. 1. For an Article III case or controversy to exist, "the plaintiff must have a 'personal stake' in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)

---

[19] Defendants do not specifically move to dismiss § 7(b) on justiciability grounds. *See generally* Dkt. # 64. But as the Court can consider Plaintiffs' § 7(b) challenge only if it has subject matter jurisdiction over the claim, it addresses the justiciability of this claim in its analysis below.

[20] All other arguments raised in the motions and not specifically addressed in this Order have been considered by the Court but are rejected as moot, unsupported by the caselaw, or otherwise legally insufficient.

(citing *Raines v. Byrd*, 521 U.S. 811, 819 (1997)).  "The party invoking federal jurisdiction bears the burden of establishing" it.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  Accordingly, "plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek[.]"  *TransUnion*, 594 U.S. at 431.

To establish standing, "a plaintiff must show (i) that [they] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief."  *Id.* at 423; *see also Lujan*, 504 U.S. at 560–61.  "[A]n injury is 'actual or imminent' where there is a 'credible threat' that a probabilistic harm will materialize."  *Nat. Res. Def. Council v. U.S. EPA*, 735 F.3d 873, 878 (9th Cir. 2013); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) ("[T]hreatened injury must be *certainly impending* to constitute injury in fact[.]").  Meanwhile, causation exists if the injury in fact is "fairly traceable to the challenged action of the defendant[.]"  *Lujan*, 504 U.S. at 560 (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)) (cleaned up).  But "[c]ausation may be found even if there are multiple links in the chain connecting the defendant's unlawful conduct to the plaintiff's injury, and there's no requirement that the defendant's conduct comprise the last link in the chain."  *Mendia v. Garcia*, 768 F.3d 1009, 1012 (9th Cir. 2014) (citing *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997)).  As for redressability, the plaintiff must show that a favorable judicial decision will relieve them of a discrete injury.  *See Massachusetts v. E.P.A.*, 549 U.S. 497, 525 (2007) (citing *Larson v. Valente*, 456 U.S. 228, 244 n. 15 (1982)).  But redressability can be found even if a favorable ruling will not provide the plaintiff with total relief.  *Id.*

The party asserting standing must support each element "in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of

evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.  On a motion to dismiss, "general factual allegations of injury resulting from the defendant's conduct may suffice [to establish standing.]" *Id.*  On a motion for summary judgment, the plaintiff must "set forth by affidavit or other evidence specific facts which for purposes of the summary judgment motion will be taken to be true." *Id.* (internal quotation marks and citations omitted). If "the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve[,]" and the claim must be rejected. *TransUnion*, 594 U.S. at 423 (quoting *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 333 (7th Cir. 2019)).

Here, the parties address standing in connection with both motions: Defendants say that the Court should not grant Plaintiffs summary judgment and should dismiss most of Plaintiffs' claims for lack of standing.  *See* Dkt. # 64 at 5–16.  The Court addresses standing for each such claim below.

a.      Voter Eligibility Requirements (§§ 2(a), 2(d), 3(d), 4(a))

(1)     *Section 2(a)*

Plaintiffs have established the three elements of Article III standing for their challenge to EO § 2(a).

Plaintiffs have shown that § 2(a) will cause concrete and particularized injuries to their proprietary interests[21] that are actual or imminent.  Plaintiffs state that § 2(a) will: (1) require state voter registration agencies to "make time-consuming and costly changes to their voter registration processes"; (2) "increase the time required to assist applicants for public assistance";

---

[21] Courts have recognized injury to proprietary interests as a valid basis for standing in suits by states against the federal government.  *See, e.g.*, *Kentucky v. Biden*, 23 F.4th 585, 601–02 (6th Cir. 2022) (holding that states likely had standing to sue the federal government based on harm to their proprietary and sovereign interests).

ORDER RE: PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT AND DEFENDANTS'
MOTION TO DISMISS - 22

(3) require Washington election officials "to spend approximately $237,000 to reprogram the State's voter registration database"; and (4) require state and local election officials to spend considerable time and expend millions of dollars to assist voters and resolve the confusion created by the new DPOC requirement.  Dkt. # 37 at 15–16 (citing Dkt. ## 39 at 8, 11, 42 at 3–6, 43 at 6–7, 44 at 2, 46 at 3–5, & 48 at 4–5).  Plaintiffs also state that these injuries are imminent, as implementing § 2(a)'s "DPOC requirement will require extensive administrative planning well in advance of [the] election[,]" thereby requiring states to begin preparing to implement DPOC now.  *Id.* at 16 (citing Dkt. ## 40 at 3, 42 at 4, 43 at 4–5, & 44 at 2).  Plaintiffs have supported these assertions with evidence in the form of declarations by various state and local officials involved in election administration and voter registration activities.  *See* Dkt. ## 38–48.  Plaintiffs have thus met their burden at the summary judgment stage of setting forth "specific facts" to demonstrate injury in fact based on harm to their proprietary interests.  *See Lujan*, 504 U.S. at 561.

Plaintiffs have also shown that § 2(a) will cause concrete and particularized injuries to their sovereign interests[22] that are actual or imminent.  The Constitution expressly grants states a sovereign interest in regulating "[t]he Times, Places and Manner" of holding elections for federal office.  U.S. Const. art. I, § 4, cl. 1; *see also id.* art. II, § 1, cl. 2.  Based on this constitutional grant of authority, Plaintiffs have enacted laws regulating the time, place, and manner of elections within their states, including laws about citizenship verification.  *See* RCW 29A.08.010(1); ORS 247.171(3).  As § 2(a) directly interferes with Plaintiffs' sovereign interests

---

[22] Courts have recognized injury to sovereign interests as a valid basis for standing in suits by states against the federal government.  *See, e.g.*, *Washington v. U.S. Food & Drug Admin.*, 108 F.4th 1163, 1176 (9th Cir. 2024) (recognizing harm to sovereign interests as a basis for a state to assert standing in a suit against the federal government); *Arizona v. Yellen*, 34 F.4th 841, 851 (9th Cir. 2022) (recognizing standing for a state based on injury to its sovereignty); *Kentucky*, 23 F.4th at 601–02 (holding that states likely had standing to sue the federal government based on harm to their proprietary and sovereign interests).

in regulating the times, places, and manner of holding elections for federal office, Plaintiffs have met their burden of proving injury in fact based on harm to their sovereign interests.

Defendants have provided no evidence to contradict Plaintiffs' claims that § 2(a) will cause injury to their proprietary and sovereign interests. *See generally* Dkt. ## 64 & 113. Instead, Defendants say that Plaintiffs have not established injury in fact because they have failed to demonstrate that their alleged injuries are "actual or imminent." Specifically, Defendants claim that because there is no "final agency action" and § 2(a) "contemplates [ ] future action" by the EAC, Plaintiffs have failed to establish sufficiently definite injuries to give rise to Article III standing. *See* Dkt. # 64 at 6–7.

Defendants' argument, however, is misguided. Contrary to their contention, § 2(a) does more than "contemplate" future action by the EAC, *see id.* at 6, or merely instruct the EAC to add a DPOC requirement to the Federal Form "if it determines such a requirement is necessary" *after* engaging in notice-and-comment-rulemaking. *See* Dkt. # 113 at 3. By its very terms, § 2(a) states that within 30 days, the EAC "*shall take* appropriate action *to require . . .* documentary proof of United States citizenship" on the Federal Form. EO 14,248 § 2(a)(i) (emphasis added). By using the terms "shall take" and "to require," § 2(a) does more than suggest that the EAC should begin to consider whether it should incorporate DPOC: it mandates "in no uncertain terms" that the EAC "take action to require documentary proof of citizenship on the Federal Form." *LULAC I*, 780 F. Supp. 3d at 184. Also, by explicitly including a list of documents that satisfy the DPOC requirement in § 2(a)(ii), the EO "leaves no uncertainty about what it requires from the EAC" nor what the DPOC requirement will look like if § 2(a) is implemented. *Id.* at 185.

As noted by Plaintiffs, it is § 2(a)'s mandatory language and the nature of the DPOC requirement itself, not the uncertain outcome of a future notice-and-comment rulemaking, that is

ORDER RE: PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT AND DEFENDANTS'
MOTION TO DISMISS - 24

the source of Plaintiffs' injuries. *See* Dkt. ## 37 at 15–17 & 103 at 17. Additionally, as Plaintiffs are bringing a non-statutory, equitable challenge to § 2(a), *see* part IV.B below, the lack of a "final rule" or "final agency action" is irrelevant to Plaintiffs' Article III standing to challenge § 2(a).[23] Plaintiffs' claimed injuries from § 2(a) are thus "certainly impending," thereby satisfying Article III's imminence requirement. *See Clapper*, 568 U.S. at 409.[24]

Plaintiffs have also established the other two elements of Article III standing: causation and redressability.[25] Plaintiffs have shown that their sovereign and proprietary injuries are "fairly traceable" to the EO, as these injuries stem directly from § 2(a)'s mandate that the EAC add a DPOC requirement to the Federal Form. Plaintiffs have also satisfied the redressability requirement, as Plaintiffs have shown that a permanent injunction against § 2(a) would eliminate the need for Plaintiffs to make changes to their voter registration systems and implement voter education campaigns, thereby eliminating their proprietary harms. The requested injunction would also eliminate the harm to Plaintiffs' sovereign interests, as it would restore Plaintiffs' power to regulate the time, place, and manner of elections, subject only to limitations by Congress.

---

[23] Plaintiffs do not bring an APA challenge to § 2(a) (nor to any other provision of the Executive Order). *See generally* Dkt. ## 37, 103, & 123. Defendants' cited case, *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433 (5th Cir. 2019), is therefore inapt. That case involved an APA challenge to a guidance document issued by an executive agency, but Plaintiffs' case involves a non-statutory, equitable challenge to an executive order issued by the President. Thus, while the existence of a "final agency action" was critical to the Fifth Circuit's analysis in *Texas* (and to APA review more generally), *see id.* at 441; *see also* 5 U.S.C. § 704, it is irrelevant to the Court's ability to review Plaintiffs' challenge to § 2(a).

[24] The DOJ's position in other litigation, as well as the EAC's actions both before and after the preliminary injunction in *LULAC I*, also support Plaintiffs' claim of imminent harm. *See, e.g.*, Dkt. # 38-1 at 4–8 (DOJ lawyer confirming that "the bottom line" of § 2(a) is that DPOC will be added to the Federal Form); Dkt. # 39 at 9–10 (state official describing communications between the EAC executive director and state election officials regarding updates to the Federal Form).

[25] Defendants do not appear to challenge Plaintiffs' standing on traceability or redressability grounds. *See generally* Dkt. ## 64 & 113.

1    Accordingly, the Court declines to dismiss Plaintiffs' § 2(a) challenge for lack of

2 standing.[26]

3                (2)    *Section 2(d)*

4    Because Defendants maintain that EO § 2(d) does not apply to any state-level agencies,

5 Plaintiffs have not established Article III standing for their challenge to § 2(d).

6    Section 2(d) mandates that the "[t]he head of each Federal voter registration executive

7 department or agency [ ] under the [NVRA] shall assess citizenship prior to providing a Federal

8 voter registration form to enrollees of public assistance programs."  EO 14,248 § 2(d).  Section

9 2(d), however, does not define "Federal voter registration executive department or agency."  *See*

10 *generally id*.  According to Plaintiffs, the term must encompass all agencies and departments that

11 are required to provide voter registration services under 52 U.S.C. § 20506(a), which includes

12 exclusively state-level agencies.  *See* Dkt. # 103 at 46.  Under this interpretation, Plaintiffs assert

13 that they have Article III standing because § 2(d) will require state-level agencies to undergo

14 costly changes to their voter registration processes.  *Id.*

15    Defendants, however, say that "Federal voter registration executive department or

16 agency" applies only to *federal* departments and agencies designated as "voter registration

17 agencies" under 52 U.S.C. § 20506(a).  *See* Dkt. # 64 at 9.  Accordingly, Defendants contend

18 that Plaintiffs lack standing, as "section 2(d) does not apply to State voter registration agencies"

19 and thus Plaintiffs will suffer no harm.  *Id.* at 25.

20    While Defendants' assertion that "Federal voter registration executive department or

21 agency" encompasses only federal agencies is peculiar given both the NVRA's text and

22

23    [26] The Court's conclusion accords with Judge Casper's opinions in *California I*, 786 F. Supp. 3d
24 at 379, and *California II*, 2025 WL 2663106, at *3–4.  It also aligns with Judge Kollar-Kotelly's analysis
of § 2(a) in *LULAC I*, 780 F. Supp. 3d at 191–94, and *LULAC II*, 2025 WL 3042704, at *14–18.

Defendants' position in prior cases, *see California I*, 786 F. Supp. 3d at 384, the Court still finds that this interpretation is reasonable.  As courts are required to give "significant weight to an agency interpretation of an executive order" so long as the interpretation is "reasonable," *see City & Cnty. of S.F. v. Trump (S.F.)*, 897 F.3d 1225, 1241–42 (9th Cir. 2018), the Court accepts Defendants' interpretation of EO § 2(d) for the purposes of its analysis.

Because Plaintiffs "do not assert that they have standing to challenge [§ 2(d)]" if it "applies only to agencies of the federal government[,]" Dkt. # 123 at 2, the Court dismisses Plaintiffs' § 2(d) challenge for lack of subject matter jurisdiction.[27]

(3)    *Section 3(d)*

Plaintiffs have alleged sufficient facts to establish Article III standing for their challenge to EO § 3(d).

Plaintiffs have adequately alleged that § 3(d) will cause concrete and particularized injuries that are actual or imminent.  Plaintiffs contend that § 3(d) "will increase the burden on state and local officials" who process FPCAs and impose "significant monetary costs" on their states.  Dkt. # 1 at 33.  Plaintiffs allege that this harm is imminent, as § 3(d)'s directives are mandatory and the "changes necessary to process DPOC on the FPCA" and the "something more" to prove voter eligibility "must begin to be made well in advance of the 2026 election."  Dkt. ## 103 at 43 & 123 at 3.

Defendants do not challenge Plaintiffs' allegation that § 3(d) will cause concrete and particularized injuries to Plaintiffs.  Instead, Defendants argue that the harm is too speculative because "[t]here are no facts to suggest what proof of eligibility might suffice, or how a

---

[27] The Court is dismissing Plaintiffs' § 2(d) challenge based on Defendants' contention that the provision applies only to *federal* voter registration agencies.  Defendants are thus estopped from advancing the position that EO § 2(d) applies to state-level voter registration agencies.

UOCAVA voter might obtain such proof." Dkt. # 64 at 10. They also argue that the harm is not immediate, as the Secretary of Defense "has not yet updated the FPCA, and the EO does not establish a deadline to do so." *Id.* But as noted in *California I*, "[e]ven if the timeframe for implementation and the specific form of identification § 3(d) requires are yet to be determined . . . [§ 3(d)] leaves no doubt that [DPOC and further proof of eligibility] will be required." 786 F. Supp. 3d at 382. Like with § 2(a), the directions in § 3(d) are not speculative or discretionary: EO § 3(d) states that "[t]he Secretary of Defense *shall update* the [FPCA] *to require*: (i) documentary proof of United States citizenship, as defined by [§ 2(a)(ii)]; and (ii) proof of eligibility to vote in elections in the State in which the voter is attempting to vote." EO 14,248 § 3(d) (emphasis added). Thus, like with § 2(a), § 3(d)'s mandatory language, coupled with the new voter eligibility requirements, suffices to support Plaintiffs' injury-in-fact argument.

Plaintiffs have also alleged, and Defendants do not contest, that their injuries are "fairly traceable" to § 3(d) and would likely be redressed by a favorable ruling by this Court. Plaintiffs have thus plausibly alleged Article III standing for their § 3(d) challenge, and so the Court denies Defendants' request to dismiss this claim on standing grounds.[28]

(4)    *Section 4(a)*

Plaintiffs have established the three elements of Article III standing for their challenge to EO § 4(a).

Plaintiffs have shown that § 4(a) will cause concrete and particularized harm that is actual and imminent. Section 4(a) requires the EAC to "cease providing Federal funds to States" that do not "accept and use the national mail voter registration form issued pursuant to 52 U.S.C.

---

[28] The Court's conclusion tracks Judge Casper's opinions in *California I*, 786 F. Supp. 3d at 382, and *California II*, 2025 WL 2663106, at *4.

20508(a)(1)" and EO § 2(a)(ii).  EO 14,248 § 4(a).  Plaintiffs have thus shown that § 4(a) will

cause injury, as § 4(a) requires states to either use a Federal Form that is promulgated pursuant to

§ 2(a), and thus suffer the injuries described in part IV.A(1)(a)(1), or fail to comply, and thus

face a substantial loss of funds.  Further, like with § 2(a), § 4(a) contains mandatory language,

making Plaintiffs' claimed harms actual and imminent, not "conjectural" or "speculative" as

argued by Defendants.  *See* Dkt. # 113 at 4.[29]  Plaintiffs' cited injuries are also traceable to EO

§ 4(a) and likely redressable by favorable judicial relief.  Accordingly, the Court declines to

dismiss Plaintiffs' § 4(a) challenge for lack of standing.[30]

b.      Voting System Requirements (§§ 4(b), 4(d))

(1)    *Section 4(b)*

Plaintiffs have established the three elements of Article III standing for their challenge to

EO § 4(b).

Plaintiffs have established that they will experience concrete and particularized injuries if

§ 4(b) is implemented.  Section 4(b) requires the EAC to alter the existing VVSGs and take

action to review, decertify, and re-certify voting systems under new standards.[31]  *See* EO 14,248

§ 4(b).  As Plaintiffs' voting systems rely on the VVSGs and the EAC's federal certification

---

[29] As the Court concludes that Plaintiffs have standing to bring their § 2(a) challenge, *see* part
IV.A(1)(a)(1) above, it rejects Defendants' § 4(a) standing arguments that hinge on the non-justiciability
of Plaintiffs' § 2(a) challenge.  *See* Dkt. ## 64 at 11 & 113 at 4.

[30] The Court's conclusion accords with Judge Casper's opinion in *California II*, 2025 WL
2663106, at *4–5.

[31] The Court finds perplexing Defendants' statement in their supplemental brief that the "EAC
has not yet formed an interpretation of Section 4(b)(ii) that is either consistent or inconsistent with
Plaintiffs' [interpretation]."  Dkt. # 122 at 3.  The Court thus concludes that while the timeline for
decertification may be disputed, there is no genuine dispute that EO § 4(b) requires the EAC to decertify
all voting systems currently certified under the pre-EO federal testing standards at some point in time.

process, *see* Dkt. # 1 at 22; *see also* RCW 29A.12.080(5); ORS 246.550; OR. ADMIN. R. 165-007-0350(1) (2025), Plaintiffs will no doubt be injured if these mandated changes take effect.

Contrary to Defendants' argument, *see* Dkt. ## 64 at 11–12 & 113 at 11–12, Plaintiffs have also established that their injuries are actual or imminent.  While Defendants ask the Court to focus on the phrase "appropriate action," the fact that the EAC has certified only one voting system under the VVSG 2.0 testing standard, and the fact that the EAC has yet to take any action to decertify voting systems, *see id.*, the Court cannot ignore § 4(b)(i)'s express mandate: it states that the EAC "*shall* initiate appropriate action to amend the [VVSG] 2.0" and that the amended guidelines "*shall* provide that voting systems should not use a ballot in which a vote is contained within a barcode or quick-response code in the vote counting process except where necessary to accommodate individuals with disabilities[.]"  EO 14,248 § 4(b)(i) (emphasis added).  Section 4(b)(ii) further provides that the EAC "*shall* take appropriate action to review and, if appropriate, re-certify voting systems under the new standards established under [§ 4(b)(i)], and to rescind all previous certifications of voting equipment based on prior standards" within "180 days of the date of this order[.]"  *Id.* § 4(b)(i)(ii) (emphasis added).  This mandatory language, coupled with the 180-day deadline,[32] makes Plaintiffs' claimed harms sufficiently imminent to satisfy Article III's injury-in-fact requirement.

Plaintiffs have also shown causation and redressability.  As they explain, without § 4(b), there would be no mandate for the EAC to amend the VVSGs to eliminate certain ballots from the vote counting process or decertify and re-certify voting systems under new standards.  *See*

---

[32] The Court notes that its imminence analysis is not affected by the EAC failing to act before September 21, 2025 (the 180-day deadline)—because the EO's mandate remains intact, the EAC could, at any point, decide to give effect to § 4(b).  Plaintiffs' claimed harms thus remain imminent.

Dkt. # 37 at 31.  This makes Plaintiffs' injuries fairly traceable to the EO and likely redressable by favorable judicial relief.

Defendants' argument that any alleged injury suffered by Plaintiffs is not traceable to the EO because Plaintiffs' adoption of the VVSGs is "completely voluntary," *see* Dkt. # 64 at 11–12, misses the mark for at least three reasons.  First, Plaintiffs' role in adopting the VVSGs does not automatically negate standing.  According to the Supreme Court, a plaintiff can establish causation even if the harm is not solely, or even primarily, caused by the government's actions. *See Massachusetts*, 549 U.S. at 523–24; *Mendia*, 768 F.3d at 1012; *see also California v. Azar*, 911 F.3d 558, 574 (9th Cir. 2018) ("Courts regularly entertain actions brought by states and municipalities that face economic injury, even though those governmental entities theoretically could avoid the injury by enacting new legislation.").  Thus, causation can still be satisfied even if other factors are contributing to Plaintiffs' injuries.  Second, some of Plaintiffs' claimed harms do not relate to Plaintiffs' adoption of the VVSGs and instead stem directly from the nature of federal decertification itself.[33]  Third, other provisions of the EO cast serious doubt on Defendants' argument that adoption of the new VVSGs is "completely voluntary."  For example, § 4(d) explicitly directs the DHS Secretary and FEMA Administrator to "heavily prioritize

---

[33] *See, e.g.*, Dkt # 39 at 17 ("[I]f counties use voting systems that are federally decertified as a result of this executive order, that will result in decreased confidence in election integrity."); Dkt. # 43 at 12 ("Using voting systems that have been decertified by the federal government will only further decrease public confidence and undermine [the Thurston County Auditor's] efforts to build trust in the election process."); Dkt. # 44 at 5 ("Using a voting system that has been decertified by the EAC would undermine voters' confidence in election results, even though that voting system would still accurately record and count votes and had been certified by the Secretary of State.").

ORDER RE: PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT AND DEFENDANTS'
MOTION TO DISMISS - 31

compliance with the [VVSG] 2.0 . . . and completion of testing through the [federal certification process]" in considering funding to states.  EO 14,248 § 4(d)

As a result, Plaintiffs have shown sufficient "personal stake" to satisfy Article III standing.  *See TransUnion*, 594 U.S. at 423.  The Court thus declines to dismiss Plaintiffs' § 4(b) challenge for lack of standing.

(2)    *Section 4(d)*

Plaintiffs have alleged sufficient facts to establish Article III standing for their challenge to EO § 4(d).

Plaintiffs have adequately alleged that § 4(d) will cause concrete and particularized harm that is actual and imminent.  Section 4(d) requires the DHS Secretary and FEMA Administrator to "heavily prioritize compliance with the [VVSG] 2.0 developed by the [EAC] and completion of testing through the Voting System Test Labs accreditation process" when "considering the provision of funding for State or local election offices or administrators through the Homeland Security Grant Programs[.]"  EO 14,248 § 4(d).  As Plaintiffs both currently receive funding from the DHS and FEMA, and do not have voting systems certified under the VVSG 2.0, *see* Dkt. # 1 at 22–23, Plaintiffs are at serious risk of suffering a significant loss of funding.

Contrary to Defendants' conclusory assertion, *see* Dkt. # 64 at 13, the Court finds that this potential loss of funding is sufficiently imminent such that it is a "relevant" and "non-speculative" injury under Article III.[34]  As this harm is also traceable to EO § 4(d) and likely

---

[34] *See, e.g.*, *The U. S. Department of Homeland Security (DHS) Notice of Funding Opportunity (NOFO) Fiscal Year 2025 Homeland Security Grant Program*, FEMA (July 28, 2025), https://www.fema.gov/grants/preparedness/homeland-security/fy-25-nofo (indicating that the 2025 Homeland Security Grant Program is prioritizing compliance with the VVSG 2.0 and testing through an EAC-accredited laboratory).

ORDER RE: PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT AND DEFENDANTS'
MOTION TO DISMISS - 32

1    redressable by favorable judicial relief, the Court will not dismiss Plaintiffs' § 4(d) challenge for

2    lack of standing.

3            c.        Ballot-Receipt Deadline (§§ 7(a), 7(b))

4        Plaintiffs have established the three elements of Article III standing for their challenges

5    to EO §§ 7(a) and 7(b).

6        Plaintiffs have shown that EO § 7 will cause concrete and particularized injuries to their

7    sovereign interests.  As noted in part IV.A(1)(a)(1), the Constitution expressly grants states a

8    sovereign interest in regulating "[t]he Times, Places and Manner" of holding elections for federal

9    office.  *See* U.S. Const. art. I, § 4, cl. 1; *see also id.* art. II, § 1, cl. 2.  In exercising this authority,

10   Plaintiffs have enacted laws that dictate the time, place, and manner in which ballots for federal

11   elections must be received by the state.  *See generally* RCW Title 29A; ORS Title 23.  By both

12   establishing a national ballot-receipt deadline,[35] and directing the Attorney General and the EAC

13   to enforce said deadline via compulsive actions, EO § 7 infringes on Plaintiffs' sovereign

14   interests in regulating the times, places, and manner of holding elections.

15       Plaintiffs have also shown that EO § 7 will cause concrete and particularized economic

16   injuries.[36]  Plaintiffs have presented specific facts in declarations by state and local election

17   officials that § 7 will cause financial harm to Plaintiffs.  *See* Dkt. ## 38–48.  Specifically,

18   Plaintiffs say that compliance with § 7's deadline will require Plaintiffs to: place more drop

19   boxes, increase the number of county staff, educate the electorate on new processes, and

20   substantially alter the process for counting votes in their states, particularly those received after

21

22       [35] The parties agree that EO § 7 imposes a national ballot-receipt deadline on states.  *See* Dkt.
23   ## 37 at 21–22 & 64 at 15.
         [36] The Ninth Circuit has recognized economic injury as a valid basis for standing in suits by states
24   against the federal government.  *See, e.g.*, *Washington*, 108 F.4th at 1174 (discussing economic injury as
     a valid basis for a plaintiff state to assert standing).

ORDER RE: PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT AND DEFENDANTS'
MOTION TO DISMISS - 33

Election Day. *See* Dkt. ## 39 at 18, 40 at 5–7, 41 at 3–6, 42 at 8, 43 at 9–10, 12, 44 at 4, 45 at 2–3, 48 at 9–10. Plaintiffs contend that these changes will require them to amend statutes, adopt new administrative rules, and incur significant costs. *Id*. Plaintiffs have also shown that failure to comply with § 7 will cause Plaintiffs financial harm, as noncompliance would trigger a loss in EAC and DOJ funding. *Id.*

Plaintiffs have also established that these injuries are imminent. Contrary to Defendants' contentions, Plaintiffs' injuries are not "entirely speculative." *See* Dkt. # 64 at 15. Although Defendants are correct that the Attorney General and EAC have yet to take direct action against Plaintiffs, "[w]here threatened action by government is concerned, [the Supreme Court] do[es] not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat[.]" *MedImmune, Inc. v. Genentech, Inc*., 549 U.S. 118, 128–29 (2007) (emphasis omitted). Section 7(a) states that the Attorney General "*shall take* all necessary action to enforce 2 U.S.C. 7 and 3 U.S.C. 1 against States" that include "absentee or mail-in ballots received after Election Day in the final tabulation of votes." EO 14,248 § 7(a) (emphasis added). Similarly, § 7(b) states that the EAC "*shall condition* any available funding to a State on that State's compliance with the requirement . . . [that] there be a uniform and nondiscriminatory ballot receipt deadline of Election Day[.]" EO 14,248 § 7(b) (emphasis added). This mandatory language gives rise to a clear and imminent threat of enforcement against states, like Plaintiffs, that permit ballots to be received and counted after Election Day.[37]

Contrary to Defendants' argument, *see* Dkt. # 64 at 15, the Executive Branch's inherent enforcement discretion does not affect this imminence analysis. Although the Court

---

[37] The DOJ's position in other litigation provides further support that Plaintiffs face an imminent threat of criminal prosecution if they maintain their current ballot-receipt deadlines. *See* Dkt. # 38-1 at 9 (DOJ lawyer stating that "[a]ny number of actions, including criminal actions" may be lawfully used against states to enforce the Election Day statutes pursuant to the EO).

acknowledges that "the choice of how to prioritize and how aggressively to pursue legal actions against defendants who violate the law falls within the discretion of the Executive Branch[,]" *see TransUnion*, 594 U.S. at 429; *see also United States v. Texas*, 599 U.S. 670, 679 (2023), the Court does not find that Plaintiffs' harms stem from the Attorney General's enforcement discretion.  Instead, these harms stem from "the Executive Order's [alleged] misapplication of the federal election day statutes" itself.  Dkt. # 103 at 28.  As Plaintiffs currently count ballots received after Election Day, Plaintiffs' claimed harms are actual and imminent, not "riddled with contingencies and speculation that impede judicial review."  *Trump v. New York*, 592 U.S. 125, 131 (2020).

Defendants' final argument, that Plaintiffs cannot establish injury in fact because of the "consistent with applicable law" language in EO § 11(b), is also misguided.  Defendants contend that whether the Attorney General's actions pursuant to EO § 7 violate Plaintiffs' legal rights is "necessarily speculative," as the Attorney General may lawfully enforce the Election Day statutes.  *See* Dkt. # 64 at 15.  But if, as Plaintiffs allege, the national ballot-receipt deadline proposed by § 7 is unlawful, there is no way the Attorney General or the EAC can, "consistent with applicable law," compel states to adopt said deadline.  Further, saving clauses must be read in context and "cannot be given effect when the Court, by rescuing the constitutionality of a measure, would override clear and specific language."  *S.F.*, 897 F.3d at 1239.  Where, as here, the Court would have to nullify clear and specific language in the EO, the Court may decline to give effect to a saving clause.  *See id.*  The EO's saving clause thus does not affect Plaintiffs' ability to establish Article III injury in fact.[38]

---

[38] The Court also notes that Defendants' cited cases on saving clauses are distinct.  The cases *Trump v. New York* and *Trump v. American Federation of Government Employees (AFGE)* both involved speculative injuries, as the implicated agencies had yet to alter census operations in a concrete manner,

1    As Plaintiffs have adequately demonstrated traceability and redressability, Plaintiffs have

2  satisfied their burden of establishing Article III standing as to their § 7 claims.  The Court thus

3  declines to dismiss Plaintiffs' §§ 7(a) and 7(b) challenges for lack of standing.[39]

4    2.    Ripeness

5    Article III "requires that a plaintiff's claim be ripe for adjudication."  *Stavrianoudakis v.*

6  *Fish & Wildlife Serv.*, 108 F.4th 1128, 1138 (9th Cir. 2024).  In evaluating ripeness, a court must

7  consider both constitutional and prudential ripeness.  *See id.* at 1139.[40]  "Constitutional ripeness

8  overlaps with the injury-in-fact element of Article III standing, and 'therefore the inquiry is

9  largely the same: whether the issues presented are definite and concrete, not hypothetical or

10 abstract.'"  *Id.* (quoting *Ass'n of Irritated Residents v. EPA*, 10 F.4th 937, 944 (9th Cir. 2021)).

11 "Prudential ripeness concerns 'the fitness of the issues for judicial decision and the hardship to

12 the parties of withholding court consideration.'"  *Id.* (quoting *Abbott Lab'ys v. Gardner*, 387

13 U.S. 136, 149 (1967)).  To demonstrate a claim is "fit for decision," the party must show that the

14

15  *see New York*, 592 U.S. at 132, or issue a specific reorganization plan, *see AFGE*, 222 L. Ed. 2d 1159,
16  1159 (2025), pursuant to the President's directives.  As such, it was unclear in these cases how, and even
    if, the plaintiffs would be harmed, especially because the agencies were instructed to develop their plans
17  only to the extent "practicable" and in a manner "consistent with applicable law."  *See New York*, 592
    U.S. at 131–32; *AFGE*, 222 L. Ed. 2d at 1159 (Sotomayor, J., concurring).  In contrast, here, Plaintiffs'
18  claimed harms are not speculative.  Although it is unclear what precise actions the Attorney General will
    take to "enforce" § 7's ballot receipt-deadline, it is clear that any action to compel Plaintiffs to adopt an
19  unlawful ballot-receipt deadline will cause harm and cannot be effectuated "consistent with applicable
    law" if § 7's ballot-receipt deadline is unlawful.  As Defendants have not suggested that § 7 is limited to
20  non-compulsive actions, nor does the Court find any reason to interpret "enforce" under § 7 so narrowly,
    it sees no reason to apply the reasoning of *New York* or *AFGE* here.  The Court also finds Judge Kollar-
    Kotelly's § 7 standing analysis in *LULAC I* distinguishable, as the *LULAC* plaintiffs were organizations,
21  not states, and the opinion specifically states that the standing of other parties, including states, is beyond
    the scope of the opinion.  780 F. Supp. 3d at 212–19.
22    [39]The Court's conclusion accords with Judge Casper's opinions in *California I*, 786 F. Supp. 3d at
    384–85, and *California II*, 2025 WL 2663106, at *5.  It also aligns with Judge Kollar-Kotelly's dicta in
    *LULAC I*, 780 F. Supp. 3d at 214.
23    [40] The Court notes that the Supreme Court recently left open the question of "the continuing
    vitality of the prudential ripeness doctrine."  *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167
24  (2014).  Because the Supreme Court has not definitively ruled on this issue, the Court assumes that the
    prudential ripeness requirement remains intact.

ORDER RE: PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT AND DEFENDANTS'
MOTION TO DISMISS - 36

"issues raised are primarily legal, do not require further factual development, and the challenged action is final." *Id.* (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126 (9th Cir. 2009)).  To demonstrate hardship, a party "must show that withholding review would result in direct and immediate hardship and would entail more than possible financial loss." *Id.*  In this analysis, "[r]elevant considerations include whether the regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance." *Id.* (internal quotation marks and citations omitted).

Defendants argue that the Court should dismiss Plaintiffs' claims as unripe.  *See* Dkt. # 64 at 5–16.  The Court addresses ripeness below for each claim for which Plaintiffs have established Article III standing.

a.    Voter Eligibility Requirements (§§ 2(a), 3(d), 4(a))

Plaintiffs have established that their challenge to the additional voter eligibility requirements in EO §§ 2(a), 3(d), and 4(a) are ripe.  As explained in part IV.A(1)(a), these provisions use mandatory language.  This causes Plaintiffs' harms, and the associated legal issues, to be "definite and concrete," not "hypothetical or abstract."  *See Stavrianoudakis*, 108 F.4th at 1139.  Plaintiffs have thus established constitutional ripeness for these claims.

Plaintiffs have also established prudential ripeness.  Plaintiffs' claims are fit for judicial review, as the "issues raised are primarily legal" and "do not require further factual development." *See id.*  Contrary to Defendants' assertion, *see* Dkt. # 64 at 7, Plaintiffs need not show that the challenged action is a "final agency action."  As explained in part IV.A(1)(a), Plaintiffs' harms stem from the EO's mandate that certain federal officials add voter eligibility requirements to the Federal Form and the FPCA, not from the hypothetical outcome of a future agency rulemaking.  Accordingly, Plaintiffs' §§ 2(a) and 4(a) claims are not "unripe" just because "a final [EAC] rule does not yet exist[.]"  *See* Dkt. # 64 at 7.  Likewise, Plaintiffs' § 3(d)

1    claims are not "unripe" even though the Secretary of Defense has yet to update the FPCA.

2    Plaintiffs have also established that they would suffer hardship if this Court were to withhold

3    review, as the Court finds that the EO has a "direct effect on [Plaintiffs'] day-to-day business[.]"

4    *See* Dkt. # 37 at 18 (quoting *Abbott*, 387 U.S. at 152). The Court thus declines to dismiss

5    Plaintiffs' challenges to EO §§ 2(a), 3(d), and 4(a) as unripe.[41]

        b.    Voting System Requirements (§§ 4(b), 4(d))

7            Plaintiffs have established that their challenges to EO §§ 4(b) and 4(d) are

8    constitutionally and prudentially ripe. As explained in part IV.A(1)(b), these provisions use

9    mandatory language. Thus, even though Defendants have yet to give effect to § 4's directives,

10   Plaintiffs' claimed harms, and the associated legal issues, are still "definite and concrete," not

11   "hypothetical or abstract." *See Stavrianoudakis*, 108 F.4th at 1139. Plaintiffs have also

12   established that the issues raised are primarily legal, further factual development is not required,

13   and they would suffer hardship absent review. *See id.* Although Defendants summarily state

14   that Plaintiffs' § 4 claims are "unripe," *see* Dkt. ## 64 at 11–13 & 113 at 11–13, the Court does

15   not find any legal support for these arguments.[42] The Court thus concludes that

16   Plaintiffs'§§ 4(b) and 4(d) claims are ripe, and declines Defendants' request to dismiss these

17   challenges for lack of ripeness.

18

19           [41] The Court's conclusion is consistent with the opinions of the other district court judges on this
     topic. *See California I*, 786 F. Supp. 3d at 379, 382; *California II*, 2025 WL 2663106, at *4; *LULAC I*,
20   780 F. Supp. 3d at 185–88; *LULAC II*, 2025 WL 3042704, at *18–23.
             [42] Defendants contend that Plaintiffs' § 4(b) claims are unripe based on a lack of imminence. *See*
21   Dkt # 64 at 11–12. But as the Court concludes that decertification is imminent, *see* part IV.A(1)(b)(1)
     above, this argument fails. As for § 4(d), Defendants argue that Plaintiffs' challenge is unripe because the
22   provision "does not contain a date certain or otherwise define the Agencies' review and prioritization[.]"
     Dkt. # 64 at 13. But neither a "date certain" nor a definition of "review and prioritization" are
23   requirements under the constitutional and prudential ripeness doctrines. *See generally* part IV.A(2)
     above. Nor would development of either fact be relevant to the legal question before the Court: whether
24   the President may direct the DHS Secretary and FEMA Administrator to add compliance with the VVSG
     2.0 as a funding condition for the Homeland Security Grant Program.

     ORDER RE: PLAINTIFFS' MOTION FOR PARTIAL
     SUMMARY JUDGMENT AND DEFENDANTS'
     MOTION TO DISMISS - 38

1

2

       c.      Ballot-Receipt Deadline (§§ 7(a), 7(b))

     Plaintiffs have established that their challenge to EO § 7 is ripe.  As explained in part

3

IV.A(1)(c), although the precise contours of enforcement have yet to be defined, § 7 contains

4

mandatory language that requires the Attorney General and the EAC to act against Plaintiffs so

5

long as they maintain their current ballot-receipt deadlines.  The issues here are thus sufficiently

6

"definite and concrete" to satisfy constitutional ripeness.  *See Stavrianoudakis*, 108 F.4th at

7

1139.

8

     Plaintiffs' § 7 claims are also prudentially ripe.  Plaintiffs have established, and

9

Defendants do not appear to contest, that the issues raised are predominantly legal, do not require

10

further factual development, and stem from a final action.  *See id.*  Plaintiffs have also shown

11

that they will suffer hardship in the absence of judicial review—§ 7 requires Plaintiffs to choose

12

between altering their current ballot-receipt deadlines, which would cause financial injury and

13

violate their sovereign rights, or maintain their current deadlines, and risk being subjected to

14

enforcement actions.  As a result, Plaintiffs have established ripeness, and the Court declines to

15

dismiss Plaintiffs' §§ 7(a) and 7(b) claims on this ground.[43]

16

                            *    *    *

17

     In sum, the Court concludes that Plaintiffs lack standing to bring their challenge to EO

18

§ 2(d).  It thus dismisses Plaintiffs' § 2(d) claim for lack of subject matter jurisdiction.  As for

19

Plaintiffs' other claims, the Court concludes that Plaintiffs have adequately alleged and proved

20

21

22

23

24

---

[43] The Court's conclusion also tracks Judge Casper's opinions in *California I*, 786 F. Supp. 3d at 385–86, and *California II*, 2025 WL 2663106, at *5.

standing and ripeness.  It thus denies Defendants' request to dismiss Plaintiffs' challenges to EO

§§ 2(a), 3(d), 4(a), 4(b), 4(d), 7(a), and 7(b) for lack of subject matter jurisdiction.[44]

B.     Equitable Cause of Action

To bring a claim in federal court, a plaintiff must have a valid cause of action.  *See Davis v. Passman*, 442 U.S. 228, 236–41 (1979).  While plaintiffs typically rely on statutory causes of action, such as the cause of action provided by the Administrative Procedure Act (APA), the lack of a statutory cause of action is not always fatal to a plaintiff's case.  *See LULAC I*, 780 F. Supp. 3d at 171–73 (collecting cases).  In the context of equitable challenges to executive actions, American courts, including the Supreme Court and the Ninth Circuit, have repeatedly held that a plaintiff may challenge an executive order or other executive act using an implied, equitable cause of action.[45]

But the Supreme Court has also made clear that a federal court's equitable powers in this arena are limited.  *See Dalton v. Specter*, 511 U.S. 462, 472 (1994) ("Our cases do not support the proposition that every action by the President, or by another executive official, in excess of

---

[44] The Court also notes that this conclusion is not disturbed by other courts preliminarily and permanently enjoining Defendants from implementing or giving effect to EO §§ 2(a), 3(d), 7(a), and 7(b). *See California v. U.S. Dep't of Health & Hum. Servs.*, 941 F.3d 410, 421 (9th Cir. 2019), *vacated on other grounds*, *Little Sisters of Poor Jeanne Jugan Residence v. California,* 207 L. Ed. 2d 1118 (2020) ("[T]o our knowledge, no court has adopted the view that an injunction imposed by one district court against a defendant deprives every other federal court of subject matter jurisdiction over a dispute in which a plaintiff seeks similar equitable relief against the same defendant.").

[45] *See, e.g.*, *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (holding that the "ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action"); *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (recognizing the existence of implied private rights of action under the Constitution); *Youngstown*, 343 U.S. at 582–89 (recognizing an implied equitable cause of action against an executive order); *Murphy Co. v. Biden*, 65 F.4th 1122, 1129–30 (9th Cir. 2023) (recognizing a court's power to review *ultra vires* actions and rejecting the government's claim that an executive action is unreviewable because of a lack of a statutory cause of action); *Sierra Club v. Trump*, 963 F.3d 874, 888–93 (9th Cir. 2020), *vacated on other grounds*, *Biden v. Sierra Club*, 210 L. Ed. 2d 985 (2021) (recognizing a constitutional and *ultra vires* cause of action to challenge an unlawful act by the Executive Branch); *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327–30 (D.C. Cir. 1996) (recognizing a cause of action and rejecting the government's claim that an executive action is unreviewable in the absence of a statutory cause of action).

ORDER RE: PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT AND DEFENDANTS'
MOTION TO DISMISS - 40

his statutory authority is ipso facto in violation of the Constitution.").  Specifically, it has held that judicial review is available only if the Executive Branch has "taken action entirely 'in excess of its delegated powers and contrary to a *specific prohibition*' in a statute."  *Nuclear Regul. Comm'n v. Texas (NRC)*, 605 U.S. 665, 681 (2025) (quoting *Ry. Clerks v. Ass'n for Benefit of Non-contract Emps.*, 380 U.S. 650, 660 (1965)).  The Supreme Court has also held that judicial review is unavailable if an existing "statutory review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for judicial review'" or "forecloses all other forms of judicial review."  *Id.* (quoting *Bd. of Governors, FRS v. MCorp Fin., Inc.*, 502 U.S. 32, 43–44 (1991)).  Absent a cause of action, equitable or otherwise, the court must dismiss the case for failure to state a claim.  *See generally Davis*, 442 U.S. at 236–41.

Defendants contend that the Court should deny summary judgment, and dismiss all of Plaintiffs' claims, because "Plaintiffs lack a cause of action to bring any claim in their Complaint."  Dkt. # 64 at 16.  Plaintiffs respond that they appropriately rely on an equitable cause of action for all[46] of their claims.  *See* Dkt. ## 103 at 15–16 & 123 at 1–2.  The Court concludes that Plaintiffs have a valid cause of action to support some, but not all, of their claims.

Plaintiffs have an equitable cause of action to support their separation-of-powers challenges[47] to EO §§ 2(a), 3(d), 4(a), 4(b), 4(d), 7(a), and 7(b) for three reasons.  First, each of these claims is rooted in the argument that the President exceeded his delegated powers and contravened specific prohibitions in the applicable statutes, thereby violating the Constitution's allocation of authority over elections to the states and Congress.  *See generally* Dkt. ## 37 &

---

[46] Although this was initially unclear, Plaintiffs' supplemental briefing confirms that they are exclusively relying on an equitable cause of action.  *See* Dkt. # 123 at 1 ("For each of their claims, Plaintiff States rely on an equitable cause of action[.]"); *see also id.* at 2 (Plaintiffs "do not rely on any other cause of action at this time.").

[47] Based on the evolution of the briefing, the Court construes Claims 4 and 5 in the Complaint ("*Ultra Vires* Action" and "Separation of Powers") to combine to form the equitable, separation-of-powers cause of action that is recognized in this Order.

103.  As these challenges are constitutional, they fall squarely within the scope of the non-statutory, equitable cause of action caselaw.

Second, none of the limitations on judicial review discussed above apply to these claims. Contrary to Defendants' contentions, there is no statutory review scheme that would provide Plaintiffs with a "meaningful and adequate opportunity for judicial review[.]"  *See NRC*, 605 U.S. at 681.  Although Defendants argue that the APA provides Plaintiffs with an adequate review scheme, *see* Dkt. # 113 at 2, Plaintiffs' challenges are aimed at the contents of the EO, not at any potential actions taken by executive agencies pursuant to the EO.  *See generally* Dkt. ## 37 & 103.  Additionally, parties cannot sue the President under the APA.  *See Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992).  It thus cannot be said that the APA, nor any other statutory review scheme, provides Plaintiffs with "a meaningful and adequate opportunity" for judicial review of EO 14,248.[48]

Third, Defendants' cited cases do not directly support the proposition that Plaintiffs are not entitled to judicial review here.  Defendants' filings rely heavily on *NRC*, a case in which the Supreme Court declined *ultra vires* review of a party's challenge to a licensing decision made by the Nuclear Regulatory Commission.  *See NRC*, 605 U.S. at 669.  The Supreme Court, however, did not deny review in *NRC* just because the plaintiffs asserted an equitable cause of action. Rather, it rejected the plaintiffs' claim because the plaintiffs: (1) had attempted to "dress up a typical statutory-authority argument as an ultra vires claim"; and (2) had a guaranteed "alternative path to judicial review."  *Id*. at 682.  In contrast, here, Plaintiffs are not making a "typical statutory-authority argument."  *See generally* Dkt. ## 37 & 103; *see also LULAC II*, 2025 WL 3042704, at *25 (concluding that "the plaintiffs' separation-of-powers claims [ ] are

---

[48] Aside from the APA, Defendants point to no other statutory review scheme which would permit (or foreclose) judicial review here.  *See generally* Dkt. ## 64 & 113.

ORDER RE: PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT AND DEFENDANTS'
MOTION TO DISMISS - 42

best characterized as constitutional, not statutory").  Defendants also cite no "alternative path to judicial review" that would encompass Plaintiffs' claims.  *See generally* Dkt. ## 64 & 113. Plaintiffs' case is also distinguishable from *NRC* on several other important grounds.[49] Accordingly, the Supreme Court's denial of *ultra vires* review in *NRC* does not affect Plaintiffs' entitlement to bring an equitable challenge to EO §§ 2(a), 3(d), 4(a), 4(b), 4(d), 7(a), or 7(b).[50]

For these three reasons, then, the Court concludes that Plaintiffs have an equitable cause of action to support their separation-of-powers challenges to EO §§ 2(a), 3(d), 4(a), 4(b), 4(d), 7(a), and 7(b).  It thus declines Defendants' request to dismiss these claims for failure to state a cause of action.

The Court does, however, agree with Defendants that Plaintiffs have not plausibly stated a cause of action for the remaining "claims" in their Complaint—Claims 1, 2, 7, and 8.  Claims 1 and 2 concern the Constitution's Elections Clause (Article I, Section 4, Clause 1), Electors Clause (Article II, Section 1), and the Tenth Amendment.  *See* Dkt. # 1 at 34–37.  While these claims are constitutional in nature, they do not fall squarely within the implied equitable cause of action caselaw discussed above.  The Court is thus unable to find sufficient facts in the

---

[49] *NRC* concerned a challenge to a licensing decision by an executive agency, 605 U.S. at 672–74, whereas this case involves a challenge to an executive order issued by the President.  In *NRC*, there was a statute that governed review of final orders (the Hobbs Act), *see id.* at 674, but here, there is no comparable statute that governs judicial review of executive orders.  In *NRC*, the plaintiffs argued that an executive agency exceeded its statutory authority, *id.* at 673, while here, Plaintiffs argue that the President has no authority to issue the directives in the EO and that it violates the Constitution.

[50] The outcomes and reasoning in Defendants' other cited cases also do not bear on Plaintiffs' entitlement to judicial review here.  *See, e.g.*, *Davis*, 442 U.S. at 249 (holding that the plaintiff has an implied cause of action under the Fifth Amendment); *Franklin*, 505 U.S. at 796 (holding that a plaintiff cannot sue the President under the APA); *Dalton*, 511 U.S. at 469–74 (affirming *Franklin*'s holding that the President's actions are not reviewable under the APA but noting that "some claims that the President has violated a statutory mandate" may still be judicially reviewable outside of the APA's framework); *City of Reno v. Netflix, Inc.*, 52 F.4th 874, 878 (9th Cir. 2022) (holding that the Declaratory Judgment Act does not provide a cause of action when the party seeking relief lacks a separate cause of action); *Glob. Health Council v. Trump*, 153 F.4th 1, 13–17 (D.C. Cir. 2025) (affirming *Dalton*'s holding that parties cannot obtain judicial review merely by recasting statutory claims as constitutional ones).

Complaint to allege a plausible claim for relief under these constitutional provisions.  It thus dismisses these claims, without prejudice, for failure to state a cause of action.[51]

The Court likewise must dismiss Claim 7 for failure to state a cause of action.  Claim 7, titled "National Voter Registration Act," suggests that the EO is unlawful because it violates the NVRA.  *See* Dkt. # 1 at 41–42.  Because this claim says nothing about the Constitution, the Court concludes that it must be characterized as a "statutory claim," not a "constitutional claim."  As Plaintiffs argue that they are challenging the EO under the "constitutional separation-of-powers doctrine," *see* Dkt. # 123 at 2, and it is not apparent on the face of the Complaint that Plaintiffs meet the more demanding standard for asserting an equitable, statutory cause of action, *see LULAC II*, 2025 WL 3042704, at *23–25 (collecting cases), the Court cannot conclude based on the present record that Plaintiffs have a valid cause of action to support Claim 7.[52]

The Court also must dismiss Claim 8 for failure to state a cause of action.  Claim 8, titled "Declaratory Judgment," appears to suggest that Plaintiffs are seeking independent relief under the Declaratory Judgment Act, i.e., that Plaintiffs are asserting a cause of action under the Act.  *See* Dkt. # 1 at 42–43.  But a declaratory judgment is a remedy, not a claim.  And the Declaratory Judgment Act "does not provide an affirmative cause of action where none otherwise exists."  *City of Reno*, 52 F.4th at 878.  Plaintiffs have also not framed Claim 8 as a constitutional claim,

---

[51] The Court notes that in dismissing Claims 1 and 2, it is not dismissing Plaintiffs' arguments that the EO violates the Elections Clause, Electors Clause, and Tenth Amendment to the extent that these arguments relate to their separation-of-powers claims, i.e., their claims that the President exceeded his delegated powers under the Constitution.  The Court is only dismissing these arguments to the extent that they present stand-alone, constitutional claims.

[52] The Court notes that in dismissing Claim 7, it is not dismissing Plaintiffs' arguments that the EO violates the NVRA to the extent that these arguments relate to their separation-of-powers claims, i.e., their claims that the President exceeded his delegated powers and acted contrary to specific provisions in the NVRA.  The Court is only dismissing Plaintiffs' NVRA arguments to the extent that they are rooted in a pure statutory claim under the NVRA.

nor satisfied the standards for *ultra vires* review of a statutory claim.  Thus, to the extent that Claim 8 asserts a "claim" under the Declaratory Judgment Act, the Court must dismiss it.[53]

*  *  *

In sum, the Court concludes that Plaintiffs have established a non-statutory, equitable cause of action for their separation-of-powers challenges to EO §§ 2(a), 3(d), 4(a), 4(b), 4(d), 7(a), and 7(b).[54]  It thus declines Defendants' request to deny summary judgment and dismiss these claims for failure to state a cause of action.  As the Court concludes that Plaintiffs have not alleged a valid cause of action for Claims 1, 2, 7, and 8 in the Complaint, the Court dismisses these claims, without prejudice, for failure to state a claim under Rule 12(b)(6).

C.    Separation-of-Powers Claims

"Separation of powers was designed to implement a fundamental insight: Concentration of power in the hands of a single branch is a threat to liberty." *Clinton v. City of New York*, 524 U.S. 417, 450 (1998) (Kennedy, J., concurring).  The Framers designed a governmental framework that serves to both "prevent the accumulation of excessive power in any one branch" and ensure "a healthy balance of power between the States and the Federal Government[.]" *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991).  "'The Framers recognized that, in the long term, structural protections against abuse of power were critical to preserving liberty.' Their solution to governmental power and its perils was simple: divide it." *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 223 (2020) (quoting *Bowsher v. Synar*, 478 U.S. 714, 730 (1986)).  The Framers thus took care to divide the "powers of the new Federal Government into three defined

---

[53] The Court notes that in dismissing Claim 8, it is only rejecting Plaintiffs' assertion of a declaratory judgment *claim*.  It is not rejecting Plaintiffs' request for a declaratory judgment as a *remedy* for a separate, equitable claim.

[54] This conclusion accords with the other district courts' opinions on this issue.  *See LULAC I*, 780 F. Supp. 3d at 171–73; *LULAC II*, 2025 WL 3042704, at *23–25; *California II*, 2025 WL 2663106, at *7–8.

categories, Legislative, Executive, and Judicial." *Id.* (quoting *INS v. Chadha*, 462 U.S. 919, 951 (1983)).

As for the executive power, the Framers provided that it "shall be vested in a President of the United States of America" and "the President shall take Care that the Laws be faithfully executed[.]" U.S. Const. art. II, § 1, cl. 1; *id.* § 3. But given the historical context, the Framers were particularly wary of designing a system that would leave unchecked powers in the hands of the President.[55] They thus took special care to impose boundaries on the executive power. These boundaries have been interpreted by federal courts to include certain key limits on the President's ability to issue directives to state and federal officials, including via an executive order.[56]

As set forth by the Supreme Court in the seminal case of *Youngstown*:

In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker. The Constitution limits his functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad. And the Constitution is neither silent nor equivocal about who shall make laws which the President is to execute.

---

[55] *See, e.g.*, THE FEDERALIST No. 47 (James Madison) ("The accumulation of all powers legislative, executive and judiciary in the same hands, whether of one, a few or many, and whether hereditary, self appointed, or elective, may justly be pronounced the very definition of tyranny."); THE FEDERALIST No. 48 (James Madison) (quoting Thomas Jefferson, *Notes on the state of Virginia* 195 (1787)) ("An elective despotism was not the government we fought for; but one which should not only be founded on free principles, but in which the powers of government should be so divided and balanced among several bodies of magistracy, as that no one could transcend their legal limits, without being effectually checked and restrained by the others.") (emphasis omitted); *Youngstown*, 343 U.S. at 640 (Jackson, J., concurring) ("The example of such unlimited executive power that must have most impressed the forefathers was the prerogative exercised by George III, and the description of its evils in the Declaration of Independence leads me to doubt that they were creating their new Executive in his image.").

[56] *See, e.g.*, *Youngstown*, 343 U.S. at 589 (concluding that the President cannot order governmental seizure of steel mills via executive order); *Ex parte Milligan*, 71 U.S. 2, 141 (1866) (concluding that the President cannot order military tribunals for civilians via executive order); *Little v. Barreme*, 6 U.S. 170, 179 (1804) (concluding that the President lacks the authority to order the seizure of certain vessels via executive order).

ORDER RE: PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT AND DEFENDANTS'
MOTION TO DISMISS - 46

343 U.S. at 587.  Accordingly, whenever the President issues an executive order, the power "to issue the order must stem either from an act of Congress or from the Constitution itself."  *Id.* at 585.  If the President lacks a statutory or constitutional basis for issuing an executive order (or any provision in it), the act is unlawful, and a federal court may use its equitable powers to enjoin its implementation.  *See generally id.* at 589.

Plaintiffs say that they are entitled to summary judgment because neither the Constitution nor any act of Congress grants the President the authority to regulate or administer elections.  *See generally* Dkt. # 37.  They thus contend that the EO's attempt to add voter eligibility requirements, interfere with the certification of voting systems, and create a national ballot-receipt deadline is unlawful.  *Id*.  Defendants respond that the President possesses the authority to issue all the directives in the EO, and thus all of Plaintiffs' separation-of-powers claims should be dismissed on the merits.  *See generally* Dkt. # 64.  The Court addresses these arguments for each of Plaintiffs' remaining claims.

1.    Voter Eligibility Requirements (§§ 2(a), 3(d), 4(a))

a.    *Section 2(a)*

Plaintiffs contend that EO § 2(a) is *ultra vires* and violates separation of powers because neither the Constitution nor the NVRA grants the President the authority to direct the EAC to add a DPOC requirement to the Federal Form.  *See* Dkt. # 37 at 18.  Defendants counter that "the President neither exceeded his constitutional authority nor violated the NVRA in directing the EAC to 'take appropriate action to require' documentary proof of citizenship on the federal form."  Dkt. # 64 at 18 (quoting EO 14,248 § 2(a)).

The Court concludes that EO § 2(a) is not authorized by the Constitution.  The Constitution's "Elections Clause," U.S. Const. art. I, § 4, cl. 1., establishes the general constitutional framework for the regulation of federal elections.  It states: "The times, places and

manner of holding elections for Senators and Representatives, shall be prescribed in each state by the legislature thereof; but the Congress may at any time by law make or alter such regulations, except as to the places of chusing Senators." *Id*. The "Electors Clause," U.S. Const. art. II, § 1, cl. 2, likewise grants states the authority to control their own elections. *See id*. ("Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress[.]"). In this way, the Constitution assigns authority over federal election administration to the states, subject only to regulations prescribed by Congress. *See id*. art. I, § 4, cl. 1; *see also Foster v. Love*, 522 U.S. 67, 69 (1997) ("[The Elections Clause] invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to preempt state legislative choices[.]") (internal quotation marks and citations omitted). Neither clause assigns any authority over federal election administration to the President or the Executive Branch, *see* U.S. Const. art. I, § 4, cl. 1; *id*. art. II, § 1, cl. 2, nor does any other constitutional provision.[57] Accordingly, the President's power to issue § 2(a) cannot stem from the Constitution itself.

The Court also determines that § 2(a) is not authorized by an act of Congress. The pertinent act of Congress here is the NVRA, as the NVRA both provides for the Federal Form and regulates its contents. *See* 52 U.S.C. §§ 20505, 20508. But the NVRA cannot be said to authorize the President's directive in § 2(a).

The NVRA makes clear that not all changes to the Federal Form are automatically authorized by Congress. The NVRA states that the Form "may require only such identifying

---

[57] Despite many constitutional provisions addressing elections, voting, or both, none authorize the President or the Executive Branch to exercise authority over the administration of federal elections. *See, e.g.*, U.S. Const. art. II, § 1, cl. 4; *id*. art. I, § 2; *id*. amends. XII, XIV, XV, XVII, XIX, XXIII, XXIV, XXVI.

ORDER RE: PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT AND DEFENDANTS'
MOTION TO DISMISS - 48

information . . . and other information . . . as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process[.]"  52 U.S.C. § 20508(b).  It also provides that the Form "may not include any requirement for notarization or other formal authentication[.]"  *Id.*  It thus follows from the text of the statute that not all updates to the Federal Form stem from the NVRA.  This is particularly true for updates involving proof of citizenship, as the NVRA already contains a provision that addresses this issue.  Per 52 U.S.C. § 20508(b)(2), the Federal Form "shall include a statement that—(A) specifies each eligibility requirement (including citizenship); (B) contains an attestation that the applicant meets each such requirement; and (C) requires the signature of the applicant, under penalty of perjury[.]"  Notably absent from this provision is any mention of "documentary proof of citizenship."  *See generally id*.  Section 2(a)'s DPOC requirement thus cannot be said to stem directly from the NVRA.

To circumvent this, Defendants argue that the NVRA authorizes the President to issue § 2(a) under a more indirect theory of statutory authority.  Defendants' argument essentially presents four steps.  First, Defendants note that Congress lawfully enacted the NVRA, thereby "empower[ing] the EAC to 'prescribe such regulations as are necessary to . . . develop a mail voter registration application form for elections for Federal office[.]'"  Dkt. # 64 at 19 (quoting 52 U.S.C. § 20508(a)).  Second, they contend that the phrase "such regulations as are necessary" gives the EAC the authority to amend the Federal Form to include a DPOC requirement.  *Id*.  Third, they argue that "[t]he EAC exercises Executive power when it carries out these duties and is therefore subject to the administrative control of the President."  *Id*.  Finally, they assert that because the EAC can add a DPOC requirement to the Federal Form and the President can exercise control over the EAC, the President is "well within his authority to direct the EAC to

'take appropriate action to require . . . documentary proof of United States citizenship' on the federal form." *Id.* (quoting EO 14,248 § 2(a)).

But this purported logic fails. Although it is unclear whether the NVRA permits the EAC to add a DPOC requirement to the Federal Form,[58] the Court declines the parties' invitations to resolve this question,[59] as it finds § 2(a) unlawful irrespective of whether the EAC can lawfully add DPOC to the Federal Form. This is because even if the EAC possesses the authority to update the Federal Form to include DPOC, it is not permitted to amend the Form ad hoc. Instead, the NVRA and HAVA prescribe specific procedures that the EAC must follow when updating the Federal Form. For example, the statutes state that the EAC,[60] "in consultation with the chief election officers of the States," may set or alter the contents of the Federal Form *only* through notice-and-comment rulemaking. 52 U.S.C. §§ 20508(a)(1)–(2), 20929. They also provide that the EAC may *only* require such information "as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process[.]" 52 U.S.C. § 20508(b). Although Defendants emphasize the phrase "take appropriate action" and thus insist that § 2(a) "contemplates" the EAC exercising its authority consistent with the NVRA and HAVA, *see* Dkt.

---

[58] The Court agrees with Plaintiffs that the text of the NVRA, coupled with the legislative history and cited cases, appear to cast doubt on whether the EAC can, consistent with the NVRA, update the Federal Form to include DPOC. *See* Dkt. # 37 at 19–20. It also notes that Congress has previously considered, and is currently considering, a measure that would amend the NVRA to require individuals to provide documentary proof of citizenship when registering to vote. *See* Safeguard American Voter Eligibility Act (SAVE Act), H.R. 8281, 118th Congress (2024).

[59] *See, e.g.*, Dkt. # 37 at 19 (Plaintiffs asserting that "the NVRA precludes the Federal Form from requiring DPOC"); Dkt. # 64 at 20 (Defendants arguing that the DPOC requirement does not violate the NVRA); *see also* Dkt. # 81 at 18 (amici Republican Party of Arizona and RITE PAC requesting that the Court hold that "the NVRA permits the EAC to include a documentary proof of citizenship field on the federal form").

[60] Congress first assigned responsibility over the Federal Form to the Federal Election Commission (FEC). *See* 52 U.S.C. § 20505(a)(1); *see also* 52 U.S.C. § 30106(a) (establishing the FEC). HAVA reassigned this responsibility to the EAC. *See* 52 U.S.C. § 21132 (transferring functions from the FEC to the EAC).

## 64 at 6 & 113 at 3, § 2(a) does not mention consultation with state officials, notice-and-comment rulemaking, nor the statutory requirement that new information to assess voter eligibility on the Federal Form must first be deemed "necessary." Instead, § 2(a) states that the EAC "*shall take* appropriate action *to require*" DPOC on the Federal Form within 30 days. EO 14,248 § 2(a) (emphasis added). Under a straightforward textual analysis, then, § 2(a) directs the EAC to act in contravention of the NVRA's specific procedures for altering the Federal Form.

But even if the Court were to ignore the text of the EO and accept Defendants' contention that § 2(a) "simply directs the EAC to begin the process" for adding DPOC to the Federal Form, *see* Dkt. # 113 at 3, § 2(a) would still violate separation of powers. In establishing the EAC, Congress explicitly provided that the EAC is an independent entity. *See* 52 U.S.C. § 20921 ("There is hereby established as an independent entity the Election Assistance Commission[.]"). Via the EAC's structure and design, Congress also provided that the EAC is a bipartisan entity. *See* 52 U.S.C. § 20923(c)(1) ("[The EAC's] chair and vice chair may not be affiliated with the same political party."); *see also* 52 U.S.C. § 20928 ("Any action which the Commission is authorized to carry out under this chapter may be carried out only with the approval of at least three of its [four] members."). Although Congress granted the President the power to appoint the EAC's members by and with the advice and consent of the Senate, *see* 52 U.S.C. § 20923(a)(1), Congress provided no other significant role for the President in the formation or operation of the EAC. *See generally* 52 U.S.C. §§ 20501–20511, 20901–21145. Given these features, it is puzzling as to how the President could lawfully order the EAC to carry out a specific policy directive without violating the EAC's enabling statutes.

While Defendants try to avoid this conclusion by arguing that the EAC exercises executive power and thus is subject to the President's supervisory authority, *see* Dkt. # 64 at 20, Defendants cite no cases that would support the President's authority to issue § 2(a)'s directive.

ORDER RE: PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT AND DEFENDANTS'
MOTION TO DISMISS - 51

Defendants' cited cases, while supporting the notion that the President may exercise a certain degree of supervisory authority over administrative agencies, all center on the removal power[61] or are otherwise irrelevant to the current dispute.[62]  *See* Dkt. # 64 at 20.  As noted by amici Bipartisan Former State Secretaries of State, "there is no understanding of executive power that grants the President the authority to control the day-to-day actions of the EAC."  Dkt. # 83 at 21. Although Defendants' cited cases (and the Supreme Court's more recent cases) hold that executive agencies must be subject to a certain degree of presidential control, in each of these cases, the Supreme Court did not choose to remedy the identified constitutional violation by ordering the transfer of the agency's rulemaking authority or other day-to-day responsibilities to the President.  Instead, the Supreme Court chose to remedy the violation by eliminating the impediment to the President's removal power.  The Court is thus unconvinced that the Supreme Court's removal cases provide an adequate basis for it to find that the President may lawfully issue an executive order that mandates that the EAC add a DPOC requirement to the Federal Form.

---

[61] *See, e.g.*, *Trump v. Wilcox*, 221 L. Ed. 2d 985, 985 (2025) (granting application for stay because the President may *remove* executive officers without cause); *Seila*, 591 U.S. at 213 (holding that the *removal* protection in the Dodd-Frank Wall Street Reform and Consumer Protection Act violates separation of powers); *Myers v. United States*, 272 U.S. 52, 176 (1926) (holding that a law which denies the President *removal* power over postmasters violates separation of powers).

[62] *See, e.g.*, *Touby v. United States*, 500 U.S. 160, 169 (1991) (holding that the challenged statute did not unconstitutionally delegate legislative power to the Attorney General and that the Attorney General's subdelegation to another officer was lawful); *Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 36 (D.C. Cir. 2002) (upholding an executive order that directed executive officials at a *non-independent* agency to implement certain policies pursuant to their uncontested statutory authority).

Because the Court finds that there is no genuine dispute as to any material fact and Plaintiffs are entitled to judgment as a matter of law on their § 2(a) claim, it denies Defendants' Motion and grants Plaintiffs summary judgment as to this claim.[63]

        b.     *Section 3(d)*

Defendants argue that Plaintiffs' challenge to EO § 3(d) must be dismissed because § 3(d) lawfully directs the Secretary of Defense to update the FPCA to require DPOC.  *See* Dkt. # 64 at 26.[64]  Plaintiffs, meanwhile, contend that they have "sufficiently alleged that [EO § 3(d)] violates the separation of powers because it infringes upon Congress's exercise of its Elections Clause power."  Dkt. # 103 at 43.

As discussed in part IV.C(1)(a), the Constitution assigns no authority to the President over federal election administration.  The President's power to issue § 3(d) thus cannot stem from the Constitution itself.

The Court also finds that Plaintiffs have plausibly alleged that the President's power to issue § 3(d) does not stem from an act of Congress.  The pertinent act of Congress here is the UOCAVA, which regulates many aspects of the election process for servicemembers and other U.S. citizens living overseas.  Unlike the NVRA, Congress did not task a specific entity or official with UOCAVA's administration.  Instead, Congress provided that the "President shall designate the head of an executive department to have primary responsibility for Federal functions under [the UOCAVA]."  52 U.S.C. § 20301(a).  These functions include: "prescrib[ing] an official post card form, containing both an absentee voter registration

---

[63] The Court's conclusion is consistent with the opinions of other district court judges on this issue.  *See California I*, 786 F. Supp. 3d at 382; *California II*, 2025 WL 2663106, at *10; *LULAC I*, 780 F. Supp. 3d at 200; *LULAC II*, 2025 WL 3042704, at *26.

[64] Plaintiffs do not move for summary judgment on this claim.  *See generally* Dkt. # 37.  Accordingly, the Court addresses Plaintiffs' § 3(d) challenge only under the motion to dismiss standard.

application and an absentee ballot application, for use by the States[;]" "prescrib[ing] a suggested design for absentee ballot mailing envelopes;" and "prescrib[ing] a standard oath for use with any document under this chapter affirming that a material misstatement of fact in the completion of such a document may constitute grounds for a conviction for perjury[.]"  52 U.S.C. § 20301(b).  But besides giving the President the power to designate the person responsible for administering the FPCA, the UOCAVA provides no other role for the President in the creation or administration of the FPCA.  *See generally* 52 U.S.C. § 20301.  UOCAVA thus does not explicitly authorize the President to mandate changes to the FPCA's contents.

While the UOCAVA could perhaps indirectly authorize the President to issue § 3(d)'s directive, Defendants have provided no caselaw to support this argument.[65]  *See generally* Dkt. ## 64 at 26–27 & 113 at 10–11.  Additionally, Plaintiffs have plausibly alleged that updating the FPCA to include a DPOC requirement would contravene the UOCAVA's statutory text and purpose.  *See* Dkt. # 103 at 44.  Accordingly, the Court denies Defendants' Motion as to this claim.[66]

    c.    *Section 4(a)*

Plaintiffs say that EO § 4(a) is unlawful because the EAC lacks the authority to withhold funding from States that fail to adopt a Federal Form with a DPOC requirement adopted pursuant to EO § 2(a)(ii).  *See* Dkt. ## 37 at 21 & 103 at 25.  Defendants contend that § 4(a) is lawful, as "the statutory sections cited in the EO provide for the condition it directs the EAC to apply[:]" the requirement that states adopt and use the EAC's Federal Form.  Dkt. # 64 at 27.

---

[65] While not explicitly mentioned in this section of Defendants' briefing, the Court notes that the cases on the President's removal power discussed in part IV.C(1)(a) are similarly inapplicable here, as the President's claimed authority to oversee the contents of the FPCA does not necessarily flow from the Supreme Court's removal cases.

[66] The Court's conclusion accords with Judge Casper's opinions in *California I*, 786 F. Supp. 3d at 384, and *California II*, 2025 WL 2663106, at *10.

The Court concludes that § 4(a) exceeds the President's statutory and constitutional authority. The President has no authority to unilaterally impose new conditions on federal funds or "thwart congressional will by canceling appropriations passed by Congress." *S.F.*, 897 F.3d at 1232. But that is what § 4(a) purports to do: it requires the EAC to cease providing federal funds to states that fail to use a version of the Federal Form that "includ[es] any requirement for documentary proof of United States citizenship adopted pursuant to [EO § 2(a)(ii)]." EO 14,248 § 4(a). As § 2(a)'s DPOC requirement is unlawful, *see* part IV.C(1)(a) above, § 4(a)'s requirement that the EAC stop providing funds to states that fail to adopt and use a Federal Form with § 2(a)'s DPOC requirement must also be unlawful.

Defendants try to avoid this conclusion by claiming that § 4(a) merely affirms the NVRA's requirement that states must adopt and use the Federal Form, "even if that federal form is updated to require DPOC[,]" to be eligible for EAC funding. Dkt. # 113 at 8. But Defendants mischaracterize § 4(a)'s directive. By its very text, § 4(a) mandates that the EAC cease providing funds to states that do not use a Federal Form with DPOC. As the Federal Form currently contains no DPOC requirement, and the President cannot lawfully direct the EAC to amend the Federal Form to include such a requirement via executive order, *see* part IV.C(1)(a) above, § 4(a) creates a new, presidentially imposed condition on EAC funding unsupported by the EO's cited statutes. As the President has no authority to unilaterally impose new conditions on federal funds, *see S.F.*, 897 F.3d at 1232, § 4(a) exceeds the President's constitutional and statutory authority.

1   Because the Court is convinced that there is no genuine dispute as to any material fact

2   and Plaintiffs are entitled to judgment as a matter of law on their § 4(a) claim, the Court denies

3   Defendants' Motion and grants Plaintiffs summary judgment as to this claim.[67]

4        2.        Voting System Requirements (§§ 4(b), 4(d))

5             a.    *Section 4(b)*

6   Plaintiffs say that EO § 4(b) is unlawful because the "President has no authority to order

7   changes to election systems guidelines or dictate the outcome of the testing and certification

8   process [for voting systems]."  Dkt. # 37 at 30.  Defendants contend that § 4(b) is lawful because

9   the EAC is an executive agency, and "the President has the authority to direct Executive agencies

10  to carry out their statutory duties in a particular way, consistent with that statute."  Dkt. # 64 at

11  29.

12  As discussed in part IV.C(1)(a), the Constitution assigns no authority to the President

13  over federal election administration.  The power to issue §§ 4(b)(i) and 4(b)(ii) thus cannot stem

14  from the Constitution itself.

15  The President's power to issue § 4(b)(i) also cannot be said to stem from an act of

16  Congress.  In enacting the HAVA and NVRA, Congress assigned the duties relating to "the

17  adoption of voluntary voting system guidelines" and "the testing, certification, decertification,

18  and recertification of voting system hardware and software" to the EAC.  52 U.S.C. § 20922(1)–

19  (2); *see also* 52 U.S.C. § 20962.  It also clearly articulated a process for altering the VVSGs.  Per

20  52 U.S.C. § 20962, before adopting or modifying the VVSGs, the EAC must: (1) undergo notice-

21  and-comment rulemaking; (2) consider the recommendations provided by the Technical

22  Guidelines Development Committee; (3) submit the proposed guidelines to the Board of

23

24  ───────────────

[67] The Court's conclusion tracks Judge Casper's opinion in *California II*, 2025 WL 2663106, at
*12.

ORDER RE: PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT AND DEFENDANTS'
MOTION TO DISMISS - 56

1    Advisors and the Standards Board, which must review and submit comments and

2    recommendations regarding the new guidelines (or modifications to the existing guidelines) to

3    the EAC; and (4) vote to approve the final adoption or modification (at least 90 days after the

4    proposal was submitted to the Board of Advisors and the Standards Board), taking into

5    consideration the comments and recommendations submitted by the Board of Advisors and the

6    Standards Board.  Under the applicable statutes, then, only if the EAC completes all these steps

7    *and* the proposal receives approval from at least three of the four EAC members can the VVSGs

8    be amended.  *Id.*; *see also* 52 U.S.C. § 20928.

9        Section 4(b)(i), however, defies this congressionally established procedure.  It not only

10   requires the EAC to take action to amend the guidelines (irrespective of whether the EAC

11   determines an update is necessary), but it also requires the EAC to amend the guidelines in a

12   particular way.  *See* EO 14,248 § 4(b)(i) ("The amended guidelines and other guidance shall

13   provide that voting systems should not use a ballot in which a vote is contained within a barcode

14   or quick-response code in the vote counting process except where necessary to accommodate

15   individuals with disabilities, and should provide a voter-verifiable paper record to prevent fraud

16   or mistake.").  Contrary to Defendants' contention, then, the directive in § 4(b)(i) cannot be

17   characterized as the President merely directing the EAC to "initiate appropriate action" to amend

18   the VVSGs in a way that accounts for the statutory process.  *See* Dkt. # 64 at 29.  Rather,

19   § 4(b)(i) directs the EAC to amend the guidelines to reach a particular outcome, in violation of

20   the statutory process prescribed by Congress.

21       Section 4(b)(ii)'s directive also cannot be said to stem from an act of Congress.  As the

22   Court finds that the President cannot direct the EAC to promulgate "the new standards

23   established under [§ 4(b)(i),]" the Court also finds that the President lacks the authority to require

24   the EAC, "within 180 days of the date of this order," to take action to "review and, if

ORDER RE: PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT AND DEFENDANTS'
MOTION TO DISMISS - 57

appropriate, re-certify voting systems under" these unlawful standards. *See* EO 14,248 § 4(b)(ii). Defendants also do not explain how such a mandate flows from the President's authority under the NVRA or HAVA, especially when these laws prescribe a specific timeline for the amendment process and assign no role to the President in overseeing the certification of voting systems. Defendants also do not explain how the President can lawfully require the EAC "to rescind all previous certifications of voting equipment based on prior standards" or "re-certify voting systems" according to new standards in a way that complies with Congress's directive in 52 U.S.C. § 20971—the provision governing the certification and testing of voting systems. Thus, the Court concludes that § 4(b) exceeds the President's statutory and constitutional authority.

Rather than grapple with these arguments, Defendants instead attempt to argue that § 4(b) is lawful because, as head of the Executive Branch, the President has the authority to direct the EAC to carry out its duties consistent with the applicable statutes. *See* Dkt. # 64 at 29. But as explained above, the Court does not find that § 4(b) contemplates the EAC carrying out its duties in a manner that comports with the applicable statutes. The Court also does not find, for the reasons discussed in part IV.C(1)(a), that the President's role as head of the Executive Branch necessarily grants him the authority to control the day-to-day activities of the EAC such that he may lawfully mandate that the EAC amend the VVSGs and rescind certifications for all voting systems currently certified under the federal standards.

Because the Court finds that there is no genuine dispute as to any material fact and Plaintiffs are entitled to judgment as a matter of law on their § 4(b) claim, the Court denies Defendants' Motion and grants Plaintiffs summary judgment as to this claim.

1

2        b.      *Section 4(d)*

3        Defendants argue that Plaintiffs' challenge to EO § 4(d) must be dismissed because

4    § 4(d) directs the DHS Secretary and FEMA Administrator to, "'consistent with applicable law,'

5    prioritize compliance with the VVSG 2.0 and completion of testing through the Voting System

6    Test Labs accreditation process[.]"  Dkt. # 64 at 30 (quoting EO 14,248 § 4(d)).[68]  Defendants

7    thus argue that § 4(d) is lawful, as "[d]efinitionally, directing executive agencies to take action to

8    the extent consistent with applicable law cannot be interpreted as an order to violate the law."

9    *Id*.  Plaintiffs respond that "Defendants place far more weight on this savings clause than it can

10   reasonably bear[,]" as "[t]here is no lawful way in which the agency heads could consider

11   Plaintiff States' compliance with these conditions that would be 'in accordance with applicable

12   law.'"  Dkt. # 103 at 41.

13       As discussed in part IV.C(1)(a), the Constitution assigns no authority to the President

14   over federal election administration.  The President's power to issue § 4(d) thus cannot stem

15   from the Constitution itself.

16       The Court also finds that Plaintiffs have plausibly alleged that the President's power to

17   issue § 4(d) does not stem from an act of Congress.  Section 4(d) concerns the Homeland

18   Security Grant Program, a program established by Congress and codified at 6 U.S.C. §§ 603–

19   609a.  In creating this program, Congress entrusted the DHS and FEMA with some discretion

20   over certain aspects of the grant-making process.  But while Congress authorized these agencies

21   to exercise some discretion over grant-making, at no point in the enabling statutes did Congress

22   mention compliance with the VVSG 2.0 or completion of testing through the Voting System Test

23   Labs accreditation process as criteria for states to receive funding under the program.

24   _____

[68] Plaintiffs do not move for summary judgment on this claim.  *See generally* Dkt. # 37.
Accordingly, the Court addresses Plaintiffs' § 4(d) challenge only under the motion to dismiss standard.

ORDER RE: PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT AND DEFENDANTS'
MOTION TO DISMISS - 59

Accordingly, § 4(d) can plausibly be described as the President acting contrary to an act of Congress by directing the DHS Secretary and FEMA Administrator to add new funding criteria for the Homeland Security Grant Program.  As the President cannot unilaterally impose new conditions on federal funds, *see S.F.*, 897 F.3d at 1232, the Court finds that Plaintiffs have plausibly stated a claim.

This conclusion is not disturbed by the "consistent with applicable law" language in § 4(d).  Although the Court agrees with Defendants that it is "lawful for the President to instruct agencies to act within their own statutory authorities to implement the President's priorities consistent with applicable law[,]" *see* Dkt. # 64 at 30, it also finds that when viewed in the light most favorable to Plaintiffs, § 4(d) does more than instruct the agency heads "to act within their own statutory authorities"—it adds new funding criteria in violation of the statutory scheme established by Congress.  The Court likewise finds that Plaintiffs have plausibly alleged that the discretion conferred to the DHS Secretary and the FEMA Administrator under 6 U.S.C. § 608(a)(1)(K) is not broad enough to encompass consideration of the states' compliance with the VVSG 2.0 or completion of testing through the Voting System Test Labs accreditation process.

Accordingly, the Court finds that Plaintiffs have adequately alleged that the President exceeded his constitutional and statutory authority by issuing EO § 4(d).  It thus denies Defendants' Motion as to this claim.

        3.      Ballot-Receipt Deadline (§§ 7(a), 7(b))

        a.     *The Ballot-Receipt Deadline*

Before addressing the lawfulness of §§ 7(a) and 7(b), it is necessary to consider the threshold question of whether the national ballot-receipt deadline contained in EO § 7 is lawful. Plaintiffs argue that this deadline is unlawful, as the President has no constitutional or statutory

authority to create a national ballot-receipt deadline via an executive order.  *See* Dkt. # 37 at 24.

Defendants respond that "the President did not create a ballot-receipt deadline for federal

elections [via EO § 7]—Congress did" when it enacted the Election Day statutes.  Dkt. # 64 at

33.  They thus contend that § 7's deadline is lawful, as it "does not alter any federal statutes, it

merely interprets them[.]"  Dkt. # 113 at 14.

    As discussed in part IV.C(1)(a), the Constitution assigns the states all authority to

regulate the time, place, and manner of elections, subject only to limitations by Congress.  As the

Constitution assigns no authority to the President over federal election administration, the

President's authority to promulgate a national ballot-receipt deadline cannot stem from the

Constitution.

    Section 7's ballot-receipt deadline is also not authorized by an act of Congress.  The

pertinent statutes here are the Election Day statutes, which establish a uniform day for federal

elections.  The first statute, 2 U.S.C. § 7, states: "The Tuesday next after the 1st Monday in

November, in every even numbered year, is established as the day for the election, in each of the

States and Territories of the United States, of Representatives and Delegates to the Congress

commencing on the 3d day of January next thereafter."  The second statute, 3 U.S.C. § 1, states:

"The electors of President and Vice President shall be appointed, in each State, on election day,

in accordance with the laws of the State enacted prior to election day."  While Defendants argue

that EO § 7 merely "interprets" these statutes to require a national ballot-receipt deadline of

Election Day, *see* Dkt. ## 64 at 35 & 113 at 14, this argument simply cannot be squared with the

text, purpose, legislative history, nor historical application of the Election Day statutes.

    To begin, although the statutes clearly establish a uniform "day for the election"

nationwide, the statutes are silent on ballot receipt.  Neither statute includes the words "ballot,"

"deadline," "receipt," or any other term that could be fairly "interpreted" to create a ballot-

1    receipt deadline.  *See generally* 2 U.S.C. § 7; 3 U.S.C. § 1.  Defendants resist this conclusion,

2    arguing that the terms "day for the election" and "election day" provide the President with the

3    requisite room to "interpret" such a deadline.  *See* Dkt. # 64 at 33.  In making this argument,

4    Defendants rely heavily on *Republican National Committee v. Wetzel*, a recent out-of-Circuit

5    opinion in which the Fifth Circuit determined that the term "day for the election" in 2 U.S.C. § 7

6    means "the day by which ballots must be both cast by voters and received by state officials."

7    120 F.4th 200, 204 (5th Cir. 2024) (emphasis omitted).  But for the reasons below, this Court

8    declines to follow this decision.

9            First, as a Fifth Circuit opinion, *Wetzel* does not bind this Court.  Its understanding of the

10    term "election" thus applies only to the extent that this Court finds its analysis persuasive.

11            Second, the Court questions *Wetzel*'s method for defining "day for the election" in 2

12    U.S.C. § 7.  The opinion begins its analysis by stating that it must interpret the words in a statute

13    consistent with their ordinary meaning at the time Congress enacted the statute.  *Wetzel*, 120

14    F.4th at 206.  A sentence later, however, it summarily concludes that contemporaneous

15    definitions of "election" "do not shed light on Congress's use of the word 'election' in the

16    nineteenth century."  *Id*. n.5.  The opinion thus discards various dictionary definitions of

17    "election" from 19th century sources, all of which define the term as an act of choosing or

18    selecting a candidate for office and "make no mention of deadlines or ballot receipt."  *Id.*[69]  It

19    then states that the court's "understanding of the statutory text" will be guided by *Foster v. Love*,

20

21            [69] *Wetzel* cites these definitions of "election": *Election*, Noah Webster, *An American Dictionary Of The English Language* 288 (1830) ("The day of a public choice of officers."); *Election*, *3 The Century Dictionary and Cyclopedia* 1866 (1901) ("The act or process of choosing a person or persons for office by vote . . . [A]lso, the occasion or set time and provision for making such choice."); *Election*, James Stormonth, *Etymological and Pronouncing Dictionary of the English Language* 173 (W. Blackwood ed., 1881) ("[T]he choice or selection of a person or persons to fill some office"); *Election*, *Black's Law Dictionary* (1st ed. 1891) ("The selection of one man from among several candidates to discharge certain duties in a state, corporation, or society."). *See Wetzel*, 120 F.4th at 206 n.5.

22

23

24    ORDER RE: PLAINTIFFS' MOTION FOR PARTIAL
      SUMMARY JUDGMENT AND DEFENDANTS'
      MOTION TO DISMISS - 62

a 1997 Supreme Court case regarding a challenge to Louisiana's open primary system. *See Wetzel*, 120 F.4th at 206. The opinion then lists, and applies, "three definitional elements" from the Supreme Court's decision in *Foster*—"(1) official action, (2) finality, and (3) consummation"—to arrive at its conclusion that the term "election day" must encompass both ballot casting and ballot receipt. *Id.* at 207–09.

But as the Fifth Circuit itself noted, in *Foster*, the Supreme Court specifically "declined to pare the term 'election' in [2 U.S.C.] § 7 down to the definitional bone[.]" *Id.* at 207 (cleaned up); *see also Foster*, 522 U.S. at 72. The *Foster* Court also did not purport to list "official action," "finality," and "consummation" as core elements of the definition of "election." *See generally Foster*, 522 U.S. at 69–73. It is thus unclear to this Court how *Wetzel* arrives at its conclusion that "official action," "finality," and "consummation" appropriately define the ordinary meaning of "election" at the time Congress enacted 2 U.S.C. § 7.

The Court also questions several other aspects of *Wetzel*'s textual analysis. For example, *Wetzel* states that a ballot cannot be "cast" before it is received, as it is "obvious that a ballot is 'cast' when the State takes custody of it." *Wetzel*, 120 F.4th at 207. But the opinion does not explain what it means to cast a ballot, nor does this Court find it obvious that a ballot is cast only when a state takes custody of it. Similarly, *Wetzel* states, without explanation, that an election "is consummated when the last ballot is received and the ballot box is closed." *Id.* at 208. But given the meaning of "consummate,"[70] it is unclear to this Court why consummation of an election occurs when the last ballot is received, rather than when the last ballot is cast, the last

---

[70] *Wetzel* does not define "consummate." *See generally Wetzel*, 120 F.4th at 208–09. The common definition of the term is: to finish, to complete, or to make perfect. *See, e.g.*, *Consummate*, Merriam-Webster's Online Dictionary (11th ed. 2025), https://www.merriam-webster.com/dictionary/consummate ("complete in every detail: perfect"); *Consummate*, *Black's Law Dictionary* (12th ed. 2024) ("Completed; fully accomplished.").

ballot is counted, or perhaps most persuasively, when the last ballot is canvassed and the election results are certified.  Accordingly, the Court declines to adopt *Wetzel*'s definition of "election."

The Court instead considers the text, purpose, legislative history, and historical application of the Election Day statutes to define "election" in 2 U.S.C. § 7 and 3 U.S.C. § 1. Starting with the text, the Court considers the ordinary meaning of "election" at the time the Election Day statutes were enacted.  According to the contemporaneous definitions cited in *Wetzel*, "election" means the "selection of one man from among several candidates to discharge certain duties in a state, corporation, or society" or the "[t]he act or process of choosing a person or persons for office by vote."  *Black's Law Dictionary* (1st ed. 1891); *3 The Century Dictionary and Cyclopedia* 1866 (1901).[71]  In other words, an "election" occurs when a voter makes their official selection for a candidate, such as when a ballot is cast in a voting booth, deposited in a drop box, or dropped in the mail.  Contemporary sources similarly define the term.[72]  The Court has found no definition of "election" from the 19th century (nor today) that mentions the receipt of ballots.  A straightforward textual analysis, then, does not permit the Election Day statutes to be "interpreted" to require a national ballot-receipt deadline of Election Day.

---

[71] *See also Election*, Noah Webster, *An American Dictionary Of The English Language* 288 (1830) ("The act of choosing; choice; the act of selecting one or more from others"; "The day of a public choice of officers."); *Election*, *3 The Century Dictionary and Cyclopedia* 1866 (1901) ("The choice of a person or persons for office of any kind by the voting of a body of qualified or authorized electors."); *Election*, James Stormonth, *Etymological and Pronouncing Dictionary of the English Language* 173 (W. Blackwood ed., 1881) ("[T]he choice or selection of a person or persons to fill some office"); *Election*, *Black's Law Dictionary* (1st ed. 1891) ("The act of choosing or selecting one or more from a greater number of persons").

[72] *See, e.g.*, *Election*, *Black's Law Dictionary* (12th ed. 2024) ("The process of selecting a person to occupy an office (usually a public office), membership, award, or other title or status."); *Election*, Collins English Dictionary, https://www.collinsdictionary.com/dictionary/english/election (last visited Jan. 6, 2026) ("An election is a process in which people vote to choose a person or group of people to hold an official position."); *Election*, Merriam-Webster's Online Dictionary (11th ed. 2025), https://www.merriam-webster.com/dictionary/election ("an act or process of electing[,]" with "electing" defined as "to select by vote for an office, position, or membership").

The purpose and legislative history of the Election Day statutes bolster this conclusion. As noted by the Supreme Court in *Foster*, the Election Day statutes were passed because

> Congress was concerned both with the distortion of the voting process threatened when the results of an early federal election in one State can influence later voting in other States, and with the burden on citizens forced to turn out on two different election days to make final selections of federal officers in Presidential election years.

*Foster*, 522 U.S. at 73 (citing Cong. Globe, 42d Cong., 2d Sess., 141 (1871) (remarks of Rep. Butler)).  This legislative record thus suggests that the purpose of the Election Day statutes was to prevent early election results, not to prevent states from counting ballots received after Election Day.  The Court also finds nothing in the parties' briefing, nor the legislative record more generally, that would suggest that Congress was concerned about votes being received or tabulated after Election Day.

Historical practice also supports the Court's interpretation.  As noted by Plaintiffs, the historical record suggests that during the Civil War, some states permitted soldiers in the field to give their ballots to military officials on Election Day, with the ballot transmitted and received by election officials after the date of the election.  Dkt. # 37 at 25–26 (citing Josiah Henry Benton, *Voting in the Field: A Forgotten Chapter of the Civil War* 171–73, 186–87, 190 (1915)).[73]  In the more than 150 years since the Election Day statutes were enacted, many states have passed laws that allow ballots to be received after Election Day.  As a result, around one-third of states, as well as Washington D.C., Puerto Rico, and the Virgin Islands, currently allow ballots received after Election Day to be counted.[74]  And despite being aware of these laws and

---

[73] The Court also notes that while Plaintiffs' historical analysis conflicts with that of *Wetzel*, Plaintiffs' account provides a more accurate characterization of the excerpt from *Voting in the Field* that is cited in *Wetzel*.  *Compare Wetzel* 120 F.4th at 209–10, *with* Dkt. # 37 at 26.

[74] *See* Dkt. # 88 at 10; *Table 11: Receipt and Postmark Deadlines for Absentee/Mail Ballots*, National Council of State Legislatures (Dec. 24, 2025), https://www.ncsl.org/elections-and-campaigns/table-11-receipt-and-postmark-deadlines-for-absentee-mail-ballots.

amending other federal election statutes, Congress has never amended the Election Day statutes or otherwise indicated that these states' ballot-receipt deadlines are unlawful.  In fact, in enacting other legislation, like UOCAVA, Congress implicitly endorsed the existence of different ballot-receipt deadlines among the states.[75]  Although courts must be wary about inferring congressional intent from congressional silence or inaction, *see United States v. Wells*, 519 U.S. 482, 495–96 (1997), this record provides a strong basis for a court to assume that Congress did not intend to preempt state laws governing ballot receipt.

Finally, this interpretation tracks the majority view advanced by other courts.  Apart from the *Wetzel* court, most courts that have reviewed the Election Day statutes have concluded that "the text of the Election Day statutes require only that all votes are cast by Election Day, not that they are received by that date."  *California I*, 786 F. Supp. 3d at 386 (collecting cases).  As a result, courts across the country have upheld state laws that permit ballots to be received after Election Day, concluding that such laws are fully consistent with the Election Day statutes.[76]

---

[75] UOCAVA states that overseas ballots "shall be submitted and processed in the manner provided by law for absentee ballots in the State involved" and the "deadline for receipt of the State absentee ballot under State law" shall apply.  52 U.S.C. § 20303(b).

[76] *See, e.g.*, *Bost v. Ill. State Bd. of Elections*, 684 F. Supp. 3d 720, 736 (N.D. Ill. 2023) (upholding an Illinois law allowing ballots postmarked on or before Election Day to be counted if received within fourteen days, concluding that this provision "is facially compatible with the relevant federal statutes"), *aff'd*, 114 F.4th 634 (7th Cir. 2024); *Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354, 372 (D.N.J. 2020) (concluding that "the Federal Election Day Statutes are silent on methods of determining the timeliness of ballots" and thus do not preempt a New Jersey law allowing ballots lacking a postmark to be counted if received within 48 hours after polls close); *Pa. Democratic Party v. Boockvar*, 238 A.3d 345, 368 n.23 (Pa. 2020) (upholding a three-day extension of the absentee and mail-in ballot receipt deadline in Pennsylvania and observing that "the tabulation of ballots received after Election Day does not undermine the existence of a federal Election Day, where the proposal requires that ballots be cast by Election Day"); *Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336, 354 (3d Cir. 2020), *vacated as moot sub nom.*, *Bognet v. Degraffenreid*, 209 L. Ed. 2d 544 (2021) (upholding a three-day extension of the absentee and mail-in ballot-receipt deadline in Pennsylvania and concluding that "[t]he Deadline Extension and federal laws setting the date for federal elections can, and indeed do, operate harmoniously").

ORDER RE: PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT AND DEFENDANTS'
MOTION TO DISMISS - 66

Defendants contend that allowing absentee ballots to be received after Election Day is just as discriminatory as allowing elections to end before Election Day. But in making this argument, Defendants appear to rely on the erroneous premise that when states count ballots received after Election Day, "absentee voters have several extra days after Election Day to cast their votes."[77] *See* Dkt. # 64 at 37. But Plaintiffs, like other states that count ballots received after Election Day, only count ballots mailed on or before Election Day.[78] It is thus unclear how Plaintiffs' decision to count these ballots amounts to "arbitrarily treat[ing] some people's votes differently[.]" *Id.*

Because the Court concludes that the Election Day statutes do not create a national ballot-receipt deadline nor allow the President to interpret such a deadline, it must conclude that the national ballot-receipt deadline in EO § 7 is unlawful.

b.    *Section 7(a)*

Plaintiffs contend that EO § 7(a) is unlawful because it directs the Attorney General to "'take all necessary action to enforce' [a] nonexistent federal ballot-receipt deadline." Dkt. # 37 at 21 (quoting EO 14,248 § 7(a)). Defendants argue that because the President has the authority to establish a national ballot-receipt deadline of Election Day, the President can lawfully direct

---

[77] Defendants also argue that because the postal service permits senders to recall mail, voters can "change" their votes after Election Day. Dkt. # 64 at 37. Yet although a voter could ostensibly recall their ballot once mailed, the voter could not then re-mail it after Election Day and have their vote counted, as a ballot mailed *after* Election Day would not be postmarked *by* Election Day, and thus would not be considered valid under Plaintiffs' laws.

[78] Defendants also argue that if postmarks are unenforced, "it is possible to imagine that an un-postmarked ballot, delivered after Election Day but before counting concluded, could be counted based on a person's fraudulent certification date." Dkt. # 64 at 37. But this argument is like saying that if hours at voting booths are unenforced or ballot drop boxes are not properly secured, it is possible to imagine that a voter could cast a ballot on a day besides Election Day—while theoretically true, it does not mean that the purpose of the Election Day statutes has been violated. Nor does the Court find that the hypothetical fraudulent activity of voters bears at all on whether the President can interpret "election" in 2 U.S.C. § 7 and 3 U.S.C. § 1 to require a national ballot-receipt deadline.

ORDER RE: PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT AND DEFENDANTS'
MOTION TO DISMISS - 67

the Attorney General to enforce said deadline against states that include absentee or mail-in ballots received after Election Day in their final vote tabulations.  Dkt. # 64 at 34–35.

Because the Court concludes that EO § 7's national ballot-receipt deadline of Election Day is unlawful, *see* part IV.C(3)(a) above, it also finds that the President lacks any constitutional or statutory authority to direct the Attorney General to "enforce" said deadline against states that "violate" 2 U.S.C. § 7 and 3 U.S.C. § 1 "by including absentee or mail-in ballots received after Election Day in the final tabulation of votes for the appointment of Presidential electors and the election of members of the United States Senate and House of Representatives."  EO 14,248 § 7(a).  It thus denies Defendants' Motion and grants Plaintiffs summary judgment as to this claim.[79]

        c.    *Section 7(b)*

Plaintiffs contend that EO § 7(b) is unlawful because it directs the EAC to "'condition any available funding to a State on that State's compliance' with a nonexistent federal ballot-receipt deadline."  Dkt. # 64 at 21 (quoting EO 14,248 § 7(b)).  Defendants respond that § 7(b) is lawful, as it simply directs the EAC to make payments to states that comply with the relevant federal statutes, including "the uniform and nondiscriminatory ballot receipt deadline" established by 2 U.S.C. § 7 and 3 U.S.C. § 1.  Dkt. # 64 at 39

But as the Court finds that EO § 7's national ballot-receipt deadline is unlawful, *see* part IV.C(3)(a) above, it also finds that the President lacks any constitutional or statutory authority to direct the EAC to condition funding to states based on their compliance with this unlawful

---

[79] This conclusion is consistent with Judge Casper's opinions in *California I*, 786 F. Supp. 3d at 388, and *California II*, 2025 WL 2663106, at *11.

1   deadline.  It thus denies Defendants' Motion and grants Plaintiffs summary judgment as to this

2   claim.[80]

3                                          *   *   *

4          In sum, the Court concludes that Plaintiffs are entitled to judgment as a matter of law on

5   their separation-of-powers challenges to EO §§ 2(a), 4(a), 4(b), 7(a), and 7(b).  It thus grants

6   Plaintiffs' Motion for Partial Summary Judgment as to these claims and proceeds to the question

7   of relief.  The Court also concludes that Plaintiffs have plausibly alleged that EO §§ 3(d)

8   and 4(d) are unlawful.  It thus denies Defendants' request to dismiss these claims for failure to

9   state a claim under Rule 12(b)(6).

10  D.     Relief

11         Plaintiffs request that the Court: (1) "hold that sections 2(a), 4(a), 4(b), and 7 of the

12  Executive Order are *ultra vires* and a violation of the separation of powers"; (2) permanently

13  enjoin Defendants from implementing these provisions; and (3) "enter a declaratory judgment

14  that the federal election day statutes, 2 U.S.C. § 7 and 3 U.S.C. § 1, do not preempt Washington

15  and Oregon's ballot-receipt deadline laws."  Dkt. # 37 at 10, 33.

16         Defendants state that they have no "independent objections" to the Court holding EO

17  §§ 2(a), 4(a), 4(b), 7(a), and 7(b) unlawful if it concludes that it has jurisdiction and that

18  Plaintiffs' arguments succeed on the merits.  *See* Dkt. # 122 at 3.  For the reasons discussed

19  above, then, the Court grants this relief without further discussion.

20         As for Plaintiffs' other requested relief, Defendants contend that it would be improper for

21  the Court to issue a "nationwide injunction prohibiting Defendants from implementing or

22  enforcing the challenged provisions of the EO" under *Trump v. CASA, Inc*., 606 U.S. 831 (2025).

23

24         _____

           [80] This conclusion accords with Judge Casper's opinions in *California I*, 786 F. Supp. 3d at 389,
    and *California II*, 2025 WL 2663106, at *11.

    ORDER RE: PLAINTIFFS' MOTION FOR PARTIAL
    SUMMARY JUDGMENT AND DEFENDANTS'
    MOTION TO DISMISS - 69

*Id.* at 4 (internal quotation marks and citations omitted). They also challenge Plaintiffs' request to facially enjoin Defendants from implementing § 7(a) and separately argue that the Court should not enter Plaintiffs' requested declaratory judgment, as such relief is improperly "tethered to Count 8 of their Complaint, which is a putative standalone claim for declaratory judgment." Dkt. ## 124 at 5 & 122 at 3. For the reasons below, the Court rejects Defendants' arguments and grants Plaintiffs' requested relief, subject to the modifications explained below.

1.    Plaintiffs' Request for a Permanent Injunction

"The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court[.]" *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). In deciding whether to issue a permanent injunction, district courts are guided by the four-factor test from *eBay*. Under this test, "[a] plaintiff must demonstrate: (1) that [they have] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.*

As noted by the Supreme Court, "[i]t is a general rule that a court of equity . . . may administer complete relief between the parties, even though this involves the determination of legal rights which otherwise would not be within the range of its authority." *Kinney-Coastal Oil Co. v. Kieffer*, 277 U.S. 488, 507 (1928). But "'[c]omplete relief' is not synonymous with 'universal relief.'" *CASA*, 606 U.S. at 851. Accordingly, district courts may issue party-specific injunctions but cannot issue universal injunctions. *Id.*

Here, the Court finds that Plaintiffs are entitled to a permanent injunction for their §§ 2(a), 4(a), 4(b), 7(a), and 7(b) claims. For the reasons discussed in part IV.A(1), Plaintiffs have shown that they will suffer irreparable harm in the absence of an injunction. Given these

ORDER RE: PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT AND DEFENDANTS'
MOTION TO DISMISS - 70

substantial sovereign and financial injuries, as well as the impracticability of states altering

election processes or results after the fact, the Court finds that monetary damages and other

remedies available at law are inadequate to compensate Plaintiffs for their injuries.[81]  The Court

also finds that the balance of hardships and the public interest favor a permanent injunction.  It

thus grants Plaintiffs' request to permanently enjoin Defendants from implementing EO §§ 2(a),

4(a), 4(b), 7(a),[82] and 7(b).

> In granting such relief, however, the Court clarifies that it is not issuing universal relief.

Instead, consistent with *CASA*, the Court is issuing only party-specific relief that is no broader

than necessary to provide complete relief to Plaintiffs.  *See CASA*, 606 U.S. at 861.  As for EO

§§ 4(a), 7(a), and 7(b), this means that the Court is permanently enjoining Defendants from

implementing or giving effect to these provisions only as applied to Plaintiffs.  As these

provisions direct agency officials to take discrete actions against states, the Court finds that it

may award Plaintiffs complete relief without enjoining Defendants from taking any action to

implement or give effect to these provisions.  In contrast, to provide Plaintiffs complete relief on

their challenges to EO §§ 2(a) and 4(b), the Court finds it must enjoin Defendants from taking

*any* action to implement or give effect to these provisions.  As EO §§ 2(a) and 4(b) concern a

single (and national) Federal Form, set of voting guidelines, and certification process, Plaintiffs

cannot receive complete relief unless the EAC and its Commissioners, directors, and agents, are

enjoined from implementing or giving effect to these provisions in full.  The Court thus finds a

---

[81] The Court also notes that because Plaintiffs rely on an equitable cause of action, legal remedies are unavailable.

[82] In granting Plaintiffs' request to enjoin Defendants from implementing EO § 7(a), the Court clarifies that it is enjoining only unlawful applications of this provision.  Thus, to the extent that "enforcement actions" under EO § 7(a) encompass lawful, non-compulsive conduct (like sending a letter), the Court does not enjoin Defendants.  But to the extent that the term "enforce" in EO § 7(a) is limited to unlawful, compulsive conduct (like bringing a criminal enforcement action or threatening to withhold funds), the Court enjoins Defendants in full.  Either way, Plaintiffs are entitled to an injunction that prevents Defendants from compelling Plaintiffs to adopt § 7's unlawful ballot-receipt deadline.

total injunction as to these provisions proper, even though such an injunction may incidentally impact nonparties.

2.    Plaintiffs' Request for a Declaratory Judgment

The Declaratory Judgment Act, 28 U.S.C. § 2201, and Federal Rule of Civil Procedure 57, apply to the question of whether to issue a declaratory judgment.  Under these standards, district courts possess "unique and substantial discretion in deciding whether to declare the rights of litigants" via a declaratory judgment.  *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995). Accordingly, a court may issue declaratory relief "whether or not further relief is or could be sought," so long as the case presents a justiciable case or controversy that falls within the court's jurisdiction and the plaintiff asserts an independent cause of action.  28 U.S.C. § 2201; *see also* Fed. R. Civ. P. 57; *City of Reno*, 52 F.4th at 878.

Here, the Court finds that Plaintiffs are entitled to a declaratory judgment as an additional equitable remedy on their § 7 claim.[83]  As explained in part IV, the Court finds that: (1) it has jurisdiction over Plaintiffs' challenge to EO § 7; (2) Plaintiffs have asserted a valid cause of action; and (3) Plaintiffs have succeeded on the merits of their § 7 claim, in part because 2 U.S.C. § 7 and 3 U.S.C. § 1 do not establish a national ballot-receipt deadline of Election Day. The Court thus finds it proper to enter a declaratory judgment stating that Plaintiffs' ballot-receipt deadlines are not preempted by 2 U.S.C. § 7 or 3 U.S.C. § 1.[84]

---

[83] Although the Court agrees with Defendants that Plaintiffs may not request a declaratory judgment on the basis of Claim 8, it finds that Plaintiffs may request a declaratory judgment on the basis of their separate, equitable cause of action, recognized by this Court in part IV.B.

[84] This relief also accords with the Supreme Court's understanding of the preemptive effects of federal election laws.  *See Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 14 (2013) ("Because the power the Elections Clause confers is none other than the power to pre-empt, the reasonable assumption is that the statutory text accurately communicates the scope of Congress's pre-emptive intent.").

1

2

# V
## CONCLUSION

For these reasons, it is hereby ORDERED that:

(1) Plaintiffs' Motion for Partial Summary Judgment (Dkt. # 37) is GRANTED in part and DENIED in part. Plaintiffs' Motion is granted with respect to their non-statutory, equitable challenges to EO §§ 2(a), 4(a), 4(b), 7(a), and 7(b), based on the specific reasoning in this Order.

(2) Defendants' Motion to Dismiss (Dkt. # 64) is GRANTED in part and DENIED in part. Plaintiffs' challenges to EO §§ 2(b)(iii), 2(d), 2(e)(ii), and 5(b), as well as Claims 1, 2, 3, 6, 7, and 8 from the Complaint, are dismissed without prejudice. Defendants' Motion is otherwise denied.

(3) The Court grants Plaintiffs the following relief:

    a.    The Court holds that EO §§ 2(a), 4(a), 4(b), 7(a), and 7(b) are unlawful.

    b.    The EAC Defendants[85] are permanently enjoined from taking any action to implement or give effect to EO § 2(a). Nothing in this Order should be taken to prevent the EAC from independently, and lawfully, making changes to the Federal Form under their delegated authority.

    c.    The EAC Defendants are permanently enjoined from taking any action against Plaintiffs to implement or give effect to EO § 4(a). Nothing in this Order should be taken to prevent the EAC from independently, and lawfully, exercising authority over grants to Plaintiffs in the manner authorized by Congress.

---

[85] The EAC Defendants are the United States Election Assistance Commission Chairman, Vice Chair, Commissioners, Executive Director, and all of their officers, agents, servants, and employees.

d.  The EAC Defendants are permanently enjoined from taking any action to implement or give effect to EO § 4(b).  Nothing in this Order should be taken to prevent the EAC from independently, and lawfully, exercising its discretion to decertify voting systems, amend the VVSGs, re-certify voting systems, or otherwise alter voting systems guidance pursuant to the existing laws and policies.

e.  The Attorney General, and the Attorney General's officers, agents, servants, and employees, are permanently enjoined from taking any action to "enforce," or attempt to "enforce," 2 U.S.C. § 7 or 3 U.S.C. § 1 in a manner that would prevent Plaintiffs from counting otherwise valid votes for federal office that are contained in timely ballots under state law.  For the purposes of this injunction, "enforce" means "compel."  Nothing in this Order should be taken to prevent the Attorney General from taking lawful, i.e. non-compulsive, actions to encourage Plaintiffs to adopt a different ballot-receipt deadline.

f.  The EAC Defendants are permanently enjoined from taking any action against Plaintiffs to implement or give effect to EO § 7(b).  Nothing in this Order should be taken to prevent the EAC from independently, and lawfully, exercising its authority to condition funds to Plaintiffs in the manner authorized by Congress.

g.  The Court declares that Washington's and Oregon's existing laws governing ballot-receipt deadlines are not preempted by 2 U.S.C. § 7 and 3 U.S.C. § 1. Unless, and until, Congress amends these statutes or otherwise enacts a law that establishes a national ballot-receipt deadline of Election Day, the Elections Clause authorizes Washington and Oregon to maintain their existing laws, which permit the counting of certain ballots received after Election Day.

Dated this 9th day of January, 2026.

John H. Chun
United States District Judge